## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-40883-659 |
| | ) | Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | |
| | ) | Hearing Date: February 19, 2019 |
| | ) | Hearing Time: 1:30 p.m. (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

### DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of interim and final orders (respectively, the "Proposed

Interim Order" and "Proposed Final Order"),[2] (i) authorizing, but not directing, the Debtors to

(a) pay prepetition wages, salaries, other compensation and reimbursable expenses, and

(b) continue, in their discretion, certain employee benefits programs in the ordinary course of

business, including payment of certain prepetition obligations related thereto, subject to the caps

---

[1] The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [2803]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179].  With respect to certain taxing authorities, the Debtors' address is 2001 Bryan Street, Suite 800, Dallas, TX 75201.  However, the location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is:  c/o Payless ShoeSource Inc., 3231 S.E. 6th Avenue, Topeka, Kansas 66607.

[2] A copy of the Proposed Interim Order and Proposed Final Order will be provided to the Notice Parties (as defined below) and made available on the Debtors' case information website at https://cases.primeclerk.com/pss.

and limits set forth in the Proposed Interim Order and Proposed Final Order; and (ii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and procedural bases for the relief requested herein are 105(a), 362(d), 363(b), 503(c) and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Missouri (the "Local Bankruptcy Rules").

## BACKGROUND

4.      The Debtors and their non-debtor affiliates (together, the "Company") are the largest specialty family footwear retailer in the Western Hemisphere, offering a wide range of shoes and accessory items at affordable prices.  The Company operates approximately 3,400 stores in more than 40 countries.  The Debtors are headquartered in Topeka, Kansas, with extensive operations that span across the United States, Canada, Latin America, Asia, the Middle East and Europe.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  The Debtors have requested that their cases be consolidated for

2

procedural purposes and administered jointly.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      The Debtors commenced these chapter 11 cases approximately 18 months after completing a restructuring and emerging from chapter 11 protection with a reduced debt burden.[3] The Debtors, however, have been unable to sustain profitable operations in the current retail environment as a result of various factors more fully described in the *Declaration of Stephen Marotta, Chief Restructuring Officer of Payless Holdings LLC, in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "First Day Declaration").[4]  Accordingly, the Debtors have determined that the best way to maximize value for all of their stakeholders is to liquidate all North America brick and mortar locations through the immediate commencement of going out of business sales.  The Debtors believe, in the exercise of their business judgment, that such measures are in the best interests of the Debtors' estates.

7.      A comprehensive description of the Debtors' businesses and operations, capital structure and events leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## THE DEBTORS' WORKFORCE

8.      The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations.  Their skills, knowledge and understanding of the Debtors' operations and infrastructure are essential to preserving

---

[3] On April 4, 2017, the Debtors' predecessors-in-interest commenced chapter 11 cases (the "Prior Cases") before the United States Bankruptcy Court for the Eastern District of Missouri, which were jointly administered under the caption *In re Payless Holdings LLC*, No. 17-42267.  A plan of reorganization was confirmed in the Prior Cases on July 26, 2017, and such plan went effective on August 10, 2017.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

operational stability and efficiency.   In many instances, the Debtors' employees, temporary workers and independent contractors include highly trained personnel who are not easily replaced.   Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' continued operations will be jeopardized.

9.      The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.   Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation, and providing benefits.   Consequently, the relief requested herein is necessary and appropriate.

10.      The Debtors employ: (a) approximately 13,700 individuals in the United States, Puerto Rico, the U.S. Virgin Islands and Guam (collectively, the "U.S. Employees") and (b) approximately 2,400 individuals in Canada (collectively, the "Canada Employees," and together with the U.S. Employees, the "Employees")[5], serving in a number of capacities supporting the Debtors' operations at either the corporate offices or in the field (the "Corporate Employees"), distribution center (the "DC Employees") or retail store level (the "Retail Employees").   The Employees are comprised of approximately 5,400 full-time ("Full-Time") and 10,800 part-time ("Part-Time") Employees.   The overwhelming majority of the Part-Time Employees are employed at one of the Debtors' various retail store locations, with a small number working either in a corporate capacity or at the Debtors' distribution center (the "Distribution Center"). The Full-Time Employees are employed at all levels of the Debtors' business operations.

---

[5] The Debtors' Employees include: (a) Employees not represented by any collective bargaining unit that are subject to the minimum wage and overtime standards of the U.S. Federal Labor Standards Act (the "FLSA" and the "Non-Exempt Employees", respectively); (b) Employees not represented by a bargaining unit that are also exempt from the FLSA (the "Exempt Employees" and, together with the Non-Exempt Employees, the "Non-Represented Employees"); and (c) Employees that are represented by various bargaining units, as discussed further below (the "Represented Employees").

11.     While the majority of the Debtors' Employees are not represented by a labor union, the Debtors are party to two collective bargaining agreements (the "CBAs") with respect to approximately 80 Employees.  Of the Debtors' Represented Employees, approximately 67 are governed by a CBA with the United Food and Commercial Workers Union, Local No. 655 (the "UFCW Local 655"), and approximately 13 are governed by a CBA with the United Food and Commercial Workers Union, Local No. 536 (the "UFCW Local 536").  With respect to the Represented Employees, and as discussed in detail below, the Debtors seek authority (but not direction) to continue to provide compensation and benefits to the Represented Employees under the CBAs in the ordinary course of business and consistent with past practice.[6]

12.     In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Workers") from approximately seven different staffing agencies (collectively, the "Temporary Staffing Agencies").  Currently, the Debtors employ approximately 25 Independent Contractors, though this number fluctuates based on the Debtors' specific needs at any given time.  Presently, approximately 165 Temporary Workers provide services to the Debtors.  The Independent Contractors, the Temporary Staffing Agencies and the Temporary Workers they provide, are a critical supplement to the efforts of the Debtors' Employees.

### EMPLOYEE COMPENSATION AND BENEFITS

13.     To minimize the personal hardship that the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense

---

[6] By requesting authority to honor obligations relating to any CBA in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBAs and the Debtors reserve all of their rights with respect thereto.

reimbursements, other compensation, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes and 401(k) contributions), health insurance, workers' compensation benefits, paid time-off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, business travel insurance, short- and long-term disability coverage, employee assistance and other benefits with respect to the Employees, Independent Contractors, Temporary Staffing Agencies and Independent Directors, as applicable, in the ordinary course of business (collectively, the "Employee Compensation and Benefits").

14.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue in their discretion their prepetition Employee Compensation and Benefits programs in the ordinary course of business to the extent provided herein.  Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

15.     The Debtors estimate that the following prepetition Employee and Compensation Benefits amounts are outstanding as of the Petition Date:

| Employee-Related Obligations | Approximate Prepetition Amount Outstanding | Prepetition Amount Sought to be Paid Under the Interim Order |
|---|---|---|
| **U.S. Employee Compensation and Withholding Obligations** | | |
| U.S. Employee Wages | $9,400,000 | $9,400,000 |
| Independent Contractor Compensation and Temporary Staffing Agency Payments | $500,000 | $500,000 |
| Independent Director Compensation | $0 | $0 |
| U.S. Withholding Obligations | $2,600,000 | $2,600,000 |
| U.S. Reimbursable Expenses | $162,500 | $162,500 |
| U.S. Corporate Card Expenses | $250,000 | $250,000 |

6

| Employee-Related Obligations | Approximate Prepetition Amount Outstanding | Prepetition Amount Sought to be Paid Under the Interim Order |
|---|---|---|
| U.S. Mobile Device Reimbursement Expenses | $14,000 | $14,000 |
| **Canada Employee Compensation and Withholding Obligations** | | |
| Canada Employee Wages | $1,600,000 | $1,600,000 |
| Canada Withholding Obligations | $247,000 | $247,000 |
| Canada Payroll Processing Fees | $10,000 | $10,000 |
| Canada Reimbursable Expenses | $16,300 | $16,300 |
| Canada Mobile Device Reimbursement Expenses | $1,500 | $1,500 |
| | | |
| **U.S. Additional Compensation Opportunities** | | |
| U.S. Store Leader All In 2 Win! Incentive Program | $425,000 | $425,000 |
| U.S. Group Leader All In 2 Win! Incentive Program | $125,000 | $125,000 |
| Distribution Center Incentive Plan | $3,600 | $3,600 |
| Puerto Rico Employee Holiday Bonuses | $0 | $0 |
| | | |
| **Canada Additional Compensation Opportunities** | | |
| Canada Store Leader Extreme Rewards Incentive Program | $218,900 | $218,900 |
| Canada Group Leader Extreme Rewards Incentive Program | $49,000 | $49,000 |
| **U.S. Employee Health and Welfare Benefits** | | |
| U.S. Health Insurance Plans | $0 | $0 |
| Health Savings Account Administrative Fees | $2,500 | $2,500 |
| Flexible Spending Account Administrative Fees | $1,000 | $1,000 |
| COBRA Administrative Fees | $2,000 | $2,000 |
| U.S. Life and AD&D Insurance | $15,000 | $15,000 |
| U.S. Disability Benefits | $33,500 | $33,500 |
| U.S. Workers' Compensation Program | $260,000 | $260,000 |
| Business Travel Insurance | $0 | $0 |
| U.S. Time-Off Benefits (Represented Employees) | $11,300 | $11,300 |
| U.S. Time-Off Benefits (Non-Represented Employees) | $2,307,000 | $2,307,000 |
| Non-Insider U.S. Severance Program[7] | $1,257,000 | $0 |
| **Canada Employee Health and Welfare Benefits** | | |
| Canada Extended Health Insurance Plans | $69,000 | $69,000 |
| Canada Life and AD&D Insurance | $200 | $200 |
| Canada Disability Benefits | $22,000 | $22,000 |
| Canada Workers' Compensation Program | $17,300 | $17,300 |
| Canada Retirement Savings Program | $168,500 | $168,500 |

---

[7] The Debtors are not seeking authority to make any payments on account of the Non-Insider U.S. Severance Program (as defined below) on an interim basis. The Debtors will seek authority, on a final basis, to pay the prepetition amounts that would be allowable as a priority claim under the Bankruptcy Code.

| Employee-Related Obligations | Approximate Prepetition Amount Outstanding | Prepetition Amount Sought to be Paid Under the Interim Order |
|---|---|---|
| Canada Time-Off Benefits | $795,100 | $795,100 |
| Non-Insider Canada Severance Program | $0 | $0 |
| **Supplemental Employee Benefits** | $179,300 | $179,300 |
| **Total** | $20,763,500 | $19,506,500 |

16.     The Debtors do not believe there are amounts owed to any individuals on account of the Employee Compensation and Benefits that exceed the $12,850 priority expense compensation and benefit cap set forth by Bankruptcy Code sections 507(a)(4) and 507(a)(5). For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $12,850 pursuant to the Proposed Interim Order.  The Debtors do, however, seek authority to pay amounts in excess of $12,850, solely pursuant to the Final Order, in the event it is determined that payment of certain prepetition amounts owed on account of the Employee Compensation and Benefits are in excess of $12,850.

I.      **Employee Compensation, Withholding Obligations, and Additional Compensation Opportunities**

A.      **U.S. Employee Compensation and Withholding Obligations**

1.      **U.S. Employee Compensation**

17.     In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to the U.S. Employees (collectively, the "U.S. Employee Compensation").  The Debtors pay their U.S. Employees' wage and salary obligations (the "U.S. Wages") on a weekly and biweekly basis, six days in arrears.[8]   Measured on a biweekly basis, the Debtors pay approximately $10.3 million in gross payroll for U.S. Wages.

---

[8]    The Debtors process payroll internally and do not utilize a third-party processor.

8

18.     Because all U.S. Wages are paid in arrears, certain U.S. Employees may be owed accrued but unpaid U.S. Wages as of the Petition Date.  U.S. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that U.S. Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such U.S. Employees.

19.     As of the Petition Date, the Debtors believe they owe approximately $9.4 million on account of unpaid U.S. Wages (excluding U.S. Withholding Obligations, U.S. Employee Expense Obligations, U.S. Time-Off Benefits and any payments provided under the U.S. Additional Compensation Opportunities and Non-Insider U.S. Severance Program, each as defined below), each of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all accrued and outstanding prepetition amounts due on account of U.S. Wages in the ordinary course of business and consistent with past practice, and to continue paying U.S. Wages on a postpetition basis in the ordinary course of business.

## 2.     Independent Contractors and Temporary Staff Compensation

20.     The Debtors rely on Independent Contractors and Temporary Workers provided by Temporary Staffing Agencies in the ordinary course of their business.  Currently, the Debtors employ approximately 25 Independent Contractors and contract with approximately seven Temporary Staffing Agencies to provide the Debtors with the Temporary Workers, though these numbers fluctuate based on current needs.  These Independent Contractors and Temporary Workers perform a wide range of services critical to the Debtors' operations, including IT- and marketing-related support, assistance at the Debtors' corporate office, retail stores and Distribution Center.  The Debtors' Employees rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and the Temporary Workers to

fill short-term assignments that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and Temporary Staffing Agencies is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors pay approximately $340,000 per month in compensation to Independent Contractors and to Temporary Staffing Agencies (collectively, the "Independent Contractor and Temporary Staffing Agency Payments").

