**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | )    Case No. 19-40883-659 |
| | )    Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*, | ) |
| | )    (Joint Administration Requested) |
| | ) |
| Debtors.[1] | ) |
| | )    Hearing Date:  February 19, 2019 |
| | )    Hearing Time:  1:30 p.m. (Central Time) |
| | )    Hearing Location:  Courtroom 7 North |

**DEBTORS' MOTION SEEKING ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS**
**TO PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS AND**
**(B) CARRIERS AND WAREHOUSEMEN AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of an interim order (the "Proposed Interim Order") and a

final order (the "Proposed Final Order")[2] (i) authorizing, but not directing, the Debtors to pay

prepetition claims held by (a) critical vendors and (b) carriers and warehousemen and (ii)

granting related relief.[3]  In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179].  With respect to certain taxing authorities, the Debtors' address is 2001 Bryan Street, Suite 800, Dallas, Texas 75201.  However, the location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc., 3231 S.E. 6th Avenue, Topeka, Kansas 66607.

[2] A copy of the Proposed Interim Order and Proposed Final Order will be provided to the Notice Parties (as defined below) and made available on the Debtors' case information website at https://cases.primeclerk.com/pss.

[3] The relief requested herein does not apply to any claims against, or vendors of Payless ShoeSource Canada, Inc., Payless ShoeSource Canada GP Inc. or Payless ShoeSource Canada LP (the "Canadian Debtors"), which will be addressed in the Canadian Debtors' *Companies' Creditors Arrangement Act* (Canada) proceedings ("CCAA").

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for relief requested herein are sections 105, 363, 1107(a) and 1108 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4.      The Debtors and their non-Debtor affiliates (together, the "Company") are the largest specialty family footwear retailer in the Western Hemisphere, offering a wide range of shoes and accessory items at affordable prices.  The Company operates approximately 3,400 stores in more than 40 countries.  The Debtors are headquartered in Topeka, Kansas with extensive operations that span across the United States, Canada, Latin America, Asia, the Middle East and Europe.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  The Debtors have requested that their cases be consolidated for procedural purposes and administered jointly.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      The Debtors commenced these chapter 11 cases approximately 18 months after completing a restructuring and emerging from chapter 11 protection with a reduced debt burden.[4] The Debtors, however, have been unable to sustain profitable operations in the current retail environment as a result of various factors more fully described in the *Declaration of Stephen Marotta, Chief Restructuring Officer of Payless Holdings LLC, in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "First Day Declaration").[5]   Accordingly, the Debtors have determined that the best way to maximize value for all of their stakeholders is to liquidate all North America brick-and-mortar locations through the immediate commencement of going out of business sales.  The Debtors believe, in the exercise of their business judgment, that such measures are in the best interests of the Debtors' estates.

7.      A comprehensive description of the Debtors' businesses and operations, capital structure and events leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## I.      The Critical Vendors and their Claims

### A.      The Critical Vendor Services

8.      By this Motion, the Debtors seek authority to pay those critical vendors (collectively, the "Critical Vendors") that supply services (collectively, the "Critical Vendor Services") that are vital to the Debtors' operations and without which the Debtors would not be able to wind down their businesses during the going out of business sales (the "Store Closing Sales").   The Critical Vendor Services, particularly with regard to the Debtors' information

---

[4] On April 4, 2017, the Debtors' predecessors-in-interest commenced chapter 11 cases (the "Prior Cases") before the United States Bankruptcy Court for the Eastern District of Missouri, which were jointly administered under the caption *In re Payless Holdings LLC*, No. 17-42267.  A plan of reorganization was confirmed in the Prior Cases on July 26, 2017, and such plan went effective on August 10, 2017.

[5] Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the First Day Declaration.

technology ("IT") infrastructure, are available only from a limited number of vendors that are able to maintain the Debtors' integrated IT systems.  The Critical Vendor Services provide IT solutions including, among other things, professional services to maintain the Debtors' call center activity for all stores and associates, database and mainframe operations, software licenses and keys and customer communications regarding promotions.  The Debtors' IT systems run continuously and require regular maintenance and repairs.  In addition, certain of the Critical Vendors provide temporary employment services at (i) the Debtors' distribution centers, where the Debtors' products are processed before being shipped to store locations and (ii) at the Debtors' corporate headquarters to fill open positions.

