## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Case No. 19-40883-659 |
| | ) Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*, | ) |
| | ) (Joint Administration Requested) |
| Debtors.[1] | ) |

## DECLARATION OF STEPHEN MAROTTA, CHIEF RESTRUCTURING OFFICER OF PAYLESS HOLDINGS LLC, IN SUPPORT OF DEBTORS' CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS

I, Stephen Marotta, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura") and concurrently serve as the Chief Restructuring Officer of Payless Holdings LLC and twenty-three of its affiliated debtors and debtors in possession (collectively, with the three Canadian debtors described below, the "Debtors," and, together with their non-debtor affiliates and subsidiaries, "Payless" or the "Company").  In this capacity, I am familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179].  With respect to certain taxing authorities, the Debtors' address is 2001 Bryan Street, Suite 800, Dallas, Texas 75201.  However, the location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc., 3231 S.E. 6th Avenue, Topeka, Kansas 66607.

2.      I have more than 35 years of experience providing professional accounting and consulting services to major corporations and businesses, including 29 years of consulting to financially-troubled companies.  My experience includes business plan development, viability assessments, reengineering and overhead reduction programs, claims and preference analyses, crisis management, and forensic investigation and litigation support.  My industry experiences include retail, healthcare, telecommunications, manufacturing, wholesale distribution, entertainment, and financial services.  I have served in restructuring advisory roles in such chapter 11 cases as *In re Model Reorg Acquisition, LLC (aka Perfumania Inc.)*, Case No. 17-11794-CSS (Bankr. D. Del. 2017) (largest specialty retailer and distributor of fragrances and related beauty products in the United States); *In re SynCardia Systems, Inc.*, Case No. 16-11599-MFW (Bankr. D. Del. 2016) (Chief Restructuring Officer) (medical technology company); *In re C. Wonder LLC*, Case No. 15-11127-MBK (Bankr. D.N.J. 2015) (Chief Restructuring Officer) (specialty retailer that designs and markets women's clothing, jewelry, shoes, handbags and other accessories as well as select home goods); *In re Deb Stores Holding LLC*, Case No. 14-12676-KG (Bankr. D. Del. 2014) (mall-based retailer in the juniors "fast-fashion" specialty sector); *In re Daytop Village Foundation Incorporated*, Case No. 12-11436-SCC (Bankr. S.D.N.Y. 2012) (Chief Restructuring Officer) (a substance abuse prevention provider); *In re CoreComm N.Y., Inc.*, Case No. 04-10214-PCB (Bankr. S.D.N.Y. 2004) (Chief Restructuring Officer) (facilities-based integrated communications providers); *In re Andover Togs, Inc.*, Case No. 96-41437-ALG (Bankr. S.D.N.Y. 1996) (garment manufacturer); *In re Alexander's Inc.*, Case No. 92-42704 (Bankr. S.D.N.Y. 1992) (chain of New York area department stores); *In re Federated Department Stores, Inc.*, Case No. 90-00130 (Bankr. S.D. Ohio 1990) (retailing and real estate conglomerate with 258 department

2

stores operating nationwide under 10 names—including Bloomingdale's, Abraham & Straus, Jordan Marsh and Burdines).[2]

3.      In early January 2019, the Debtors selected Ankura as their restructuring advisor because of Ankura's experience and reputation for providing advisory and crisis management services in large, complex chapter 11 cases.  I have overseen the team of Ankura professionals that has been working with the Debtors in connection with this process.  On January 29, 2019, the Board of Managers of Payless Holdings LLC appointed me as the Chief Restructuring Officer of Payless Holdings LLC, the parent company, to oversee the management and operation of the Debtors' business and to perform certain professional services.[3]

4.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to Bankruptcy Code section 1107(a) and 1108.

5.      I submit this declaration (the "Declaration") to assist this court (the "Court") and parties in interest in:  (a) understanding the Debtors, their operations, and their capital structure; (b) understanding the circumstances related to the commencement of the chapter 11 cases; and (c) in support of:  (i) the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code; and (ii) the relief requested by the Debtors pursuant to the pleadings described herein.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my

---

[2] The foregoing list is a list of cases handled by Marotta Gund Budd & Dzera, LLC, a predecessor in interest of Ankura, except for (i) *In re Model Reorg Acquisition, LLC*, which was handled by Ankura and (ii) *In re Andover Togs, Inc.*, *In re Alexander's Inc.* and *In re Federated Department Stores, Inc.*, which were handled by Zolfo Cooper, a predecessor in interest to AlixPartners, LLP.

[3] On January 29, 2019, the Board of Managers of Payless Holdings LLC also appointed Adrian Frankum, a senior Managing Director at Ankura, as Restructuring Officer of Payless Holdings LLC.

review of relevant documents, information supplied to me by members of the Company's management, other Ankura professionals and the Company's other professional advisors, or my opinion based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

## **Preliminary Statement**

7.      The Debtors have commenced these cases approximately 18 months after completing a restructuring and emerging from chapter 11 cases in this Court with a reduced debt burden.[4]  Notwithstanding the decline in the Debtors' overall financial performance, Payless Latin America continues to demonstrate stable growth and is the Company's most profitable business segment.  Moreover, Payless' franchise business segment continues to provide the Debtors with favorable royalty fees.  Accordingly, the Company has determined that the best way to maximize value for all stakeholders is to commence an orderly wind-down of the North America brick and mortar business and pursue a reorganization of the Latin America and franchise business segments. This overall strategy is to be implemented through an organized suite of international initiatives including (i) the commencement of these chapter 11 cases; (ii) the commencement of a CCAA proceeding in Canada and (iii) a reorganization around the Latin America and franchise business. The Company believes that this approach is in the best interests of the Debtors and their estates, and will preserve the most profitable segments of the Payless enterprise for the benefit of their stakeholders.

---

[4] On April 4, 2017, the Debtors' predecessors in interest (the "Prior Debtors") commenced chapter 11 cases (the "Prior Cases") in this Court, which were jointly administered under the caption *In re Payless Holdings LLC*, No. 17-42267. All of the Prior Cases have been closed except for the Prior Cases of Payless Holdings LLC (Case No. 17-42267) and Payless ShoeSource Worldwide Inc. (Case No. 17-42288).  The Debtors believe that the Prior Cases, which are limited to final claim reconciliation and the administration of distributions to unsecured creditors, can continue to conclusion without interruption as a result of these chapter 11 cases.

8.      In furtherance of this objective, the Debtors have entered into a Consulting Agreement (as defined below) with the contractual joint venture comprised of Great American Group, LLC and Tiger Capital Group, LLC to effectuate the closure of the North America stores through going-out-of-business sales (the "Store Closing Sales").

9.      This Declaration is submitted to assist this Court in becoming familiar with the Debtors, the Debtors' strategy for these chapter 11 cases, and the initial relief sought by the Debtors to stabilize operations.  This Declaration is organized as follows:  (a) *Part I* provides an overview of the Company and its operations; (b) *Part II* summarizes the Company's prepetition organizational structure, capitalization and indebtedness; (c) *Part III* describes the circumstances leading to the commencement of these chapter 11 cases and the Company's restructuring initiatives; (d) *Part IV* describes key components of and strategies for these chapter 11 cases; and (d) *Part V* provides an overview of the relief the Debtors seek at the outset of these chapter 11 cases, and, through the attached **Exhibit A**, provides the evidentiary basis for the relief requested in the first day pleadings.

## I.
## Company Background

**A.      Overview**

10.      Founded in 1956 in Topeka, Kansas, Payless is an iconic American footwear retailer selling quality shoes at affordable prices in a self-select environment.  With approximately 3,400 stores in more than 40 countries across the world, Payless is globally recognized and is the largest specialty footwear retailer in the Western hemisphere.  Payless operates through its three business segments (North America, Latin America, and franchise stores), producing approximately 110

million pairs of shoes per year across the world.  Payless also operates an e-commerce business through which it sells goods online at www.payless.com and Amazon.

