**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Case No. 19-40883-659 |
|  | ) Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*, | ) |
|  | ) (Joint Administration Requested) |
| Debtors.[1] | ) |

**DECLARATION OF JOSEPH A. MALFITANO
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
ASSUME THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES
FOR STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF**

I, Joseph A. Malfitano, hereby declare under penalty of perjury:

1. I am the founder and Managing Member of Malfitano Advisors, LLC ("MA"). On or about February 8, 2019, MA was retained by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases, to serve as asset disposition advisors and consultants. Unless otherwise indicated, all facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my discussions with the Debtors' senior management, Ankura Consulting Group, LLC ("Ankura"), my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. With respect to certain taxing authorities, the Debtors' address is 2001 Bryan Street, Suite 800, Dallas, Texas 75201. However, the location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc., 3231 S.E. 6th Avenue, Topeka, Kansas 66607.

operations. If called upon to testify, I would testify competently to all of the facts set forth herein.

2. This Declaration is being submitted in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "Store Closing Motion"), filed contemporaneously herewith.[2] I have reviewed and am familiar with the Store Closing Motion and the relief sought therein.

## QUALIFICATIONS

3. I hold a Bachelor of Science degree from the State University of New York, College at Buffalo and a Juris Doctorate from Temple University School of Law. After graduating from law school in the year 2000, I joined the restructuring practice of Young Conaway Stargatt & Taylor, LLP ("YCST") in Wilmington, Delaware, where the primary emphasis of my practice was on the representation of debtors in chapter 11 proceedings, particularly cases that involved the sale of businesses/section 363 sales.

4. In 2007, I joined Hilco Global ("Hilco") as its in-house global transactional counsel. Hilco is a leading valuation and monetization company for retail inventory, furniture, fixtures and equipment, real estate, accounts receivable and intellectual property. In that role, I documented and closed hundreds of transactions around the globe representing an aggregate asset valuation in excess of ten billion dollars.

5. In 2011, I transitioned from the legal group at Hilco to become a senior business executive for the holding company for all of the Hilco entities (consisting of over 20 businesses during my tenure). In my capacity as an Executive Vice President, I was responsible for sourcing and structuring distressed and non-distressed transactions that involved the investment

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the Store Closing Motion.

2

of capital by all of Hilco's platform companies, including its retail inventory disposition platform company.

6. In January 2016, I founded MA. MA is a boutique firm that provides clients around the globe with asset acquisition and disposition services, particularly in the context of restructurings and reorganizations, both in and out of court. MA helps formulate asset disposition plans for a range of assets, such as retail inventory, real estate, accounts receivable, furniture, fixtures and equipment, and industrial machinery and equipment. Leveraging my experience structuring complex asset acquisition and disposition transactions, both from the sell and buy side, MA assists clients by (i) identifying non-core assets, (ii) formulating a program to dispose of those assets in order to maximize the assets' value, including the preparation of due diligence and related offering materials, (iii) implementing the agreed upon program and assisting in the solicitation and evaluation of disposition proposals, and (iv) monitoring the disposition process to its conclusion.

7. MA or my affiliated law practice Joseph A. Malfitano, PLLC, have been engaged in various capacities, including asset disposition advisors and consultants, in many of the retail restructurings that have occurred since MA was launched in January 2016, including, but not limited to, Toys "R" Us, The Bon-Ton Stores, Gymboree Group, Things Remembered, Charlotte Russe, Heritage Home Group, hhgregg, Golfsmith International and Eastern Mountain Sports/Bob's Stores. Since launching MA and my affiliated law practice, the firm has been involved in over one hundred asset acquisition and disposition transactions representing an aggregate asset valuation in excess of six billion dollars. In addition, prior to launching MA, I personally was involved, either as a lawyer or as a business executive, in some of the largest retail bankruptcies in this country's history, including, but not limited to, Linens 'n Things,

Borders Group, The Sharper Image, Circuit City, Boater's World, and Goody's Family Clothing. I am intimately familiar with the structure and financial and operational metrics that drive a successful retail liquidation and have been involved in the creation and evolution of the various retail liquidation structures and strategies over the course of my career.

