**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19-40883-659 |
| | ) | Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*, | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Related Docket No. 216 |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[1] of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")[2] in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), seeking entry of an interim order (this "**Interim Order**"), and a final order (the "**Final Order**") pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), *inter alia*:

(i)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $25,000,000 (net of original issue discount) (the "**DIP Facility**," and the term loans thereunder, the "**DIP Loans**") pursuant to the terms and conditions of that certain Superpriority Senior Secured Priming Debtor-in-Possession Credit Facility Term Sheet attached hereto as Exhibit A (the "**DIP Term Sheet**") and the

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Motion, the DIP Documents (as defined herein) or the Interim Cash Collateral Order (as defined herein), as applicable.
[2] References in this Interim Order to "Debtors" shall exclude the Payless Canada Entities (as defined below) unless such entities become Guarantors (as defined below) under the DIP Credit Agreement (as defined below). For the avoidance of doubt, the Payless Canada Entities shall not become Guarantors without a further order of the Canadian Court (as defined below).

Superpriority Senior Secured Priming Debtor-in-Possession Credit and Guarantee Agreement to be entered into following entry of this Interim Order (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"[3], by and among Payless Inc., as Borrower (as defined in the DIP Credit Agreement), the Guarantors (as defined in the DIP Credit Agreement) party thereto from time to time (together with the Borrower, the "**DIP Loan Parties**"), the financial institutions party thereto from time to time as lenders (collectively, the "**DIP Lenders**"), and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacity, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**") for and on behalf of itself and the DIP Lenders, providing for the borrowing of delayed draw term loans as follows, in each case subject to the terms and conditions set forth in the DIP Documents (as defined below): (i) one initial draw (the "**Initial DIP Draw**") upon entry of this Interim Order and satisfaction of other requirements set forth in the DIP Term Sheet (the "**Closing Date**"), in an aggregate principal amount equal to $17,000,000 (net of the original issue discount), (ii) an additional draw (the "**Interim DIP Draw**") in an aggregate principal amount of $4,000,000 (net of the original issue discount) on or after March 1, 2019 and following entry into the DIP Credit Agreement, and (iii) an additional DIP Draw (the "**Final DIP Draw**", and together with the Initial DIP Draw and the Interim DIP Draw, collectively, the "**DIP Draws**") in an aggregate principal amount of $4,000,000 (net of the original issue discount) on or after the date of entry of the Final Order;

(ii)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other documentation, including security agreements, pledge agreements, mortgages, guaranties,

---

[3] Prior to entry into the DIP Credit Agreement, all references to "DIP Credit Agreement" shall mean the DIP Term Sheet, and all references to "DIP Documents" shall include the DIP Term Sheet (but exclude the DIP Credit Agreement).  Following execution of the DIP Credit Agreement, such definitions shall no longer include the DIP Term Sheet.

promissory notes, certificates, instruments, and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Documents**"), each of which shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders; and to perform such other acts as may be necessary, desirable or appropriate in connection with the DIP Documents;

(iii)     granting to the DIP Secured Parties allowed superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations (as defined below), and valid, enforceable, non-avoidable and automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, to secure the DIP Obligations, in each case as and to the extent, and subject to the relative ranking and priorities set forth herein;

(iv)     authorizing and directing the Debtors to pay all principal, interest, fees, costs and expenses and other amounts payable under the DIP Documents as such become due, as provided and in accordance therewith;

(v)     vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(vi)     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the Declaration of Stephen Marotta, the Debtors' Chief Restructuring Officer, in support of the Chapter 11 petition and first day motions, the Declaration of Derek C. Pitts in support of the Motion, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d); and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]:

A.    *Petition Date*.  On February 18, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Court**") commencing the Cases.

---

[4] Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

B.      *Debtors in Possession*.   The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      *Committee Formation*.  As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not yet appointed any official committee in the Cases pursuant to Section 1102 of the Bankruptcy Code (each, a "**Statutory Committee**").

E.      *Canadian Proceeding*.  On February 19, 2019, Payless ShoeSource Canada Inc., a Canadian federal corporation ("**Payless Canada**"), Payless ShoeSource Canada GP Inc., a Canadian federal corporation ("**Payless Canada GP**") and Payless ShoeSource Canada LP, an Ontario limited partnership (together with Payless Canada and Payless Canada GP, collectively, the "**Payless Canada Entities**"), obtained protection in Canada under the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c C-36, as amended (the "**Canadian Case**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**").

F.      *Store Closing Sales*. The Debtors have commenced store closures and related dispositions of inventory and other goods at all store locations in North America (the "**Store Closing Sales**") and, in connection therewith, have engaged a joint venture (the "**Liquidation Consultant**") of Great American Group, LLC and Tiger Capital Group, LLC as a consultant to conduct the Store Closing Sales pursuant to that certain Store Closing Program – Consulting Agreement, dated as of February 12, 2019, by and among, *inter alios*, Payless Holdings, LLC

and Payless ShoeSource Canada GP Inc., and the Liquidation Consultant (together with (x) all material documents relating thereto and (y) all exhibits, annexes and schedules thereto, in each case, as amended, restated, supplemented or otherwise modified from time to time, the "**Liquidation Consulting Agreement**").

G.      *Authorization to Use Cash Collateral*.   On February 20, 2019, the Court entered an interim order [Docket No. 138] (the "**Interim Cash Collateral Order**") approving the Debtors' motion seeking the use of the cash collateral of certain of its prepetition secured creditors. The DIP Facility provided under the DIP Documents and this Interim Order constitutes "Permitted DIP Financing" under the Interim Cash Collateral Order.

H.      *Stipulations*.   Subject to paragraph 22 of the Interim Cash Collateral Order, including the reservations in paragraph 22(c), the Debtors' Stipulations set forth in Paragraph G of the Interim Cash Collateral Order are fully incorporated herein by reference, without duplication; *provided*, *however*, that such Debtor Stipulations shall, pursuant to the DIP Documents and to the extent applicable, also be deemed to have been admitted, stipulated, acknowledged and agreed to by each of the Debtors and the Debtors' non-Debtor affiliate Guarantors (collectively, the "**Non-Debtor Guarantors**").

I.      *Findings Regarding Postpetition Financing*.

(i)      Request for Postpetition Financing.   The Debtors seek authority to enter into the DIP Facility on the terms described herein and in the DIP Documents to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing pursuant to the Final Order, which shall be in form and substance acceptable to the Prepetition ABL Agent (whose consent shall not be unreasonably

delayed or withheld), the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement).

(ii)  <u>Priming of the Prepetition Liens</u>.  The priming of the liens of the Prepetition Term Loan Lenders and the Prepetition ABL Lenders (solely as provided herein) under Section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors.

(iii)  <u>Need for Postpetition Financing</u>.  The Debtors have an immediate and critical need to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, preserve the value of their estates.  The ability of the Debtors to maintain business relationships with their vendors, suppliers and customers requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the DIP Facility.

(iv)  <u>No Credit Available on More Favorable Terms</u>.  The DIP Facility is the best source of debtor in possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b)

credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(v)    Use of proceeds of the DIP Facility.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility, the DIP Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used solely in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents.

J.    *Sections 506(c)*.  In light of the DIP Secured Parties' agreement to extend credit to the Debtors on the terms described herein, upon entry of the Final Order, each of the DIP Secured Parties is entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

K.    *Good Faith*.

(i)    Willingness to Provide Financing.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Secured Parties are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and

liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by Section 364(e) of the Bankruptcy Code.

(ii)    _Business Judgment and Good Faith Pursuant to Section 364(e)_.  The terms and conditions of the DIP Facility, DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Entry of this Interim Order is in the best interests of the Debtors, their estates, and their creditors and equity holders.  The terms and conditions of the DIP Facility were negotiated in good faith and at arms' length among the Debtors, DIP Agent, and the DIP Lenders, with the assistance and counsel of their respective advisors. Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties, within the meaning of Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

L.    _Adequate Protection_.  The Interim Cash Collateral Order provides the Prepetition ABL Administrative Agent, for the benefit of itself and the other Prepetition ABL Credit Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the other Prepetition Term Loan Credit Parties with sufficient adequate protection pursuant to Sections 361, 363, 364 and 507(b) of the Bankruptcy Code for any diminution in value of each of their respective interests in the Prepetition Collateral including as a result of, among other things, the priming of the Prepetition Liens by the DIP Liens as provided for herein.

M.      *Notice*. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agents, (i) Choate Hall & Stewart LLP (Attn: Kevin Simard, Doug Gooding and Jonathan Marshall) and (ii) Thompson Coburn LLP (Attn: Mark Bossi); (d) counsel to the FILO Agent, Greenberg Traurig, LLP (Attn: Jeffrey Wolf); (e) counsel to certain Prepetition Term Loan Lenders and DIP Lenders, (i) Kramer Levin Naftalis & Frankel LLP (Attn: Stephen D. Zide) and (ii) Doster, Ullom & Boyle, LLC (Attn: Gregory D. Willard), (f) counsel to certain Prepetition Term Loan Lenders, certain DIP Lenders and the DIP Agent, (i) Stroock & Stroock & Lavan LLP (Attn: Kristopher M. Hansen and Daniel A. Fliman) and (ii) Lewis Rice LLC (Attn: Sonette T. Magnus); (g) counsel to the Prepetition Term Loan Agent, Norton Rose Fulbright US LLP (Attn: Stephen Castro and David A. Rosenzweig); (h) the proposed Monitor, FTI Consulting Canada, Inc.; (i) counsel to the proposed Monitor, Bennett Jones LLP; (j) counsel to any Statutory Committee; (k) the United States Attorney's Office for the Eastern District of Missouri; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the state attorneys general for all states in which the Debtors conduct business; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

N.      *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim

Order, the Debtors' businesses, and estates would be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and stakeholders.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.   <u>Interim Financing Approved</u>.   The Motion is granted on an interim basis in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Documents.   Subject to paragraph 47 hereof, nothing in this Interim Order or any Final Order (collectively, the "**<u>DIP Orders</u>**") shall abridge or impair any rights or remedies existing under the Interim Cash Collateral Order or any Order approving the Cash Collateral Motion on a final basis (the "**<u>Final Cash Collateral Order</u>**" and, together with the Interim Cash Collateral Order, the "**<u>Cash Collateral Orders</u>**") and/or the Existing Intercreditor Agreement.   The DIP Obligations shall be deemed Term Obligations for all purposes under the Existing Intercreditor Agreement.   Without limiting the generality of the foregoing, for the avoidance of doubt, and notwithstanding anything in the DIP Orders to the contrary: (i) the term "Obligations" as defined under the DIP Credit Agreement does not include any of the Prepetition Term Loan Obligations; (ii) any and all rights to exercise any remedies against any Prepetition Collateral and/or DIP Collateral, as set forth in paragraph 20 herein, and any and all rights to enter onto any leased premises to access any Prepetition Collateral and/or DIP Collateral, as set forth in paragraph 36 herein, is subject to the provisions of the Cash Collateral Orders and Existing Intercreditor Agreement; (iii) until the ABL Obligations have been paid in full, in cash, the DIP Secured Parties shall not exercise any rights or remedies, including with respect to the rights and

-11-

remedies set forth in paragraph 20 and paragraph 36 of this Interim Order, with respect to ABL Priority Collateral or Term Loan Priority Collateral that is the subject of the Store Closing Sales; and (iv) until the ABL Obligations have been indefeasibly paid in full, in cash, and notwithstanding anything to the contrary in the DIP Orders or the DIP Documents, the Debtors shall not pay any Obligations, other than interest accruing at the non-default rate under the DIP Facility so long as a Termination Event has not occurred under the Interim Cash Collateral Order, owing to the DIP Secured Parties under the DIP Documents except for proceeds of Term Loan Priority Collateral that is not the subject of the Store Closing Sales.  For the avoidance of doubt, the Debtors are authorized to (i) pay interest accruing at the non-default rate under the DIP Facility from ABL Priority Collateral so long as a Termination Event has not occurred under the Interim Cash Collateral Order, and (ii) pay DIP Lender Professional Fees from the DIP Draws.