21.     As of the Petition Date, the Debtors believe they owe approximately $500,000 on account of the Independent Contractor and Temporary Staffing Agency Payments, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Independent Contractor and Temporary Staffing Agency Payments, and to continue paying the Independent Contractor and Temporary Staffing Agency Payments on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 3.     Independent Director Compensation

22.     Payless Holdings LLC as the parent Debtor maintains a board of directors that includes five non-employee independent directors (the "Independent Directors"). The Debtors pay retainers of approximately $84,000 per month to the Independent Directors in the aggregate, payable on a monthly basis (collectively, the "Independent Director Fees"). The Independent Directors are also entitled to expense reimbursement for out-of-pocket expenses (together with the Independent Director Fees, the "Independent Director Compensation"). As of the Petition Date, the Debtors believe they do not owe any amounts on account of Independent Director Compensation. However, out of an abundance of caution, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of Independent Director Compensation and to continue honoring their obligations on account of Independent Director Compensation on a

postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 4.    U.S. Withholding Obligations

23.    During each applicable pay period, the Debtors routinely deduct certain amounts from their U.S. Employees' paychecks for, among other things, garnishments, child support, medical child support and other pre-tax and after-tax deductions payable pursuant to certain of the U.S. Health and Welfare Programs (as defined below) (collectively, the "U.S. Deductions"). Certain of the U.S. Deductions are forwarded to various third-party recipients.  On a biweekly basis, the Debtors deduct approximately $850,000 in the aggregate from their U.S. Employees' paychecks on account of the U.S. Deductions.

24.    The Debtors are also required by law to deduct from the U.S. Employees' Compensation amounts related to, among other things, federal, state and local income taxes as well as Social Security and Medicare taxes (collectively, the "U.S. Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities.  The Debtors must then match the U.S. Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "U.S. Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "U.S. Payroll Taxes").  The U.S. Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time as the U.S. Employees' payroll checks are disbursed.  On a biweekly basis, the Debtors remit approximately $2.6 million in the aggregate on account of the U.S. Payroll Taxes.

25.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid U.S. Deductions and U.S. Payroll Taxes (together, the "U.S. Withholding Obligations") is approximately $2.6 million, substantially all of which will become due and

11

payable within the first 21 days of these chapter 11 cases.  The Debtors seek authority to pay in a manner consistent with historical practice any unpaid U.S. Withholding Obligations and to continue to honor the U.S. Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

  B.  **Canada Employee Compensation and Withholding Obligations**

    1.  **Canada Employee Compensation**

  26.  In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries and other compensation owed to the Canada Employees (collectively, the "Canada Employee Compensation").  The Debtors pay their Canada Employees' wage and salary obligations (the "Canada Wages") on a biweekly basis, six days in arrears.  The Debtors pay approximately $1.2 million in Canada Wages (after Canada Withholding Obligations (as defined below) on a biweekly basis on account of the Canada Employee Compensation in the aggregate.

  27.  Because all Canada Wages are paid in arrears, certain Canada Employees may be owed accrued but unpaid Canada Wages as of the Petition Date.  Canada Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Canada Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Canada Employees.

  28.  As of the Petition Date, the Debtors believe they owe approximately $1.6 million on account of accrued but unpaid Canada Wages (the "Unpaid Canada Wages") (excluding Canada Withholding Obligations, Canada Employee Expense Obligations, Canada Time-Off Benefits and any payments provided under the Canada Additional Compensation Opportunities and Non-Insider Canada Severance Program, each as defined below), all of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors

12

request authorization to pay all outstanding prepetition amounts on account of the Unpaid Canada Wages in the ordinary course of business and consistent with past practice, and to continue paying Canada Wages on a postpetition basis in the ordinary course of business.

### 2.    Canada Withholding Obligations

29.    During each applicable pay period, the Debtors routinely deduct certain amounts from their Canada Employees' paychecks for, among other things, garnishments and other required levies and benefit premiums pursuant to certain of the Canada Health and Welfare Programs (as defined below) (collectively, the "Canada Deductions").  Certain of the Canada Deductions are forwarded to various third-party recipients.  On a biweekly basis, the Debtors deduct approximately $31,000 in the aggregate from their Canada Employees' paychecks on account of the Canada Deductions.

30.    The Debtors are also required by law to withhold from the Canada Employees' Compensation amounts related to, among other things, payroll taxes and government-mandated benefits for remittance to appropriate federal, provincial, and local authorities (collectively, the "Canada Employee Payroll Taxes").  The Debtors are also required to pay, from their own funds, additional amounts mandated by federal and provincial authorities for government-mandated benefits, workers' compensation, and employment insurance (the "Canada Employer Payroll Taxes," and together with the Canada Employee Payroll Taxes, the "Canada Payroll Taxes"). The Canada Payroll Taxes are generally processed and forwarded to the appropriate federal, provincial or local taxing authority at the same time that Canada Employees' payroll checks are disbursed.  On a biweekly basis, the Debtors remit approximately $216,000 in the aggregate on account of the Canada Payroll Taxes.

31.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Canada Deductions and Canada Payroll Taxes (together, the "Canada Withholding

Obligations," and further together with the U.S. Withholding Obligations, the "Withholding Obligations") is approximately $247,000, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid Canada Withholding Obligations and to continue to honor the Canada Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

### 3.    Canada Payroll Processing

32.    The Debtors contract with Automatic Data Processing, Inc. ("ADP"), a third-party payroll service, to process and administer their payroll and reimbursements in Canada. Each biweekly pay period, the Debtors calculate the Canada Employee Compensation for each Canada Employee and transfer funds sufficient to satisfy such obligations to ADP in advance of each applicable pay period. ADP then distributes the Canada Employee Compensation to the Canada Employees on behalf of the Debtors.

33.    On average, the Debtors pay approximately $20,000 per month to ADP for the payroll-related services that it provides to the Debtors and related administrative costs (the "Canada Payroll Fees"). As of the Petition Date, approximately $10,000 has accrued and remains unpaid on account of Canada Payroll Fees. Failure to pay the Canada Payroll Fees in the future could lead to delayed disbursement of Canada Employee Compensation and related benefits to the appropriate Canada Employees to the detriment of the Canada Employees and the Debtors' operations. As a result, the Debtors seek to pay any unpaid Canada Payroll Fees that have accrued prior to the Petition Date and to continue administering payroll for Canada Employees in the ordinary course of business consistent with the Debtors' historical practices.

14

C.      **Employee Reimbursable Expense Obligations**

1.      **U.S. Employee Expense Obligations**

a.      **U.S. Reimbursable Expenses**

34.      The Debtors reimburse U.S. Employees for non-relocation business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, car rentals, parking and fuel costs not paid through a Corporate Card (as defined below) (collectively, the "U.S. Reimbursable Expenses"). U.S. Employees pay for incurred U.S. Reimbursable Expenses by using either a personal credit card or cash (alternatively, some U.S. Employees with Corporate Cards may still incur U.S. Reimbursable Expenses for items such as mileage or charges incurred for vendors who do not accept the Corporate Cards).      U.S. Employees then submit paper receipts to request reimbursement and, if approved in accordance with internal policies and procedures, the U.S. Reimbursable Expenses are processed through the Debtors' accounts payable system.  Without continued reimbursement of the U.S. Reimbursable Expenses, U.S. Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship.   On average, the Debtors pay approximately $243,000 per month in U.S. Reimbursable Expenses.

35.      As of the Petition Date, the Debtors believe they owe approximately $162,500 on account of U.S. Reimbursable Expenses, all of which will become due and owing within the first 21 days of these chapter 11 cases.  Additionally, although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur.  U.S. Employees may therefore submit reimbursement requests for prepetition U.S. Reimbursable Expenses after the Petition Date.  By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the U.S. Reimbursable Expenses, including unfiled amounts by U.S. Employees, and to continue paying the U.S. Reimbursable Expenses on a

postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### b.    U.S. Corporate Card Expenses

36.    U.S. Employees pay for the majority of the U.S. Reimbursable Expenses they incur through a combination of commercial credit card accounts and related contractual arrangements with U.S. Bank, N.A. ("US Bank").  The Debtors provide three Debtor-guaranteed US Bank corporate Visa credit cards to U.S. Employees for ordinary course expenses that such U.S. Employees incur in performing their job functions (collectively, the "Corporate Credit Cards").  Corporate Credit Cards are used by U.S. Employees to charge business-related travel and marketing expenses.  It is critical to the Debtors' business operations that the Debtors continue reimbursing, or making direct payments on behalf of, U.S. Employees for such expenses.

37.    Additionally, certain U.S. Employees use Debtor-guaranteed US Bank-issued purchasing cards to pay for the Debtors' procurement of items and services, such as office supplies or travel bookings and satisfy certain of the Debtors' business obligations (the "Corporate Purchasing Cards," and together with the Corporate Credit Cards, the "Corporate Cards"), which are used in the ordinary course of the operation of Debtors' businesses. Currently, the Debtors use approximately eight Corporate Purchasing Cards.

38.    Use of the Corporate Cards is integral to the Debtors' cash management and account functions, and continuation of the U.S. Employees' ability to use the Corporate Cards for procurement of office supplies, travel-related purposes, and other business purposes is essential to the Debtors' business operations.  On average, the Debtors pay approximately $200,000 per month for amounts incurred on the Corporate Cards (the "U.S. Corporate Card Expenses").

39.     As of the Petition Date, the Debtors believe they owe approximately $250,000 in U.S. Corporate Card Expenses, all of which will become due and owing within the first 21 days of these chapter 11 cases.   By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on the Corporate Cards, and to continue the Corporate Card programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### c.     U.S. Mobile Device Expenses

40.     Historically, the Debtors have provided certain U.S. Employees and Canada Employees with mobile phones under company mobile plans (the "Company Mobile Plans") for business use for the purposes of enhanced Employee productivity.   In order to reduce costs in recent years, the Debtors have started two programs that instead reimburse certain U.S. Employees for their purchasing and use of personal cell phones and mobile plans for business use (the "U.S. Mobile Device Reimbursement Programs").[9]   One U.S. Mobile Device Reimbursement Program offers reimbursement of $20 a month to participating U.S. Store Leaders (as defined below) (the "U.S. Store Leader Mobile Device Reimbursement Program"). As of the Petition Date, 337 U.S. Store Leaders are enrolled in the U.S. Store Leader Mobile Device Reimbursement Program.  The other U.S. Mobile Device Reimbursement Program offers reimbursement of $35 a month to participating U.S. Group Leaders (as defined below) and other non-insider Employees managing or overseeing operations in the field or store regions (the "U.S. Group Leader Mobile Device Reimbursement Program").   As of the Petition Date, 218 Employees are enrolled in the U.S. Group Leader Mobile Device Reimbursement Program.  The

---

[9] The Debtors are in progress on scaling down their Company Mobile Plans in favor of deploying the U.S. Mobile Device Reimbursement Programs and Canada Mobile Device Reimbursement Program (as defined below). However, the Debtors seek to continue their performance under the Company Mobile Plans and to pay any prepetition obligations thereunder, as described further below.

Debtors spend approximately $14,000 a month on reimbursements under the U.S. Mobile Device Reimbursement Programs (the "U.S. Mobile Device Expenses," and together with the U.S. Reimbursable Expenses and the U.S. Corporate Card Expenses, the "U.S. Employee Expense Obligations").

41.     As of the Petition Date, the Debtors believe they owe approximately $14,000 on account of the U.S. Mobile Device Expenses.  By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the U.S. Mobile Device Reimbursement Programs, including the U.S. Mobile Device Expenses.  Further, the Debtors request authorization, in their discretion, to continue the U.S. Mobile Device Reimbursement Programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 2.     Canada Employee Expense Obligations

#### a.     Canada Reimbursable Expenses

42.     The Debtors reimburse Canada Employees for business expenses under the same criteria applicable to the U.S. Reimbursable Expenses (the "Canada Reimbursable Expenses"). Canada Employees pay for incurred Canada Reimbursable Expenses by using either personal credit cards or cash.  Canada Employees then submit paper receipts to request reimbursement, and if approved in accordance with internal policies and procedures, the Canada Reimbursable Expenses are processed through the Debtors' accounts payable system.  Without continued reimbursement of the Canada Reimbursable Expenses, Canada Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship.  On average, the Debtors pay approximately $26,000 per month in Canada Reimbursable Expenses.