9.      Importantly, due to the nature of the Debtors' global operations, the Debtors rely on an integrated IT infrastructure and temporary employment services.  Nonpayment of prepetition obligations may cause these Critical Vendors to use extreme caution and adopt a wait-and-see attitude towards the Debtors, resulting in costly delays to services essential to maximize the success of the Store Closing Sales.  If the Critical Vendor Claims (as defined below) are not paid, the Critical Vendors may take precipitous action against the Debtors, resulting in costly delays that would jeopardize the Debtors' ability to execute the Store Closing Sales.  This threat is not speculative; as a result of the Debtors' repeated failure to pay invoices when due, before the filing of these chapter 11 cases, some of the Critical Vendors providing temporary employment services have warned that they will discontinue product-processing services at the Debtors' distribution centers.  As the Store Closing Sales run their course, the Debtors will require the continued cooperation of, and assistance from, their Critical Vendors to wind down their North America brick and mortar business successfully.

4

10.     Even if it were possible to locate alternate Critical Vendor Services, the costs associated with switching from one vendor to another are significant and would be detrimental to the Debtors' estates.  Specifically, any new vendor would require months to become acquainted with the integrated IT solutions that the Debtors require.  This delay would make it impossible for the Debtors to continue operations and therefore would hurt the Debtors' ability to preserve asset value.  Moreover, any interruption of the Critical Vendor Services would prevent the Debtors from:  (i) tracking inventory; (ii) distributing their remaining products in the supply chain to store locations and (iii) sending customer communications, all of which are necessary to the success of the Store Closing Sales.

**B.      Tailored Relief**

11.     With the assistance of their advisors, the Debtors have spent significant time: (1) reviewing and analyzing their books and records; (2) consulting operations managers and purchasing personnel; (3) reviewing contracts and supply agreements and (4) analyzing applicable law, regulations and historical practice to understand the Company's critical business relationships and suppliers of services—the loss of which would keep the Debtors from achieving the goals of the chapter 11 cases.  In this process, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining services from alternative sources;

- whether a vendor is a sole-source, limited-source or high-volume supplier of services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

5

- the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases; and

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse provide critical services on a postpetition basis.

12.     Following this analysis, the Debtors have identified Critical Vendor Services that are vital to the Debtors' operations and without which the Debtors would not be able to operate their business.  By this Motion, the Debtors therefore request authorization, but not direction, to pay up to $5 million of their outstanding prepetition obligations to certain Critical Vendors (the "Critical Vendor Claims") upon entry of the Proposed Interim Order.  The resulting payments on account of Critical Vendor Claims will be in an amount significantly less than the total amount outstanding as of the Petition Date.  The size of these Critical Vendor Claims reflects the Debtors' significant extension of credit with various creditors.  It also reflects an assumption that these vendors will *not* be paid in full for claims outstanding during that time.  Instead, the Critical Vendor Claims are an estimate of the minimum amount that the Debtors believe they would need to pay to maintain critical services.[6]

II.     **The Carriers and Warehousemen and the Debtors' Analysis of the Potential Carriers and Warehousemen Claims**

13.     The Debtors' ability to deliver their products in a timely manner is critically important to the Store Closing Sales and depends on a seamless interaction with various third-

---

[6] Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor, including, but not limited to, a violation of the automatic stay pursuant to Bankruptcy Code section 362(a).

party service providers.  Thus, the Debtors depend on certain vendors to transport and store

products (collectively, the "Carrier and Warehouse Products").  After leaving source factories in

Asia, the Debtors' products go to consolidated freight stations in the applicable sourcing country

before sailing on freight vessels to ports on the West Coast of the United States.  From there, the

products are sent to local distribution centers before being delivered to the Debtors' stores.