11.     Payless has offered its budget-conscious customers outstanding value on basics, on-trend and special occasion footwear through a national assisted-service store footprint, localized assortment, and a low-cost integrated-sourcing business model, including a significant online presence.  This business model depends upon (a) identifying and developing on-trend merchandise, (b) developing strong relationships with branding partners, and (c) maintaining an overseas sourcing network that can develop and produce products at a scale and cost necessary to serve Payless' customers.

12.     Payless has a strong seasonal cadence, as evidenced by its four key selling periods: Easter, summer sandals, back-to-school, and Holiday.  Because these periods fall relatively evenly throughout the course of the year, Payless' selling periods create a broad, even flow of business throughout the year, even though the composition of the business varies widely depending on the time of year.  This has served over many years to create a largely continuous overall flow of product from overseas suppliers through Payless' supply chain to customers in North America and abroad. An interruption in this product flow typically causes significant harm to the Company's (and thus the Debtors') business.

**B.      North America**

13.     Payless' North America business represents a majority of its store base, with approximately 2,500 wholly-owned stores in the United States, Puerto Rico, the U.S. Virgin Islands, Guam, Saipan, and Canada.  Due to the industry-wide shift away from brick-and-mortar stores, the North America business (brick and mortar and e-commerce businesses) has experienced a precipitous decline in EBITDA, with 2018 EBITDA totaling negative $63 million and 2017 EBITDA totaling negative $4 million.  Payless North America also provides an extensive range of

operational and corporate services to the Latin America and franchise business segments, including product development and sourcing, retail operations, marketing, IT, finance, tax, and legal assistance.  In connection with the Store Closing Sales for the North America business, the Debtors are in the process of strategically transitioning certain of the operational and corporate services that Payless North America provides to the Latin America and franchise segments.

## C.     Latin America

14.     Nineteen years after opening its first store in Latin America, Payless has become the largest specialty footwear retailer in the region.  Payless Latin America has experienced stable growth since its inception, opening 15-20 new stores per year and averaging 6% annual revenue growth since 2013.  It is also highly profitable, contributing approximately $23 million to Payless' overall EBITDA despite accounting for less than 12% of Payless' store footprint.  Payless currently operates approximately 420 stores in Latin America and enjoys leadership positions in each relevant market.

15.     Many of Payless' Latin America operations are governed by joint venture agreements and related ancillary agreements, pursuant to which Payless receives certain sourcing and other corporate fees, as well as dividends, on a periodic basis, in exchange for use of the Debtors' intellectual property, sourcing, operational management and information technology.  In exchange, the joint venture agreements have allowed Payless to utilize its partners' significant local market knowledge to buy, plan, and distribute their products.  The Latin America business continues to perform well notwithstanding the challenges facing the North America brick and mortar business.

## D.     Franchise Store Segment

16.     Payless' franchise segment consists of stores operated by franchisees in several countries in Africa, Asia, and the Middle East.  Since opening their first franchise stores in 2009,

the Debtors' franchise business has grown to approximately 371 stores. The franchise stores are held to the same high standards as the Company's wholly-owned and joint venture stores and provide a similar customer experience. The Company receives royalty fees, which typically range from 6 to 8 percent of the franchisee's net revenue, pursuant to applicable franchise agreements. The franchise business requires minimal upfront risk, capital requirements, and overhead expenses, as it has historically leveraged the existing North America operations and sourcing capabilities to support the business segment. Payless intends to explore opportunities in connection with a reorganization around the franchise business.

### E.    Merchandising Strategy and Licensing

17.    Payless maintains a number of branding relationships to assist it in bringing to market popular brands and designs to follow the trends of its core customer groups. The Company is also party to certain license agreements that grant it rights to use a number of popular, broadly-recognized brands, including Champion, Christian Siriano, Disney, Star Wars, and Marvel, each of which helps the Company maintain its strength in various niche target markets. The Company also utilizes design partnerships, through which popular labels provide the Company with existing product designs in exchange for a fee. These partnerships allow the Company to offer its partners' designs under the Payless name at much cheaper prices for the consumer. Finally, the Company markets certain high-volume proprietary brands, such as American Eagle, among others, which it owns outright.

### F.    Procurement and Global Supply Chain

18.    Payless depends heavily on its supply chain and has unique relationships with its vendors, primarily based out of China and Vietnam. The Company has developed long-standing relationships (in some cases extending over 15 years) and highly streamlined processes with key supplier factories. The Company's ability to deliver its products in a timely manner also depends

on seamless interaction with various third-party service providers who ship and store the Company's products.   This coordination across factories, distributors, shippers, carriers, warehousemen, and customer-facing stores is vital to ensuring Payless' shoes reach customers at the right season and at the right price.

## II.
## Prepetition Organizational Structure, Capitalization and Indebtedness

### A.    Prepetition Organizational Structure

19.    Payless first traded publicly in 1962, and was taken private in May 2012.  As set forth on the structure chart attached hereto as **Exhibit B**, Payless Holdings LLC currently owns, directly or indirectly, each of Payless' subsidiaries.  One of the Debtors, Payless ShoeSource, Inc., is incorporated in the state of Missouri.  In addition, the Debtors operate several Payless stores throughout the state.  The Prior Cases that are still open are pending in the United States Bankruptcy Court for the Eastern District of Missouri under the caption *In re Payless Holdings LLC*, No. 17-42267.

### B.    Prepetition Capital Structure and Indebtedness

20.    The Debtors' prepetition capital structure includes approximately $470 million in aggregate principal amount of outstanding debt as of the Petition Date, primarily consisting of: (a) approximately $156.7 million in aggregate principal amount revolving loans and FILO loans under the ABL Credit Facility (as defined below) as well as approximately $36 million of undrawn letters of credit outstanding under the ABL Credit Facility (the "Standby Letters of Credit"); and (b) approximately $277.2 million in secured debt under a term loan credit agreement (the "Term Loan Facility").  Certain non-debtor affiliates or subsidiaries included in the capital structure have outstanding indebtedness, including:    (x) Payless CA Management Limited, which owes approximately $45.4 million in aggregate principal amount of secured debt outstanding under a

first lien term loan (the "Payless CA Management Term Loan"); (y) Payless ShoeSource of Trinidad Unlimited, which owes approximately $900,000 in aggregate principal amount pursuant to a demand loan (the "Trinidad Demand Loan"); and (z) Payless ShoeSource Ecuador Cia. Ltda., which owes approximately $5.7 million in aggregate principal amount pursuant to a credit agreement (the "Ecuador Loan").

     **i.**     **The ABL Credit Facility**

     21.     Payless, Inc., Payless Finance, Inc., Payless ShoeSource, Inc. and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Wells Fargo Bank, National Association ("Wells Fargo"), as collateral agent and administrative agent, Wells Fargo as FILO agent, and the lenders party thereto from time to time are parties to that certain Credit Agreement, dated as of August 10, 2017 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "ABL Credit Facility"). The ABL Credit Facility provides for (x) a senior secured revolving credit facility, with a maximum availability of $250 million, subject to borrowing base limitations and (y) a $35 million FILO loan. The ABL Credit Facility is secured by a first priority lien over certain of the Debtors' assets including, among other things and subject to certain limitations, accounts, cash, inventory, and real property (such collateral package, the "ABL Priority Collateral"). The ABL Credit Facility is also secured by a junior lien on the remaining assets of the Debtors including, among other things and subject to certain limitations, equipment and intellectual property (such collateral package, the "Term Priority Collateral"). As of the Petition Date, an aggregate balance of approximately $156.7 million remains outstanding under the ABL Credit Facility as well as approximately $36 million in Standby Letters of Credit.

     22.     Due to the Debtors' diminishing liquidity the Debtors were required to enter into "cash dominion" with Wells Fargo, pursuant to which the Debtors agreed to cause all funds held

in certain of their deposit accounts, subject to any nominal minimum balances required, to be swept daily into an account under the dominion and control of Wells Fargo (the "Concentration Account"), and cause the proceeds of all collections and balances of all other deposit accounts, subject to any nominal minimum balances required, to also be swept daily into the Concentration Account.