### PROCESS TO SELECT AN ASSET DISPOSITION FIRM

8. Upon its engagement, MA reviewed initial proposals from national liquidation firms that had been previously solicited by the Debtors and Ankura and began working with the Debtors' senior management and Ankura to evaluate a potential store closing timeline for its North America brick and mortar stores. Right around the same time period, the Debtors were facing various liquidity issues and were dealing with a series of negative stories that surfaced in the press indicating the Debtors' likely demise.

9. MA worked with the Debtors and Ankura, after consultation with the Debtors' lenders, to resolicit "fee" based liquidation proposals$^3$ from the various national liquidation firms that could handle the disposition project for the Debtors' inventory and owned furniture, fixtures, and equipment in the anticipated closing stores (collectively, the "Assets"). Given the size of the potential transaction, time constraints to commence a liquidation event, and the desire to retain as much of the liquidation upside as possible for the estates, the Debtors, in consultation with MA and the Debtors' lenders, were focused on obtaining the best "fee" based proposal that minimized operational risks as much as possible.

10. The liquidation of all of the Debtors' North America fleet of stores comes during the perfect storm of retail liquidations. The retail liquidation industry is very busy given the widely reported "retail apocalypse" and the liquidation of the Debtors' remaining stores is the

---

[3] A "fee" based structure generally provides for a commission or fee to the liquidation firm in exchange for assisting with the sale of particular asset(s) in addition to reimbursing the liquidation firm for its out of pocket expenses.

largest retail liquidation in U.S. history in terms of number of stores being closed at one time. These market conditions have presented a significant human resource challenge for both the liquidation firms and the Debtors as the liquidation firms do not have unlimited field resources to assist in the operation of the liquidation event. Under any circumstance, it was clear that the success of the liquidation event would be dependent on a combination of resources utilized from the liquidation firms and field leadership resources from the Debtors.

11. In connection with MA's solicitation of proposals, MA contacted the following entities, each of which signed non-disclosure agreements with the Debtors prior to MA's involvement: Gordon Brothers Retail Partners, LLC; Hilco Merchant Resources, LLC; Tiger Capital Group, LLC; and Great American Group, LLC. Additionally, prior to MA's involvement, the following firms submitted bids as joint ventures: Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC ("Hilco/GB") and Tiger Capital Group, LLC and Great American Group, LLC ("Tiger/GA").

12. Late in the day on February 8, 2019, MA sent a request for resubmission of proposals ("RFP") along with a form agreement to the bidding groups, setting the deadline to submit additional materials (the "Bid Deadline") on February 11, 2019. The RFP additionally required each of the bidders to provide a financial model with projected recovery rates, expense budget with breakdown of supervision and advertising, a biography for the lead supervisor that would be assigned to the transaction, a roster of supervisors that would be assigned to the transaction along with description of retail and liquidation experience, and an overview of operating strategy. MA encouraged all bidders to submit any additional materials they wanted the Debtors to consider in making a selection and responded to additional information requests

from the potential bidders. Each of the bidding groups spent considerable time, resources, and effort in evaluating the opportunity; none sought additional time prior to submitting bids.

13. On the Bid Deadline, the Debtors received proposals from the two bidding groups (Hilco/GB and Tiger/GA). Each of the proposals provided a "fee" based structure and the other information required by the RFP. On that same day, MA hosted conference calls with each bidding group to review the materials submitted in response to the RFP (the "Bid Review Calls"). Representatives from the Debtors, MA, Ankura and the Debtors' lenders participated in the Bid Review Calls.

14. When evaluating the proposals, our goal was to select the liquidation firm partner or partners that (a) had realistic views on overall recovery on the Debtors' inventory, (b) had recent experience liquidating specialty footwear retail inventory, (c) would dedicate the best resources to accomplish the Debtors' goals, (d) had familiarity with the Debtors, their inventory systems and operational structure, and (e) had shown the ability to execute a large-scale liquidation on an expedited basis.

15. One bidding group, Tiger/GA, had previously assisted the Debtors in the closing of approximately 600 stores in the prior chapter 11 cases. In light of timeline to launch and execute the transaction, this experience was a critical factor in the selection of Tiger/GA after consultation with the Debtors and their lenders.