2.      Objections Overruled.  All objections to the Motion to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled.

3.      Authorization of the DIP Facility.  The DIP Facility, and the borrowing of the Interim Financing (as defined herein), is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with the DIP Documents and this Interim Order, the principal,

interest, fees, expenses and other amounts described in the DIP Documents as such become due and without need to obtain further Court approval, including, without limitation, original issue discount, administrative agent's fees, the reasonable and documented fees, costs, disbursements and expenses of the DIP Secured Parties' respective attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents, including without limitation delivery of invoices to the Fee Notice Parties (as defined herein) as provided for in paragraph 23 herein. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  For the purposes hereof, the term "DIP Obligations" means all "Obligations" as defined in the DIP Credit Agreement, and shall include, without limitation, principal, interest, all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including any original issue discount and any administrative agent fees), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Documents, provided, however, that the term "Obligations" expressly excludes any obligations under or relating to the Prepetition Term Loan Credit Documents.  Any requirement to obtain a fairness opinion as set forth in Section 5.10 of the Limited Liability Company Agreement for Payless Holdings LLC with respect to negotiation, execution and delivery of, and performance by the Debtors and their subsidiaries of their obligations under, the DIP Facility and the DIP Documents is hereby waived.

4.     <u>Authorization of the Interim Financing</u>.

(a)     To prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Declaration (as defined herein), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, the Borrower is hereby authorized to borrow under the DIP Facility, and the Guarantors are authorized to guarantee such borrowings, in an aggregate outstanding principal amount of not greater than $21,000,000 (net of original issue discount) (the "**<u>Interim Financing</u>**"), incurred pursuant to, and in accordance with, this Interim Order and the DIP Documents.

(b)     In accordance with the DIP Documents, the Interim Financing shall be funded by the DIP Lenders in two draws as follows: (i) the Initial Draw in the amount of $17,000,000 (net of $259,000 in original issue discount) and (ii) the Interim DIP Draw in the amounts of $4,000,000 (net of $61,000 in original issue discount) on or after March 1, 2019, following entry into the DIP Credit Agreement, in each case subject to the terms and conditions set forth in the DIP Documents.  The full principal amount of the Interim Financing (after adding back such original issue discount) shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding upon the drawing of such DIP Draws.

(c)     On the Closing Date, the Initial DIP Draw shall be available prior to entry into the DIP Credit Agreement, following the satisfaction of the "Conditions Precedent to DIP Draws" set forth in the DIP Term Sheet.  Prior to entry into the DIP Credit Agreement, the provisions of the DIP Term Sheet, this Interim Order and any other executed DIP Documents shall govern the parties' rights with respect to the DIP Loans.  As set forth in the DIP Term

Sheet, 100% of the proceeds of the Initial DIP Draw shall be used only to purchase at least $23,000,000 of first cost augment inventory at not less than a 35% discount, which inventory shall consist of first quality, in-season goods, in an appropriate assortment of sizes and colors consistent with the schedule provided by the Debtors to the DIP Lenders and the Prepetition ABL Agents, and which inventory shall constitute ABL Priority Collateral for all purposes and shall be delivered to and available for sale in the Debtors' U.S. stores and/or U.S. distribution center not later than the date that is six weeks after the Petition Date (collectively, the "**Augmentation Inventory**"), and to pay applicable freight, duties and an agent fee as provided for under the Liquidation Consulting Agreement associated therewith; provided that the Debtors may not use the proceeds of the Initial DIP Draw to pay for such Augmentation Inventory until title to such Augmentation Inventory has passed to the Debtors or Collective Brands Logistics Limited.

(d)    Within seven days following the Initial DIP Draw (as such date may be extended by the agreement of the Debtors and the DIP Agent, at the direction of the Required DIP Lenders) (the "**Credit Agreement Deadline**"), the Debtors, the DIP Agent and the DIP Lenders shall enter into the DIP Credit Agreement and related DIP Documents, in each case, in form and substance (x) satisfactory to the DIP Agent and the DIP Lenders, and (y) reasonably satisfactory to the Prepetition ABL Agents.  The Debtors shall file on the docket of these Cases a copy of the executed DIP Credit Agreement within one day following the execution thereof. Upon execution of the DIP Credit Agreement, (i) the DIP Term Sheet shall no longer be in force and effect and (ii) the DIP Credit Agreement will be binding and enforceable against the Debtors, as of the date of the entry of this Interim Order, as if the DIP Credit Agreement was executed upon entry of this Interim Order.  Any actions taken in accordance with the DIP Term

-15-

Sheet will be deemed to have been in taken in accordance with the DIP Credit Agreement or other applicable DIP Documents.  If the DIP Credit Agreement is not executed by the Credit Agreement Deadline, the DIP Facility shall terminate without further notice or Court order (with such event being deemed a DIP Termination Event hereunder).  Upon a DIP Termination Date occurring prior to the execution of the DIP Credit Agreement, the DIP Secured Parties shall, subject to the Remedies Notice Period (as defined herein) and paragraph 1 herein, have all rights and remedies under this Interim Order and under applicable law for a transaction of this type under these facts and circumstances and the Debtors shall not, in any court or other forum, defend against any rights or remedies asserted by the DIP Secured Parties based of the absence of a formal executed credit agreement, security agreement or other ancillary document at the time of the DIP Termination Date.

5.     DIP Obligations.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon entry of this Interim Order, the DIP Obligations will include all loans, obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents but expressly excluding any obligations owed under or relating to the Prepetition Term Loan Credit Documents. The DIP

Loan Parties shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Date (as defined herein). No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under Sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.    <u>DIP Liens</u>.

(a)    To secure the DIP Obligations, upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "**<u>DIP Liens</u>**") on all DIP Collateral (as defined below) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.

(b)    The term "DIP Collateral" shall mean all prepetition and postpetition assets and properties (real and personal) of the DIP Loan Parties, including all "Collateral" as defined in the DIP Credit Agreement, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Loan Parties (including under any trade names, styles, or

derivations thereof), whether owned or consigned by or to, or leased from or to, the DIP Loan Parties, and wherever located including, without limitation, all cash and cash equivalents of the DIP Loan Parties wherever located, inventory, accounts and accounts receivable, other rights to payment, contracts, instruments, documents and chattel paper, all securities (whether or not marketable), goods, equipment, inventory and fixtures, all real and leasehold property interests, general intangibles, patents, copyrights, trademarks, trade names and all other intellectual property, capital stock, investment property, all books and records, commercial tort claims (including, subject to entry of the Final Order, the proceeds of all claims and causes of action arising under Chapter 5 of the Bankruptcy Code) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; provided, however, that the DIP Collateral shall not include any assets or property that is expressly excluded from DIP Collateral under the DIP Credit Agreement; provided, further, however, that DIP Collateral shall include all proceeds and products of such excluded assets or property; provided, further, however, that the Alden BVI Liens (as defined below) on the assets of CA, CO and PSS Latin America Holdings shall, subject to paragraph 48(e) below, be *pari passu* with any liens on such proceeds or products granted to secure the obligations under the DIP Facility. Notwithstanding the foregoing, the DIP Collateral shall not include the Debtors' real property leases but shall include all proceeds of such leases.

(c)     The Debtors shall also, to the extent required by, and subject to the terms and conditions set forth in, the DIP Documents, cause the Non-Debtor Guarantors to grant similar security interests in and liens on the DIP Collateral owned by such Non-Debtor Guarantors.

(d)    To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order.

7.    <u>DIP Lien Priority</u>.

(a)    The DIP Liens securing the DIP Obligations are valid, automatically and properly perfected, non-avoidable, liens on all DIP Collateral, and shall have the following priorities, subject to paragraph 7(b) herein:

(i)    pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a valid, perfected, enforceable and unavoidable lien or security interest in existence as of the Petition Date (the "**Permitted Prior Liens**");

(ii)    a perfected lien on, and security interest in, all DIP Collateral that constitutes ABL Priority Collateral (as defined in the Existing Intercreditor Agreement) including, without limitation, all assets supporting the Store Closing Sales and proceeds thereof (including all North American real estate, inventory and receivables, and all proceeds thereof) (collectively, "**GOB Collateral**"), which DIP Liens shall (a) pursuant to Section 364(c)(3) of the Bankruptcy Code, be junior in priority to (x) Permitted Prior Liens (other than the Prepetition

-19-

Term Loan Liens), (y) the ABL Adequate Protection Lien and (z) the Prepetition ABL Liens; and (b) pursuant to Section 364(d) of the Bankruptcy Code, be priming liens senior in priority to all other liens on such assets, including, without limitation, the Prepetition Term Loan Liens;

(iii)      a perfected lien on, and security interest in, all DIP Collateral that does not constitute ABL Priority Collateral, including, without limitation, any Term Priority Collateral (as defined in the Existing Intercreditor Agreement), all intellectual property and all of the Loan Parties' franchise operations, which DIP Liens shall be (a) pursuant to Section 364(c)(3) of the Bankruptcy Code, be junior in priority to Permitted Prior Liens and (b) pursuant to Section 364(d) of the Bankruptcy Code, priming liens senior in priority to (x) the Prepetition ABL Liens, and (y) the Prepetition Term Loan Liens.

(b)      Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims: (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Cases or any Successor Cases and/or upon the dismissal of any of the Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.  Notwithstanding anything contained in this Interim Order to the contrary, the DIP Liens shall be (a) junior to (x) the Carve-Out (as defined in the Interim Cash Collateral Order as of the date hereof) and (y) the ABL Adequate Protection Liens (as defined in the Interim Cash Collateral Order as of the date hereof) solely with respect to ABL Priority Collateral; and (b) senior to (x) the ABL Adequate Protection

-20-

Liens solely with respect to Term Priority Collateral (the "**Term Priority Collateral Priming Lien**"); provided, however, that the value of the Term Priority Collateral Priming Lien shall not exceed the lesser of (i) the amount advanced under the DIP Facility and (ii) the actual realized value of Augmentation Inventory received in the Debtors' U.S. stores and/or U.S. distribution center (net of any sales tax, commissions owing under the Liquidation Consultant Agreement, and other costs of sale relating to the Augmentation Inventory paid out of ABL Priority Collateral) and less any interest, fees or expenses paid in connection with or related to the DIP Facility out of ABL Priority Collateral, and less such other amounts determined by mutual agreement of the Prepetition ABL Agents and the DIP Agent or ordered by the Court.

(c)     Consent to Priming.  The consent of the Prepetition Term Loan Lenders to the priming by the DIP Liens of their Prepetition Term Loan Adequate Protection Liens and the Prepetition Term Loan Liens are solely with respect to the DIP Facility contemplated herein and shall not be construed as a consent for any other financing or other arrangement that primes the Prepetition Term Loan Adequate Protection Liens or the Prepetition Term Loan Liens.  The Prepetition Term Loan Lenders reserve their rights to contest the priming of the Term Loan Adequate Protection Liens and the Term Loan Prepetition Liens in any manner or by any other party, and reserve all rights under the Prepetition Term Loan Credit Documents.  The Debtors reserve all rights to seek to refinance the DIP Facility with financing on similar terms as the DIP Facility.