43.     As of the Petition Date, the Debtors believe they owe approximately $16,300 on account of Canada Reimbursable Expenses, all of which will become due and owing within the

first 21 days of these chapter 11 cases.    Additionally, although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur.  Canada Employees may therefore submit reimbursement requests for prepetition Canada Reimbursable Expenses after the Petition Date.  By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the Canada Reimbursable Expenses, including unfiled amounts by Canada Employees, and to continue paying the Canada Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

#### b.        Canada Mobile Device Expenses

44.    The Debtors reimburse certain Canada Group Leaders (as defined below) and other eligible non-insider Canada Employees managing or overseeing operations in the field or store regions for their use of personal cell phones and mobile plans for business use (the "Canada Mobile Device Reimbursement Program").    The Canada Mobile Device Reimbursement Program offers reimbursement of $55 a month to participating Canada Employees, of which there are 23 as of the Petition Date.  The Debtors spend approximately $1,000 a month on reimbursements under the Canada Mobile Device Reimbursement Program (the "Canada Mobile Device Expenses," and together with the Canada Reimbursable Expenses, the "Canada Employee Expense Obligations").

45.    As of the Petition Date, the Debtors believe they owe approximately $1,500 on account of the Canada Mobile Device Expenses.  By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the Canada Mobile Device Reimbursement Program, including the Canada Mobile Device Expenses.  Further, the Debtors request authorization, in their discretion, to continue the Canada Mobile Device

Reimbursement Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices

D.    **U.S. Additional Compensation Opportunities**

46.    The Debtors have five additional compensation programs for U.S. Employees (the "U.S. Additional Compensation Opportunities"):

- the U.S. Store Leader All In 2 Win! Incentive Program;

- the U.S. Group Leader All In 2 Win! Incentive Program;

- DC PRIDE Plan; and

- Puerto Rico Employee Holiday Bonuses.

47.    Each of these programs is an integral part of the Debtors' Employee Compensation and Benefits.  By this Motion, the Debtors are not seeking to make any payments to insiders ("Insiders")[10] under any of the U.S. Additional Compensation Opportunities.[11]

**1.    U.S. Store Leader All In 2 Win! Incentive Program**

48.    The Debtors offer a quarterly incentive program (the "U.S. Store Leader All In 2 Win! Incentive Program") to all U.S. Employees who serve as store managers at single or multiple stores ("U.S. Store Leaders").  The U.S. Store Leader All In 2 Win! Incentive Program is based on the percent of sales plan achieved by a group/district of retail stores (a "U.S. Store Group").  U.S. Store Leaders in U.S. Store Groups that achieve greater than 95% of sales plan are eligible for the U.S. Store Leader All In 2 Win! Incentive Program's award.  Eligible U.S. Store Leaders qualify for one of four payment levels based on the corresponding U.S. Store Group's ranking within its region (Copper, Bronze, Silver and Gold).  Additionally, U.S. Store

---

[10] The term Insiders shall have the meaning set forth in 11 U.S.C. § 101(31).

[11] To the extent the Debtors propose to make prepetition payments to any potential Insiders under any of the U.S. Additional Compensation Opportunities, the Debtors will seek separate approval from the Court with respect to such payments or U.S. Additional Compensation Opportunities.

Leaders who lead multiple stores qualify for slightly higher payments than those who lead single stores.  The maximum payment that can be earned under the U.S. Store Leader All In 2 Win! Incentive Program is 12% of a U.S. Store Leader's quarterly gross earnings.

49.     As of the Petition Date, approximately 1,390 U.S. Store Leaders qualify to participate in the U.S. Store Leader All In 2 Win! Incentive Program.  For the fourth quarter of the Debtors' 2018 Fiscal Year, 447 U.S. Store Leaders earned payments under the U.S. Store Leader All In 2 Win! Incentive Programs, with such payments equaling approximately $425,000 in the aggregate and averaging out to approximately $950 per U.S. Store Leader, the balance of which is all outstanding as of the Petition Date and will become due and owing in the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Store Leader All In 2 Win! Incentive Program upon entry of the Proposed Final Order.  To be clear, the Debtors do not propose to make any payment on account of the U.S. Store Leader All In 2 Win! Incentive Program to Insiders.

### 2.     U.S. Group Leader All In 2 Win! Incentive Program

50.     The Debtors offer a quarterly incentive program (the "U.S. Group Leader All In 2 Win! Incentive Program") to Employees who directly manage one store (the "Home Store") and oversee multiple, such as approximately six, other stores ("U.S. Group Leaders").  The U.S. Group Leader All In 2 Win! Incentive Program is based on the percent of sales plan achieved by a U.S. Group Leader's U.S. Store Group.  U.S. Group Leaders in U.S. Store Groups that achieve greater than 95% of sales plan are eligible for the award.  Eligible U.S. Group Leaders qualify for one of four payment levels based on the corresponding U.S. Store Group's ranking within its region (Copper, Bronze, Silver, and Gold).  Additionally, U.S. Store Leaders who lead multiple stores qualify for slightly higher payments than those who lead single stores.  The maximum

payment that can be earned under the U.S. Group Leader All In 2 Win! Incentive Program is 15% of a U.S. Group Leader's quarterly gross earnings.

51.     As of the Petition Date, approximately 184 U.S. Group Leaders qualify to participate in the U.S. Group Leader All In 2 Win! Incentive Program.  For the fourth quarter of the Debtors' 2018 fiscal year, 67 U.S. Group Leaders earned payments under the U.S. Group Leader All In 2 Win! Incentive Programs, with such payments equaling approximately $125,000 in the aggregate and averaging out to approximately $1,860 per qualifying U.S. Group Leader, the balance of which is all outstanding as of the Petition Date and will become due and owing in the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Group Leader All In 2 Win! Incentive Program upon entry of the Proposed Final Order.  To be clear, the Debtors do not propose to make any payment on account of the U.S. Group Leader All In 2 Win! Incentive Program to Insiders.

### 3.     DC PRIDE Plan

52.     The Debtors also offer an incentive plan for hourly full-time DC Employees at the Debtors' Distribution Center (the "DC PRIDE Plan"), which is tied to the achievement of productivity goals based on established standards at the Distribution Center (*i.e.*, receiving, shipping, packing).  Eligible DC Employees qualify for the DC PRIDE Plan on a weekly basis with such amounts being paid in the following week's paycheck.  The maximum additional amount that an individual hourly DC Employee can accumulate under the DC PRIDE Plan is $3.01 per hour worked.  In addition, under the DC PRIDE Plan, DC Employees who earn awards over multiple consecutive weeks earn points that may be redeemed for merchandise (the "DC Point Recognition Program").  In fiscal year 2018, the Debtors incurred costs of approximately $3,200 implementing the DC Point Recognition Program.

22

53.     As of the Petition Date, approximately 178 hourly DC Employees qualify for the DC PRIDE Plan.  The Debtors pay approximately $4,900 in the aggregate per week on account of the DC PRIDE Plan, exclusive of the DC Point Recognition Program.  As of the Petition Date, the Debtors believe they owe approximately $3,600 on account of the DC PRIDE Plan, all of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the DC PRIDE Plan and to continue paying obligations under the DC PRIDE Plan on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.  The Debtors do not propose to make any payment on account of the DC PRIDE Plan to Insiders.

**4.     Puerto Rico Employee Holiday Bonuses**

54.     All U.S. Full-Time Employees in Puerto Rico who work 700 or more hours within the 12-month period beginning on October 1 of a calendar year and ending on September 30 of the subsequent calendar year receive an annual Christmas bonus equal to 6% of the Employee's wages, up to a maximum of $600 (the "Puerto Rico Christmas Bonuses").  The Puerto Rico Christmas Bonuses are paid in December of each year to all eligible Employees, regardless of whether they are current or former Employees.

55.     As of the Petition Date, the Debtors do not believe they owe any amounts on account of Puerto Rico Christmas Bonuses.  However, out of an abundance of caution, by this Motion, the Debtors request authority to pay any outstanding prepetition Puerto Rico Christmas Bonuses upon entry of the Proposed Final Order.

E.    **Canada Additional Compensation Opportunities**

56.    The Debtors have two additional compensation programs for Canada Employees (the "Canada Additional Compensation Opportunities, and together with the U.S. Additional Compensation Opportunities, the "Additional Compensation Opportunities"):

- the Canada Store Leader Extreme Rewards Incentive Program and
- the Canada Group Leader Extreme Rewards Incentive Program.

57.    Each of these programs is an integral part of the Debtors' Employee Compensation and Benefits. By this Motion, the Debtors are not seeking to make any payments to Insiders under any of the Canada Additional Compensation Opportunities.[12]

**1.    Canada Store Leader Extreme Rewards Incentive Program**

58.    The Debtors offer a quarterly incentive program (the "Canada Store Leader Extreme Rewards Incentive Program") to all Canada Employees who serve as store managers ("Canada Store Leaders"). The Canada Store Leader Extreme Rewards Incentive Program is tied to sales performance at individual retail stores and is calculated based on one of two metrics. For established stores ("Established Stores"),[13] rewards are based on a year-over-year comparison of quarterly gross sales. For new or relocated stores (collectively, "New Stores"),[14] rewards are based on a store's quarterly gross sales versus an established sale metric. If a store meets a specified threshold level of performance for the quarter, Canada Store Leaders may qualify for one of three payout levels under the Canada Store Leader Rewards Program (Bronze, Silver and Gold). The maximum payment that can be earned under the Canada Store Leader Extreme Rewards Incentive Program for Established Stores is 15% of a Canada Store Leader's quarterly

---

[12] To the extent the Debtors propose to make prepetition payments to any potential Insiders under any of the Canada Additional Compensation Opportunities, the Debtors will seek separate approval from the Court with respect to such payments or Canada Additional Compensation Opportunities.

[13] Established Stores are stores that have been open for a minimum of 14 months.

[14] New Stores are stores that have either been opened or relocated within the last 14 months.

gross earnings.  For New Stores, the maximum payment amount is 11% of a Canada Store Leader's gross earnings.

59.      As of the Petition Date, approximately 189 Canada Store Leaders qualify to participate in the Canada Store Leader Extreme Rewards Incentive Program.  In the fourth quarter of the Debtors' 2018 Fiscal Year, 157 Canada Store Leaders received payments under the Canada Store Leader Extreme Rewards Incentive Program, with such payments equaling approximately $218,900 in the aggregate and averaging out to approximately $1,390 per qualifying Canada Store Leader, the balance of which is all outstanding as of the Petition Date and will become due and owing in the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Store Leader Extreme Rewards Incentive Program upon entry of the Proposed Final Order.  To be clear, the Debtors do not propose to make any payment on account of the Canada Store Leader Extreme Rewards Incentive Program to Insiders.

## 2.    Canada Group Leader Extreme Rewards Incentive Program

60.      The Debtors offer a quarterly incentive program (the "Canada Group Leader Incentive Program") to multi-store leaders who directly manage a Home Store and oversee approximately six other stores ("Canada Group Leaders").  The Canada Group Leader Extreme Rewards Incentive Program is based on the sales performance of each store in the Canada Group Leader's group.  The Canada Group Leader's payout is determined by averaging the Canada Store Leader Extreme Rewards Incentive Program payout earned by each of the Canada Group Leader's seven stores.  The Group Leader is not eligible for a Canada Store Leader Extreme Rewards Incentive Program payout for the Home Store, but the sales performance of this store is factored into the Canada Group Leader Extreme Rewards Incentive Program award calculation.  A payout matrix determines the Canada Group Leader's actual payout, and no award is payable

25

if the combined Canada Store Leader Extreme Rewards Incentive Program payout average for the Canada Group Leader's stores is less than 3%. The maximum payment under the Canada Group Leader Extreme Rewards Incentive Program is 20% of such Canada Group Leader's quarterly gross earnings.

61.     As of the Petition Date, approximately 18 Canada Group Leaders qualify to participate in the Canada Group Leader Extreme Rewards Incentive Program. In the fourth quarter of the Debtors' 2018 Fiscal Year, 15 Canada Group Leaders received payments under the Canada Group Leader Extreme Rewards Incentive Program, with such payments equaling approximately $49,000 in the aggregate and averaging out to approximately $3,300 per qualifying Canada Group Leader, the balance of which is all outstanding as of the Petition Date and will become due and owing in the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Group Leader Extreme Rewards Incentive Program upon entry of the Proposed Final Order. To be clear, the Debtors do not propose to make any payment on account of the Canada Group Leader Extreme Rewards Incentive Program to Insiders.

II.     **Employee Benefits and Supplemental Benefits Programs**

A.     **U.S. Employee Benefits Programs**

1.     **U.S. Health and Welfare Programs**

62.     The Debtors offer a comprehensive employee benefits package to eligible U.S. Employees for medical, dental, prescription and vision care coverage and certain other welfare benefits, including health savings accounts, flexible spending accounts, life and accidental death and dismemberment insurance benefits, disability benefits, workers' compensation benefits, business travel insurance and a 401(k) plan (collectively, the "U.S. Health and Welfare Programs").