14.     The Debtors engage certain vendors (the "Carriers") to transport and deliver the

Carrier and Warehouse Products throughout their supply chain.  The Carriers regularly possess

the Carrier and Warehouse Products belonging to the Debtors and certain of the Debtors' partners

in the course of transporting and delivering the Carrier and Warehouse Products.  In any given

week, approximately $69.7 million worth of the Debtors' inventory is being shipped on water

and $13.6 million is being shipped on land.[7]

15.     In the ordinary course of business, the Debtors also use a number of warehouses

to store various products when not being used or at various points during transit from vendors to

the stores (collectively, the "Warehousemen").  The Debtors pay the Warehousemen in arrears;

therefore, many Warehousemen are owed certain amounts on account of prepetition storage fees.

As of the Petition Date, certain Carriers and Warehousemen will have outstanding invoices for

services provided to the Debtors before the Petition Date (the "Carriers and Warehousemen

Claims").

16.     Under the laws of certain states, provinces and countries, a Carrier or

Warehouseman may have a lien on the goods in its possession securing the charges or expenses

incurred in connection with the transportation or storage of those goods.  If the Debtors do not

pay the Carriers and Warehousemen Claims on a timely basis, the Carriers and Warehousemen

---

[7] These figures reflect an estimate of the Debtors' cost to produce the shipped goods.  The retail value of the shipped goods is substantially higher.

may assert possessory liens on the goods currently in their possession (which the Debtors estimate have in aggregate a value far in excess of any amounts owed) and refuse to deliver or release such goods until their invoices are paid.  In addition, pursuant to Bankruptcy Code section 363(e), the Carriers and Warehousemen, as bailees, may be entitled to adequate protection for any valid possessory lien.

17.     The refusal of Carriers or Warehousemen to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue.  Accordingly, by this Motion, the Debtors seek authorization, but not direction, to pay outstanding prepetition obligations on account of the Carriers and Warehousemen up to $6.5 million upon entry of the Proposed Interim Order and to continue to pay the Carriers and Warehousemen in the ordinary course of business upon entry of the Proposed Final Order.

## RELIEF REQUESTED

18.     By this Motion, and pursuant to Bankruptcy Code sections 105(a), 363, 1107(a) and 1108 and Bankruptcy Rules 6003 and 6004, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order (i) authorizing, but not directing, the Debtors to pay (a) the Critical Vendor Claims in an aggregate amount not to exceed $5 million and (b) the Carriers and Warehousemen Claims in an aggregate amount not to exceed $6.5 million and (ii) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

**BASIS FOR RELIEF**

### I.      The Court Should Authorize the Payment of the Critical Vendor Claims

19.      Courts in this district and others generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. *See, e.g., In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) (authority to pay prepetition claims of vendors); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authority to pay prepetition claims of servicers).  In so doing, courts rely on several legal theories rooted in Bankruptcy Code sections 105(a), 363(b), 1107(a) and 1108.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 2002) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims when an appropriate business justification exists).

20.      Courts recognize that payments to prepetition creditors are appropriate pursuant to Bankruptcy Code section 105(a) under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern."); *In re Wehrenberg, Inc.*, 260 B.R. at 469 ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor.") (citation omitted); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); *In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "because otherwise there will

9

be no reorganization and no creditor will have an opportunity to recoup any part of its prepetition

claim"); and *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the

existence of a judicial power to authorize trustees to pay claims for goods and services that are

indispensably necessary to the debtors' continued operation).   Several courts apply the doctrine

of necessity where payment of a prepetition claim (a) is "necessary for the successful

reorganization of the debtor," (b) falls within "the sound business judgment of the debtor," and

(c) will not "prejudice other unsecured creditors."   *United Am.*, 327 B.R. at 782; *see also In re

Universal Fin., Inc.*, 493 B.R. 735, 739-40 (Bankr. M.D. N.C. 2013) (applying the *United

American* three-part test); and *In re Corner Home Care, Inc.*, 438 B.R. 122, 127-29 (Bankr. W.D.