### ii.    The Term Loan

23.    Payless, Inc., Payless Finance, Inc., Payless ShoeSource, Inc., and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Cortland Products Corp., as administrative and collateral agent, and the lenders party thereto from time to time are parties to that certain Term Loan and Guarantee Agreement, dated as of August 10, 2017 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "Term Loan Agreement").  The Term Loan Agreement originally provided for $280 million of term loans secured by a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral.  The Term Loan Agreement is comprised of two tranches:  Tranche A-1 in an original principal amount of $80 million and Tranche A-2 in an original principal amount of $200 million, which bear interest at different rates and mature on different dates.  Tranche A-1 bears interest at LIBOR (as defined in the Term Loan Agreement) plus 8.00% per annum and matures on February 10, 2022 and Tranche A-2 bears interest at LIBOR (as defined in the Term Loan Agreement) plus 9.00% per annum and matures on August 10, 2022.  An aggregate principal amount of $277.2 million was outstanding as of the Petition Date under the Term Loan Facility.

### iii.    The Intercreditor Agreement

24.    The Debtors' prepetition indebtedness under the ABL Credit Facility and the Term Loan Agreement is also subject to an intercreditor agreement, generally referred to as the

ABL/Term Loan Intercreditor Agreement.[5]  The ABL/Term Loan Intercreditor Agreement governs the relative contractual rights of lenders under the ABL Credit Facility and the Term Loan Facility.

### iv.    Unsecured Claims

25.    As of the Petition Date, the Debtors estimate that they owe approximately $225 million to unsecured creditors, consisting primarily of amounts owed to vendors and suppliers.

### C.    Indebtedness of Non-Debtor Affiliates

### i.    The Payless CA Management Term Loan

26.    As described in additional detail below, Payless raised capital required to fund ordinary-course business operations in October 2018 through the incurrence of indebtedness at a non-debtor affiliate that owns the Company's 60% interest in two Latin America business joint venture entities.   Non-debtor Payless CA Management Limited, as the borrower, certain subsidiaries of Payless CA Management Limited party thereto from time to time as guarantors, Alden Global Opportunities Master Fund, L.P., as administrative agent, and the lenders party thereto from time to time are parties to that certain Term Loan and Guarantee Agreement, dated as of October 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Payless CA Management Term Loan Agreement").  The Payless CA Management Term Loan Agreement, which matures on October 2, 2023 and accrues paid in kind interest at 10% per annum, provided for an approximately $45.5 million delayed draw term loan secured by a first priority lien in substantially all tangible and intangible assets of non-debtor Payless CA Management Limited and the other guarantor thereunder, but specifically excluding

---

[5] The "ABL/Term Loan Intercreditor Agreement" means that certain Intercreditor Agreement dated as of August 10, 2017 (as amended, supplemented, restated, amended and restated or otherwise modified from time to time) by and among Wells Fargo Bank, National Association, as administrative agent for the lenders under the ABL Credit Agreement and Cortland Products Corp., the administrative agent and collateral agent under the Term Loan, and acknowledged by the Debtors.

the Company's 60% interest in two Latin America business joint venture entities. The obligations under the Payless CA Management Term Loan Agreement are also secured by a non-recourse pledge of the equity in non-debtor Payless CA Management Limited held by its direct parent. An aggregate principal amount of $45.4 million was outstanding as of the Petition Date under the Payless CA Management Term Loan.

### ii. The Trinidad Demand Loan

27.    Non-debtor Payless ShoeSource of Trinidad Unlimited, as the borrower, and First Citizens Bank Limited, as the lender, are parties to that certain demand loan credit facility dated as of December 5, 2017. The Trinidad Demand Loan, which matures on June 5, 2019, provides a €3,000,000 demand loan secured by a cash deposit held with First Citizens Bank Limited. The proceeds of Trinidad Demand Loan were used to pay a prior loan and dividends. An aggregate amount of $900,000 was outstanding as of the Petition Date under the Trinidad Demand Loan.

### iii. The Ecuador Loan

28.    Non-debtor Payless ShoeSource Ecuador Cia. Ltda., as the borrower, and Banco de la Produccion S.A., as the lender, are parties to that certain credit agreement comprised of two tranches: Tranche 1 dated as of September 29, 2017 and Tranche 2 dated as of December 14, 2017 (the "Ecuador Loan Agreement"). PSS Latin America Holdings is the ultimate owner of the Payless ShoeSource Ecuador Cia. Ltda. The Ecuador Loan is comprise of two tranches: Tranche 1 in the amount of $6 million and Tranche 2 in the amount of $2 million, which bear interest at

difference rates.[6]  The proceeds of the Ecuador Loan were used to pay dividends.  An aggregate

amount of $5.7 million was outstanding as of the Petition Date under the Ecuador Loan.

### III.
### Events Leading to Chapter 11 and Restructuring Initiatives

**A.      The Prior Cases**

29.      I understand that beginning in early 2015, the Prior Debtors experienced a top-line

sales decline driven primarily by:  (a) a set of significant and detrimental non-recurring events,

(b) foreign exchange rate volatility, and (c) challenging retail market conditions.  Those pressures

led to the Prior Debtors' inability to both service their prepetition secured indebtedness and remain

current with their trade obligations.  Industry-wide declines in sales and traffic during 2015 and

2016 compounded these challenges.  The Prior Debtors' weaker-than-anticipated financial

performance forced management to curtail certain capital and marketing investments required to

combat the broader challenges facing the retail industry.  To address these challenges, the Prior

Debtors took steps to evaluate and implement cost-reduction initiatives.

30.      In early 2017, the Prior Debtors negotiated a restructuring support agreement with

the support of a majority of their prepetition secured lenders and, on April 4, 2017, commenced

the Prior Cases in this Court.  On July 27, 2017, the Court confirmed the *Debtors' Fifth Amended*

*Plan of Reorganization*, No. 17-42267 [Docket No. 1507] (Bankr. E.D. Mo. 2017) (as

supplemented, the "Plan").  The Plan effective date occurred on August 10, 2017 (the "Effective

Date").  Two of the Prior Debtors' chapter 11 cases, Payless Holdings LLC and Payless ShoeSource

Worldwide, Inc., remain open in this Court while the claims reconciliation process and creditor

distributions are completed.

---

[6] Tranche 1 bears interest at 7.29% interest per annum.  Tranche 2 bears interest at 7.45% per annum.

31.     The Prior Cases accomplished three main objectives:   (a) approximately $435 million in funded debt was eliminated; (b) approximately 675 underperforming brick and mortar stores were closed and liquidated; and (c) approximately $50 million in annual expenditure savings was realized through landlord concessions and modification of existing leases.

**B.      Challenges Subsequent to the 2017 Plan Effective Date**

32.     Upon emergence from the Prior Cases, the Debtors sought to capitalize on the deleveraging of their balance sheet with additional cost-reduction measures, including reviewing marketing expenses, downsizing their corporate office, reevaluating the budget for every department, and reducing their capital expenditures plan.  Notwithstanding these measures, the Debtors have continued to experience a top-line sales decline driven primarily by inventory flow disruption during the 2017 holiday season, same store sales declines resulting in excess inventory, and challenging retail market conditions.  These conditions are described in more detail below.

33.     In the year following the Prior Debtors' emergence from chapter 11, the Debtors faced unanticipated delays from key supplier factories.  Given the significant volume of made-to-order shoes, the Debtors depended heavily on receiving regular shipments of product from their existing vendors.  Due to interruptions in production during the Prior Cases, the Debtors' key supplier factories took longer than expected to procure the raw materials and workers required for the Debtors to deliver their products in a timely manner.  The delayed production caused a major inventory flow disruption during the 2017 Holiday season and a computer systems breakdown in the summer of 2018 significantly affected the back to school season, leading to diminished sales and same store sales declines.