16. MA negotiated the fee and expense budget with Tiger/GA for the transaction. These negotiations were arms' length and in good faith between sophisticated parties represented by sophisticated counsel. The Debtors and their lenders and advisors were regularly apprised of the status of these negotiations. Upon being selected, the Debtors, MA, Ankura and Tiger/GA

6

worked around the clock to prepare for a smooth launch of liquidation event, which commenced officially on Sunday, February 17, 2019.

17. In my view, the process that the Debtors engaged in to select a liquidation firm was fair and reasonable under the circumstances, and the consulting agreement executed with Tiger/GA reflects a market rate for transactions of this type given the scope of the transaction. In addition, I am not aware of any facts to suggest that there was any fraud or collusion in connection with the bidding process.

18. Tiger/GA is comprised of two nationally recognized liquidation firms, both have extensive experience in conducting liquidation sales and are best suited to oversee and assist in the management and implementation of the liquidation of the Assets in an efficient and cost-effective manner. The commencement of the sales at the closing stores as soon as possible is imperative to maximize the value of the Assets.

### THE STORE CLOSING PROCEDURES

19. Certain states in which the Debtors operate stores have licensing or other requirements governing the conduct of store closings, liquidation, or other inventory clearance sales, including state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws"). Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the store closing sales. Additionally, many of the Debtors' leases with their landlords restrict the use of "store closing" or similarly themed signage. Absent relief from the Court, such requirements would hamper the Debtors' ability to maximize value in selling their inventory.

20. Prior to the Petition Date, the Debtors' ability to advertise the store closings as "going out of business" sales were limited in some jurisdictions based on Liquidation Sale Laws

or by the terms of the Debtors' leases. Accordingly, the Debtors were forced to use a "soft" message and signage was limited based on the type and amount used to advertise the sale.

21. A very important factor in maximizing value in the context of a store closing sale is the ability to drive a message to the consumer that creates some urgency to purchase. Thus, being able to advertise and use signage that delivers a message such as "going out of business" is important to obtain the necessary consumer traffic to the stores to drive sales. Further, if the Debtors cannot increase sales volume through appropriate advertising, the Debtors may incur additional liabilities, including additional rent costs, to the detriment of their estates.

22. Complying with Liquidation Sales Laws and lease provisions restricting store closing sales will have a significant negative impact on sales at the closing stores and value that the Debtors will be able to generate from the store closing sales. Procedures substantially similar to the Store Closing Procedures have been used in numerous retail chapter 11 cases. The Store Closing Procedures provide a uniform framework for how the store closings will be conducted and afford the Debtors' landlords with a fair and reasonable process to voice their opposition while balancing the Debtors' duty to maximize value of the inventory and fixed assets without delay.

### THE STORE CLOSING INCENTIVE PLAN

23. Additionally, the Debtors are requesting the authority, but not the obligation to pay Store Closing Incentives (the "Store Closing Incentive Plan") to store-level non-insider employees, who remain in the employ of the Debtors during the sales. As mentioned above, the use and cooperation of the Debtors' employees during this liquidation event is imperative to achieving a successful result. I believe that the Store Closing Incentive Plan will motivate employees during the sales and will enable the Debtors to retain those employees necessary to complete the sales successfully.

24. The amount of the incentives offered under the Store Closing Incentive Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the closing store in which the relevant employees work. The Debtors will set the amounts and metrics of the Store Closing Incentive Plan and eligible employees in consultation with MA and the Consultant, who typically utilize such programs to retain employees and incentive them to achieve higher recoveries during store closing sales. Based on the number of closing stores, it is anticipated that the Store Closing Incentives paid will not exceed $8.6 million in the aggregate for all eligible employees.

25. For the foregoing reasons, I respectfully submit that the Court should approve the Store Closing Motion as in the best interests of the Debtors' estates and sound exercise of the Debtors' business judgment.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing and correct to the best of my knowledge and belief.

Dated: February 19, 2019

/s/ *Joseph A. Malfitano*
Joseph A. Malfitano
Malfitano Advisors, LLC