8.     DIP Superpriority Claim.  Upon entry of this Interim Order, the DIP Secured Parties are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations: (a) except as set forth

herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law; provided, however, that the DIP Superpriority Claim shall be (x) junior to the Carve-Out (as defined in the Interim Cash Collateral Order as of the date hereof); (y) pari passu with the ABL Adequate Protection Superpriority Claim (as defined in the Interim Cash Collateral Order as of the date hereof); and (z) senior to the Prepetition Term Loan Adequate Protection Superpriority Claim. The DIP Superpriority Claim shall, for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any the proceeds thereof).

9.     Adequate Protection. The Prepetition ABL Agents, for the benefit of themselves and the other Prepetition ABL Credit Parties, and the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Parties, are each entitled to receive adequate protection pursuant to Sections 361, 363, 364 and 507(b) of the Bankruptcy Code for any diminution in value of each of their respective interests in the Prepetition Collateral including as a result of the imposition of the automatic stay, the priming of the Prepetition Liens, including the priming of

the Prepetition Liens by the DIP Liens as provided for herein, the Debtors' use, sale or lease of the Prepetition Collateral, and the subordination of the Prepetition Liens to the Carve Out, each as set forth in this Interim Order and the Interim Cash Collateral Order, which provisions are fully incorporated herein by reference, without duplication.

10.     <u>No Obligation to Extend Credit</u>.   The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent (acting at the direction of the Required DIP Lenders), as applicable, and in accordance with the terms of the DIP Credit Agreement.

11.     <u>Use of Proceeds of DIP Facility; DIP Deposit Account</u>.

(a)     From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the terms and conditions in this Interim Order and the DIP Documents, and in accordance with a budget (a summary of which is attached as <u>Exhibit B</u> hereto), as the same may be amended, supplemented, or otherwise modified from time to time in accordance with this Interim Order and the DIP Documents and any Final Order or with the prior written consent of the DIP Agent (as so amended, supplemented, or otherwise modified from time to time, the "**DIP Budget**"), solely for: (a) the purchase of the Augmentation Inventory and payment of any costs or expenses in connection with the purchase, importation or handling of such Augmentation Inventory (collectively, the "**Inventory Related Expenses**") and (b) payment of all reasonable and documented accrued and unpaid transaction costs, fees and expenses with respect to the DIP Facility, including reasonable and documented costs, fees and

-23-

expenses of professional advisors to the DIP Secured Parties (the purposes set forth in clauses (a) and (b), the "**Permitted DIP Uses**"); provided that Inventory Related Expenses shall be paid solely from proceeds of the DIP Facility, and the proceeds of the DIP Facility shall be used solely to pay such amounts; provided, further, that other than as set forth in the DIP Budget, without the prior written consent of the Prepetition ABL Agents and the Required DIP Lenders, no proceeds of the DIP Loans will be used to make any investment in, or to pay direct expenses, obligations or liabilities of, the Debtors' LatAm Business (as defined in the DIP Documents) or any direct or indirect Subsidiary of Collective Brands Cooperatief U.A.

(b)     The proceeds of the DIP Facility shall be deposited by the Debtors in a segregated deposit account (the "**DIP Deposit Account**") and shall be used solely for the purpose of funding the purchase of the Augmentation Inventory and as otherwise permitted under the DIP Documents.  The funds in the DIP Deposit Account shall not be subject to the Debtors' cash management system until such funds are transferred to the Debtors' Operating Account to fund purchases authorized by the DIP Budget, and the DIP Deposit Account shall not constitute Prepetition Collateral or Post-Petition Collateral (as those terms are defined in the Interim Cash Collateral Order).

12.     Amendment of the DIP Documents.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without further order of the Court if: (a) the amendment, modification, or supplement (i) is in accordance with the DIP Documents, and (ii) does not prejudice the rights of the Prepetition ABL Credit Parties or the Debtors in any material respect; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel to the Prepetition ABL Agents, any Statutory Committee and the U.S. Trustee (together, the "**Notice Parties**"); and (c) the

-24-

amendment, modification or supplement is filed with the Court; *provided, however*, that neither consent of the Notice Parties nor approval of the Court will be necessary to effectuate any non-material amendment, modification or supplement and provided further that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard.

13.    Budget Maintenance.  The use of borrowings under the DIP Facility shall be in accordance with the DIP Budget and the terms and conditions set forth in the DIP Documents. The DIP Budget and any modification to, or amendment or update of, the DIP Budget shall be as set forth in the DIP Documents and, solely to the extent such modification, amendment, or update relates to a use of borrowings other than pursuant to a Permitted DIP Use, subject to the consent of the Prepetition ABL Agents.  Subject to the consent of the Prepetition ABL Agents, the Debtors, the DIP Agent, and the Required DIP Lenders are hereby authorized to modify, amend or update the DIP Budget from time to time in their sole discretion without further notice or order of the Court, underlined provided that counsel for any Statutory Committee, the Prepetition ABL Agents, the U.S. Trustee and FTI Consulting Canada Inc. in its capacity as Monitor of the Payless Canada Entities in the Canadian Case, shall receive notice of such modification, amendment or update.  Prior to entry of the Final Cash Collateral Order, the Prepetition ABL Agents shall consult with the Prepetition Term Loan Agent, AlixPartners, LLP and the DIP Agent to amend the then-current Budget to address changes in receipts.  Upon the payment in full, in cash, of the ABL Obligations, the then-current Budget shall expire and the Debtors shall deliver a new Budget that, subject to the approval by the DIP Agent, shall become the new Budget.

14.    <u>Budget Compliance</u>.  The use of borrowings under the DIP Facility shall be in accordance with the DIP Budget, this Interim Order and the DIP Documents.  Without limiting the foregoing, prior to the execution of the DIP Credit Agreement, the Debtors shall comply with the DIP Budget requirements set forth in the DIP Term Sheet and the Interim Cash Collateral Order.

15.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claim; (b) permit the Debtors to perform such acts as the DIP Agent or the DIP Lenders each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties under the DIP Documents, the DIP Facility and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

16.    <u>Automatic Perfection of DIP Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, filing of Uniform Commercial Code financing statements, mortgages, assignments, notices of lien and similar documents, and entering into any deposit account control agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Secured Parties to the priorities granted herein.

-26-

Notwithstanding the foregoing, the DIP Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, notices and other documents as the DIP Agent may reasonably request.  The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

17.     <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full of all DIP Obligations and the termination of the DIP  Secured Parties' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent or the Prepetition ABL Administrative Agent, as applicable, to be applied in accordance with this Interim Order, the Cash Collateral Orders, and,

as applicable, the DIP Documents or the Prepetition Documents (as defined in the Interim Cash Collateral Order), which shall include the Existing Intercreditor Agreement.

18.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, the Debtors shall, and shall cause the Non Debtor Guarantors to: (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Credit Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court which has first been agreed to by the DIP Agent or as otherwise required by the DIP Documents.

19.    <u>DIP Termination Events</u>.  Each of the following occurrences or events, unless waived by the DIP Agent in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute a termination event under this Interim Order (each, a "**DIP Termination Event**", and the date upon which such DIP Termination Event occurs, the "**DIP Termination Date**"): (i) the occurrence of the maturity date of the DIP Facility; (ii) the date that is 45 days after the entry of this Interim Order, if the Final Order in form and substance satisfactory to the DIP Agent and the Required DIP Lenders has not been entered by the Court by such date; (iii) the failure by the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (iv) the consummation of one or more sales that, in the aggregate, constitute a sale of all or substantially all of the Non-GOB Collateral under Section 363 of the Bankruptcy Code or otherwise; (v) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no earlier than the "effective date" thereof) of any Chapter 11 plan; (vi) the occurrence of an "Event of Default" under, and as defined in, the DIP Credit Agreement; and

-28-

(vii) prior to execution of the DIP Credit Agreement, (A) the breach by the Debtors of any material provision of the DIP Term Sheet or (B) the occurrence of an "Event of Default" set forth on <u>Schedule I</u> attached hereto.

20.     <u>Rights and Remedies Upon a DIP Termination Event</u>.  Subject to the limitations set forth in paragraph 1 herein, immediately upon the occurrence and during the continuation of a DIP Termination Event, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP Agent may declare (any such declaration shall be referred to herein as a "**Termination Declaration**"): (1) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (3) termination of the DIP Facility and the respective DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Statutory Committee (if appointed), counsel to the Prepetition ABL Agents and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders and the Prepetition Credit Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such period, the "**Remedies Notice Period**"): the DIP Secured Parties shall be entitled to exercise their rights and remedies, subject to the terms of the Existing Intercreditor Agreement, in accordance with the respective DIP Documents and this Interim Order, including without limitation, exercising rights of setoff or foreclosing on all or a portion of the DIP Collateral, occupying the Debtors' premises, or a sale or disposition of

the DIP Collateral, and shall be permitted to satisfy the relevant DIP Obligations, DIP
Superpriority Claim and DIP Liens.  During the Remedies Notice Period, the only basis on
which the Debtors and/or the Statutory Committee (if appointed) shall be entitled to seek an
emergency hearing within the Remedies Notice Period with the Court shall be to contest whether
a DIP Termination Event has occurred and/or is continuing and the DIP Lenders shall consent to
such emergency hearing.  Unless during the Remedies Notice Period, the Court determines that a
DIP Termination Event has not occurred, the automatic stay imposed under Section 105 or
362(a) of the Bankruptcy Code or otherwise, as to the DIP Secured Parties, shall automatically
be terminated at the end of the Remedies Notice Period without further notice or order.  Upon
expiration of the Remedies Notice Period, the DIP Secured Parties shall be permitted to exercise
all remedies set forth herein, in the DIP Documents, and as otherwise available at law without
further order of or application or motion to the Court.  Notwithstanding the foregoing, the DIP
Agent shall not exercise any remedies under this Interim Order with respect to ABL Priority
Collateral until the payment in full of the ABL Obligations.  The Debtors shall, and shall cause
the Non-Debtor Guarantors to, cooperate with the DIP Agent in its exercise of rights and
remedies, whether against the DIP Collateral or otherwise.  For the avoidance of doubt, until the
payment in full, in cash of the ABL Obligations, the DIP Secured Parties shall have no right to
exercise any remedies granted under this Interim Order against any ABL Priority Collateral,
including any Prepetition Collateral or DIP Collateral being sold in the Store Closing Sales.

21.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or
Stay of this Interim Order.  The DIP Secured Parties have acted in good faith in connection with
this Interim Order and are entitled to rely upon the protections granted herein and by Section
364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the

record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.    Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

22.    <u>Debtors' Stipulations</u>.    Subject to paragraph 22 of the Interim Cash Collateral Order, including the reservations in paragraph 22(c), the Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest, including, without limitation, any Statutory Committee.

23.    <u>DIP and Other Expenses</u>.    The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees, costs, disbursements and expenses of the DIP Secured Parties in connection with the DIP Facility, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, as set forth herein, in each case, including attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Stroock & Stroock & Lavan LLP, Lewis Rice, LLC, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle LLC, Fasken Martineau DuMoulin LLP, Alix Partners, and Houlihan Lokey  (the "**<u>DIP Lender Professional Fees</u>**").  Payment of the DIP Lender Professional Fees shall not be subject to the DIP Budget and not be subject to allowance by the Court. Professionals for the DIP Secured Parties shall not be required to comply with the U.S. Trustee

fee guidelines and no attorney or advisor to the DIP Agent or DIP Lenders shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Notwithstanding the foregoing, the professionals for the DIP Secured Parties shall deliver a summary of their respective invoices to counsel for the Debtors, any Statutory Committee, the Prepetition ABL Agents and the U.S. Trustee (the "**Fee Notice Parties**"), redacted as necessary with respect to any privileged or confidential information contained therein.  If no objection is raised by any of the Fee Notice Parties with respect to such summaries within ten (10) days of the receipt thereof (the "**Professional Fee Objection Period**") then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Professional Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent or DIP Lenders in connection with or with respect to the DIP Facility are hereby approved in full. Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon the Interim DIP Draw all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Secured Parties incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Documents.