26

63.    The Debtors offer Full-Time U.S. Employees the opportunity to participate in a variety of health benefit plans, including the medical plans, dental plans, prescription coverage plans and the vision plans (collectively, the "U.S. Health Benefits").  The Debtors do not offer the U.S. Health and Welfare Programs for Part-Time U.S. Employees.[15]  The U.S. Health Benefits are customary for similarly-sized companies and the Full-Time U.S. Employees and their dependents have come to rely on the U.S. Health Benefits.  Without the U.S. Health Benefits, the Full-Time U.S. Employees would be forced to obtain potentially expensive out-of-pocket insurance coverage, which would likely adversely affect Full-Time U.S. Employee morale and retention.  By this Motion, the Debtors request authorization to pay or remit all outstanding prepetition amounts incurred on account of the U.S. Health Benefits and to continue paying the U.S. Health Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### a.    U.S. Health Insurance Plans

64.    The Debtors offer a variety of medical, dental, and vision coverages to both Represented and Non-Represented Full-Time U.S. Employees (collectively, the "U.S. Health Insurance Plans").  The Debtors' medical plans (the "U.S. Medical Plans"), dental plans (the "U.S. Dental Plans") and vision plans (the "U.S. Vision Plans") for U.S. Employees located in the United States are offered through the Aon Active Health Exchange (the "AAHE"), which is an online insurance marketplace where Full-Time U.S. Employees can shop for coverage from multiple insurance carriers.  The Debtors' prescription drug coverage is embedded in the U.S. Medical Plans.  Through the AAHE, Full-Time U.S. Employees are given the opportunity to choose from several plan levels, a variety of insurance carriers, and a range of costs.  Based on

---

[15] It is possible that certain of the Debtors' Part-Time Employees have access to the Health Benefits as a result of the lookback provisions of the Affordable Care Act or where required by state law.

the marketplace nature of the AAHE, coverage options for Full-Time U.S. Employees vary depending on geographical location.

65.     All of the Debtors' U.S. Health Insurance Plans through the AAHE are fully-insured products.  Fully-insured health plans for the Debtors' U.S. Employees in Puerto Rico, Virgin Islands and Guam are not offered through the AAHE.  Instead, health plans for these U.S. Employees are offered by the Debtors through arrangements with individual insurance carriers in those specific geographies with similar premium-sharing arrangements.[16]

66.     The Debtors and the participating Full-Time U.S. Employees share in the cost of premiums for the U.S. Medical and U.S. Dental Plans, with the Debtors paying a fixed amount based on geographic area and coverage tier (single, family, etc.) and the participating Full-Time U.S. Employee paying (through payroll deduction) the remainder, which amount varies depending on the type of plan selected, geographic area, and coverage tier.  U.S. Vision Plan premiums are fully paid by the participating Full-Time U.S. Employee through payroll deduction.  On average, the Debtors pay approximately $2.2 million per month on account of the U.S. Health Insurance Plans, in addition to premiums paid on behalf of participating U.S. Employees pursuant to the U.S. Withholding Obligations described above.

67.     As of the Petition Date, the Debtors believe they do not owe any amounts on account of their portion of the premiums with respect to U.S. Health Insurance Plans. Nonetheless, out of an abundance of caution, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Health Insurance Plans and to continue paying premiums for the U.S. Health Insurance Plans on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

---

[16] The Debtors also offer fully-insured Health Plans to eligible Full-Time Employees on expatriate assignments outside the U.S.  Such Employees may elect to participate in a Cigna International plan specifically designed for this purpose.  There are currently no eligible Employees participating in the Cigna International Plan.

### b.       Health Savings Accounts

68.     Eligible Full-Time U.S. Employees who participate in a high-deductible U.S. Health Plan through the AAHE may also contribute a portion of their U.S. Employee Compensation into a health savings account (the "HSA"), administered by Aon Hewitt and its affiliates ("Aon") (the "HSA Program").  Part-Time U.S. Employees are not eligible for the HSA Program.  Full-Time U.S. Employees may make pre-tax contributions (collectively, the "HSA Deductions") to their HSA through payroll deductions to cover qualified health expenses up to the maximum amount permitted by the Internal Revenue Service.  The Debtors pay Aon a monthly administration fee of approximately $2,500 (the "HSA Administration Fee") depending on the level of participation by the Debtors' U.S. Employees.  Currently, approximately 319 Full-Time U.S. Employees contribute to a Debtor-sponsored HSA, and on average, the Debtors deduct approximately $47,000 in the aggregate from Full-Time U.S. Employees' Employee Compensation on account of Full-Time U.S. Employee contributions to their respective HSAs on a monthly basis (the "Employee HSA Deductions").

69.     As of the Petition Date, the Debtors believe they owe approximately $2,500 on account of the HSA Administration Fee, all of which will become due and owing within the first 21 days of these chapter 11 cases.  Amounts to be paid with respect to the Employee HSA Deductions are contained in the projections for Withholding Obligations discussed above.  By this Motion, the Debtors request authorization to remit any prepetition amounts outstanding under the HSA Program to the extent necessary and continue honoring their obligations under the HSA Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

29

### c.      Flexible Spending Accounts

70.      To allow Full-Time U.S. Employees to set aside pre-tax income to be used for qualified expenses, the Debtors provide Full-Time U.S. Employees with a number of flexible spending (reimbursement) account options (the "FSA Programs") through payroll deductions, which include: (a) a flexible spending account for health care (the "Healthcare Flexible Spending Account") to pay qualified health care expenses; (b) a limited flexible spending account for health care (the "Limited Purpose Flexible Spending Account") to pay for qualified healthcare expenses; and (c) a flexible spending account to pay for qualified expenses related to care for eligible dependents (the "Dependent-Care Flexible Spending Account," and together with the Health Care Flexible Spending Account and the Limited Purpose Flexible Spending Account, the "FSAs").  The Debtors do not offer FSAs to Part-Time U.S. Employees.  The FSA Programs are administered by Aon for a monthly fee of approximately $1,000, depending on participation rates by eligible U.S. Employees, which is paid by the Debtors (the "FSA Administration Fee").[17] Currently, approximately 187 Full-Time U.S. Employees contribute to the FSAs.  On average, the Debtors deduct, in the aggregate, approximately $21,000 from Full-Time U.S. Employees' Employee Compensation on account of Full-Time U.S. Employee contributions to their respective FSAs on a monthly basis (the "Employee FSA Deductions").

71.      As of the Petition Date, the Debtors believe they owe approximately $1,000 on account of the FSA Administration Fee, all of which will become due and owing within the first 21 days of these chapter 11 cases.  Amounts to be paid with respect to the Employee FSA Deductions are contained in the projections for Withholding Obligations discussed above.  By this Motion, the Debtors request authorization to remit any prepetition amounts outstanding

---

[17] The approximately $1,000 paid to Aon each month is inclusive of administration fees paid in connection with the Commuter Program described below.

under the FSA Programs to the extent necessary and continue honoring their obligations under the FSA Programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### d.    COBRA

72.    Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain former Full-Time U.S. Employees of the Debtors (the "COBRA Participants") may continue insurance coverage under the Medical Plan, Dental Plan, Vision Plan and HSA and certain FSA Programs (the "COBRA Benefits").  More specifically, COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment.  Approximately 66 COBRA Participants per COBRA Benefit elect to continue coverage through COBRA.  COBRA Participants are responsible for paying all premium costs associated with the COBRA Benefits.

73.    The Debtors use a third-party service provider, COBRAGuard, to assist in the administration of the COBRA Benefits, including but not limited to all required notifications, collection of premiums, coordination of enrollment information with the AAHE insurers, and customer service and support for COBRA Participants.  On average, the Debtors pay COBRAGuard administrative fees of approximately $2,300 monthly for these services (the "COBRA Administrative Fees").

74.    As of the Petition Date, the Debtors estimate that they owe approximately $2,000 on account of COBRA Administrative Fees.  The Debtors request the authority to (a) pay all outstanding prepetition amounts incurred on account of the COBRA Benefits, (b) continue to offer the COBRA Benefits, including to those U.S. Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, and (c) continue to pay

31

COBRA Administrative Fees on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### e.    U.S. Life and AD&D Insurance

75.    The Debtors offer life and accidental death and dismemberment insurance coverage (the "U.S. Basic Life and AD&D Insurance") to eligible Full- and Part-Time U.S. Employees, which provides benefits up to one times such U.S. Employees' covered pay.  Full-Time U.S. Employees also have the option to purchase additional life insurance up to an amount equal to four times a Full-Time U.S. Employee's total annual earnings (the "U.S. Optional Life Insurance").  The maximum combined coverage for U.S. Employees under both the U.S. Basic Life & AD&D Insurance and the U.S. Optional Life Insurance is $1 million for each U.S. Employee.  The U.S. Basic Life and AD&D Insurance and U.S. Optional Life Insurance are fully insured products through Cigna.  An additional dependent spouse and dependents life insurance option is also available for U.S. Employees through Cigna (the "U.S. Dependent Life Insurance," and together with the U.S. Basic Life and AD&D Insurance and U.S. Optional Life Insurance, the "U.S. Life and AD&D Insurance").  Under the U.S. Dependent Life Insurance, U.S. Employees may elect spousal coverage of up to $25,000, in an amount not to exceed 50% of the Employee's combined coverage under the U.S. Basic Life and AD&D Insurance and U.S. Optional Life Insurance, and $5,000 coverage for children.   The Debtors pay approximately $21,000 per month with respect to their portion of the premiums for the U.S. Basic Life and AD&D Insurance.  U.S. Employees electing to receive U.S. Optional Life Insurance and U.S. Dependent Life Insurance are fully responsible for the premiums due thereunder, which the Debtors withhold and remit as components of the U.S. Withholding Obligations described above.

76.    As of the Petition Date, the Debtors estimate that they owe approximately $15,000 on account of accrued and unpaid premiums for the U.S. Basic Life and AD&D

Insurance, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the U.S. Life and AD&D Insurance, and to continue honoring their obligations under the U.S. Life and AD&D Insurance on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### f.  U.S. Disability Benefits

77.   The Debtors provide Full-Time U.S. Employees with both short-term disability benefits (the "U.S. Short-Term Disability Benefits") and long-term disability benefits (the "U.S. Long-Term Disability Benefits," and together with the U.S. Short-Term Disability Benefits, collectively, the "U.S. Disability Benefits") through Cigna.  Under the U.S. Short-Term Disability Benefits program, eligible Full-Time U.S. Employees are entitled to, among other things, continuation of 60 percent of their weekly base-wages for the first 13 weeks of their covered disability, including a 14 calendar day elimination period.  Full-Time Retail Employee U.S. Short-Term Disability premiums are paid in full by eligible Full-Time Retail Employees. U.S. Short-Term Disability Benefits for Full-Time Corporate Employees are self-insured by the Debtors with benefits being fully funded.  U.S. Short-Term Disability Benefits for Full-Time DC Employees, in turn, are fully-insured, with benefits being paid by Cigna and premiums being fully-funded by the Debtors.  The Debtors pay approximately $2,500 per month with respect to the U.S. Short-Term Disability Benefits.

78.   Following the period of the U.S. Short-Term Disability Benefits, Full-Time U.S. Employees are eligible to receive U.S. Long-Term Disability Benefits, which are offered through Cigna.  Under the U.S. Long-Term Disability Benefits program, eligible Full-Time U.S. Employees are entitled to receive 60 percent of their monthly wages, up to a monthly maximum of $20,000 for exempt U.S. Employees and $3,000 for non-exempt U.S. Employees.  The U.S.

Long-Term Disability Benefits begin after a Full-Time U.S. Employee is absent from work for 90 consecutive days following a covered disability and continue for an initial period of two years, which can be extended if such Full-Time U.S. Employee's disability deems the Full-Time U.S. Employee unable to perform any occupation for which the Full-Time U.S. Employee is qualified by education, training, or experience.

79.    If a Full-Time U.S. Employee is eligible, U.S. Long-Term Disability Benefits continue indefinitely, but are reduced by other income sources, including Social Security and U.S. Workers' Compensation.  U.S. Long-Term Disability Benefits are voluntary and fully paid by participating Full-Time U.S. Employees, but the Debtors do partially fund U.S. Long-Term Disability Benefits for select Corporate Employees.  The Debtors pay Cigna approximately $3,000 per month in premiums with respect to the U.S. Long-Term Disability Benefits.