Ky. 2010) (same).   A bankruptcy court's use of its equitable powers to "authorize the payment of

pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not

a novel concept."   *Ionosphere*, 98 B.R. at 175.   "Under 11 U.S.C. § 105 the court can permit pre-

plan payment of a pre-petition obligation when essential to the continued operation of the

debtor."   *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere*, 98 B.R. at

177).   The rationale for the necessity of payment rule—the rehabilitation of a debtor in

reorganization cases—is "the paramount policy and goal of Chapter 11."   *Ionosphere*, 98 B.R. at

175-76; *see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re

Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition

worker's compensation claims on grounds that the fundamental purpose of reorganization and

equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the

greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately"); *In re Just For Feet*, 242 B.R. 821, 826 (D. Del 1999) (finding that payment of

prepetition claims to certain trade vendors was "essential to the survival of the debtor during the

chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor in possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment"); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); and *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate).

21.     Courts have also authorized payment of prepetition obligations under Bankruptcy Code section 363(b) where a sound business purpose exists for doing so.  *See In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004) (recognizing that payment of prepetition claims may be permitted under section 363, but holding that the debtor's evidentiary record did not support paying the prepetition claims of vendors); *Ionosphere*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of prepetition wages); and *James A. Phillips,* 29 B.R. at 397-98 (relying on Bankruptcy Code section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

22.     Moreover, pursuant to Bankruptcy Code sections 1107(a) and 1108, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and

11

preserve the estate, including an operating business's going-concern value." *Id.* Some courts

have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by

the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted the

pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary

duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

23.     Courts in this district and other jurisdictions routinely grant relief consistent with

that which the Debtors are seeking herein. *See, e.g., In re Toys "R" Us, Inc.*, No. 17-34665

(KLP) (Bankr. E.D. Va. Oct. 24, 2017) [Docket No. 708] (authorizing payment of approximately

$325 million of prepetition obligations to critical vendors); *In re Peabody Energy Corp.*, No. 16-

42529 (BSS) (Bankr. E.D. Mo. May 17, 2016) [Docket No. 525] (approving the payment of

prepetition claims of essential suppliers and service providers); *In re Noranda Aluminum, Inc.*,

No. 16-10083-399 (Bankr. E.D. Mo. Feb. 10, 2016) [Docket No. 96] (approving payment of the

prepetition claims of critical vendors up to $100,000 per vendor); and *In re Arch Coal, Inc.*, No.

16-40120-705 (Bankr. E.D. Mo. Jan. 14, 2016) [Docket No. 71] (approving payment of

prepetition claims of critical vendors up to $5 million). The foregoing cases reflect the

recognition that payment of prepetition claims of certain critical vendors can maximize creditor

recoveries.

24.     The Debtors submit that the requested relief represents a sound exercise of the

Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is

justified under Bankruptcy Code sections 105(a), 363(b), 1107 and 1108. The Debtors' failure to

pay the Critical Vendor Claims could prolong the Debtors' inability to obtain necessary services

and increase the likelihood for significant disruptions to the Debtors' operations. This failure

could, in turn, jeopardize the Store Closing Sales and could significantly impair the value of the

Debtors' businesses and assets for their estates and creditors. The resulting harm to the Debtors'

estates far outweighs the cost associated with paying a portion of the Debtors' prepetition

obligations to the vendors. Thus, the Debtors' other creditors, including their non-critical

vendors, will be no worse off, and in fact will fare far better, if the Debtors are empowered to

negotiate such payments to achieve a smooth liquidation process with minimal disruption to their

operations. As such, the Debtors believe the relief sought in this Motion is vitally necessary to

preserve the value of their estates for the benefit of all stakeholders in these chapter 11 cases and

should be granted.

**II.     Payment of Certain of the Debtors' Obligations to Carriers and Warehouseman Is Necessary to Prevent Perfection of Liens Against the Debtors' Assets**

25.     In addition, certain of the Debtors' assets may be subject to perfection of liens by

third parties, including the Carriers and Warehousemen. As discussed above, a Carrier or

Warehouseman may have a lien on goods in its possession that secures the charges or expenses

incurred in connection with the transportation of the goods. The Carrier or Warehouseman may

be unwilling to release goods in their possession on which they may be entitled to liens because

releasing possession of goods may convert the status of their claims against the Debtors from

secured to unsecured. Therefore, unless the Court authorizes the Debtors to pay the Carriers and

Warehousemen Claims, it is unlikely the Debtors will be able to obtain goods currently in transit.