34.     The Debtors also faced an oversupply of inventory in the fall of 2018 leading into the winter of 2019.  As a result, the Debtors were forced to sell merchandise at steep markdowns, which depressed margins and drained liquidity.  Customers filled their closets with these deeply

discounted products, which served to reduce customer demand for new product. In total, millions of pairs of shoes were sold at below market prices in order to realign inventory and product mix. These challenges and the general trend toward online shopping, contributed to a decline in EBITDA for Payless' North America brick and mortar stores for 2018 at negative $66 million compared to negative $11 million in 2017 and $51 million in 2016.

35.     Moreover, Payless was unable to fulfill its plan for omni-channel development and implementation, *i.e.*, the integration of physical store presence with online digital presence to create a seamless, fully integrated shopping experience for customers. As of the Petition Date, the completion of this unified customer experience has been limited to approximately two hundred stores. Without a robust omni-channel offering, Payless has been unable to keep up with the shift in customer demand and preference for online shopping versus the traditional brick-and-mortar environment. In addition, the Debtors' liquidity constraints prevented the Debtors from investing in their store portfolio to open, relocate, or remodel targeted stores to keep up with competitors. All of the foregoing pressures prevented the Payless' North America business from achieving profitability in the last eighteen months.

**C.     Efforts to Address Liquidity Challenges**

36.     The Debtors negotiated with their prepetition lenders for additional credit under their existing ABL Credit Facility and the strategic infusion of capital through a debt offering to lenders under their Term Loan Facility to build liquidity reserves in light of mounting operational issues. In March 2018, the Debtors executed that certain First Amendment and Joinder to Credit Agreement dated as of March 1, 2018, which among other things increased the aggregate FILO commitment under the ABL Credit Facility from $10 million to $35 million (the "ABL Amendment").

37.     Subsequently, in August 2018, the Debtors entered into discussions with their existing Term Loan lenders regarding, among other things, a potential transaction structure that would enable the Debtors to obtain capital, manage their vendor issues, and right size their balance sheet.  Initially the Debtors engaged with the Term Loan lenders regarding a potential equity offering.  Due to the Company's declining financial performance, none of the Term Loan lenders expressed interest in an equity offering.  As such, the Debtors sought to develop an alternative transaction structure including a combined equity-debt offering.  After attempts to negotiate an equity or debt offering on terms acceptable to the Term Loan Lenders proved unsuccessful, Alden Global Opportunities Master Fund, L.P. ("Alden"), which holds approximately 66.5% of the total outstanding equity of Payless, agreed to explore alternative financing options with the Company. Payless offered a debt financing opportunity to all of the Term Loan lenders and all lenders declined participation except for Alden.  On October 2, 2018, Alden provided an approximately $45.5 million delayed draw term loan to non-debtor affiliate, Payless CA Management Limited, which was offered to all Term Loan lenders pursuant to the terms of the Term Loan Facility.  The funds from this loan, which were ultimately upstreamed to fund ordinary-course business operations of the Debtors and their subsidiaries, provided a much-needed injection of capital.

38.     After emerging from the Prior Cases, the Debtors also engaged in employee reduction measures in light of their financial performance and operational needs.  In the fall of 2017, the Debtors reduced their headquarters staff by approximately 170 employees located at the Debtors' corporate headquarters in Topeka.  In the winter of 2018, the Debtors terminated an additional 49 employees in field organization positions.  Between August 2018 and the Petition Date, the Debtors eliminated approximately 37 employees in their finance department and almost

50 employees in their merchandising and design department.  Finally, the Debtors eliminated 65 store leaders and 10 group leaders in certain of their retail locations.

39.    In October 2018, the Debtors also explored opportunities to sell their corporate headquarters located at 3231 S.E. 6th Avenue, Topeka, Kansas.  Following an auction, the Debtors agreed on terms with a proposed buyer and, on December 27, 2018, entered into purchase and sale agreement to sell the headquarters for approximately $2 million.  The purchase and sale agreement also provides the Debtors with a leaseback on a portion of the building, including their data center, dock area, and limited office space, with extensions as needed as the Debtors wind down their North America business.  The sale closed on February 14, 2019 after the requisite consents and releases from the Debtors' lenders were obtained.

**D.    Exploration of Strategic Alternatives and Restructuring Initiatives**

40.    Notwithstanding the measures taken above, Payless was unable to return to profitability under its current business model.  While the Latin America and franchise businesses continued to perform well, the Debtors' North America brick and mortar business suffered from same store sales declines and declining store productivity.  As a result, in December 2018, the Company engaged PJ Solomon, L.P. ("Solomon"), as investment banker to perform a review of the go forward business plan and explore strategic alternatives.  The Company also engaged Ankura, as financial advisor.  Both Solomon and Ankura worked alongside Akin Gump to develop a restructuring strategy for the Company's businesses.

41.    The Company and its advisors analyzed the Company's capital structure and potential alternatives, including the impact of reducing the store footprint in North America to various levels depending on store profitability.  The analysis showed that achieving any profitable North America store base would require meaningful improvements in merchandizing margin, stabilized comparable store sales, and significant capital investment.  However, the Company and

its advisors believed that significant value could be achieved through a reorganization around the Latin America and franchise businesses. As a result, the Company's efforts shifted to preserving the Latin America and franchise businesses while preparing for an orderly wind down of the North America business.

42.    At the same time, the Company has been managing liquidity by making only payments to the merchandise vendors and suppliers that are essential to the Company's operations. Given the significant product volume concentrated among Payless' small group of merchandise vendors abroad, the suppliers have withstood delayed payments for nearly 80 days, and some of them have continued to ship products to Payless in January and February of this year. The suppliers require immediate liquidity to procure the raw materials necessary to meet the Company's product needs for maintaining the Latin America and franchise businesses. To that end, the Company and its advisors have been diligently meeting with vendors and suppliers to work through supply chain issues while limiting disruption to the greatest extent possible.

43.    Beginning in January 2019, the Company commenced discussions with an ad hoc group of Term Loan lenders regarding the possible strategic alternatives including a potential transaction structure that would allow the Company to wind down the North America brick and mortar business through the commencement of these chapter 11 cases while preserving the value of their Latin America and franchise business. Given the relative priorities of the collateral securing the Debtors' indebtedness, it is the Company's view that the Term Loan lenders would be the primary recipient of value as associated with the Latin America and franchise business. For that reason, the Company has been in active discussions with the Term Lender group regarding financing to fund the reorganization efforts around such businesses. As of the commencement of

these chapter 11 cases, the Debtors have not obtained a commitment for such financing, but the Debtors intend to continue such discussions and efforts.

**E.**    **Appointment of Independent Managers**

44.    In January 2019, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of managers of Payless Holdings LLC (the "Board") appointed Patrick Bartels and Scott Vogel to the Board as disinterested directors (the "Independent Managers").  Both of the Independent Managers have extensive experience serving on boards of managers and boards of directors in distressed situations.  The Independent Managers will review and investigate matters regarding any transactions between the Debtors (including their subsidiaries and affiliates) and any related parties and/or insiders and any other matters delegated to the Independent Managers by the Board.  The Independent Managers subsequently retained Seward & Kissel LLP as independent counsel to assist the Independent Managers in their review. The investigation is progressing, and the Independent Managers and their advisors continue their efforts to evaluate applicable matters and transactions.