24.     <u>Indemnification</u>.  The Debtors shall, and shall cause the Non-Debtor Guarantors to, indemnify and hold harmless the DIP Secured Parties in accordance with the terms and conditions of the DIP Credit Agreement.

25.    <u>Limitations on Use of DIP Proceeds and Carve-Out</u>.    No DIP Collateral, DIP Loans or the proceeds of the foregoing or any portion of the Carve-Out may be used directly or indirectly by any of the Debtors, the Payless Canada Entities, any Statutory Committee or any trustee or other estate representative appointed in the Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with: (a) preventing, hindering, or delaying the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral; (b) using or selling or otherwise disposing of DIP Collateral without the consent of the DIP Agent; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent and the Required DIP Lenders except to the extent permitted under the DIP Credit Agreement; (d) incurring indebtedness without the prior consent of the DIP Agent and the Required DIP Lenders, except to the extent permitted under the DIP Credit Agreement; (e) seeking authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the DIP Superpriority Claim; (f) seeking to amend or modify any of the rights granted to the DIP Agent or the DIP Lenders, including seeking to use DIP Collateral on a contested basis; (g) objecting to or challenging in any way the DIP Liens, the DIP Obligations, and/or the DIP Collateral, or the Prepetition Liens, the ABL Obligations, Prepetition Term Loan Obligations and/or the Prepetition Collateral or any other claims or liens, held by or on behalf of any of the DIP Agent, the DIP Lenders or the Prepetition Credit Parties; (h) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against the DIP Agent, the DIP Lenders or the Prepetition Credit Parties, or any of their respective affiliates, agents, attorneys, advisors,

professionals, officers, directors and employees; (i) litigating, objecting to, challenging, investigating (including by way of examination or discovery), contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, DIP Liens, the ABL Obligations or the Prepetition Term Loan Obligations, or any other rights or interests of the DIP Agent, the DIP Lenders or the Prepetition Credit Parties;  or  (j) seeking to subordinate, recharacterize, disallow or avoid the DIP Liens, the DIP Obligations, the Prepetition Liens or ABL Obligations or the Prepetition Term Loan Obligations.

26.    <u>Financial Information and Reporting Requests</u>.

(a)    The Debtors shall allow the DIP Agent reasonable access during business hours (but in no event more than once per month) to the premises, officers, employees, auditors, appraisers, financial advisors, and the books and records of the Debtors, upon reasonable advance written notice, in order to conduct appraisals (including, without limitation, the performance of weekly desktop appraisals in form and substance acceptable to the DIP Agent), analyses, and audits of the DIP Collateral, and the Debtors' financial affairs, and shall otherwise cooperate in providing any other financial information reasonably requested by the DIP Agent, all at the cost and expense of the Debtors (other than information (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure is prohibited or restricted by any applicable law or confidentiality restrictions or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product).  The Debtors shall furnish to the DIP Agent such financial and other information as the DIP Agent shall reasonably request.

(b)    The Debtors as and when required under the DIP Documents shall furnish to the DIP Agent each of the financial reports provided for under the DIP Documents.  The

-34-

Debtors shall provide the DIP Agent with all financial reporting provided to the Prepetition ABL Agents under the Interim Cash Collateral Order.

27. <u>Communication with Financial Advisors</u>.  The Debtors authorize the DIP Agent and the DIP Lenders and their respective representatives to communicate directly with PJ Solomon, Ankura Consulting Group, LLC and Malfitano Partners (collectively, the "**<u>Financial Advisors</u>**) and shall instruct the Financial Advisors to communicate to the DIP Agent, the DIP Lenders and their representatives information relating to the Debtors with respect to their business, results of operations, prospects and financial condition.  The Debtors acknowledge and agree that the Debtors and their representatives will reasonably cooperate with the Financial Advisors and any professionals retained by the DIP Agent or the DIP Lenders.  The Financial Advisors shall, together with senior management of the Debtors, participate in weekly telephonic calls with the DIP Agent (and/or their advisors and counsel) and the DIP Lenders to discuss various matters, including, without limitation, the DIP Budget, the Budget, budget variance, Store Closing Sales and bankruptcy milestones upon the reasonable request of the DIP Agent.

28. <u>Disposition of DIP Collateral; Rights of Prepetition Credit Parties</u>.  Unless otherwise authorized by the Court, the Debtors shall not, and shall cause the Non-Debtors Guarantors to not, sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (other than sales and collection of accounts receivables in accordance with the Liquidation Consulting Agreement) other than in the ordinary course of business and the Store Closing Sales without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or DIP Lenders), except as otherwise provided for in the DIP Documents.  Nothing provided herein shall limit the

rights of the DIP Agent or the DIP Lenders to object to any proposed disposition of DIP Collateral.

29.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

30.     <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of each of the DIP Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agent or lenders.

31.     <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

32.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of the Cases, any Successor Case or the Canadian Case, conversion of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans.  Other

-36-

than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties are preserved.

33.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of DIP Secured Parties.

34.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, all other creditors of the Debtors, any Statutory Committee or any other court appointed committee appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Cases, any Successor Case, or upon dismissal of the Cases or any Successor Case.

35.     <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Secured Parties and, until payment in full, in cash of the ABL Obligations, the Prepetition ABL Agents, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the

kind specified in Sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Cases or any Successor Case, equal or superior to the DIP Superpriority Claim; or (b) without the prior written consent of the DIP Agent and, until payment in full, in cash of the ABL Obligations, the Prepetition ABL Agents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens. The Debtors irrevocably waive any right to seek any material amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent and, until payment in full, in cash of the ABL Obligations, the Prepetition ABL Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or the Prepetition ABL Agents, as applicable. Notwithstanding anything to the contrary herein, the consent of the Prepetition ABL Agents that is otherwise required pursuant to this paragraph shall not be unreasonably delayed or withhled.

36.    Access to Prepetition Collateral and DIP Collateral. Subject to the limitations set forth in paragraph 1 herein and subject to the terms of the Existing Intercreditor Agreement, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, exercisable on behalf of the DIP Lenders contained in this Interim Order, the DIP Documents, or otherwise available at law or in equity, subject to the Remedies Notice Period, upon written notice to the landlord of any leased premises that a DIP Termination Event or the DIP Termination Date has occurred and is continuing, the DIP Agent may, subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord and the DIP Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the DIP

Agent shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent calculated on a daily per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded in this paragraph. For the avoidance of doubt, subject to (and without waiver of) the rights of the DIP Secured Parties under applicable nonbankruptcy law, the DIP Secured Parties can only enter upon a leased premises after a DIP Termination Event or the DIP Termination Date, and in any case subject to the Remedies Notice Period, in accordance with (i) a separate agreement with the landlord at the applicable leased premises, or (ii) upon entry of an order of this Court obtained by motion of any of the DIP Secured Parties on such notice to the landlord as shall be required by this Court.

37. <u>Limits on Lender Liability</u>. Nothing in this Interim Order or in any of the DIP Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases. The DIP Agent, and the DIP Lenders shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

38.    Insurance Proceeds and Policies.   Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

39.    Joint and Several Liability.   Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates or a substantive consolidation with any Non-Debtor Guarantor, it being understood, however, that the DIP Loan Parties (including, for the avoidance of doubt, the Non-Debtor Guarantors) shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

40.    Non-Debtor Guarantors.   Any direct or indirect subsidiary of the Debtors that hereafter becomes a debtor in a case under Chapter 11 of the Bankruptcy Code in the Court and is or is required to be a Guarantor (as defined in the DIP Credit Agreement) under the DIP Credit Agreement automatically and immediately, upon the filing of a petition for relief for such Subsidiary, shall be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Interim Order and the Final Order, including, those provisions granting security interests in, and liens on, the DIP Collateral, and DIP Superpriority Claim in each of the Cases, shall, to the extent not already, immediately be applicable in all respects to such subsidiary and its Chapter 11 estate, subject to the terms and conditions of any Cash Collateral Order, the Existing Intercreditor Agreement and this Interim Order.  Within two (2) Business Days of the filing of a petition for relief for any such Subsidiary, the Debtors shall file a

notice with the Court indicating that the subsidiary is a Guarantor under the DIP Credit Agreement.

41.    <u>Payless Canada Entities</u>.  Notwithstanding anything herein to the contrary, none of the Payless Canada Entities, nor their assets or estates shall be subject to any of the DIP Liens, the DIP Superpriority Claim, any DIP Obligations, or any other liens, claims, rights, obligations or interests created or confirmed pursuant this Interim Order.  For the avoidance of doubt, nothing herein shall obviate the need for any consent or approval that may be required from the Canadian Court with respect to any matter relating to any of the Payless Canada Entities or any of their assets.

42.    <u>Waiver of Requirement to File Proofs of Claim</u>.  The DIP Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the DIP Agent on behalf of itself and the DIP Lenders, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the DIP Lenders.  Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the DIP Agent and the DIP Lenders.

43.    <u>Credit Bidding</u>. Subject to the terms of the Existing Intercreditor Agreement, the DIP Secured Parties shall have the right to credit bid for the assets and property of the Debtors and Non-Debtor Guarantors up to the full amount of their DIP Obligations, as provided for in

Section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through Section 363(k) or 1129(b) of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise.

44.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the DIP Term Sheet and the DIP Credit Agreement and/or any other DIP Documents, the provisions of the DIP Credit Agreement and/or any other DIP Documents control. In the event of any inconsistency between the terms and conditions of the DIP Documents and/or this Interim Order, the provisions of this Interim Order shall govern and control.

45.     <u>Discharge</u>.  The DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless (i) such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or (ii) each of the DIP Secured Parties has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) or is otherwise reasonably acceptable to the Required DIP Lenders (a "**Prohibited Plan or Sale**"), without the written consent of each of the DIP Secured Parties.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with

-42-

respect thereto, shall constitute a DIP Termination Event hereunder and under the DIP Documents.

46.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in the Cases; (b) converting the Cases to cases under Chapter 7 of the Bankruptcy Code; (c) dismissing the Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Cases or any Successor Case, provided however that the various superpriority claims or other administrative expenses shall survive only to the extent permitted by applicable law.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties pursuant to this Interim Order or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Case, or following dismissal of the Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been paid in full.

47.     <u>Claims Against Alden Parties</u>. Notwithstanding anything to the contrary, including any provision in the Cash Collateral Orders, any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any Debtor or their chapter 11 estates, as applicable, against any of Alden Global Capital LLC or Alden Global Opportunities Master Fund, L.P. or their current or former affiliates, subsidiaries, member firms, associated entities, shareholders, principals, members, limited partners, general partners, equity investors, managed entities, and their respective attorneys, financial advisors, investment advisors, employees, officers, directors, managers, members, agents and other authorized representatives,

predecessors, successors, and assigns (collectively, the "**Alden Parties**"), whether known or unknown, foreseen or unforeseen, existing as of the Petition Date, in law, equity, or otherwise, that any Debtor or their chapter 11 estates are legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, ownership, sale, transfer or rescission of the purchase, sale or transfer of any debt, security, asset, right, or interest of or in any Debtor, the business or contractual arrangements of any Debtor with the Alden Parties or otherwise, or the extent, validity, priority, perfection, or avoidability of any debt, security, asset, right, or interest of any Debtor owned or assertable by any of the Alden Parties (including, for the avoidance of doubt, equitable subordination of any of the Alden Parties' claims against any of the Debtors) (the "**Alden Claims**") shall be deemed to be conclusively, absolutely, unconditionally, irrevocably released, waived, and discharged upon the expiration of 270 days from the Petition Date (the "**Claim Deadline**") except for (i) claims brought by the Debtors, any statutory committee, or any other party in interest that are commenced in the Bankruptcy Court prior to the Claim Deadline or (ii) claims that are the subject of any motion for standing or authority to pursue the Alden Claims (a "**Standing Motion**") filed by a party in interest (including any Statutory Committee) with the Bankruptcy Court prior to the Claim Deadline, solely with respect to parties in interest that have filed such a Standing Motion.  In addition, the Claim Deadline may be extended prior to its expiration by the Court for good cause shown.  Notwithstanding anything to the contrary, nothing herein shall release any claim against the Debtors or their direct and indirect subsidiaries.