80.    As of the Petition Date, the Debtors believe that they owe (i) approximately $2,500 on account of premiums associated with the U.S. Short-Term Disability Benefits, all of which will become due and owing within the first 21 days of these chapter 11 cases, (ii) approximately $31,000 on account of premiums associated with the U.S. Long-Term Disability Benefits, all of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay all such outstanding prepetition amounts incurred on account of the U.S. Disability Benefits, and to continue honoring their obligations on account of the U.S. Disability Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

g.    **U.S. Workers' Compensation Program**[18]

81.    The Debtors maintain workers' compensation insurance for U.S. Employees at the levels required by law in the states and territories in which the Debtors operate (the "U.S. Workers' Compensation Program").  Currently, the Debtors maintain coverage under the U.S. Workers' Compensation Program for U.S. Employees in the United States and Guam through American Zurich Insurance Company and Pacific Indemnity Insurance Company (the "U.S. Workers' Compensation Policies"), the claims of each of which are administered by Gallagher Bassett ("Gallagher Bassett").  On average, the Debtors pay Gallagher Bassett administrative fees of approximately $20,000 monthly for these services.  As of the Petition Date, the Debtors estimate that they owe approximately $20,000 for prepetition administrative service fees to Gallagher Bassett.

82.    Premiums on account of the U.S. Workers' Compensation Policies are paid in advance on an annual basis and depend substantially on the Debtors' payroll, the Debtors' risk profile (claims history), and the U.S. Employee's workers' compensation classification.  The Debtors paid approximately $400,000 in premiums for 2018 on account of the U.S. Workers' Compensation Policies.  The U.S. Workers' Compensation Policies are subject to a per-claim deductible in the amount of $1.0 million, and the Debtors paid approximately $5.8 million for 2018 on account of such deductibles, paid on a weekly basis (the "U.S. Workers' Compensation Deductibles").  The premiums paid on the U.S. Workers' Compensation Policies are then subject to adjustment following an audit of the Debtors' actual payroll for the applicable policy year.

---

[18] Contemporaneously herewith, the Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders (I)Authorizing the Debtors to (A) Continue Their Prepetition Insurance Program and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Supplement, or Purchase Insurance Policies and (II) Granting Related Relief* (the "Insurance Motion"), in which the Debtors are not seeking relief related to workers' compensation.

83.     Additionally, the Debtors do business in certain states and territories that require workers' compensation insurance be purchased through their state/territorial workers' compensation programs (the "State Coverage Policies").  An overview of the State Coverage Policies follows:

- **Wyoming**.  Specifically, coverage under the U.S. Workers' Compensation Program for U.S. Employees in Wyoming is maintained through the Wyoming Department of Workforce Services, for which the Debtors pay approximately $4,500 each year in the aggregate.

- **North Dakota**.  Coverage under the U.S. Workers' Compensation Program for U.S. Employees in North Dakota is maintained through North Dakota Workforce Safety and Insurance, for which the Debtors pay approximately $6,000 each year in the aggregate.

- **Washington**.  Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Washington is maintained through the Washington State Department of Labor and Industries, for which the Debtors pay approximately $175,000 each year in the aggregate.

- **Ohio**.  Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Ohio is through Ohio Bureau of Workers' Compensation, for which the Debtors pay approximately $450,000 each year in the aggregate.  In Ohio, there is a $10,000 deductible for Retail Employees and a $100,000 deductible for DC Employees.

- **Virgin Islands**.  Coverage under the U.S. Workers' Compensation Program for U.S. Employees in the Virgin Islands is maintained through the Virgin Islands Department of Labor, Division of Workers' Compensation, for which the Debtors pay approximately $8,200 each year in the aggregate.

- **Puerto Rico**.  Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Puerto Rico is maintained through Corporation del Fondo del Seguro del Estado, for which the Debtors pay approximately $85,000 each year in the aggregate.

84.     The Debtors make payments on account of State Coverage Policies on a yearly, quarterly, or bi-monthly basis.  The Debtors do not yet know the precise amounts that will be owed on account of the State Coverage Policies until such time as the next assessment is received from the applicable state or territory.

36

85.    The Debtors must continue the claim assessment, determination, adjudication and payment process pursuant to the U.S. Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[19]  Currently, there are approximately 170 open claims under the U.S. Workers' Compensation Program that must be addressed in this fashion.

86.    For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their statutory and contractual obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the U.S. Workers' Compensation Program during these chapter 11 cases.  In addition, to the extent any U.S. Employees assert claims arising under the U.S. Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under Bankruptcy Code section 362 to permit the U.S. Employees to proceed with their claims under the U.S. Workers' Compensation Program.

87.    As of the Petition Date, the Debtors estimate that they owe approximately $240,000 on account of accrued and unpaid U.S. Workers' Compensation Deductibles.  Because the Debtors are statutorily and/or contractually obligated to maintain the U.S. Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process.  Thus, the Debtors request authority to (a) pay all outstanding prepetition amounts incurred on account of the U.S. Workers' Compensation Program and the State Coverage Policies, including the U.S. Workers' Compensation

---

[19] The Debtors' U.S. Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the U.S. Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

Deductibles, (b) maintain the U.S. Workers' Compensation Program and continue to honor their obligations thereunder on a postpetition basis in the ordinary course of business and consistent with past practices and (c) modify the automatic stay to allow U.S. Employees to assert claims under the U.S. Workers' Compensation Program to the extent applicable.

### h.    Business Travel Insurance

88.    The Debtors provide various benefits to U.S. Employees who are injured or experience a medical emergency while traveling on a company-paid and/or approved business or relocation trip.  Specifically, the Debtors contract with Chubb Corporation and International SOS (collectively, the "Business Travel Insurers") to provide all U.S. Employees with business travel accident insurance (the "Business Travel Insurance").  Business Travel Insurance is provided by the Debtors to U.S. Employees at no cost to the U.S. Employees and provides coverage of up to three times the U.S. Employee's annual salary, up to a maximum amount of $1.5 million (and provides coverage of up to $150,000 for a spouse or $10,000 for any child traveling with the U.S. Employee on an approved business trip), as well as related travel accident and medical insurance.

89.    The Debtors pay approximately $95,000 per year to the Business Travel Insurers for fees related to the Business Travel Insurance (the "Business Travel Insurance Fees").  As of the Petition Date, the Debtors do not believe they owe any Business Travel Insurance Fees.  However, out of an abundance of caution, by this Motion, the Debtors request authority to pay any outstanding prepetition Business Travel Insurance Fees and to continue paying the Business Travel Insurance Fees on a postposition basis in the ordinary course of business and consistent with their prepetition practices.

### i.      401(k) Plan

90.      The Debtors provide eligible Part-Time and Full-Time U.S. Employees with the ability to participate in a 401(k) defined contribution plan (the "401(k) Plans").  U.S. Employees become eligible to participate in the 401(k) Plan, as a contributor, upon the date of hire subject to certain minimum age requirements.  The 401(k) Plan generally provides for deductions of compensation up to limits set by the Internal Revenue Code and consistent with certain plan limit pre- and post-tax contribution deduction percentages.  Each U.S. Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and thereafter transferred by the Debtor to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions").  Amounts to be remitted by the Debtors as of the Petition Date are included in the projections for U.S. Withholding Obligations discussed above.

91.      The 401(k) Plans are currently administered by Wells Fargo Bank, N.A. and certain of its affiliates ("Wells Fargo").  The 401(k) Plans incur annual costs associated with Wells Fargo's administration of the 401(k) Plans, but such costs are borne directly by the U.S. Employees and charged to the U.S. Employee's account through the trust established for the U.S. Employees participating in the 401(k) Plans.  The Debtors are not directly responsible for such amounts.

92.      Many U.S. Employees' retirement savings solely consists of their 401(k) Plan.  As such, the Debtors believe that continuing the 401(k) Plans is essential to maintaining U.S. Employee morale and protecting U.S. Employees' expectations.  In addition, the Debtors believe that the 401(k) Deductions are generally held in a trust by the Debtors and are not property of their estates.  Therefore, the Debtors request the authority to (i) pay all outstanding prepetition amounts incurred on account of the 401(k) Plans, (ii) remit any unpaid prepetition 401(k) Deductions, and (iii) to continue honoring their obligations related to the 401(k) Plans, to the

extent such obligations arise, on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 2.  U.S. Time-Off Benefits

93.     The Debtors offer several paid and unpaid time-off benefits for U.S. Full-Time Corporate Employees and Retail Employees, including Vacation Time, Sick Leave, Personal/Community Service Days, Paid Time Off, Leave of Absence Benefits and Other Paid Leave (each as defined below, and collectively, the "U.S. Time-Off Benefits"), which U.S. Time-Off Benefits increase based on an U.S. Employee's tenure with the Debtors.  DC Employees and certain Represented Employees receive Paid Time Off ("PTO") benefits in lieu of separate Vacation Time, Sick Leave, and Personal/Community Service Days.

94.     As of the Petition Date, the Debtors believe they owe approximately $2.3 million in unpaid prepetition cash obligations on account of the U.S. Time-Off Benefits.  By this Motion, the Debtors request authorization to pay all outstanding prepetition cash obligations incurred on account of the U.S. Time-Off Benefits, and, in the Debtors' discretion, to continue paying the U.S. Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### a.  U.S. Represented Employee Vacation Time

95.     In the ordinary course of business, the Debtors provide Represented Employees with vacation time ("U.S. Represented Employee Vacation Time").  Represented Employees who have been employed for at least one year accrue between one and four weeks of U.S. Represented Employee Vacation Time per year depending on their length of service with the Debtors.  For those Represented Employees covered under the UFCW Local 655 CBA, unused U.S. Represented Employee Vacation Time is paid out to such Represented Employee no later than 30 days after the conclusion of the Represented Employees anniversary year.  For those

Represented Employees that have been employed by the Debtors for more than one year and are covered under the UFCW Local 536 CBA, such Represented Employees are entitled to be paid for any accrued, but unused, Vacation Time at the time of the Represented Employee's termination. As of the Petition Date, the Debtors estimate their current cash obligations for U.S. Represented Employee Vacation Time is approximately $10,000.

### b.    U.S. Represented Employee Sick Leave

96.    In the ordinary course of business, the Debtors provide Represented Employees covered under the local UFCW 536 CBA with sick leave ("U.S. Represented Employee Sick Leave"). Such Represented Employees who have been employed for at least 30 days accrue three or six days of Sick Leave per year depending on their length of service with the Debtors. Such Represented Employees are entitled to be paid for any accrued, but unused, Sick Leave at the end of each year of employment. As of the Petition Date, the Debtors estimate their current cash obligations for Sick Leave for Represented Employees is approximately $1,300.

### c.    U.S. Represented Employee Paid Time Off

97.    In the ordinary course of business, the Debtors provide Represented Employees covered under the local UFCW 655 CBA with PTO. Such Represented Employees receive three PTO days (for Part-Time Represented Employees) or eight PTO days (for Full-Time Represented Employees) per calendar year. Such Represented Employees are entitled to be paid for a maximum of three days of unused PTO at the end of the calendar year, with any remaining days being forfeited. Upon termination, all unused PTO days are forfeited. As of the Petition Date, the Debtors believe they have no current cash obligations for PTO for Represented Employees.

### d.    DC Full-Time Employee Paid Time Off

98.    In the ordinary course of business, the Debtors provide DC Full-Time Employees with PTO in lieu of vacation time, sick leave, and personal/community service days. PTO is

accrued on a monthly basis, with such amounts of PTO being dependent on the eligible Employee's tenure with the Debtor. Upon termination, all accrued, but unused PTO is paid out to Employees. As of the Petition Date, the Debtors estimate their current cash obligations for PTO for DC Full-time Employees is approximately $307,000.

### e.       U.S. Non-Represented Employee Vacation Time

99.     The Debtors also provide vacation time for Corporate Employees and non-represented Full-Time Retail Employees ("U.S. Non-Represented Employee Vacation Time"). Eligible Employees who have completed at least six months of service accrue U.S. Non-Represented Employee Vacation Time each pay period at a rate based on an Employee's hire date and the number of hours worked each week by the Employee. Accrued and unused U.S. Non-Represented Employee Vacation Time does not carry over into each new fiscal year unless required by certain state law. Employees who leave the Debtors with accrued, but unused, U.S. Non-Represented Employee Vacation Time are entitled to a cash payment equal to such unused U.S. Non-Represented Employee Vacation Time. As of the Petition Date, the Debtors estimate their current cash obligations for U.S. Non-Represented Employee Vacation Time is approximately $2.0 million.

### f.       U.S. Non-Represented Employee Sick Leave

100.    In the ordinary course of business, the Debtors provide sick-days ("U.S. Non-Represented Employee Sick Leave") to Non-Represented Corporate and Full-Time Retail Employees as a U.S. Time-Off Benefit. Full-Time U.S. Employees are allotted up to six days of U.S. Non-Represented Employee Sick Leave, and certain Part-Time U.S. Employees (excluding Part-Time Retail Employees) are allotted U.S. Non-Represented Employee Sick Leave of up to three days, with such amounts of U.S. Non-Represented Employee Sick Leave being dependent on a U.S. Employee's tenure with the Debtors. U.S. Non-Represented

Employee Sick Leave is accrued on a monthly basis and may be used for personal illness, wellness and healthcare appointments, and for similar leave for U.S. Employees' immediate family members.  Non-Represented Employees who are terminated or resign are not entitled to cash payments in lieu of the accrued but unused U.S. Non-Represented Employee Sick Leave. If a U.S. Employee is absent for more than one work week as a result of illness, such U.S. Employee must apply for a U.S. Non-Represented Employee Leave of Absence (described more fully below).