If the Carriers or Warehousemen possess lien rights or have the ability to exercise "self-help"

remedies to secure payment of their claims, failure to satisfy the obligations owed to the Carriers

and Warehousemen could have a material adverse effect that ultimately may devastate the

Debtors' operations to the detriment of the Debtors' creditors.

26.     In addition, pursuant to Bankruptcy Code section 363(e), the Carriers or the

Warehousemen, as bailees, may be entitled to adequate protection of a valid possessory lien.

Given that the value of the Carrier and Warehouse Products generally will far exceed the value of their respective claims, the satisfaction of prepetition claims of such parties will not harm creditors—and, in fact, will benefit them—because such payments will help preserve the going-concern value of the Debtors' business.[8]

27.     Indeed, where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and other jurisdictions have routinely authorized payments to carriers and warehousemen under similar circumstances. *See, e.g.*, *In re Arch Coal, Inc.,* No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) [Docket No. 93] (approving payment of prepetition claims related to shipping, warehousing and servicing); *accord In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 20, 2018) [Docket No. 843] (approving payment of prepetition claims of shippers and warehousemen); and *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. Aug. 17, 2015) [Docket No. 180] (same).

### PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS SHOULD BE AUTHORIZED

28.     Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Critical Vendor Claims and Carriers and Warehousemen Claims.  The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Thus, the Debtors request that the Court authorize, but not direct, all applicable financial institutions to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims and Carriers and Warehousemen Claims; *provided that*

---

[8] Additionally, to the extent that a portion of the Carriers' claims are related to the payment of custom duties, such claims may entitled to priority under Bankruptcy Code section 507(a)(8)(F).

sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

29.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."   For the reasons discussed above, authorizing the Debtors to pay these claims and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases.   Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.   The relief requested is necessary for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.   Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

30.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, failure to grant the relief requested herein would be detrimental to the Debtors, their estates and all stakeholders.  For this reason and those set forth above, the Debtors submit that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## RESERVATION OF RIGHTS

31.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' or any other party-in-interest's rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under Bankruptcy Code section 365.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## NOTICE

32.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Administrative Agent, (i) Choate Hall & Stewart LLP (Attn:  Kevin Simard, Doug Gooding and Jonathan Marshall) and (ii) Thompson Coburn LLP (Attn:  Mark Bossi); (d) counsel to certain Prepetition Term Loan Lenders (i) Kramer Levin Naftalis & Frankel LLP (Attn:  Stephen D. Zide) and (ii) Doster, Ullom & Boyle, LLC (Attn:  Gregory D. Willard), (iii) Stroock & Stroock & Lavan LLP (Attn: Kristopher M. Hansen and Daniel A. Fliman) and (iv) Lewis Rice LLC (Attn: Sonette T. Magnus); (e) the proposed Monitor, FTI Consulting Canada, Inc. (Attn:  Paul Bishop, Greg Watson and Jim Robinson); (f) counsel to the proposed Monitor, Bennett Jones LLP (Attn:  Sean Zweig, Kevin Zych and Aiden Nelms); (g) counsel to any statutory committee appointed in the chapter 11 cases; (h) the United States Attorney's Office for the Eastern District of Missouri; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business

16

and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

33.     WHEREFORE, the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order (i) granting the relief requested herein and (ii) granting such other relief as is just and proper.

[*Remainder of page intentionally left blank.*]

Dated:  February 19, 2019
        St. Louis, Missouri

/s/ *Richard W. Engel, Jr.*
Richard W. Engel, Jr. MO 34641
Erin M. Edelman MO 67374
John G. Willard MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com
jwillard@armstrongteasdale.com

-and-

Ira Dizengoff (*pro hac vice* admission pending)
Meredith A. Lahaie (*pro hac vice* admission pending)
Kevin Zuzolo (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
mlahaie@akingump.com
kzuzolo@akingump.com

-and-

Julie Thompson (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
julie.thompson@akingump.com


*Proposed Counsel to the Debtors and Debtors in
Possession*