**IV.**
**The Current Chapter 11 Cases**

**A.**    **Liquidity and Use of Cash Collateral**

45.    Prior to the Petition Date, the events herein caused the Debtors to continue to experience tightening liquidity, leading the ABL Lenders to impose additional reserves under the ABL Credit Facility that affected the Debtors' availability under that facility.  In the weeks leading up to these chapter 11 cases, the Debtors focused their efforts on negotiating terms for the consensual use of cash collateral to fund the Store Closing Sales.  After arms' length and good faith negotiations, the lenders under the ABL Credit Facility and Term Loan Facility agreed to the use of cash collateral while the Debtors wind down the North America business subject to the

terms and conditions set forth in the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing* (the "Cash Collateral Order").[7]

**B.     Store Closing Sales**

46.     As described above, the Debtors, after thoughtfully evaluating all suitable alternatives under the circumstances, made the difficult decision to liquidate and close all stores in North America.  Accordingly, the Debtors and their advisors conducted an extensive evaluation process for selecting a consultant to serve as the Debtors' exclusive consultant in connection with conducting the Store Closing Sales in the North America brick and mortar locations.  The Debtors' evaluation process included, among other things, a formal request for proposals from potential consultants, access to diligence information, and review of recovery assumptions, forecasts and analysis.  The Debtors also engaged Malfitano Advisors LLC to assist the Debtors and their lenders with selecting a consultant and conducting the Store Closing Sales.  The Debtors received proposals from two bidders, a joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC, and a joint venture of Great American Group, LLC and Tiger Capital Group, LLC.  Each of the bidders provided a fee-based proposal and an equity proposal and the Debtors worked with their advisors and creditor constituencies to evaluate the various alternatives.  Under the circumstances, the Debtors, in consultation with their advisors, determined that the fee-based proposal offered by the joint venture composed of Great American Group, LLC

---

[7] For a summary of the terms on which the Debtors have obtained the consensual use of cash collateral, please refer to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing*

and Tiger Capital Group, LLC (together, the "Consultant") provided the best and most competitive proposal to conduct the Store Closing Sales and store closings.[8]

47.    On February 12, 2019, the Debtors and the Consultant entered into the Consultant Agreement attached to the Store Closing Motion, which will govern the terms of the Consultant's engagement (the "Consulting Agreement"). Andrian Frankum, a Senior Managing Director with Ankura, and I were personally involved in negotiations with the Consultant regarding the terms and conditions of the Consulting Agreement, and I believe they were conducted in good faith and at arm's length. The Consulting Agreement will enable the Debtors to use the logistical capabilities, experience, skills, and resources of the Consultant to conduct the Store Closing Sales effectively and efficiently. Based on my experience with liquidation agents and liquidation consulting agreements approved in other retail chapter 11 cases, I believe the terms of the Consulting Agreement are reasonable and market based. I believe that implementing the store closing procedures and conducting the Store Closing Sales at the Debtors' stores in the manner proposed in the Store Closing Motion will provide the best and most efficient means for the Debtors to maximize the value of the Debtors' inventory and other store assets.

48.    Further, I believe that it is in the best interests of the Debtors' estates to assume the Consulting Agreement and formally implement the Store Closing Sales. Prior to the Petition Date, the Debtors commenced "soft sales" as the stores prepared for the launch of the Store Closing Sales. Any delay in consummating the Store Closing Sales would diminish the recovery tied to the monetization of such assets for a number of reasons. Among other things, many of the Debtors' stores fail to generate sufficient positive cash flow to support the required costs of systems, design,

---

[8] For further information regarding the store closure process, *see Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "Store Closing Motion"), filed contemporaneously herewith.

sourcing, merchandising and other corporate costs.  With the Store Closing Sales, however, these stores (and indeed all of the Debtors' stores) will experience increased sales and cash inflows, which will supplement the Debtors' liquidity.  Moreover, the swift and orderly implementation of the Store Closing Sales will allow the Debtors to timely reject the applicable store leases and avoid the accrual of unnecessary administrative expenses for rent payments.    It is also important that the Store Closing Sales coincide with the Easter season, one of the Debtors' key selling periods. In sum, any delay in running the Store Closing Sales could deteriorate the Debtors' asset value and thus creditor recoveries in these cases.

49.     In addition, on February 18, 2019, the Debtors engaged A&G Realty Partners, LLC to serve as their real estate consultant and advisor in connection with these chapter 11 cases to assess potential sale transactions with respect to the Debtors' store leases.

**C.      Reorganization of Latin America and Franchise Businesses**

50.     In parallel with running the Store Closing Sales, the Company will continue to pursue a reorganization involving the Latin America and franchise businesses.  Among other things, these efforts will include:  (a) seeking appropriate financing or other capital investments for the operation efforts associated with the Latin America and franchise businesses; (b) transitioning support services that were previously provided by the North America business to the Latin America and franchise businesses; (c) evaluating the most efficient transaction structures to create a stand-alone Latin America and franchise business; and (d) working with the Company's vendors and suppliers to adjust the supply chain to support the Latin America and franchise efforts. The Debtors believe that a reorganization of these business segments will provide value to the

Debtors' stakeholders while maintaining the Payless brand and preserving the ability for further growth.

**D.    Canadian Proceedings**

51.    In connection with the relief sought in these proceeding, Debtors Payless ShoeSource Canada Inc., ("Payless Canada") and Payless ShoeSource Canada GP Inc., ("Payless Canada GP") will commence proceedings in Canada under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended ("CCAA") by filing an application with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"). Payless ShoeSource Canada LP ("Payless ShoeSource LP" together with Payless Canada GP and Payless Canada, the "Canadian Debtors"), is a partnership and not an applicant in the CCAA proceedings, but the Canadian Debtors will seek to extend the protections of the CCAA proceedings to Payless ShoeSource LP.

52.    The purpose of the proceedings is to request that the Canadian Court authorize the relief required to implement the wind down of the North America business with respect to the Debtors' Canadian operations under the applicable provisions of the CCAA. In addition, the Canadian Debtors will seek the appointment of a Monitor, as required under the CCAA, to report to the Canadian Court regarding, among other things, the CCAA proceedings, the reasonableness of proposed transactions post-filing, the status of payment of post-filing obligations, the Canadian Debtors' conduct of the wind down, and other events arising in the CCAA proceedings. The Monitor will also serve as resource for Canadian stakeholders in the CCAA proceedings. The Debtors will work closely with the Monitor to provide information as required under applicable law.

53.    After the commencement of the CCAA proceedings, the Canadian Debtors will be subject to the laws governing insolvency proceedings in the US and Canada. I have been informed

by Canadian counsel that the CCAA proceedings to be commenced in Canada are not recognition proceedings under Part IV of the CCAA, but plenary proceedings which subject the Canadian Debtors to more fulsome supervision by the Court.  Because the Canadian Debtors' operations and many of their stakeholders are located in Canada, the Debtors, on advice from Canadian counsel, propose that with respect to the Canadian Debtors, in the event of a conflict between an order of this Court and an order of the Canadian Court, the order of the Canadian Court will control.  I am advised by Akin Gump that the language governing a potential conflict between an order of this Court and an order of the Canadian Court in respect only of Canadian debtors in the context of plenary proceedings in both Canada and the U.S., was recently accepted in the cross border case of *In Toy R Us, Inc.*, No. 17- 34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017) [Docket No. 725].  The Debtors expect to work closely with their Canadian counsel and the Monitor to avoid any discrepancy between the U.S. and Canadian orders wherever possible.

**V.**
**Relief Sought in the First Day Pleadings**

54.     Contemporaneously herewith, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to administer efficiently their estates with minimal disruption and loss of value during the store closing and reorganization efforts described herein.  The Debtors request that the relief requested in each of the first day pleadings be granted as critical elements in ensuring the maximization of value of the Debtors' estates.

55.     I have reviewed each of the first day pleadings.  The facts stated therein are true and correct to the best of my information and belief, and the relief sought in each of the first day pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully completing these chapter

11 cases.  A description of the relief requested in and the facts supporting each of the first day

pleadings is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 19, 2019

By:  *Stephen Marotta*
Name:  Stephen Marotta
Title:   Chief Restructuring Officer, Payless
Holdings LLC

# EXHIBIT A

**Evidentiary Support for First Day Pleadings**[1]

---

[1] Capitalized terms used but not defined in this **Exhibit A** shall have the meanings ascribed to them in the *Declaration of Stephen Marotta in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* or the first day pleadings described herein, as applicable.