48.     Additional DIP Terms.  The Debtors, the DIP Lenders and the Alden Parties are deemed to agree and the Court hereby orders, the following:

(a)      Although Payless CA Management Ltd ("**CA**") and Payless CO Management Limited ("**CO**") are Delayed Guarantors (as defined in DIP Motion) of the Debtors' obligations under the DIP Facility, subject to paragraph 48(e) below, the DIP Lenders or the DIP Agent will not take any liens or pledges on any equity interests in the direct or indirect subsidiaries of CA and CO (collectively, the "**LatAm JVs**") to secure the DIP Facility. None of the lenders or agents (including the Alden Parties that are party thereto, collectively, the "**CA Lender Parties**") under that certain Term Loan and Guarantee Agreement dated as of October 2, 2018, among Payless CA Management Limited, as Borrower, the guarantors and lenders from time to time party hereto, and Alden Global Opportunities Master Fund, L.P., as agent (the "**CA Credit Agreement**") may take any liens or pledges on any equity interests in the LatAm JVs to secure the obligations of the obligors under the CA Credit Agreement or the documents related thereto.

(b)      Subject to paragraph 48(e) below, neither CA nor CO will grant a lien or pledge on the equity interests in the LatAm JVs or suffer any such lien or pledge to exist on such assets.

(c)      The CA Lender Parties and CA will enter into an amendment to the CA Credit Agreement to include in the CA Credit Agreement a covenant that, subject to paragraph 48(e) below, CA will not grant a lien or pledge on the equity interests it owns in the LatAm JVs or suffer any such lien or pledge to exist on such assets.

(d)      Subject to paragraph 48(e) hereof, the liens granted or to be granted by each of CA, CO and PSS Latin America Holdings (the "**DIP BVI Liens**") to secure the guarantee obligations of such entities with respect to the DIP Facility (the "**DIP BVI Guarantees**") on the assets and properties of such entities on which such entities granted, or may

-45-

in the future grant, liens (the "**Alden BVI Liens**") to any of the CA Lender Parties to secure the obligations under the CA Credit Agreement (the "**Alden BVI Obligations**"), shall be equal and ratable in all respects with the Alden BVI Liens and the DIP BVI Guarantees shall be pari passu in all respects with the Alden BVI Obligations, regardless of and notwithstanding the fact that the DIP BVI Liens shall be issued, filed and perfected later in time than the Alden BVI Liens, and the CA Lender Parties shall enter into such documents and execute such instruments governed by the relevant jurisdictions as may be necessary to effectuate the foregoing.

(e)     Unless waived by Alden Global Capital LLC and its affiliates ("**Alden**") in its sole discretion, in the event that the Final Order is entered by the Bankruptcy Court with language different from paragraph 47 above in a manner adverse to Alden, then (i) paragraph 48(a) above will automatically be null and void without any further order of the Bankruptcy Court or any further action of any person, (ii) the covenants described in paragraphs 48(b) and 48(c) will automatically be null and void without any further order of the Bankruptcy Court or any further action of any person and (iii) the Debtors will undertake commercially reasonable efforts to cause CA and CO to grant pledges on their respective equity interests in the LatAm JVs to secure the Debtors' obligations under the DIP Facility, in each case, on terms and subject to the conditions set forth in the DIP Term Sheet or the DIP Documents (each as defined herein).

(f)     Alden is hereby deemed to have waived any requirement for a fairness opinion as set forth in Section 5.10 of the Limited Liability Company Agreement for Payless Holdings LLC with respect to the negotiation, execution and delivery of, and performance by the Debtors' and their subsidiaries' of their obligations under, the DIP Facility and the DIP Documents.  Alden shall execute and deliver such documentation as may be necessary to effectuate the foregoing waiver.

(g)    The agreements set forth in paragraphs 47 and 48(a)-(d) above will be reflected in the proposed Final Order filed with the Bankruptcy Court.

49.    <u>Credit Ratings</u>. The Debtors shall use commercially reasonable efforts to obtain and maintain public ratings for the DIP Facility from each of S&P and Moody's within twenty (20) days following the Closing Date, with no requirement to maintain any specific minimum rating (it being understood and agreed that "commercially reasonable efforts" shall in any event include the payment by the Borrower of customary rating agency fees and reasonable cooperation with information and data requests by Moody's and S&P in connection with their ratings process).

50.    <u>Final Hearing</u>.   The Final Hearing to consider entry of the Final Order is scheduled for March 14, 2019 at 10:00 a.m. (prevailing Central Time) before the Honorable Kathy A. Surratt-States, Chief United States Bankruptcy Judge, Courtroom 7-North, at the United States Bankruptcy Court for the Eastern District of Missouri located at the Thomas F. Eagleton U.S. Courthouse, 111 South 10th St., 7th Floor, St. Louis, MO 63102.

51.    <u>Notice of Final Hearing</u>:  No later than two (2) Business Days after the date of this Interim Order, the Debtors shall serve a copy of the Interim Order on the Notice Parties and shall file a certificate of service no later than 24 hours after service.

52.    <u>Objection Deadline</u>:  Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the Court, and personally served upon so that such objections are filed with the Court and received by said parties on or before 4:00 p.m. (prevailing Central Time) on March 7, 2019, with respect to entry of the Final Order.

53. <u>Effect of this Interim Order</u>.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED:  February 25, 2019
St. Louis, Missouri
jjh

**Order Prepared By:**

Richard W. Engel, Jr., MO 34641
Erin M. Edelman, MO 67374
John G. Willard, MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-2239
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com
jwillard@armstrongteasdale.com

Ira Dizengoff (*pro hac vice* admission pending)
Meredith A. Lahaie (*pro hac vice* admission pending)
Kevin Zuzolo (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
mlahaie@akingump.com
kzuzolo@akingump.com

Julie Thompson (*pro hac vice* admission pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
julie.thompson@akingump.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Schedule I

An "Event of Default" shall occur if any of the following events shall occur and be continuing; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied (any such event, an "Event of Default"):[1]

the Borrower shall fail to pay any principal of any DIP Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any DIP Loan, any fee or any other amount payable in respect of the DIP Loans within three (3) business days after any such interest or other amount becomes due; or

1.  Holdings or any of its subsidiaries shall default in (i) making any payment of principal of any indebtedness (other than the DIP Loans) having a principal amount in excess of $5,000,000 ("Material Indebtedness"), (ii) making any payment of premium or interest on any Material Indebtedness, in each case of clauses (i) and (ii) beyond the period of grace, if any, provided in the instrument or agreement under which such indebtedness was created or incurred, or (iii) the observance or performance of any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to (x) cause, or to permit the holder or beneficiary of such Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause (determined without regard to whether any notice is required) such Material Indebtedness to become due prior to its stated maturity or (in the case of any such Material Indebtedness constituting a guarantee obligation) to become payable or (y) to cause (determined without regard to whether any notice is required) Holdings or any of its subsidiaries to purchase or redeem or make an offer to purchase or redeem such Material Indebtedness prior to its stated maturity, in each case of clauses (i), (ii) and (iii) unless the exercise of any rights or remedies by a holder of such Indebtedness is subject to the automatic stay in the Cases; or

2.  one or more judgments or decrees (other than a judgment or decree against a Loan Party that is a Debtor entered prior to the Petition Date that is subject to the automatic stay in the Cases) shall be entered against Holdings or any of its subsidiaries involving in the aggregate a liability (not paid or covered by insurance as to which the relevant reputable and solvent insurance company has been notified of the claim and has not denied coverage in writing) of $1,500,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

3.  any guarantee shall cease, for any reason, to be in full force and effect; or

---

[1] This schedule of Events of Default shall apply prior entry into the DIP Credit Agreement. Upon and following entry into the DIP Credit Agreement, this Schedule I shall not longer apply, and the "Events of Default" set forth in the DIP Credit Agreement shall govern. For the avoidance of doubt, the DIP Credit Agreement will contain additional Events of Default that are not included on this Schedule I.

4.  at any time (a) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (as defined in the Existing Credit Agreement), beneficially own, directly or indirectly, more than 50% of the voting interests in Holdings' capital stock (on a fully diluted basis), (b) a "change of control" or similar event occurs under any other Material Indebtedness of Holdings or its subsidiaries (unless the exercise of any rights or remedies by a holder of such Material Indebtedness is subject to the automatic stay in the Cases), (c) any plan for the liquidation or dissolution of the Borrower or any Guarantor is approved by holders of the capital stock of such entity, other than the GOB Sales, or (d) all or substantially all of the assets of any Borrower or Guarantor are sold, leased, transferred or otherwise disposed of, other than in connection with the GOB Sales; or

5.  Chapter 11 Cases.  There shall have occurred any of the following in the Cases:

    (i)  the bringing of a motion or taking of any action, in each case, by any Debtor in the Cases, or the entry of any order by the Court in the Cases: (w) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all DIP Loans and all other DIP Obligations in full in cash on the date of closing of such additional financing; (x) to grant any lien upon or affecting any DIP Collateral; (y) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the DIP Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Agent and the Required DIP Lenders; or (z) that requests or seeks authority for or that approves or provides authority to take any other action or actions adverse to the DIP Agent and the DIP Lenders (each in their capacity as such) or their rights and remedies hereunder or their interest in the DIP Collateral;

    (ii)  the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Debtor which is not an Acceptable Plan;

    (iii)  the entry of an order in any of the Cases confirming a plan or plans of reorganization (or of liquidation) other than an Acceptable Plan;

    (iv)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Term Sheet, the Interim Order, the Interim Cash Collateral Order (or any final order approving the use of cash collateral), the Confirmation Order, the Disclosure Statement Order, the Interim GOB Sales Order or the Final GOB Sales Order in any case without the prior written consent of the DIP Agent and the Required DIP Lenders;

    (v)  the failure to comply with any Milestone, except to the extent such Milestone is extended to a later date with the prior written consent of the Required DIP Lenders;

    (vi)  the payment of, or application by any Debtor for authority to pay, any pre-petition claim without the DIP Agent's and the Required DIP Lenders' prior written consent other than as provided in any "first day order" as set forth in the Approved Budget; provided that the Debtors may prepay the Borrower's ABL facility from the proceeds of the GOB Sales;

2

(vii)   the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Debtor, for an order seeking the appointment of, in either case without the consent of the Required DIP Lenders, an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of any of the Debtors or with the power to conduct an investigation of (or compel discovery from) the DIP Agent or the DIP Lenders; or the sale without the DIP Agent's and the Required DIP Lenders' consent, of all or substantially all of a Debtor's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Cases, or otherwise, in each case, that does not provide for payment in full in cash of the DIP Loans and other DIP Obligations on the closing date of such sale and is otherwise acceptable to the Required DIP Lenders, and in each case other than the GOB Sales;

(viii)   the dismissal of the Cases, or if any Debtor shall file a motion or other pleading seeking the dismissal of the Cases;