### g.      Non-Represented Employee Personal/Community Service Days

101.    In the ordinary course of business, the Debtors provide personal/community service days ("U.S. Non-Represented Employee Personal/Community Service Days") to the U.S. Non-Represented Employees as a U.S. Time-Off Benefit.  Full-Time Retail Employees are allotted up to thirteen U.S. Non-Represented Employee Personal/Community Service Days, and Full-Time Corporate Employees, are allotted up to seven U.S. Non-Represented Employee Personal/Community Service Days.  U.S. Non-Represented Employee Personal/Community Service Days are prorated if a U.S. Employee begins work for the Debtors mid-year.  U.S. Non-Represented Employee Personal/Community Service Days can be used for any purpose, including volunteer or community service commitments as well as additional days off.  U.S. Employees who are terminated or resign are not entitled to cash payments in lieu of the accrued but unused U.S. Non-Represented Employee Personal/Community Service Days.

### h.      Medical Leave of Absence Benefits

102.    In the ordinary course of business, the Debtors provide medical leave of absence benefits ("U.S. Medical Leave of Absence Benefits") to eligible U.S. Employees to cover extended illnesses, injuries, maternity leave and other family needs.  The Debtors also provide eligible U.S. Employees with personal leave of absence benefits ("U.S. Personal Leave of

43

Absence Benefits," and together with U.S. Medical Leave of Absence Benefits, the "U.S. Leave of Absence Benefits"). Whether a U.S. Employee is entitled to U.S. Leave of Absence Benefits is handled by the Debtors on a case-by-case basis. A U.S. Employee that uses U.S. Leave of Absence Benefits either draws benefit hours from the other U.S. Time-Off Benefits for which the U.S. Employee is eligible or is not paid during the personal leave of absence.

### i.    Other Paid Leave

103.    The Debtors also permit all of their Full-Time U.S. Employees to take certain other paid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Full-Time U.S. Employees for certain missed work time in the ordinary course of business for bereavement leave and jury duty or court attendance (the "U.S. Other Paid Leave"). Full-Time U.S. Employees are not entitled to any separate cash payments in addition to their normal compensation for the U.S. Other Paid Leave.

### 3.    Non-Insider U.S. Severance Program

104.    In the ordinary course of business, the Debtors maintain a severance plan for non-Insider U.S. Employees in the event of termination by the Debtors that is not for "cause" (the "Non-Insider U.S. Severance Program"). Under the Non-Insider U.S. Severance Program, U.S. Employees receive, upon termination, a severance benefit of one week of continuation of salary for every year of employment, with a minimum severance benefit of one week of continuation of salary and a maximum severance benefit of twelve weeks of continuation of salary benefit.[20] Upon the end of the salary continuation period, participants in the Non-Insider U.S. Severance Program are eligible to enroll in health benefit continuation coverage through the COBRA benefits discussed above.

---

[20] Severance benefits for certain senior vice president- and vice president-level U.S. Employees are governed by individual employment agreements or other written arrangements.

44

105.    The Debtors spent approximately $3.9 million in the aggregate on account of the Non-Insider U.S. Severance Program in the 2018 fiscal year.  As of the Petition Date, the Debtors estimate that there is approximately $1.3 million in unpaid obligations under the Non-Insider U.S. Severance Program.  By this Motion, the Debtors are not seeking authority to make any payments on account of the Non-Insider U.S. Severance Program on an interim basis.  Pursuant to the Proposed Final Order, the Debtors are seeking authority to pay any prepetition amounts that would be allowable as a priority claim pursuant to Bankruptcy Code section 507(a)(4) on account of the Non-Insider U.S. Severance Program and, to the extent that an employee is terminated after the Petition Date, to pay the postpetition amount that would be treated as an administrative expense claim.  For the avoidance of doubt, the Debtors are only seeking to make payments on account the Non-Insider U.S. Severance Program on a final basis and do not seek authority to make prepetition or postpetition severance payments to any Insiders through the relief requested herein.

B.    **Canada Employee Health and Welfare Benefits**

1.    **Canada Extended Health Insurance Programs**

106.    The Debtors offer "extended" healthcare coverage (which includes medical, prescription drug, and vision coverage) and dental coverage to Full-Time Canada Employees (collectively, the "Canada Extended Health Plans") through Sun Life Financial ("Sun Life"). The Canada Extended Health Plans serve as a supplement to the already available national healthcare offered in Canada under the Canada Health Act.  The Canada Extended Health Plans are fully-insured products.  The Debtors work with a third-party broker, Mercer Canada, to benchmark their offerings under the Canada Extended Health Plans and to evaluate premiums, carriers, and plan designs on an annual basis.  Mercer Canada is not paid a direct fee by the Debtors, but instead receives commission from Sun Life.

45

107.    The Debtors and the participating Canada Employees share in the cost of premiums for the Canada Extended Health Plans.  On average, the Debtors pay approximately $40,000 per month on account of the Canada Extended Health Plans, in addition to premiums collected from participating Canada Employees pursuant to the Canada Withholding Obligations described above.  As of the Petition Date, the Debtors believe they owe approximately $69,000 on account of their portion of the premiums with respect to Canada Extended Health Plans, all of which may become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Extended Health Plans, and to continue paying premiums for the Canada Extended Health Plans on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

### 2.    Canada Life and AD&D Insurance

108.    The Debtors offer life and accidental death and dismemberment insurance coverage (collectively, the "Canada Basic Life and AD&D Insurance") to eligible Full-Time Canada Employees, which provides benefits up to one times such Canada Employees' covered pay.  Part-Time Canada Employees are not eligible for the Canada Basic Life and AD&D Insurance.  Full-Time Canada Employees also have the option to purchase additional life insurance up to an amount equal to two times a Full-Time Canada Employee's total annual earnings (the "Canada Optional Life Insurance").  The maximum coverage for Canada Employees is CAD 250,000, or approximately $188,000, under both the Canada Basic Life and the Canada Optional Life Insurance.  The maximum coverage does not apply to coverage under the Canada AD&D Insurance.  The Canada Basic Life and AD&D Insurance and Canada Optional Life and AD&D Insurance are fully insured products through Sun Life.  The Debtors

46

pay approximately $2,700 per month with respect to their premiums for the Basic Life and AD&D Insurance.

109.    As of the Petition Date, the Debtors estimate that they owe approximately $200 on account of accrued and unpaid premiums for the Canada Basic Life and AD&D Insurance, all of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Canada Basic Life and AD&D Insurance, and to continue honoring their obligations under the Canada Basic Life and AD&D Insurance on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 3.    Canada Disability Benefits

110.    The Debtors provide Full-Time Canada Corporate Employees and Canada Store Leaders with short-term disability benefits coverage (the "Canada Short-Term Disability Benefits") and long-term disability benefits coverage to all Full-Time Canada Employees (the "Canada Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, collectively, the "Canada Disability Benefits") through Sun Life.  Under the Canada Short-Term Disability Benefits, Full-Time Canada Corporate Employees and Canada Store Leaders are entitled to, among other things, continuation of 60 percent of their weekly base Canada Wages for the first 17 weeks of their covered disability, including a seven calendar day elimination period.  Canada Short-Term Disability Benefits are fully-insured for Canada Corporate Employees, with benefits being paid by Sun Life and premiums (the "Canada Short-Term Disability Premiums") being fully-funded by the Debtors.  Canada Store Leaders pay for their premiums under the Canada Short-Term Disability Benefits.

111.    Full-Time Canada Employees are eligible to elect Canada Long-Term Disability Benefits, which are also offered through Sun Life.  Under the Canada Long-Term Disability

Benefits, eligible Full-Time Canada Employees are entitled to receive 60 percent of their monthly Canada Wages, up to a monthly maximum of CAD 3,500, or approximately $2,600, or CAD 7,500, or approximately $5,600, based on job classification.  The Canada Long-Term Disability Benefits begin after a 120-day waiting period.  Canada Long-Term Disability Benefits are voluntary and fully paid for by participating Full-Time Canada Employees (approximately 400 Canada Employees as of the Petition Date).  The Debtors remit approximately $9,000 per month to Sun Life on account of such electing Canada Employees (the "Canada Long-Term Disability Premiums")

112.    As of the Petition Date, the Debtors: (a) believe that they owe approximately $9,000 on account of the Canada Short-Term Disability Premiums, all of which will become due and owing within the first 21 days of these chapter 11 cases and (b) believe they owe approximately $13,000 on account of the Canada Long-Term Disability Premiums as of the Petition Date, all of which will become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Canada Disability Benefits, and to continue honoring their obligations on account of the Canada Disability Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 4.    Canada Workers' Compensation Program

113.    The Debtors maintain workers' compensation insurance for Canada Employees at the levels required by law in the Canadian provinces in which the Debtors operate (the "Canada Workers' Compensation Program," and together with the U.S. Workers' Compensation Program, the "Workers' Compensation Programs").  Similar to the jurisdictions covered by the State Coverage Policies described above, the Canadian provinces in which the Debtors operate are also

considered "monopolistic" territories.    An overview of the Canada Workers' Compensation

Program by province follows:

- **Alberta.**  Coverage under the Canada Workers' Compensation Program for Canada Employees in Alberta is maintained through Workers' Compensation Board of Alberta, for which the Debtors pay approximately $24,000 each year in the aggregate.

- **British Columbia.**  Coverage under the Canada Workers' Compensation Program for Canada Employees in British Columbia is maintained through Worksafe BC, for which the Debtors pay approximately $56,000 each year in the aggregate.

- **Manitoba.**  Coverage under the Workers' Compensation Program for Canada Employees in Manitoba is maintained through Workers' Compensation Board of Manitoba, for which the Debtors pay approximately $3,000 each year in the aggregate.

- **New Brunswick.**  Coverage under the Workers' Compensation Program for Canada Employees in New Brunswick is maintained through Worksafe NB, for which the Debtors pay approximately $7,100 each year in the aggregate.

- **Newfoundland.**  Coverage under the Workers' Compensation Program for Canada Employees in Newfoundland is maintained through Workplace Health, Safety & Compensation Commission of Newfoundland and Labrador, for which the Debtors pay approximately $5,800 each year in the aggregate.

- **Nova Scotia.**  Coverage under the Workers' Compensation Program for Canada Employees in Nova Scotia is maintained through Workers' Compensation Board of Nova Scotia, for which the Debtors pay approximately $15,200 each year in the aggregate.

- **Ontario.**  Coverage under the Workers' Compensation Program for Canada Employees in Ontario is maintained through Workplace Safety and Insurance Board, for which the Debtors pay approximately $215,000 each year in the aggregate.

- **Prince Edward Island.**  Coverage under the Workers' Compensation Program for Canada Employees in Prince Edward Island is maintained through Workers' Compensation Board of Prince Edward Island, for which the Debtors pay approximately $2,400 each year in the aggregate.

- **Québec.**  Coverage under the Workers' Compensation Program for Canada Employees in Québec is maintained through Commission des

normes, de l'équité, de la santé et de la sécurité du travail (CNESST), for which the Debtors pay approximately $10,000 each year in the aggregate.

- **Saskatchewan.**  Coverage under the Workers' Compensation Program for Canada Employees in Saskatchewan is maintained through Saskatchewan Workers' Compensation Board, for which the Debtors pay approximately $5,100 each year in the aggregate.

114.   Similar to the U.S. Workers' Compensation Program the Debtors must continue the claim assessment, determination, adjudication and payment process pursuant to the Canada Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[21]  Indeed, for the claims administration process to operate in an efficient manner, and to ensure that the Debtors comply with their statutory and contractual obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the Canada Workers' Compensation Program during these chapter 11 cases.  The Debtors also request that the Court modify the automatic stay under Bankruptcy Code section 362 to permit the Canada Employees to proceed with the claims under the Canada Workers' Compensation Program.

115.   As of the Petition Date, the Debtors estimate that they owe approximately $17,300 on account of the Canada Workers' Compensation Program.  Because the Debtors are statutorily obligated to maintain the Canada Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process.  Thus, the Debtors request authority to (a) pay all outstanding prepetition amounts incurred on account of the Canada Workers' Compensation Program, (b) maintain the Canada

---

[21] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

Workers' Compensation Program and continue to honor their obligations thereunder on a postpetition basis in the ordinary course of business and consistent with past practices and (c) modify the automatic stay to allow Canada Employees to assert claims under the Canada Workers' Compensation Program to the extent applicable.