I.      **Debtors' Motion Seeking Entry of an Order (I) Scheduling an Expedited Hearing on First Day Pleadings Filed by the Debtors, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief (the "<u>Expedited Hearing Motion</u>")**

1.      The Debtors will request entry of an order (a) scheduling an expedited hearing on certain of the First Day Pleadings and (b) approving the First Day Notice.  I believe that expedited relief is essential to maintaining the normal day-to-day operations of the Debtors' business and is necessary to preserve and maximize the value of Debtors' estates.

II.     **Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>")**

2.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

3.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. The entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the U.S. Trustee and all parties-in-interest to monitor these chapter 11 cases with greater ease and efficiency. Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties-in-interest will not be harmed by the relief requested; instead, they will benefit from the cost reductions associated with the joint administration of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties-in-interest.

**III.    Debtors' Motion Seeking Entry of an Order (I) Extending Time to (A) File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (B) Schedule the Meeting of the Creditors and (II) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>")**

4.      Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by forty-six (46) days, for a total of 60 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) authorizing the U.S. Trustee to schedule the 341 Meeting after the 40-day deadline imposed by Bankruptcy Rule 2003; and (c) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3 to the later of:  (i) 30 days after the meeting of creditors to be held pursuant to Bankruptcy Code section 341 or (ii) 45 days from the Petition Date, or to file a motion with the Court seeking a modification of such reporting requirements for cause, without prejudice to the Debtors' ability to request additional extensions.

5.      To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees. Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements. Given the amount of work entailed in completing the Schedules and Statements and the competing

demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.  Accordingly, I believe that cause exists to grant the extensions requested in the Schedules and Statements Extension Motion.

**IV.**   **Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (IV) Granting Related Relief (the "Matrix Motion")**

6.   Pursuant to the Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to:  (i) prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (ii) file a consolidated list of the Debtors' 50 largest unsecured creditors, and (iii) mail initial notices through their Proposed Claims and Noticing Agent; (b) authorizing the Debtors to redact certain personal identification information for individual creditors; (c) approving the form and manner of notifying creditors of commencement of these chapter 11 cases; and (d) granting related relief.

7.   I believe that permitting the Debtors to maintain a single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases.  Specifically, maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties-in-interest and reduce the potential for duplicate mailings. Indeed, many of the Debtors' creditors overlap, and thus, to the extent that the Debtors are required

to maintain separate mailing matrices, a substantial number of parties likely would receive multiple copies of the same notice.

8.        Accordingly, the Debtors, working with the proposed Claims and Noticing Agent, have prepared a single, consolidated list of the Debtors' creditors in electronic format.  To ensure that no parties-in-interest are prejudiced, the Debtors will make their consolidated list of creditors available in readable electronic format to any party in interest who so requests (or in non-electronic format at such requesting party's sole cost and expense).  Accordingly, I submit that the preparation and maintenance of a single consolidated creditor list is warranted under the facts and circumstances present in these chapter 11 cases.

**V.    Debtors' Application for Appointment of Prime Clerk LLC as Claims, Noticing and Solicitation Agent *Nunc Pro Tunc* to the Petition Date (the "<u>Claims Agent Application</u>")**

9.        Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Prime Clerk, LLC as the Claims and Noticing Agent and Administrative for the Debtors in their chapter 11 cases, working under the Office of the Clerk of the Bankruptcy Court's delegation of duties including the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  Given the complexity of these chapter 11 cases, the number of creditors and other parties in interest involved in these chapter 11 cases, and the reasonableness of their rates, I believe that appointing Prime Clerk, LLC as the notice and claims agent in these chapter 11 cases will maximize the value of the Debtors' estates for all its stakeholders.

**VI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using The Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and Books and Records; (II) Authorizing Continued Intercompany Transactions; (III) Granting**

4

**Administrative Expenses Status to Post-Petition Intercompany Payments; and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")**

10.     Pursuant to the Cash Management Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue to operate the Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to maintain business relationships with each other and with non-Debtor affiliates consistent with historical practice.

11.     The Cash Management System is vital to the Debtors' ability to conduct business throughout the United States and in foreign markets.  It helps control funds, serves as a repository for cash receipts, manages cash disbursements, ensures cash availability for each of the Debtors, and reduces administrative expenses by facilitating the movement of funds among multiple entities by centralizing cash operations.  Any disruption of the Cash Management System would have an immediate adverse effect on the Debtors' business and operations to the detriment of their estates and numerous stakeholders, as their business requires prompt access to cash and accurate cash tracking, particularly with respect to global merchandise flows.  In addition, the Debtors' ability to engage in intercompany transactions with each other and with non-Debtor affiliates as well as their ability to make payments on behalf of non-Debtor affiliates subject to the creation of intercompany claims is an important and integral part of the Debtors' ongoing business interests.  Discontinuing the intercompany transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their stakeholders.  Accordingly, to minimize disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases.

12.     As part of their Cash Management System, the Debtors utilize various preprinted and electronic business forms including checks, letterhead, correspondence forms, invoices, purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors should be permitted to use their currently existing Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

13.     I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' businesses. I further believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses as they transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.  By the Cash Management Motion, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order authorizing, but not directing, the Debtors to pay any outstanding prepetition Bank Fees, which the Debtors estimate amount to approximately $200,000, on interim and final bases.

**VII.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and**

**Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>")**

14.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

15.     As of the Petition Date, the Debtors employ: (a) approximately 13,700 individuals in the United States, Puerto Rico, the U.S. Virgin Islands, and Guam and (b) approximately 2,400 individuals in Canada.  The Debtors' employees perform a wide variety of functions critical to the administration of these chapter 11 cases and to preserving operational stability and efficiency.  In many instances, the employees include personnel who are highly trained and cannot be easily replaced. Without the continued, uninterrupted services of the employees, the Debtors' continued operations and ability to conduct going out of business sales will be jeopardized.  Consequently, the relief requested herein is necessary and appropriate.

16.     While the substantial majority of the Debtors' employees are not represented by a labor union, the Debtors are party to two collective bargaining agreements with respect to approximately 80 employees.  With respect to these employees, the Debtors seek authority (but not direction) to continue to provide compensation and benefits in the ordinary course of business and consistent with past practice.  In addition to the aforementioned employees, the Debtors also retain independent contractors and temporary workers from staffing agencies from time to time. These contractors and temporary workers are a critical supplement to the efforts of the Debtors' Employees.

17.     To minimize the personal hardship that the employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor the Employee Compensation and Benefits (as defined in the Wages Motion).  I believe that paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, I believe that without the relief requested herein, employees may seek immediate alternative employment opportunities.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing recoveries for stakeholders.  The loss of valuable employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on liquidating their North America business operations and reorganizing around the remaining portion.  There can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor certain wage, benefits, and related obligations, including certain of the prepetition Employee Compensation and Benefits. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

18.     By the Wages Motion, the Debtors seek entry of an order authorizing the Debtors to pay prepetition amounts outstanding on account of Employee Compensation and Benefits in an aggregate amount not to exceed $19,506,500 on an interim basis.

**VIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Carriers and Warehousemen and (II) Granting Related Relief (the "<u>Critical Vendors Motion</u>")**

19.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition claims held by (a) Critical

8

Vendors and (b) certain Carriers and Warehousemen (each as defined in the Critical Vendors Motion).

20.    As the Store Closing Sales run their course, the Debtors will required the continued cooperation of, and assistance from, their Critical Vendors to wind down their North America brick and mortar business successfully.  To this end, the Critical Vendors that supply services (the "Critical Vendor Services"), particularly with regard to their information technology ("IT") infrastructure, are available only from a limited number of vendors that are able to maintain the Debtors' integrated IT systems.  The Critical Vendor Services provide IT solutions including, among other things, professional services to maintain the Debtors' call center activity for all stores and associates, database and mainframe operations, software licenses and keys, and customer communications regarding promotions.  The Debtors' IT systems run continuously and require regular maintenance and repairs.  In addition, certain of the Critical Vendors provide temporary employment services at (i) the Debtors' distribution centers, where the Debtors' products are processed before being shipped to store locations, and (ii) at the Debtors' corporate headquarters to fill open positions.