(ix)   the conversion of the Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the conversion of the Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)   the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on any DIP Collateral, or (y) with respect to any lien of or the granting of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority;

(xi)   the entry of an order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the DIP Loans or other DIP Obligations;

(xii)   (x) the failure of any Debtor to perform any of its material obligations under the Interim Order, the Final Order, the Interim Cash Collateral Order (or any final order approving the use of cash collateral), the Confirmation Order, the Disclosure Statement Order, the Interim GOB Sales Order, the Final GOB Sales Order or any violation of any of the terms of any of the foregoing or (y) the occurrence of a Termination Event under and as defined in the Interim Cash Collateral Order (or any final order approving the use of cash collateral);

(xiii)   the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under, or any obligations arising under, the Prepetition Debt Documents or securing the DIP Loans;

(xiv)   the remittance, use or application of cash collateral other than in accordance with any cash management procedures and orders entered by the Court;

(xv)   the entry of an order (other than the Interim Order or Final Order) in any of the Chapter 11 Cases granting any other super priority administrative claim or lien equal or superior to that granted to the DIP Agent, on behalf of itself and the DIP Lenders, without the consent in writing of the DIP Agent and the Required DIP Lenders;

(xvi)   the filing of a motion by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the DIP Lenders' claims except to the extent the claim relates to new financing that provides for the repayment of all DIP Loans and other DIP Obligations irrevocably in full in cash on the closing of such new financing and is acceptable to the Required DIP Lenders;

(xvii)   the entry of an order precluding or modifying the DIP Agent from having the right to or being permitted to "credit bid";

(xviii)   any attempt by any Debtor to reduce, set off or subordinate the DIP Loans or other DIP Obligations or the DIP Liens securing the DIP Loans or other DIP Obligations to any other debt;

(xix)   the Interim Order, the Final Order, the Cash Collateral Orders, the Confirmation Order, the Disclosure Statement Order, the Interim GOB Sales Order, the Final GOB Sales Order or any provision thereof (as applicable) is reversed, vacated or stayed, in each case, without the consent of the Required DIP Lenders;

(xx)   except as authorized by any of the Cash Collateral Orders, the payment of or granting adequate protection with respect to any prepetition indebtedness, except as set forth in the Interim Cash Collateral Order (or any final order approving the use of cash collateral), the Interim Order or the Final Order;

(xxi)   the cessation of liens or super-priority claims granted with respect to the DIP Loans or other DIP obligations to be valid, perfected and enforceable in all respects; or

(xxii)   the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies in respect of the DIP Loans or other DIP obligations, the Interim Order, the Final Order, and the DIP Collateral.

## <u>Exhibit A</u>

**DIP Term Sheet**

**PAYLESS HOLDINGS LLC**

**SUPERPRIORITY SENIOR SECURED PRIMING
DEBTOR-IN-POSSESSION CREDIT FACILITY**

**Summary of Proposed Material Terms and Conditions**

This Summary of Proposed Material Terms and Conditions (the "DIP Term Sheet"), dated as of February 25, 2019, sets forth certain terms of the DIP Facility (as defined below), subject to the conditions set forth below, by the DIP Lenders (as defined below). This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the Required DIP Lenders (as defined below) in their sole discretion. This Term Sheet is qualified in all respects by the Interim DIP Order, to which this Term Sheet shall be attached as Exhibit A, and therefore, to the extent that any provision hereof conflicts with the terms of the Interim DIP Order, the Interim DIP Order shall control.

| | |
|---|---|
| **Borrower:** | Payless Inc. (the "Borrower"). |
| **Guarantors:** | (x) Payless Holdings LLC ("Holdings") and each subsidiary of Holdings (other than the Borrower and any Canadian subsidiary of Holdings) that is a debtor in the jointly administered cases under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on February 18, 2019 (the "Petition Date") (collectively, together with the Borrower, the "Debtors") and (y) the Delayed Guarantors (as defined below) (each, a "Guarantor", and collectively, the "Guarantors"); provided, however, that no Delayed Guarantor shall be, or shall be deemed to be, a Guarantor unless and until such Delayed Guarantor shall have executed and delivered a guarantee of the DIP Obligations. |
| | The Debtors shall, (i)(A) in the event that in connection with the entry of the Interim DIP Order the Bankruptcy Court enters an order waiving the requirement for a Fairness Opinion (as defined below) with respect to all Debtors and domestic non-debtor subsidiaries of the Debtors (a "Waiver Order"), within 30 days after the closing date of the DIP Facility (the "Closing Date"), cause each of the entities listed in Part A of Schedule I hereto (each of the entities listed on Part A of Schedule I hereto, collectively, the "Domestic Delayed Guarantors") to become Guarantors of the DIP Loans and the other obligations under the DIP Facility (the "DIP Obligations") or (B) in the event that in connection with the entry of the Interim DIP Order the Bankruptcy Court does not enter a Waiver Order, within 30 days after the receipt by the Debtors of an executed Fairness Opinion (as defined below) or Fairness Waiver (as defined below), cause each of the Domestic Delayed Guarantors to become Guarantors of the DIP Obligations, and (ii) for 30 days after the receipt by the Debtors of an executed Fairness Opinion or Fairness Waiver, use commercially reasonable efforts (and in any event subject to local laws restricting or limiting such guarantees) to cause each of the entities listed in Part B of Schedule I hereto (each of the entities listed on Part B of Schedule I hereto, collectively, the "Foreign Delayed Guarantors," and together with the |

Domestic Delayed Guarantors, the "Delayed Guarantors") to become Guarantors of the DIP Obligations, which such guarantees shall be subject to the priorities set forth in the DIP Orders; provided, however, that the failure of any Delayed Guarantor, after the use of commercially reasonable effort of the Debtors as set forth above, to become a Guarantor or otherwise guarantee the DIP Obligations shall not be a default or event of default under the DIP Facility.

In the event that (i) Payless CA Management Limited ("Payless CA") becomes a Guarantor, (ii) in the reasonable business judgment of the Debtors, the Debtors' Latin America business (the "LatAm Business") has a legitimate need for up to $15 million in principal amount of additional financing (a "LatAm Financing"), (iii) a LatAm Financing is proposed to be incurred by Payless CA and/or any of its subsidiaries, but such entities would only be permitted to incur such debt in accordance with terms of the Term Loan and Guarantee Agreement dated as of October 2, 2018 (the "Existing Payless CA Credit Facility"), among Payless CA Management Limited, as Borrower, the guarantors and lenders from time to time party hereto, and Alden Global Opportunities Master Fund, L.P., as agent, if the guarantees of the DIP Obligations (and the associated liens securing such guarantees) were reduced by an amount equal to such LatAm Financing, (iv) the terms of the LatAm Financing are reasonable in the reasonable business judgment of the Debtors, (v) the LatAm Financing shall be offered in a competitive process in which the DIP Lenders shall be afforded the opportunity to participate, and (vi) the DIP Loans will be afforded the benefit of MFN provisions to the extent the all-in yield applicable to the LatAm Financing (to be calculated in a manner to be agreed) exceeds the all-in yield applicable to the DIP Loans, then the guaranty of Payless CA and any other subsidiary thereof which is a Guarantor (and the associated liens securing such guarantees) shall be automatically reduced to the extent necessary to enable Payless CA and/or its Subsidiaries to incur such LatAm Financing; provided, that, after giving effect to such reduction such entities shall remain liable for at least $10 million in principal amount of the DIP Loans and the other obligations under the DIP Facility.  The Agent and the DIP Lenders agree to take any and all actions, and execute any and all instruments, reasonably necessary to effect the forgoing.

For the avoidance of doubt, none of Payless Colombia (BVI) Holdings Ltd., Payless ShoeSource Andean Holdings, Payless ShoeSource Peru Holding, S.L., Payless ShoeSource Ecuador CIA Ltda, nor any of their respective subsidiaries shall be Guarantors.

| | |
|---|---|
| **Administrative Agent / Collateral Agent:** | Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Lenders (the "Agent"). |
| **DIP Lenders:** | Axar Capital Management LP, Citibank, Invesco, Benefit Street and Octagon and/or one or more of their respective affiliates, related/advised |

2

funds and/or managed accounts and/or designees (collectively, the "DIP Lenders").[1]

| | |
|---|---|
| **Type and Amount of the DIP Facility:** | A debtor-in-possession delayed draw term loan facility (the "DIP Facility", and the term loans thereunder, "DIP Loans") in an aggregate principal amount not to exceed $25.0 million (net of the original issue discount) (the aggregate principal amount of the DIP Lenders' commitments under the DIP Facility, the "Total DIP Commitments"). |

DIP Loans shall, subject to the borrowing conditions set forth herein, in the loan agreement evidencing the DIP Facility (the "DIP Credit Agreement") and in the applicable DIP Order (as defined below), be made in (i) one initial draw (the "Initial DIP Draw") on the Closing Date, in an aggregate principal amount equal to $17 million (net of the original issue discount), (ii) an additional draw (the "Interim DIP Draw") in an aggregate principal amount of $4 million (net of the original issue discount) on or after March 1, 2019, and (iii) an additional DIP Draw (the "Final DIP Draw", and together with the Interim DIP Draw, the "Additional DIP Draws", and the Additional DIP Draws together with the Initial DIP Draw, collectively, the "DIP Draws") in an aggregate principal amount of $4 million (net of the original issue discount) on or after the date of entry of the Final DIP Order (as defined below) in an aggregate amount equal to the remaining principal balance of the Total DIP Commitments.

| | |
|---|---|
| **Interest Rate; Default Rate:** | At all times prior to the occurrence of an Event of Default (as defined below), interest on the DIP Loans shall accrue at a rate per annum equal to the LIBOR Rate (to be defined in a manner consistent with the Existing Credit Agreement[2] and acceptable to the Required DIP Lenders) *plus* 800 basis points per annum (the "Interest Rate"). All interest shall be payable in cash. The borrower shall only be permitted to elect one (1) month LIBOR interest periods. |

Upon the occurrence and during the continuation of an Event of Default, interest on the DIP Loans shall accrue at the Interest Rate plus an additional 200 basis points per annum (the "Default Interest"), which shall be payable in cash on demand.

All interest shall be computed on the basis of a 360-day year for the actual number of days occurring in the period for which such interest is payable.

---

[1] All DIP Lenders shall be part of an ad hoc term loan lender group represented by Kramer Levin Naftalis & Frankel LLP or Stroock & Stroock & Lavan LLP and such DIP Lenders shall be subject to a non-disclosure agreement with the Debtors.

[2] "Existing Credit Agreement" means that certain Term and Loan Guarantee Agreement, dated as of August 10, 2017, among Holdings, Payless Inc., Payless Finance, Inc., Payless Shoesource, Inc. and Payless Shoesource Distribution, Inc., collectively, as borrowers, the several lenders from time to time parties thereto, and Cortland Products Corp., as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date. Capitalized terms used and not defined herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

| | |
|---|---|
| **Original Issue Discount:** | The DIP Loans shall be made with an original issue discount of 1.50% of the aggregate principal amount of such DIP Loans. |
| **Priority and Security under DIP Facility:** | The DIP Obligations shall be secured by perfected liens on and security interest in (the "DIP Liens") all assets and property (real and personal), whether now owned by or owing to, or hereafter acquired by, or arising in favor of the Borrower and the Guarantors that are Debtors, including, after entry of the Final Order, all proceeds of claims and causes of action under Chapter 5 of the Bankruptcy Code (the "Collateral"), with the following priority: |

1. with respect to all Collateral that constitutes ABL Priority Collateral (as defined in the Intercreditor Agreement), including, without limitation, all assets supporting the Debtors' going out of business sales (the "GOB Sales") and proceeds of the GOB Sales (i.e., all North American real estate, inventory and receivables, and all proceeds thereof) ("GOB Proceeds"), such DIP Liens shall be (a) junior in priority to (x) liens on such assets securing the ABL Facility and (y) any enforceable and unavoidable lien or security interest in existence as of the Petition Date (the "Permitted Prior Liens") and (b) senior in priority to all other liens on such assets, including, without limitation, liens securing the Tranche A-1 Term Loans and the Tranche A-2 Term Loans[3]; and

2. with respect to all Collateral that does not constitute ABL Priority Collateral, including, without limitation, any Term Loan Priority Collateral (as defined in the Intercreditor Agreement), including, without limitation, all intellectual property and all of the Debtors' franchise operations, such DIP Liens shall be (a) junior in priority to Permitted Prior Liens and (b) senior in priority to (x) the liens, if any, on such assets securing the ABL Facility and (y) the liens on such assets securing the Tranche A-1 Term Loans and the Tranche A-2 Term Loans (the "Non-GOB Collateral").