### 5.    Canada Business Travel Insurance

116.    Canada Employees who are injured or experience a medical emergency while traveling on a company paid and/or approved business or relocation trip are also covered by Business Travel Insurance (described above) (the "Canada Business Travel Insurance").  All obligations with respect to the Canada Business Travel Insurance are included in the description of the benefit for U.S. Employees.

### 6.    Canada Retirement Savings Program

117.    The Debtors provide eligible Canada Employees with the ability to participate in a group registered retirement savings plan (the "RRSP Plan") and a deferred profit sharing plan (the "DPSP Plan," and together with the RRSP Plan, the "Canada Retirement Savings Program"). Canada Employees become eligible to participate in the Canada Retirement Savings Program upon completing one year of continuous employment with the Debtors.  Each Canada Employee's contributions under the RRSP Plan are deducted automatically from each paycheck and thereafter transferred by the Debtor to a group annuity policy established under the RRSP Plan (collectively, the "RRSP Deductions").  The maximum amount of RRSP Deductions a Canada Employee may contribute is limited by the Income Tax Act (Canada).  Canada Employees do not make any contributions under the DPSP Plan.  Amounts of RRSP Deductions to be remitted by the Debtors as of the Petition Date are included in the projections for Canada Withholding Obligations discussed above.

51

118.   133.   The Debtors match the Canada Employees' RRSP Deductions at 50% on the first 1% - 5% of a Canada Employees' earnings up to 2.5% of earnings (the "RRSP Matching Contributions").  Contributions are made to eligible Canada Employees actively employed on December 31 of each calendar year.  The RRSP Matching Contributions are typically credited to eligible Canada Employees' accounts in March of the following calendar year.  For the 2018 plan year, the Debtors' RRSP Matching Contributions will be approximately $90,000.  Within the limitations on maximum amounts set by the Income Tax Act (Canada), the Debtors provide fully discretionary annual contributions under the DPSP Plan (the "DPSP Contributions, and together with the RRSP Matching Contributions, the "Canada Retirement Savings Contributions"), usually credited to eligible Canada Employees' accounts at around the same time of year that they credit the RRSP Matching Contributions.  For the 2018 plan year, the Debtors' DPSP Contributions will be approximately $78,000.

119.   The Canada Retirement Savings Program is currently administered by Sun Life, with an annual administrative cost of approximately $6,000 (the "Canada Retirement Savings Program Administrative Fees") born by the Debtors.   As of the Petition Date, the Debtors believe they owe approximately $500 in Canada Retirement Savings Program Administrative Fees to Sun Life, all of which may become due and owing within the first 21 days of these chapter 11 cases.

120.   Many Canada Employees' retirement savings solely consist of their RRSP Plan and DPSP Plan.  As such, the Debtors believe that continuing the Canada Retirement Savings Program and the Canada Retirement Savings Contributions are essential to maintaining Canada Employee morale and protecting Canada Employees' expectations.  In addition, similar to the 401(k) Plan for U.S. Employees described above, the Debtors believe that the RRSP Deductions

are generally held in a trust by the Debtors and are not property of their estates.  Therefore, the Debtors request the authority to (a) pay all outstanding prepetition amounts incurred on account of the Canada Retirement Savings Program, including the Canada Retirement Savings Contributions, (b) remit any unpaid prepetition RRSP Deductions, and (c) to continue paying, in the Debtors' discretion, obligations related to the Canada Retirement Savings Program and Canada Retirement Savings Contributions, to the extent such obligations arise, on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 7.    Canada Time-Off Benefits

121.    Canada Employees receive Time-Off Benefits in the form of Vacation Time, Sick Leave, Personal Days, Leaves of Absence and other miscellaneous paid leaves required by law or local custom including marriage, maternity/parental and funeral leaves (the "Canada Time-Off Benefits").  With the exception of Vacation Time, no Canada Time-Off Benefits are paid out upon termination of a Canada Employee's employment.

122.    As of the Petition Date, the Debtors believe they owe approximately $795,100 in unpaid prepetition cash obligations on account of the Canada Time-Off Benefits.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Time-Off Benefits (each as described more fully below) and, in the Debtors' discretion, to continue paying the Canada Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### a.    Canada Vacation

123.    As required under Canadian law, Canada Employees receive vacation time of up to four weeks per year depending on the amount of time such Canada Employees have worked for the Debtors (the "Canada Vacation") and vacation pay of up to 8% of their wages.  In Canada, vacation pay is considered to be under a deemed trust under employment standards

legislation. The Canada Employees' unused vacation time in excess of the statutory minimum is forfeited at the end of the calendar year. In exceptional circumstances, the Debtors permit carryover of vacation days to the end of January of the following calendar year, after which time unused vacation is forfeited. As of the Petition Date, the Debtors estimate that their current potential cash obligation for Canada Vacation is approximately $795,100.

### b.    Canada Sick Leave

124.    In the ordinary course of business, the Debtors provide Sick Leave (as defined above) to eligible Full-Time Canada Retail Employees as a Canada Time-Off Benefit. Eligible Employees are allotted up to six days of Sick Leave per year with such amounts being dependent on position and accruing year-over-year. Canada Employee Sick Leave is accrued on a monthly basis and may be used for personal illness, wellness and healthcare appointments and for similar leave for Canada Employees' immediate family members. Eligible Employees who are terminated or resign are not entitled to a cash payment in lieu of the accrued but unused Sick Leave. If an eligible Employee is absent for more than one work week as a result of illness, such Employee must apply for a Leave of Absence (described more fully below).

### c.    Canada Personal Days

125.    In the ordinary course of business, the Debtors provide Personal Days (as defined above) to eligible Full-Time Canada Employees as a Canada Time-Off Benefit. Full-time Canada Employees are eligible for up to six Personal Days each year with such amounts being dependent on position and accruing year-over-year. Canada Employee Personal Days are prorated if a Canada Employee begins work for the Debtors mid-year. Personal Days can be used for any purpose, including volunteer or community service commitments, as well as for additional days off. Canada Employees who are terminated or resign are not entitled to a cash payment in lieu of accrued but unused Personal Days.

### d.      Canada Medical Leave of Absence Benefits

126.    In the ordinary course of business, the Debtors provide eligible Canada Employees with Medical Leave of Absence Benefits (defined above) (the "Canada Medical Leave of Absence Benefits").  Whether a Canada Employee is entitled to Canada Medical Leave of Absence Benefits is handled by the Debtors on a case-by-case basis.

### e.      Canada Other Paid Leave

127.    The Debtors also permit all Full-Time Canada Employees to take Other Paid Leave (as defined above) (the "Canada Other Paid Leave").  Full-Time Canada Employees are not entitled to any separate cash payments in addition to their normal compensation for the Canada Other Paid Leave.

### f.      Non-Insider Canada Severance Program

128.    Under applicable Canadian provincial law, the Debtors' Canada Employees are entitled to statutorily required notice, or pay in lieu of notice, if they have prescribed minimum period of service and their employment is terminated without cause (the "Non-Insider Canada Severance Program," and together with the Non-Insider U.S. Severance Program, the "Non-Insider Severance Programs").  Non-Insider Canada Severance Program is not payable if a Canada Employee voluntarily resigns or if a Canada Employee is terminated for cause.  The formula for determining amounts under the Non-Insider Canada Severance Program varies based on how long an eligible Canada Employee has worked for the Debtors.

129.    As of the Petition Date, the Debtors believe they do not owe any amounts on account of the Non-Insider Canada Severance Program.  However, out of an abundance of caution, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Non-Insider Canada Severance Program and to continue honoring their obligations on account of the Non-Insider Canada Severance Program on a postpetition basis in

the ordinary course of business and consistent with their prepetition practices, each solely to the extent as permitted by any orders of the Ontario Superior Court of Justice (Commercial List) in proceedings in respect of certain of the Debtors pursuant to the Companies' Creditors Arrangement Act (Canada).

### C.    Supplemental Employee Benefits

130.    The Debtors offer supplemental employee benefits (collectively, the "Supplemental Benefits") to certain of their Employees, including:

- vehicle leasing program;

- company mobile data plans;

- auto/home and pet insurance;

- commuter benefits;

- identity theft protection program;

- charitable giving programs; and

- Employee assistance, counseling, and adoption assistance.

131.    The Debtors provide the Supplemental Employee Benefits as elective benefits. The Debtors seek authority to pay or remit any prepetition amounts due under the Supplemental Benefits, which they estimate total $179,300, and, in the Debtors' discretion, to continue the Supplemental Benefits postpetition in the ordinary course of business.

### 1.    Vehicle Program

132.    The Debtors offer certain U.S. Employees and Canada Employees the ability to participate in a vehicle lease program whereby the Debtors contract with a third party, Emkay, to lease vehicles for use by Employees working in the field (the "Vehicle Program"). The vehicles are largely used by eligible Employees for business, but may also be used for personal purposes. To the extent an eligible Employee utilizes a vehicle for personal use, personal use charges are

assessed to the Employees for their personal use.  In connection with the provision of a leased vehicle to an eligible Employee, the Employee is also given a fuel card by Emkay to charge fuel costs for the leased vehicle that are associated with business travel.  These costs are a part of the administrative costs that the Debtors are obligated to pay to Emkay.  The Debtors spent approximately $780,000 in the aggregate on account of the Vehicle Program in fiscal year 2018.

133.    As of the Petition Date, the Debtors believe they owe approximately $110,000 on account of the Vehicle Program, all of which may become due and owing within the first 21 days of these chapter 11 cases.  By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Vehicle Program and, in the Debtors' discretion, to continue paying Vehicle Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 2.    Company Mobile Device Plans

134.    As of the Petition Date, the Debtors continue to provide approximately five U.S. Employees and 10 Canada Employees with mobile phones covered under the Debtors' Company Mobile Plans.  The Debtors pay Sprint Corporation ("Sprint") approximately $26,000 per month to provide Company Mobile Plans for U.S. Employees and pay Bell Mobility Inc. ("Bell") approximately $1,500 per month to provide Company Mobile Plans for Canada Employees.  As of the Petition Date, the Debtors believe they owe approximately $26,000 to Sprint and $1,500 to Bell on account of the Company Mobile Plans.  The Debtors are in the process of transitioning all eligible U.S. Employees to the U.S. Mobile Device Reimbursement Programs and all eligible Canada Employees to the Canada Mobile Device Reimbursement Program.  However, by this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the Company Mobile Plans and, in the Debtors' discretion, to continue the Company

Mobile Plans on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 3. Auto/Home & Pet Insurance

135. The Debtors offer Full-Time U.S. Employees automobile, home, and pet insurance ("Additional Insurance Benefits"), under which the Debtors offer U.S. Employees access to coverage from Liberty Mutual, MetLife, and Travelers. The Additional Insurance Benefits are paid entirely by participating Full-Time U.S. Employees and are not an obligation of the Debtors.

### 4. Commuter Benefits

136. The Debtors offer both Full- and Part-Time U.S. Employees the ability to utilize a portion of their pre-tax income to purchase a commuter pass, which Full-Time U.S. Employees, in turn, can then utilize to pay for bus, light rail, regional rail and streetcar passes (the "Commuter Program"). The Commuter Program does not allow participating U.S. Employees to pay for gas, tolls, tickets and certain other commuting related expenses. The Debtors deduct approximately $1,000 on a monthly basis on account of the Commuter Program from the roughly 25 participating Full-Time U.S. Employees.

137. As of the Petition Date, the Debtors believe they hold approximately $1,600 of payroll deductions to be disbursed on account of the Commuter Program. Moreover, the Debtors believe that the amounts under the Commuter Program generally are held in trust by the Debtors and are not property of their estates. However, out of an abundance of caution, the Debtors request the authority to remit any outstanding prepetition amounts incurred on account of the Commuter Program and, in the Debtors' discretion, to continue paying the amounts under the Commuter Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### 5.      Identity Theft Protection Program

138.    The Debtors offer Full-Time U.S. Employees access to a voluntary identity theft protection program offered by InfoArmor (the "Voluntary Identity Theft Protection Program"). The Identity Theft Protection Program is paid entirely by participating Full-Time U.S. Employees and is not an obligation of the Debtors.

### 6.      Choose to Give Program

139.    On an annual basis, the Debtors provide all U.S. Employees and Canada Employees an opportunity to make a one-time or recurring donation to a selected group of eligible 501(c)(3) charitable organizations through payroll deduction with the Choose to Give Program.   The Debtors then disburse these payroll deductions to the designated charitable organizations, generally on a quarterly basis.  The Debtors deduct approximately $32,000 per month on account of the Choose to Give Program from approximately 3,750 Employees.  As of the Petition Date, the Debtors hold approximately $39,200 of payroll deductions to be disbursed to designated charitable organizations.