21.    With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts, and analyzing applicable law, regulations, and historical practice to understand the Debtors' critical business relationships and suppliers of services—the loss of which would immediately and irreparably harm their business, by, *inter alia,* preventing the Debtors from:  (i) tracking inventory; (ii) distributing their remaining products in the supply chain to store locations and (iii) sending customer communications, all of which are necessary to the success of the Store Closing Sales.

9

22.     The success of the Debtors' Store Closing Sales also depends on the uninterrupted flow of inventory through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' merchandise.  The Debtors engage certain vendors to transport, deliver, and store the Carrier and Warehouse Products.  The Carriers regularly possess the Carrier and Warehouse Products belonging to the Debtors and certain of the Debtors' partners in the course of transporting and delivering the Carrier and Warehouse Products.  The refusal of carriers or warehousemen to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.  Accordingly, I believe cause exists to grant the relief requested in the Critical Vendors Motion.

23.     By the Critical Vendors Motion, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order (i) authorizing, but not directing, the Debtors to pay (a) the Critical Vendor Claims in an aggregate amount not to exceed $5 million and (b) the Carriers and Warehousemen Claims in an aggregate amount not to exceed $6.5 million and (ii) granting related relief.

**IX.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

24.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) prohibiting utility providers from altering, refusing, or discontinuing services; (b) determining

adequate assurance of payment for future utility services; and (c) establishing procedures for determining adequate assurance of payment for future utility services.

25.    In the ordinary course of their business and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telephone, internet, cable, and other similar utility services from approximately 1330 utility providers.  On average, the Debtors pay approximately $2,103,384.77 million each month for the Utility Services, calculated as a historical average over the twelve months ended December 2018.  In the ordinary course of business, the Debtors pay for all utility services through third-party agents, which then pay the Company's utility providers directly for utility services provided to the Company. These third-party utility agents charge a fee for their services.

26.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ability to administer these chapter 11 cases.  It is critical that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

27.    By the Utilities Motion, the Debtors seek entry of the Proposed Interim and Proposed Final order authorizing the Debtors to deposit an aggregate amount of $1,100,000 in the Adequate Assurance Account for the purposes of the Adequate Assurance Procedures.

**X.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Supplement, or Purchase Insurance Policies, and (II) Granting Related Relief (the "Insurance Motion")**

28.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew,

11

supplement, or purchase insurance coverage in the ordinary course of business on a postpetition basis.

29.     In the ordinary course of business, the Debtors maintain approximately 110 domestic and foreign insurance policies (the "Insurance Policies") administered by multiple third-party insurance carriers.  The Insurance Policies provide the Debtors with coverage for, among other things, the Debtors' property, general liability, automobile liability, marine cargo, travel accident, directors' and officers' liability, employment practices liability, fiduciary liability, employed lawyers professional liability, and foreign commercial liability.  In addition, the Insurance Policies include several layers of excess liability coverage and an umbrella policy.

30.     I believe that continuation of the Insurance Policies, payment of the Deductible Fees, Brokerage Fees, and Insurance Administrator Fees (each as defined in the Insurance Motion), and entry into new insurance policies is essential to the preservation of the value of the Debtors' properties and assets.  Further, I believe that continuation of the services of the Brokers and Insurance Administrators is necessary to assure the Debtors' ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, and ensure adequate protection of the Debtors' property postpetition.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

31.     By the Insurance Motion, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order authorizing, but not directing, the Debtors to pay up to $360,000 in Deductible Fees.

**XI.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion")**

32.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay Taxes and Fees accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date.

33.     In the ordinary course of their business, the Debtors collect, withhold, and incur income, sales, use, excise, import, franchise, foreign, and property taxes, as well as business fees (together, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, local, and foreign governmental units, including taxing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed through the financial institutions at which the Debtors maintain the bank accounts that comprise their cash management system.

34.     The Debtors' failure to pay prepetition Taxes and Fees may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' directors, officers, or employees, thereby distracting such key personnel from the administration of these chapter 11 cases.

35.     Although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek to make such payments where:  (a) Taxes and Fees are accrued or incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities;

13

or (d) Taxes and Fees were incurred for prepetition periods but will become due after the commencement of these chapter 11 cases.  I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

36.     By the Taxes Motion, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order authorizing, but not directing, the Debtors to pay Taxes and Fees in an aggregate amount not to exceed $10,285,000 without further relief from the Court.

**XII.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "NOL Motion")**

37.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Payless Holdings LLC's common stock or any beneficial ownership therein, and directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio.*

38.     I understand that the Debtors possess NOLs and certain other Tax Attributes (each as defined in the NOL Motion) that are of significant value to the Debtors and their estates because the Debtors can carry forward such Tax Attributes to reduce future taxable income, thereby reducing their future aggregate tax obligations.  The NOLs are substantial, and I believe that any termination or limitation of the NOLs including during the first month of these chapter 11 cases

14

could cause significant and irreparable damage to the Debtors' estates and stakeholders. As of the Petition Date, the federal NOLs total approximately $231 million and state NOLs total approximately $373 million.

39.     If no restrictions on trading or worthlessness deductions are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs. I believe that the loss of these valuable estate assets could lead to significant negative consequences for the value of the Debtors' estates and for their stakeholders. I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the NOL Motion.

## XIII.   Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue and Renew the Surety Bond Program on an Uninterrupted Basis, and (II) Granting Related Relief (the "<u>Surety Bond Motion</u>")

40.     By the Surety Bond Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to continue and renew the Surety Bond Program on an uninterrupted basis. In the ordinary course of business, certain third parties, including governmental units or other public agencies, require the Debtors to post surety bonds to secure their payment or performance of certain obligations. These obligations relate to, among other things: (a) customs and excise tax obligations; (b) utilities; (c) sales and use tax obligations; and (d) workers' compensation claims. Failure to provide, maintain, or timely replace the Debtors' surety bonds may prevent the Debtors from undertaking essential functions related to their operations.

41.     The Debtors must be able to provide financial assurances to governmental units, public agencies, and other third parties. This, in turn, requires the Debtors to maintain the existing

Surety Bond Program, including: (a) paying Premiums as they come due; (b) providing the Sureties with collateral; (c) renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business; (d) requesting releases from duplicate bonding obligations; (e) canceling, revising, and/or supplementing surety bonds; and (f) executing other agreements in the ordinary course of business, as needed, in connection with the Surety Bond Program.

42.    I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

**XIV.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief (the "Store Closing Motion")**

43.    By the Store Closing Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to assume the Consulting Agreement by and among Payless Holdings, LLC (the "Merchant"), Payless ShoeSource Canada LP (the "Canadian Merchant," and together with the Merchant, the "Merchants") and the contractual joint venture comprised of Great American Group, LLC and Tiger Capital Group, LLC (together, the "Consultant") and (b) authorizing and approving store closings or similarly themed sales in accordance with the Store Closing Procedures, with such sales to be free and clear of all liens, claims, and encumbrances.

44.    The Debtors, with assistance from their financial advisor Ankura Consulting Group, LLC ("Ankura"), and investment banker PJ Solomon, L.P. ("Solomon"), conducted an extensive analysis of the performance, sales, and profitability of all of the retail stores across Payless' North American, Latin American and franchised business segments.  A majority of the Stores have

16

negative sales trends and have failed to meet the performance standards set by the Debtors.  The Debtors therefore determined that commencing the Store Closings was the best way under the circumstances to maximize the value of the Debtors' businesses and assets for their estates and creditors and, accordingly, the Debtors commenced the Store Closing Sales prior to the Petition Date on February 17, 2019 (the "Sale Commencement Date").[1]

45.      The Debtors thereafter engaged the Consultant to assist in liquidating store inventory and associated furniture, fixtures, and equipment and otherwise prepare the stores for turnover to the applicable landlords.  The Debtors have determined that (a) the services of the Consultant are necessary (i) for a seamless and efficient large-scale store closing process and wind down, as is contemplated by this Motion, and (ii) to maximize the value of the assets being sold, and (b) the Consultant is capable of performing the required tasks on favorable financial terms. Therefore, the Debtors seek to assume the Consulting Agreement to allow the Consultant to continue its work uninterrupted.