The Debtors shall (I)(A) in the event that in connection with the entry of the Interim DIP Order the Bankruptcy Court enters a Waiver Order, within 30 days of the Closing Date, cause each of the Domestic Delayed Guarantors to grant to the Agent a security interest in substantially all of such Domestic Delayed Guarantor's assets and property (real and personal), whether now owned by or owing to, or hereafter acquired by, or arising in favor of such Domestic Delayed Guarantor or (B) in the event that in connection with the entry of the Interim DIP Order the Bankruptcy Court does not enter a Waiver Order, within 30 days after the receipt by the Debtors of an executed Fairness Opinion or a Fairness Waiver, cause each of the Domestic Delayed Guarantors to grant to the Agent a security interest in substantially all of such Domestic Delayed Guarantor's assets and property (real and personal), whether now owned by or owing to, or hereafter acquired by, or arising in favor of such Domestic Delayed

---

[3] Each as defined in the Existing Credit Agreement.

Guarantor and (II) for 30 days after the receipt by the Debtors of an executed Fairness Opinion or Fairness Waiver, use commercially reasonable efforts (and in any event subject to local laws restricting or limiting the grant of such security interests and subject, in the case of any equity interested in joint ventures, the consent of such joint venture parties)[4] to cause each of the Foreign Delayed Guarantors to grant to the Agent a security interest in substantially all of such Foreign Delayed Guarantor's assets and property (real and personal), whether now owned by or owing to, or hereafter acquired by, or arising in favor of such Foreign Delayed Guarantor, including, without limitation, a pledge of all of the equity interests held by the applicable Foreign Delayed Guarantors in Payless Columbia (BVI) Holdings Ltd. and Payless ShoeSource (BVI) Holdings, Ltd. (collectively, the "Non-Debtor Collateral"), with the DIP Liens on Non-Debtor Collateral to be (v) first-priority liens on any assets that are unencumbered, (w) subject to the DIP Orders, with respect to the assets of Payless CA Management Limited (and any equity interests thereof) and Payless CO Management Ltd. (and any equity interest thereof), pari passu with liens on assets securing the Existing Payless CA Credit Facility, (x) senior in priority to liens, if any, on such assets securing the ABL Facility, (y) senior in priority to liens, if any, on such assets securing the Tranche A-1 Term Loans and the Tranche A-2 Term Loans and (z) junior in priority to prior existing non-subordinated liens on such assets; provided, however, that the Non-Debtor Collateral shall not include any Excluded Property (as defined in the Existing Credit Agreement), except that such Non-Debtor Collateral shall include Excluded Equity (as defined in the Existing Credit Agreement) described in (x) clauses (i) and (ii) of such definition and (y) solely with respect to Payless Columbia (BVI) Holdings Ltd. and Payless ShoeSource (BVI) Holdings, Ltd., clause (iii) of such definition (the "Post-Closing Collateral Requirement"); provided, further, that the failure of any Delayed Guarantor, after the use of commercially reasonable effort of the debtors as set forth above, to satisfy the Post-Closing Collateral Requirement shall not be a default or event of default under the DIP Facility.  In furtherance of the foregoing, the Debtors and the Delayed Guarantors shall use commercially reasonable efforts (subject to applicable law) to take all actions reasonably requested by the Agent and the Required DIP Lenders (including, without limitation, providing appropriate legal opinions of local counsel) in connection with the Post-Closing Collateral Requirement.

For the avoidance of doubt, none of the assets or properties of Payless Colombia (BVI) Holdings Ltd., Payless ShoeSource Andean Holdings, Payless ShoeSource Peru Holding, S.L., Payless ShoeSource Ecuador CIA Ltda, or any of their respective subsidiaries shall be subject to the DIP Liens nor shall any of such entities be required to grant liens on or security

---

[4] It being understood and agreed that the use of commercially reasonable efforts with respect to obtaining the consent of any such joint venture partner shall not require the payment of any consent or other fee, the reimbursement of the fees, costs or expenses of legal or other advisors to such joint venture or its partners, the amendment of any organizational or governing documents of such joint venture, or a material change or limitation in the operations of such joint venture.

interests in any of its assets or properties.

**Superpriority DIP Claims:** All of the claims of the DIP Agent and the DIP Lenders on account of the DIP Obligations shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code.

**Chapter 11 Cases Milestones:** The DIP Credit Agreement will include certain milestones (collectively, the "Milestones") related to the Debtors' chapter 11 cases as may be determined by the Required DIP Lenders, including, without limitation (it being understood that, except as provided below, all orders must be reasonably acceptable to the Required DIP Lenders):

1. entry of the Interim DIP Order on or before February 25, 2019, which order must be acceptable to the Required DIP Lenders in their sole discretion;
2. entry of the Final DIP Order on or before the day that is 45 days after the date of entry of the Interim Order, which order must be acceptable to the Required DIP Lenders in their sole discretion;
3. entry of an order approving the GOB Sales on an interim basis on or before February 20, 2019;
4. conclusion of the GOB Sales with respect to substantially all of the assets subject to such sales on or before June 15, 2019;
5. Delivery to the DIP Lenders on or before March 31, 2019, of a transition services plan relating to the operation or sale of the LatAm Business and the Debtors' information technology and intellectual property;
6. filing a motion seeking approval of the disclosure statement to an Acceptable Plan on or before May 3, 2019;
7. entry of an order approving the disclosure statement to an Acceptable Plan on or before May 31, 2019; and
8. entry of an order confirming an Acceptable Plan on or before June 28, 2019.

**Acceptable Plan:** A chapter 11 plan (an "Acceptable Plan") that provides for the repayment in full in cash of the DIP Loans or is otherwise acceptable to the Required DIP Lenders in their sole discretion.

**Conditions Precedent to DIP Draws:** The DIP Credit Agreement will contain usual and customary conditions precedent for transactions of this type and others that are determined to be appropriate by and which are reasonably acceptable to the Required DIP Lenders (in their sole discretion), including, without limitation, the following:

1. (a) as a condition to the Initial DIP Draw, an interim order shall have been entered by the Bankruptcy Court approving the DIP Facility, which order shall be acceptable to the Required DIP Lenders (the "Interim DIP Order"), and shall not have been reversed, modified, amended, stayed or vacated, and (b) as a condition to the Final DIP Draw, a final order entered by the Bankruptcy Court approving the DIP

6

Facility, which order shall be acceptable to the Required DIP Lenders (the "<u>Final DIP Order</u>", and together with the Interim DIP Order, the "<u>DIP Orders</u>")), and shall not have been reversed, modified, amended, stayed or vacated;

2.  as a condition to the Initial DIP Draw, Lenders shall have received a cash flow forecast setting forth all forecasted receipts and disbursements of the Debtors on a weekly basis for the period beginning as of the week of the petition date through the week ending 13 weeks thereafter, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility for such period, which forecast shall be reasonably acceptable to the Required DIP Lenders (the "<u>Initial Budget</u>") (it being understood and agreed that the budget referenced in the Cash Collateral Order (as defined below) shall be deemed to be acceptable to the DIP Lenders and shall deemed to be the Initial Budget for purposes of the DIP Facility; provided that upon the payment in full, in cash, of the ABL obligations, the then-current budget shall expire and the Debtors shall deliver a new budget that, subject to the approval by the DIP Lenders, shall become the Approved Budget);

3.  as a condition to the Initial DIP Draw, the DIP Agent shall have received for the benefit of itself and the DIP Lenders a valid, perfected, enforceable and unavoidable Lien on all of the Collateral owned by the Borrower and each Guarantor, other than the Delayed Guarantors;

4.  as a condition to any DIP Draw, there shall be no default or Event of Default under the DIP Credit Agreement and each of the representations and warranties set forth in the DIP Credit Agreement shall be true and correct in all material respects;

5.  as a condition to any Additional DIP Draw, the aggregate amount of actual receipts of the type included in the line item "Total Receipts" received by the Debtors from the Petition Date to the date of such Additional DIP Draw shall not be less than 80% of the amount set forth under the line item "Total Receipts" in the then Approved Budget;

6.  as a condition to any Additional DIP Draw, receipt by the DIP Lenders of a schedule setting forth the identities of, and the aggregate amounts of cash to be paid from time to time in the chapter 11 cases to, any and all of the Debtors' critical vendors above $50,000 in the aggregate for any such vendor and its Affiliates, which schedule shall be acceptable to the Required DIP Lenders; and

7.  as a condition to the Final DIP Draw, the Augmentation Inventory (as defined below) shall have been delivered to the Debtors in the US.

It is understood and agreed that no legal opinions shall be a condition to the funding of any DIP Draw.

**Maturity:**      All DIP Obligations will be due and payable in full in cash on the earliest of: (i) September 30, 2019; (ii) the date of consummation of one or more sales that, in the aggregate, constitutes a sale of all or substantially all of the Non-GOB Collateral; (iii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone, the date of the applicable Milestone; (iv) the date of acceleration of the DIP Loans and the termination of the DIP Lenders' commitments under the DIP Facility

7

pursuant to the terms of the DIP Credit Agreement; (v) the date the Bankruptcy Court orders the conversion of the chapter 11 case of any of the Debtors to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; (vi) the filing by the Debtors of a proposed chapter 11 plan other than the Acceptable Plan; and (vii) the effective date of a chapter 11 plan of the Debtors (the "Effective Date").

**Optional and Mandatory Prepayments:**

Usual and customary for transactions of this type and others determined to be reasonably appropriate by the Required DIP Lenders, in each case, that are reasonably acceptable to the Required DIP Lenders, including, except as provided herein or in the DIP Credit Agreement, the mandatory prepayment of the DIP Loans, subject to the terms of the Cash Collateral Order, with 100% of the net cash proceeds of any asset sale or debt issuance received by the Borrower or the Guarantors. The Borrower may repay the DIP Loans at any time and from time to time, in whole or in part, without premium or penalty.

**Use of Proceeds:**

Proceeds of the DIP Loans will be used only for the following purposes, in each case, in accordance with and subject to the Approved Budget (as defined below) then in effect: (i) general corporate and working capital purposes; (ii) the payment of restructuring costs; and (iii) the payment of all reasonable and documented accrued and unpaid transaction costs, fees and expenses with respect to the DIP Facility, including reasonable and documented costs, fees and expenses of professional advisors to the DIP Agent and the DIP Lenders; provided, however, that (x) other than as set forth in the Approved Budget, without the prior written consent of the Required DIP Lenders, no proceeds of the DIP Loans will be used to make an Investment in, or to pay expenses, obligations or liabilities of, the LatAm Business or any direct or indirect Subsidiary of Collective Brands Cooperatief U.A., and (y) 100% of the proceeds of the Initial DIP Draw will be used only to purchase at least $23 million of first cost augment inventory at not less than a 35% discount, which inventory shall consist of first quality, in-season goods, in an appropriate assortment of sizes and colors consistent with the schedule provided by the Debtors to the Lenders, and which inventory shall be delivered to and available for sale in the Debtors' U.S. stores and/or U.S. distribution center not later than the date that is six weeks after the date that the Debtors file their bankruptcy petitions (collectively, the "Augmentation Inventory"), and to pay applicable freight, duties and an agent fee as provided for under the consulting agreement with the liquidators associated therewith; provided, that the Debtors may not use the proceeds of the Initial DIP Draw to pay for such Inventory until title to such Inventory has passed to the Debtors or Collective Brands Logistics Limited.