### 7.      Employee Assistance, Counseling and Adoption Assistance

140.    The Debtors also offer their U.S. Employees and Canada Employees a confidential counseling service to help address personal issues that the Employees and their dependents may be facing (the "Counseling Program").  Cigna, the current provider of U.S. Life and AD&D Insurance to the Debtors, provides this program at no additional cost to the Debtors, with the exception of critical incident support that is charged on a fee-for-service basis.   In addition, the Debtors offer Full-Time U.S. Employees with an adoption assistance program (the "Adoption Program," and together with the Counseling Program the "Wellness Programs") under which the Debtors will reimburse certain Qualified Adoption Expenses (as such term is defined in the Internal Revenue Code) for the adoption of a child.  As of the Petition Date, the Debtors

believe they have no outstanding payment obligations with respect to the Wellness Programs. Out of an abundance of caution, however, the Debtors request authority to pay any prepetition outstanding amounts associated with the Wellness Programs and, in the Debtors' discretion to continue the Wellness Programs in the ordinary course of business consistent with historical practice.

III.    **WARN Act**

141.    After the Petition Date, the Debtors may be required to issue notices to certain U.S. Employees consistent with the federal Worker Adjustment Retraining and Notification Act, 29 U.S.C. §§ 2101 – 2109, its California counterpart, California Labor Code §§ 1400 – 1408 and similar counterparts in other jurisdictions in which the Debtors operate (collectively, the "WARN Act").

142.    Out of an abundance of caution, the Debtors seek the authority, but not the direction, to make any payments required to comply with the WARN Act.

**RELIEF REQUESTED**

143.    By this Motion, the Debtors seek entry of the Proposed Interim Order, pending the entry of the Proposed Final Order, (i) authorizing, but not directing, the Debtors to (a) pay and honor prepetition amounts on account of the Employee Compensation and Benefits, and (b) continue and modify, in their discretion, the Employee Compensation and Benefits in the ordinary course of business and consistent with prepetition practices, subject to the caps and limits set forth in the Proposed Interim Order; and (ii) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

<u>**BASIS FOR RELIEF**</u>

I.    **Sufficient Cause Exists to Authorize the Debtors To Honor the Employee Compensation and Benefit Obligations.**

    A.    **Certain of the Employee Compensation and Benefits Are Entitled To Priority Treatment.**

144.    Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle the majority of the Employee Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under Bankruptcy Code sections 507(a)(4) and 507(a)(5), for (a) wages, salaries or commissions, including vacation, severance and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than $12,850 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

    B.    **Payment of Certain Employee Compensation and Benefits Is Required by Law.**

145.    The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate

taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (holding that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'") ; *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co. v. Michigan (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Similarly, the Eighth Circuit has established that a debtor does not have an equitable interest in the property held in trust for another, but rather that the trustee "[holds] bare legal title to the trust res subject to a duty to reconvey it to the rightful owner."  *See Chiu v. Wong*, 16 F.3d 306, 310 (8th Cir. 1994) (citation omitted) (allowing plaintiff to impose a constructive trust on former debtor's estate to recover amount former debtor had previously invested).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

146.    Similarly, state and provincial laws require the Debtors to maintain the Workers' Compensation Programs.  *See, e.g.* MO. REV. STAT. § 287.280 (2017) (requirement that companies maintain a workers' compensation program).  If the Debtors fail to maintain the Workers' Compensation Programs, state and provincial laws may prohibit the Debtors from operating in those jurisdictions.  Payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

II. **Payment of the Employee Compensation and Benefits Is Warranted Under Bankruptcy Code Section 363(b)(1) and the Doctrine of Necessity.**

147.    Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, No. 15-649, 137 S. Ct. 973, 985 (2017) (citing favorably to the entry of "first day orders" authorizing the payment of prepetition wages where doing so would, among other things, "enable a successful reorganization"); *In re Falcon Prods., Inc.*, No. 07-01495, 2008 WL 363045, at *10 (E.D. Mo. Feb. 8, 2008) (affirming the bankruptcy court's decision that the provider of employee health benefits was entitled to administrative priority status); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in Bankruptcy Code sections 105(a), 363(b), 507, 1107(a), and 1108.

148.    Pursuant to Bankruptcy Code sections 1107(a) and 1108, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also Lange v. Schropp (In re Brook Valley VII, Joint Venture)*, 496 F.3d 892, 900 (8th Cir. 2007). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *See CoServ* 273 B.R. at 497. Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

63

149.     Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under Bankruptcy Code section 363(b) where a sound business purpose exists for doing so.  *See, e.g., In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *see also Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to Bankruptcy Code section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Id.* at 175.

150.     In addition, this Court may authorize payment of prepetition claims in appropriate circumstances based on Bankruptcy Code section 105(a).   Bankruptcy Code section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under Bankruptcy Code section 105(a), courts may permit preplan payments of prepetition obligations when essential to the continued operation of the debtor's business.  Specifically, this Court may use its power under Bankruptcy Code section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. §105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor.") (citation omitted); *see also In re NVR L.P.,* 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

151.    Courts also have permitted postpetition payment of prepetition claims pursuant to Bankruptcy Code section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' continued business operations in chapter 11.  *See In re UNR Indus., Inc.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that Bankruptcy Code section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).  In particular, courts have authorized the payment of non-insider severance obligations to union employees.  *See In re Sunedison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. May 20, 2016) [Docket No. 362] (approving final order permitting Debtors' paying approximately $1.7 million in prepetition and postpetition severance obligations to 70 former non-insider union employees); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del. Feb. 24, 2016) [Docket No. 306] (approving final order permitting Debtors' paying approximately $3.3 million in prepetition and postpetition severance obligations to former non-insider union employees of the Debtors).

152.    This flexible approach is particularly critical where prepetition creditors, here Employees and related third parties, provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations.  For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately.'" *Id.* (citation omitted).  The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

153.    The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 6003.  Paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, the Debtors believe that without the relief requested herein, Employees may seek immediate alternative employment opportunities.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing recoveries for stakeholders.  The loss of valuable Employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on liquidating their North America business operations and reorganizing around the remaining portion.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor certain wage, benefits, and related obligations, including certain of the prepetition Employee Compensation and Benefits.

154.    In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses.  Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto.  Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors'

businesses.  Further, if this Court does not authorize the Debtors to honor their various obligations under the insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

155.    The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this circuit and other jurisdictions, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Armstrong Energy, Inc.,* No. 17-47541-659 (Bankr. E.D. Mo. Dec. 1, 2017) [Docket No. 213] (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Payless Holdings LLC*, No. 17-42267-659 (Bankr. E.D. Mo. May 9, 2017) [Docket No. 633] (same); *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. July 26, 2016) [Docket No. 181] (same); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Apr. 14, 2016) [Docket No. 109] (same); *In re Arch Coal, Inc*., No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) [Docket No. 54] (same); *In re Magnetation, LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. May 7, 2015) [Docket No. 59] (same); *In re Bakers Footwear Group, Inc.*, No. 12-49658-705 (CER) (Bankr. E.D. Mo. Oct. 10, 2012) [Docket No. 82] (same). Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits

and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

III.     **The Additional Compensation Opportunities and Non-Insider Severance Programs Are Reasonable and a Sound Exercise of the Debtors' Business Judgement.**

A.      **The Additional Compensation Opportunities and Non-Insider Severance Programs are Authorized Under Bankruptcy Code Section 363(c)(1).**

156.    The Debtors further request that they be allowed, in their discretion, to continue to honor the Additional Compensation Opportunities and Non-Insider Severance Programs in the ordinary course of business and as otherwise modified herein to be consistent with the Bankruptcy Code.  The Debtors submit that the Additional Compensation Opportunities and Non-Insider Severance Programs should be reviewed under Bankruptcy Code section 363(c)(1) rather than Bankruptcy Code section 503(c) because the Additional Compensation Opportunities and Non-Insider Severance Programs are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of the Additional Compensation Opportunities or Non-Insider Severance Programs.  *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).

B.      **The Additional Compensation Opportunities and Non-Insider Severance Programs are Authorized Under Bankruptcy Code Sections 363(b) and 503(c)(3).**

157.    Alternatively, to the extent that the Additional Compensation Opportunities and Non-Insider Severance Programs are not authorized under Bankruptcy Code section 363(c)(1), the Debtors submit that payment of the Additional Compensation Opportunities and Non-Insider Severance Programs is also authorized under Bankruptcy Code sections 363(b) and 503(c). Importantly, because the Debtors do not propose to pay any Insiders on account of the Additional Compensation Opportunities and Non-Insider Severance Programs, the Additional Compensation Opportunities and Non-Insider Severance Programs are not subject to the heightened standards

of Bankruptcy Code sections 503(c)(1) and 503(c)(2).  *See* 11 U.S.C. § 503(c)(1) and (2) (applying only to insiders).

158.   Instead, pursuant to Bankruptcy Code section 503(c)(3), the Additional Compensation Opportunities and Non-Insider Severance Programs only require a showing that they are "justified by the facts and circumstances of" the Debtors' chapter 11 cases.  *See* 11 U.S.C. § 503(c)(3).  This standard, in turn, is essentially the same as the business judgment standard that is applied under Bankruptcy Code section 363(b).  *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).") (citation omitted); *In re Global Home Prods. LLC,* 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

159.   The Debtors submit that continuing to maintain the Additional Compensation Opportunities and Non-Insider Severance Programs for non-Insiders is a sound exercise of their business judgment and in the best interests of the estates.   Importantly, the Additional Compensation Opportunities and Non-Insider Severance Programs are long-standing components of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize and protect the Employees in the ordinary course of the Debtors' business operations.  Moreover, at least with respect to the Non-Insider Canada Severance Program, the Debtors are required by law to make such payments.  The Debtors, therefore, believe that it is necessary to continue these programs for non-insiders on a postpetition basis.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue the

Additional Compensation Opportunities and Non-Insider Severance Programs in the ordinary course of business, including payment of any prepetition obligations related thereto.

## IV.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate in This Case.

160.    Bankruptcy Code section 362(a)(1) operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362(a)(1).  Bankruptcy Code section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

161.    The Debtors seek authorization, under Bankruptcy Code section 362(d), to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of Employees and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause severe disruptions in the Debtors' businesses to the detriment of all parties in interest.

## PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS SHOULD BE AUTHORIZED

162.    The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits in the ordinary course of business as provided herein.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has

70

not authorized will be inadvertently made.  Thus, the Debtors request that the Court authorize, but not direct, all applicable financial institutions to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Employee Compensation and Benefits; provided that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

163.    Pursuant to Bankruptcy Rule 6003, this Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.  As described above, the Debtors' Employees and Independent Contractors are vital to the Debtors' operations.  Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 21 days of these chapter 11 cases will jeopardize their loyalty and trust, causing Employees and Independent Contractors to leave the Debtors' employ, severely disrupting the Debtors' operations at a critical juncture.

164.    Moreover, the Debtors' Employees and Independent Contractors rely on the Employee Compensation and Benefits to pay their living expenses and the Debtors' inability to satisfy such obligations in the ordinary course of business could be financially ruinous to Employees and Independent Contractors.  Accordingly, the Debtors submit they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Compensation and Benefits.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

165.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a)

and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

166.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' or any other party-in-interest's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## NOTICE

167.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agent, (i) Choate Hall & Stewart LLP (Attn: Kevin Simard, Doug Gooding and Jonathan Marshall) and (ii) Thompson Coburn LLP (Attn: Mark Bossi); (d) counsel to certain Prepetition Term Loan Lenders (i) Kramer Levin Naftalis & Frankel LLP (Attn: Stephen D. Zide) and (ii) Doster, Ullom & Boyle, LLC (Attn: Gregory D. Willard); (e) the proposed Monitor, FTI Consulting Canada, Inc. (Attn: Paul Bishop, Greg Watson and Jim Robinson); (f) counsel to the proposed Monitor, Bennett Jones LLP (Attn: Sean Zweig, Kevin Zych and Aiden Nelms); (g) counsel to any statutory committee appointed in the chapter 11 cases; (h) the United States Attorney's Office for the Eastern District of Missouri; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for all states in which the Debtors

conduct business; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; (m) UFCW Local 655; and (n) UFCW Local 536 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Proposed Interim Order granting the relief requested in the Motion and such other and further relief as may be just and proper, and (b) schedule a final hearing on the Motion as soon as is otherwise practicable thereafter to consider entry of the Proposed Final Order.

*[Remainder of page intentionally left blank.]*

Dated:  February 19, 2019
        St. Louis, Missouri

/s/ *Richard W. Engel, Jr.*

Richard W. Engel, Jr. MO 34641
Erin M. Edelman MO 67374
John G. Willard MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com
jwillard@armstrongteasdale.com

-and-

Ira Dizengoff (*pro hac vice* admission pending)
Meredith A. Lahaie (*pro hac vice* admission pending)
Kevin Zuzolo (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
mlahaie@akingump.com
kzuzolo@akingump.com

- and -

Julie Thompson (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
julie.thompson@akingump.com

*Proposed Counsel to the Debtors and Debtors in Possession*

74