46.      The Debtors also seek approval of the Store Closing Procedures to sell the Store Closure Assets, in each case free and clear of liens, claims, or encumbrances.  Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, but not limited to, state and local laws, statutes, rules, regulations, and ordinances.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  The Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures without complying with the Liquidation Sale Laws.  Similarly, the Debtors respectfully request a waiver of any contractual

---

[1] For greater certainty, the Sale Commencement Date for any Canadian Stores shall be no earlier than the date on which the Approval Order (as defined in the Consulting Agreement) is granted by the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").

restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings.

47.     The Debtors have determined that, in the exercise of their business judgment and in consultation with their advisors, the Store Closing Procedures provide the best and most efficient means of selling the Store Closure Assets to maximize the value to their estates.  The Consulting Agreement contemplates that the Store Closing Sales will end no later than May 31, 2019.

48.     I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to conduct the Store Closing Sales efficiently for the benefit of all stakeholders.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Store Closing Motion should be granted.

## XV.     Debtors' Motion for an Order Implementing Cross-Border Insolvency Protocol (the "Cross-Border Protocol Motion")[2]

49.     By this Motion, and pursuant to Bankruptcy Code section 105, the Debtors seek entry of an Order approving and implementing a procedural protocol which shall govern matters with respect to any cross-border issues arising from the Debtors' concurrent insolvency proceedings in the United States and Canada.

50.     The Debtors' submit that it is necessary to implement a cross-border protocol between this Court and the Canadian Court to address certain issues that are anticipated to arise in coordinating the Insolvency Proceedings.  The Debtors submit that the relief requested herein is essential, appropriate, and in the best interest of the Debtors' estate, creditors, and all parties in interest, and therefore, should be granted in these chapter 11 cases.  Specifically, the Protocol is

---

[2] Capitalized term not otherwise defined in this section shall have the meaning ascribed to them in the Cross-Border Protocol Motion.

needed to ensure that: (i) the Insolvency Proceedings are coordinated to avoid inconsistent, conflicting or duplicative rulings by the Courts; (ii) all parties in interest are provided sufficient notice of key issues in both Insolvency Proceedings; (iii) the substantive rights of all the parties are protected; and (iv) the jurisdictional integrity of the Courts is preserved. The Protocol is designed to achieve these objectives by implementing a framework of general principles and timing considerations to address the basic administrative and procedural issues arising out of the cross-border nature of the Insolvency Proceedings. Such coordination is essential and should, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort and the possibility of conflicting rulings by the Courts. Accordingly, I respectfully submit that the Court should grant the relief sought in the Cross-Border Protocol Motion.

## XVI. Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief ("Case Management Motion")

51. By this Motion, and pursuant to Bankruptcy Code sections 102(1), 105(a), and 105(d), Bankruptcy Rules 1015(c), 2002(m), 9006, 9007 and 9014 and Local Bankruptcy Rule 9004(C), the Debtors seek entry of the Proposed Order (i) approving and implementing certain notice, case management, and administrative procedures (the "Case Management Procedures"); and (ii) granting related relief.

52. Given the size and complexity of these chapter 11 cases, the Debtors believe that implementing the Case Management Procedures, as more fully set forth in the Case Management Motion, will facilitate the fair and efficient administration of these cases and promote judicial economy. Accordingly, I respectfully submit that the Court grant the relief sought in the Case Management Motion.

19

**XVII. Debtors' Motion for Entry of an Order Granting Leave to Exceed the Page Limitations In Their First Day Pleadings ("Page Limit Motion")**

53.     By this Motion, and pursuant to Bankruptcy Code section 105(a) and Local Rule 9004(C), the Debtors seek entry of an Order authorizing the Debtors to exceed the page limitations of certain First Day Pleadings filed by the Debtors contemporaneously herewith.  Due to the complexity and size of the Debtors' chapter 11 cases, the Debtors submit that an extension of the page limitation is warranted.  Accordingly. I respectfully submit that the Court grant the relief sought in the Page Limit Motion.

## **EXHIBIT B**

**Organizational Chart**



**NOTES:**
1. One share owned by Payless ShoeSource Worldwide, Inc.
2. PSS Investment I, Inc. owns one share in Payless Servicios, S.A. de C.V. and in Payless ShoeSource, S.A. de C.V.
3. Payless ShoeSource Canada GP Inc. General Partner – 0.1% Payless ShoeSource Canada Inc. Limited Partner – 99.9%
4. 2 shares owned by Payless Finance, Inc.
5. Payless ShoeSource Worldwide, Inc – Limited Partner – 1% and Payless Netherlands Holdings, LLC – General Partner – 99%

(A) Gold Value operates PSS gift card activities
(B) PSW is the entrepreneur in supply chain for PSS US – Also holds intellectual property for PSS
(C) Fixed profit as percentage of sales
(D) Compensated at cost plus

**Payless Holdings LLC
Corporate Structure
(Payless International)**



NOTES:
1. One Share owned by Collective Brands Services, Limited
2. 0.0001726892% owned by Collective Brands Logistics, Limited
3. 0.1% owned by Collective Brands Cayman Finance, Limited
4. Payless Asia Sourcing (JV - 2016) – owned 98% by Payless Sourcing, LLC and 2% by Collective Brands Logistics, Limited
5. Payless ShoeSource Worldwide, Inc. – Limited Partner – 1% and Payless Netherlands Holdings, LLC – General Partner – 99%
(C) Fixed profit as percent of sales
(D) Compensated at cost plus
(E) Collective Brands II Coöperatief U.A. owns the Payless South Africa marks and the rights to the Cuban marks

**Payless Holdings LLC**
**Corporate Structure**
**(Payless International)**



NOTES:
1. 0.0001726892% owned by Collective Brands Logistics, Limited
2. One share owned by Payless ShoeSource, Inc.
3. South America Local Partners S.A. – 40% PSS Latin America Holdings – 60%
4. PLP S.A. – 40% Payless CA Management Ltd. – 60%
5. Payless ShoeSource (BVI) Holdings, Ltd. – 98% Payless ShoeSource, Limitada – 2%
6. Payless ShoeSource (BVI) Holdings, Ltd. – 99% Payless ShoeSource, Limitada – 1%
7. Payless ShoeSource (BVI) Holdings, Ltd. – 99.98% Payless ShoeSource, Limitada – .02%
8. Payless ShoeSource (BVI) Holdings, Ltd. – 999 shares Payless ShoeSource, Limitada – 1 share
9. Payless ShoeSource (BVI) Holdings, Ltd. – 99.99% Payless ShoeSource, Limitada – 0.1%
10. Payless Colombia (BVI) Holdings, Ltd. – 60,524,009 quotas Payless CA Management Limited – 1 quota
11. Payless CO Management Ltd. – 60% Patagonia Capital Limited – 30% Pataya Inc., – 10%
12. This entity is owned by Xavier Rosales of our law firm Corral & Rosales
13. Collective Brands Coöperatief U.A. – 99% and Collective Brands II Coöperatief U.A. – 1%
14. Collective Brands Coöperatief U.A. – 99% and is Oscar Brelles Mariño Dicen– 1%
15. Payless ShoeSource Peru Holding, S.L. is a JV entity which is owned 60% by Collective Brands Coöperatief U.A. and 40% by Bluestone Financials Inc.
16. Payless ShoeSource Peru Holding, S.L. owns 9,999 quotas and Collective Brands II Cooperatief U.A.  owns 1 quota
17. Payless International Finance B.V. and its subsidiary, Payless ShoeSource Spain Licensing, S.L., moved under Collective Brands Cooperatieff U.A.
18. 500 shares are owned (250 & 250) by our law firm in trust on behalf of Payless ShoeSource (BVI) holdings, Ltd