**Representations and Warranties:**

Usual and customary for transactions of this type and others determined to be reasonably appropriate by the Required DIP Lenders, in each case, that are reasonably acceptable to the Required DIP Lenders.

**Affirmative and Negative Covenants:**

Usual and customary for transactions of this type and others determined to be reasonably appropriate by the Required DIP Lenders, in each case, that

8

are reasonably acceptable to the Required DIP Lenders, including, without limitation:

1. The Debtors shall use commercially reasonable efforts for 15 business days after the Closing Date to obtain a fairness opinion with respect to the DIP Facility that satisfies the requirements set forth in the organizational documents of Holdings (the "Fairness Opinion"), unless such requirements with respect to the DIP Facility are waived in accordance with the terms of the organizational documents of Holdings as set forth in the DIP Orders (the "Fairness Waiver").

2. delivery of weekly budget updates (including to reflect GOB Sales) to the Initial Budget, with variance reports (together with the Initial Budget, each, an "Approved Budget") (it being understood and agreed that the budget referenced in the Cash Collateral Order (as defined below) shall be deemed to be acceptable to the DIP Lenders and shall deemed to be the Approved Budget for purposes of the DIP Facility; provided that upon the payment in full, in cash, of the ABL obligations, the then-current budget shall expire and the Debtors shall deliver a new budget that, subject to the approval by the DIP Lenders, shall become the Approved Budget);

3. limitations on variances from the Approved Budget on disbursements and receipts, which limitations (including any permitted variances) and the line items of such Approved Budget tested in connection therewith, and the frequency and periods of such testing, shall be identical to such limitations and budget testing set forth in the Cash Collateral Order;

4. subject to exceptions to be agreed in the definitive documentation (which such exceptions shall be acceptable to the Required DIP Lenders), the Debtors may not incur any Indebtedness (provided that the DIP Credit Agreement shall contain an exception for up to $15 million of Indebtedness at the LatAm Business), grant any lien, make any Investment, Dispose of any property (except in the GOB Sales), make any payment or distribution in respect of any prepetition claim or liability or on account of any of its capital stock, including to any critical vendors or in respect of any critical vendor program, or permit any direct or indirect Subsidiary of Collective Brands Cooperatief U.A. to incur any Indebtedness or grant any Lien, or, in each case, enter into any agreement to do any of the foregoing, in each case without the prior written consent of the Required DIP Lenders;

5. the Debtors shall consult with the DIP Lenders in pursuit of and in connection with any sale of the Debtors' interests in the LatAm Business, including as to the marketing process and the terms and conditions of the marketing process and the sale;

6. weekly budget update conference calls among the DIP Lenders and Ankura Consulting;

7. other than as set forth in the Approved Budget, the Debtors may not enter into any Affiliate Transaction involving aggregate

       payments or consideration of more than $1 million, except with the prior written consent of the Required DIP Lenders;

8.    within seven days of the Initial DIP Draw or such later date as agreed to by the Debtors and the Required DIP Lenders, the Debtors, the DIP Agent and the DIP Lenders shall enter into a credit agreement and related loan documents, in each case, in form and substance satisfactory to the DIP Agent and the DIP Lenders;

9.    except as set forth in the Cash Collateral Order, after payment in full of the ABL Facility, all GOB Proceeds shall be deposited into a segregated deposit account subject to the control of the collateral agent and held in trust for the benefit of the DIP Lenders to fund (x) the repayment of all DIP Loans on the Effective Date or (y) at the direction of the Borrower, the voluntary prepayment of the DIP Loans; and

10.  subsequent to borrowing any DIP Loans but prior to using the proceeds thereof, the Borrower shall hold such funds in a segregated account, which shall not be subject to the Liens or claims of any Person other than the DIP Lenders (other than the liens of the depository bank at which such account is held).

| | |
|---|---|
| **Events of Default and Remedies:** | Usual and customary defaults and events of default (each, an "<u>Event of Default</u>") for transactions of this type and others determined to be reasonably appropriate by the Required DIP Lenders, in each case, that are acceptable to the Required DIP Lenders, including, without limitation, certain Events of Default arising from non-compliance with the Milestones. |
| **Required DIP Lenders:** | DIP Lenders holding at least a majority of the commitments and the aggregate outstanding principal amount of the DIP Loans, and including at least two DIP lenders who are not affiliates of each other.  Except as to customary "sacred rights" requiring the consent of all DIP Lenders or all affected DIP Lenders under the DIP Facility documents, amendments and modifications to the DIP Credit Agreement and other related loan documents will be subject to the consent of Required DIP Lenders. |
| **Professional Fees:** | All then reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements and expenses of the DIP Agent and the DIP Lenders (including, without limitation, the reasonable and documented fees, costs and expenses of their respective legal counsel (including, for the avoidance of doubt, the fees, costs and expenses of Stroock & Stroock & Lavan LLP and Kramer Levin Naftalis & Frankel LLP) and financial advisors (including, for the avoidance of doubt, the fees, costs and expenses of Houlihan Lokey Capital, Inc. and AlixPartners, LLP) shall be paid upon entry of the DIP Orders and thereafter on a monthly basis. |
| **Assignments**: | The DIP Lenders shall be permitted to assign DIP Loans with the consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned); provided that such consent of the Borrower shall not be required (x) if such assignment is made to (i) another DIP Lender or an affiliate or approved fund of any such DIP Lender or (ii) any lender under the Existing Credit Agreement as of the Closing Date or an affiliate or |

approved fund of any such lender or (y) during the continuation of an Event of Default.

SCHEDULE I

**DELAYED GUARANTORS**

<u>Part A</u>
Collective Brands International Franchising, LLC
Collective Indonesia Franchising, LLC
Payless India Franchising, LLC
Payless Netherlands Holdings LLC
Payless Sourcing LLC

<u>Part B</u>
Payless CA Management Limited
PSS Latin America Holdings
Payless CO Management Ltd.
Payless Netherlands B.V.
PSS Global Holdings C.V.
Collective Brands Cooperatief U.A.
Collective Franchising, Ltd.
Dynamic Assets Limited
PSS International Holdings Limited

## <u>Exhibit B</u>

**DIP Budget**

Payless
DIP Budget
($ in 000's)

| 4-5-4 Month | Feb | Mar | Mar | Mar | Mar | Mar | Apr | Apr | Apr | Apr | May | May | May | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 3/1/2019 | 3/8/2019 | 3/15/2019 | 3/22/2019 | 3/29/2019 | 4/5/2019 | 4/12/2019 | 4/19/2019 | 4/26/2019 | 5/3/2019 | 5/10/2019 | 5/17/2019 | 5/24/2019 | Total 13 Week |
| Forecast Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Forecast/Actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total 13 Week |
| **I. Cash Flow** | | | | | | | | | | | | | | |
| **1 Receipts** | | | | | | | | | | | | | | |
| 2 GOB Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 3 Sales Tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 Canada / Latin / Franchise | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5 Total Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **6 Operating Disbursements** | | | | | | | | | | | | | | |
| 7 Merchandise / Freight / Duty | $ (18,083) | $ - | $ - | $ - | $ (2,765) | $ - | $ - | $ (1,831) | $ (2,321) | $ - | $ - | $ - | $ - | (25,000) |
| 8 Payroll & Benefits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9 Occupancy | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 Other Operating Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 11 Total Operating Disbursements | $ (18,083) | $ - | $ - | $ - | $ (2,765) | $ - | $ - | $ (1,831) | $ (2,321) | $ - | $ - | $ - | $ - | (25,000) |
| 12 Total Operating Cash Flow | $ (18,083) | $ - | $ - | $ - | $ (2,765) | $ - | $ - | $ (1,831) | $ (2,321) | $ - | $ - | $ - | $ - | (25,000) |
| **13 Financing** | | | | | | | | | | | | | | |
| 14 ABL Debt Service | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 15 ABL Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 16 DIP Debt Service | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 Total Financing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| 18 Total Free Cash Flow | $ (18,083) | $ - | $ - | $ - | $ (2,765) | $ - | $ - | $ (1,831) | $ (2,321) | $ - | $ - | $ - | $ - | (25,000) |
| **19 Restructuring Disbursements** | | | | | | | | | | | | | | |
| 20 Restructuring Prof Fees / Escrow | (500) | - | (500) | - | - | - | - | - | - | - | - | - | - | (1,000) |
| 21 ABL Pre-Petition Indemnity Acct | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 22 Severance / WARN Act | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23 Agency Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 24 Liquidator Expenses | - | - | - | (6) | (18) | (29) | (35) | (30) | (40) | (28) | (22) | (17) | (13) | (238) |
| 25 Store Employee Incentive Bonus | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 26 Retention / KEIP / KERP | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 27 Critical Vendor Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 28 Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 29 First Day Motion Freight | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 30 First Day Motion Sales Tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 31 Total Restructuring Disbursements | $ (500) | $ - | $ (500) | $ (6) | $ (18) | $ (29) | $ (35) | $ (30) | $ (40) | $ (28) | $ (22) | $ (17) | $ (13) | (1,238) |
| 32 Net Cash Flow | $ (18,583) | $ - | $ (500) | $ (6) | $ (2,783) | $ (29) | $ (35) | $ (1,861) | $ (2,361) | $ (28) | $ (22) | $ (17) | $ (13) | (26,238) |
| **33 Liquidity** | | | | | | | | | | | | | | |
| 34 Cash Schedule | | | | | | | | | | | | | | |
| 35 Beginning Cash Balance | $ - | $ 2,417 | $ 2,417 | $ 1,917 | $ 1,911 | $ 3,128 | $ 3,099 | $ 3,064 | $ 1,203 | $ (1,158) | $ (1,186) | $ (1,208) | $ (1,225) | - |
| 36 Net Cash Flow | (18,583) | - | (500) | (6) | (2,783) | (29) | (35) | (1,861) | (2,361) | (28) | (22) | (17) | (13) | (26,238) |
| 37 DIP - Draw / (Paydown) | 21,000 | - | - | - | 4,000 | - | - | - | - | - | - | - | - | 25,000 |
| 38 Ending Cash Balance | $ 2,417 | $ 2,417 | $ 1,917 | $ 1,911 | $ 3,128 | $ 3,099 | $ 3,064 | $ 1,203 | $ (1,158) | $ (1,186) | $ (1,208) | $ (1,225) | $ (1,238) | (1,238) |
| **DIP Schedule** | | | | | | | | | | | | | | |
| 39 Beginning Balance | $ - | $ 21,320 | $ 21,320 | $ 21,320 | $ 21,320 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | 25,381 |
| 40 Draw | 21,000 | - | - | - | 4,000 | - | - | - | - | - | - | - | - | 25,000 |
| 41 Original Issue Discount | 320 | - | - | - | 61 | - | - | - | - | - | - | - | - | |
| 42 (Paydown) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 43 Ending Balance | $ 21,320 | $ 21,320 | $ 21,320 | $ 21,320 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | $ 25,381 | 25,381 |