**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Case No.: 19-40883-659 |
| | ) Chapter 11 |
| PAYLESS HOLDINGS LLC., *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hearing Date:  March 28, 2019 |
| | ) Hearing Time:  10:00 a.m. (CT) |
| | ) Hearing Location:  Courtroom 7 North |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY AND (IV) SCHEDULING A FINAL HEARING <u>AND</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Payless

Holdings, LLC, *et al.* (the "<u>Debtors</u>") hereby objects (the "<u>Objection</u>") to the:

- *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* [Docket No. 61] (the "<u>Cash Collateral Motion</u>") and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [Docket No. 216] (the "<u>DIP Motion</u>," and together with the Cash Collateral Motion, the "<u>Motions</u>").

In support of its Objection, the Committee respectfully represents as follows:

# I. <u>INTRODUCTION</u>

1.      The Motions should be denied.  After a failed reorganization under the protections of this Court, the lenders and Alden are seeking to again use the protections of this Court and to deplete assets that would otherwise be available to pay unsecured creditors to maximize their recovery in a liquidation.  If the Lenders and Alden want to use this Court's powers to run their foreclosure sale, they need to pay the freight of the Bankruptcy Case - ALL THE FREIGHT - not just the expenses that they pick and choose.  As is set for below, any financing or use of cash collateral should require, among other things, that all administrative claims are assured payment and should not permit the lenders to assert liens and claims on the valuable unencumbered assets that may be the most significant source of recovery for unsecured creditors.

2.      The Debtors have ceased operations in North America, and over 2,000 retail stores are being liquidated and closed through going-out-of-business (GOB) sales.  The proceeds of the GOB sales are projected to be sufficient enough to pay off $195 million outstanding under the ABL facility and the $25 million proposed to be borrowed under the post-petition DIP financing facility in full.  Indeed, as the GOB sales are proceeding faster than expected, while the ABL Obligations[1] were originally proposed to be paid in full by April 26, 2019, the full payoff of the ABL Obligations may occur sooner based on Debtors' counsel's statements at the March 14, 2019 hearing.

---

[1] Terms not defined herein have the meaning ascribed to them in the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 (1) Authorizing Use Cash Collateral, (2I) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing* [Docket No. 138] (the "<u>Interim Cash Collateral Order</u>") or the *Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 265] (the "<u>Interim DIP Order</u>"), as applicable.

3.      The Debtors also owe over $277 million to their Prepetition Term Loan Lenders.  Although the Prepetition Term Loan Lenders are benefitting substantially from the GOB sales, the proceeds are not expected to be sufficient to pay off the Prepetition Term Loan Obligations in full.  *See* Budget (ending projected cash balance of $30.1 million) [Docket No. 138 at p. 68]  Therefore, the Term Lenders must look to the Debtors' interests in their Latin American business, franchise business, and intellectual property assets for the majority of their recovery, which may or not be adequate to pay off their debt in full.

4.      The Debtors filed these cases owing unsecured creditors consisting primarily of vendors and suppliers approximately $225 million.  [Docket No. 22 at ¶ 25]  Given the Debtors' liquidation of all North American stores, unless there are interested parties for the lease locations, the size of the general unsecured claims pool will increase by hundreds of millions more due to lease rejection damages claims.

5.      The only assets that may realistically be available for a distribution to general unsecured creditors in these cases are the unencumbered assets as they existed on the Petition Date, which include commercial tort claims, avoidance actions, and unencumbered portions of the Latin American and franchise businesses, which the Committee believes to be significant.  Through the Cash Collateral Motion, the Debtors propose to provide adequate protection liens on all unencumbered assets as well as super-priority claims that can be paid from the proceeds of such assets, in favor of the Prepetition Credit Parties (which includes both the Prepetition ABL and Term Loan Lenders) for diminution in value.  The adequate protection liens and super-priority claims for diminution of value allow the Prepetition Credit Parties to make a blatant land grab for the unencumbered assets by arguing that the significant costs (including the

3

chapter 11 professional fees) of the GOB liquidation of the money losing North American operations are by definition creating a diminution of value that should be borne by the unencumbered assets, even though the unsecured creditors get no value from the GOB liquidation. These GOB sales are being utilized by the Prepetition Credit Parties to maximize the value of their secured claims, and the unsecured creditors should not be exposed to a subsequent fight over whether the Prepetition Credit Parties' collateral has diminished in value.

6.    Through the DIP Motion, which provides funds to the Debtors to purchase augmentation inventory to maximize the value of the GOB sales, the Debtors are proposing to provide direct liens and super-priority claims (not for adequate protection) in all of the unencumbered assets to the DIP Lenders. Again, for the same reasons noted immediately above, the unsecured creditors should not have to fund any hypothetical shortfall to the DIP Lenders when the DIP Lenders are providing such funds to maximize the value of their prepetition secured claims.

7.    Additionally, the proposed final orders impose onerous terms that have less to do with providing the Debtors with financing than with gaining immediate leverage over the chapter 11 process and attempting to disadvantage the Committee and unsecured creditors by (i) imposing expedited and completely unrealistic case milestones that will create defaults and provide the lenders with enormous leverage; and (ii) validating and granting releases of all claims relating to insiders, including Alden, which is not even providing any funding under the DIP Facility.

8.    Allegations abound over Alden's prepetition conduct and improper role in the DIP negotiations leading to the DIP Facility and, in particular, the facts and circumstances

4

relating to the Alden release that is proposed under both Motions.  Under no circumstances should Alden be provided a release, whether or not that occurs within 270 days or otherwise.

9.      The Budget is deficient in fundamental respects.  The Budget was filed with a gaping administrative hole for:  (i) February stub rent payments; (ii) section 503(b)(9) claims; and (iii) Committee's professional fees (the Budget provides a line item for the Committee's professionals that is 50% less than what the Debtors propose for their claims agent even though the Debtors' professional fees are not subject to any cap).  Administrative claimants must take on faith that they will be paid at the end of the case through a plan that may or may not occur.  Yet the Debtors are required to grant a permanent section 506(c) waiver for all Prepetition Credit Parties who are proposed to be immunized now from any surcharge at any time in the cases, leaving the estates with no ability to fund the unpaid administrative costs of maintaining and disposing of these remaining assets.

10.      Without material modifications, the Committee urges the Court to deny the Motions.

## II. <u>STATEMENT OF FACTS</u>

### A.      <u>Relevant Background</u>

11.      On March 1, 2019, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of: (i) Moda Shoe, Ltd.; (ii) C and C Accord, Ltd.; (iii)  Simon Property Group, Inc.; (iv) Brookfield Property REIT, Inc.; (v) Xiamen C&D Light Industry Co., Ltd.; (vi) Yaquelin Garcia; and (vii) Huge Development, Ltd.

12.     Per agreement of the Debtors and the Committee, the Committee's response deadline to the Motions was extended to March 22, 2019.

**B.     The Cash Collateral Motion**

13.     On the Petition Date, the Debtors filed the Cash Collateral Motion, under which no financing is provided, that provides the Prepetition Credit Parties with every form of "adequate protection" possible:

- ***Full Paydown of ABL***:  Based on the budget attached as exhibit A to the Interim Cash Collateral Order (the "Budget"), within ten weeks of the Petition Date or sooner, the Debtors project that they will have liquidated enough of their inventory to have paid down the Prepetition ABL Obligations in full (including replacing outstanding letters of credit) in the amount of ***$195 million***.

- ***Payment of Default Interest and Fees***.  For the privilege of paying down the ABL Obligations in full, the Debtors propose to pay the Prepetition Lenders default interest, which totals $1.461 million during the budgeted period, and fees of $850,000, for a total of **$2.31 million** of interest and fees.  Interim Cash Collateral Order at ¶ 4(a); *see also* Budget.

- ***Payment of Lenders' Professionals' Fees***.  The Prepetition Credit Parties are paid their professional fees.   The Budget provides for ***10 sets of the lenders' professionals*** to be paid millions of dollars in addition to the millions they were paid pre-petition.  Interim Cash Collateral Order at ¶ 23.

- ***Liens/Superpriority Claims on Unencumbered Assets***:  The Lenders are granted DIP liens and superpriority claims on all assets of the Debtors, including any Avoidance Actions, commercial tort claims, or other unencumbered assets that existed as of the Petition Date, including potentially valuable claims against the Debtors' equity sponsors and the Debtors' unpledged interests in foreign subsidiaries.  Interim Cash Collateral Order at ¶¶ 4, 5.

- ***Stipulations, Waivers, Acknowledgments, Releases***:  The Debtors make various stipulations, waivers, and acknowledgments, subject to the Committee's challenge rights, regarding (a) the amount of the Prepetition Obligations; (b) the validity, enforceability, and priority of the Prepetition Credit Parties' interests in the Prepetition Collateral; and (c) the binding nature of the Prepetition Obligations.  If no challenge is timely brought, the Prepetition Credit Parties also benefit from broad-ranging releases.  *See* Interim Cash Collateral Order at Recital G, ¶ 22.

- ***Alden Release***:  Unless challenged within 270 days of the date of the Interim Cash Collateral Order, the "Non-Released Parties," which are presumably all

Alden-related parties, are also released and receive the benefit of the Debtors' acknowledgements, waivers, and stipulations under the Interim Cash Collateral Order. *See* Interim Cash Collateral Order at ¶ 22(c).

- ***Section 506(c) / Marshalling / Equities of the Case Waivers***: The Prepetition Credit Parties will be granted a waiver of the estates' section 506(c) claims, which would insulate them from any surcharge rights that the Debtors may have for the cost of preserving the Postpetition Collateral. Also, the Debtors propose that the equitable remedy of marshalling and the "equities of the case" exception under section 552(b) would not apply to the Lenders with respect to the proceeds of any of the Collateral. Interim Cash Collateral Order at ¶¶ 25 – 27.

## C.   **The DIP Motion**

14.     The Debtors propose to borrow $25 million from a subset of their Prepetition Term Lenders, not including Alden (the "DIP Lenders"). The Interim DIP Order suffers from all of the same infirmities as the Interim Cash Collateral Order noted above.[2] In addition:

- ***Alden Release***. Alden is granted the benefit of broad release and challenge provisions (after 270 days from the Petition Date) in exchange for Alden's agreement (i) to waive the need for a fairness opinion regarding the DIP Facility; and (ii) allowing the guarantor liens at Payless CA Management Ltd. and Payless CO Management Ltd. to be granted under the DIP Facility on a *pari passu* basis with the Alden liens that exist at those entities as a result of the $44.5 million loan that those entities borrowed pre-petition (the proceeds of which were upstreamed to the Debtors) (the "Latin American Loan"). *See* Interim DIP Order ¶¶ 47, 48. The releases for Alden in the Interim DIP Order are broader than the releases in the Interim Cash Collateral Order.

- ***Onerous Case Milestones***. On March 15, 2019, the Debtors filed the DIP credit agreement in connection with the DIP Motion [Docket No. 576] (the "DIP Credit Agreement"). As noted further below, the case milestones will destroy value and must be extended.

---

[2] Under the Interim DIP Order (paragraph 4(d)), the massive 280 page DIP Credit Agreement was supposed to be filed on March 7, but was not filed until Friday, March 15, at 12:30 p.m. Thus the Committee reserves the right to make comments on the DIP Credit Agreement prior to the hearing.

### III.  OBJECTIONS

**A.**     **Unencumbered Assets Should Remain Unencumbered and Free from Super-priority Claims for the Benefit of the Estates**

15.     As previously noted, the Cash Collateral Motion provides adequate protection liens and super-priority claims that attach to all of the unencumbered assets of these estates for diminution of value, and the DIP Motion provides for direct liens and super-priority claims that attach to such unencumbered assets.  The Committee has only recently been appointed and begun its investigation, but preliminarily, the Debtors' unencumbered assets likely include:  (i) avoidance actions; (ii) commercial tort claims; (iii) (2,300 leasehold interests; and (iv) interests in certain foreign subsidiaries that were wholly unencumbered or only partially encumbered as of the Petition Date.

16.     A court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body."  *In re Roblin Industries, Inc.,* 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.,* 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983).  *See also In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The Debtor's pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").  Moreover, the proposed financing must be "fair, reasonable, and adequate."  *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).  Postpetition financing also should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37

8

(Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [secured creditor]").

17.     Avoidance actions are uniquely for the benefit of general creditors of the estate, not secured creditors, and are rarely encumbered in favor of secured lenders.  The intent behind avoidance powers and a debtor's power to bring causes of actions is to allow the debtor-in-possession to gain recoveries for the benefit of all unsecured creditors.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Sweetwater*, 55 B.R. 724, 734 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors).  Accordingly, bankruptcy courts customarily restrict the ability of debtors-in-possession to pledge avoidance actions and their proceeds as security.  *See, e.g., In re Goold Electronics Corp.*, 1993 WL 408366, at *3-4 (N.D. Ill. Sep. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).

18.     A financing proposal that contemplates a delegation or compromise of the debtor's fiduciary responsibilities is especially problematic.  *Tenney Village*, 104 B.R. at 569 (denying approval of proposed debtor-in-possession financing that was so onerous as to violate the debtors' fiduciary obligations to the estate); *Roblin*, 52 B.R. at 243 (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary

9

duties); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law). Bankruptcy courts "should not ignore the basic injustice of an agreement in which a debtor, acting out of desperation, has compromised the rights of unsecured creditors." *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D. N.C. 1985); *accord In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) (recognizing that debtors-in-possession "generally enjoy little negotiating power" with secured lenders, "particularly where the lender has a prepetition lien on cash collateral," resulting in "terms that harm the estate and creditors").

19.     Bankruptcy Courts across the country agree and exclude unencumbered assets from the scope of adequate protection liens and superpriority claims. *See, e.g., In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 at ¶¶ 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) (excluding avoidance actions, commercial tort claims, and the proceeds thereof from adequate protection liens and claims); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan. 28, 2019) (same); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec. 4, 2018) (excluding avoidance actions and the proceeds thereof and commercial tort claims and the proceeds thereof, in part, from adequate protection liens and claims); *In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) (providing that adequate protection liens only attach to Prepetition Collateral and further providing that adequate protection claims cannot be paid out of the proceeds of avoidance actions); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e)(Bankr. D. Del. Apr. 19, 2018) (excluding

10

avoidance actions and commercial tort claims from adequate protection liens and claims); *In re*

*SFX Entertainment, Inc.*, Case No. 16-10238 (MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr.

D. Del. Mar. 8, 2016) (excluding avoidance actions and the proceeds thereof from adequate

protection liens and claims).

20.     The Court should not condone this end-run around what could likely be

the only sources of meaningful recovery for unsecured creditors.  The final orders approving the

Motions should make clear that no DIP Liens or Adequate Protection Liens shall attach to

unencumbered assets, including avoidance actions or proceeds, and that the superpriority claims

shall not be payable from proceeds thereof.

**B.      The Alden Release is Inappropriate**

21.     As the Court is aware, the Ad Hoc Group of Prepetition Term Lenders and

Axar Capital Management have raised numerous allegations regarding Alden's prepetition

conduct as the controlling entity of the Debtors, including that: (1) the Debtors caused non-

debtor Payless CA to "borrow" $45 million from Alden that had little benefit on the Debtors, but

permitted Alden to gain a senior position with respect to other term loan lenders; (2) that Debtors

recently and inexplicably leased office space in Dallas from an Alden affiliate; and (3) Debtors

entered into a shared services contract with Aerosoles, and Alden-affiliated company, raising

numerous questions as to the appropriateness of that transaction.

22.     Moreover, such parties allege that postpetition Alden inappropriately

controlled the process to obtain competing bids on the DIP Facility in order to obtain a short

claims deadline against insiders such as itself.  *See, e.g., Joint Limited Objection and Reservation*

*of Rights of the Ad Hoc Group of Prepetition Term Loan Lenders and Axar Capital Management*

11

*to the Debtors' Applications to Retain Counsel* [Docket No. 444]; March 14, 2019 Hearing Tr. (arguments made re same).

23.     Any transaction among debtors and insiders, such as the one contemplated in these cases between the Debtors and its majority equity owner/term loan lender, Alden, is subject to a heightened standard of scrutiny.  *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939); *Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.)*, 346 B.R. 798, 804 (8th Cir. BAP 2006) ("An insider is one who has a sufficiently close relationship with the debtor that his or her conduct should be subject to closer scrutiny than those dealing at arm's length with the debtor."); *In re Auto Style Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001).

24.     Alden Global Capital ("Alden"):  (i) holds 66.5% of the Debtors' equity interests; (ii) holds a majority (3/5) of the seats on the Debtors' Board of Managers, including Heath Freeman, who is Alden's President; (iii) controls the Debtors' day-to-day management through its appointed interim CEO, Martin Wade III; (iv) is a Term Lender to the Debtors; (v) is a term lender to certain of the Debtors' non-debtor Latin American affiliates in connection with the August 2018 Latin American Loan; and (vi) is the landlord to the Debtors on their headquarters lease.

25.     Although Alden attempted to obtain a short challenge period of 60 days, it ended up with a 270 day challenge period.   In light of Alden's inappropriate conduct in the DIP negotiations described by the Ad Hoc Group of Prepetition Term Lenders and Axar Capital Management, there should be no limitation on the Debtors' estates' ability to assert claims against Alden and any attempt to restrict such claims to any challenge period with respect to

12

Alden and other insiders should be denied.  *See* Interim Cash Collateral Order at Recital at ¶ 22(c); Interim DIP Order at ¶ 47.

26.     Moreover, while the Debtors do not receive any consideration in the form of new money and the only thing being offered by Alden are concessions to the other Term Lenders who are DIP Lenders, Alden is granted a full release of estate claims under both Motions.  The releases are extremely broad and go well beyond what would be considered "market" in cash collateral and financing orders.  While the release in the Cash Collateral Order is limited to matters related to the Prepetition Debt, the release in the DIP Financing Order covers any and all actions by Alden or any of its related parties, related to the Debtor, including breach of fiduciary duty claims against officers and directors (the "Alden Claims").

27.     The Debtors will argue that because parties in interest have 270 days to investigate Alden and oppose the releases, there is no harm in granting the contingent releases.  However, for the reasons set forth below, because the top two Debtor parent entities on the corporate organizational chart (Payless Holdings LLC and Payless Intermediate Holdings LLC) are Delaware LLCs and the Alden Directors are directors of a Delaware LLC, arguably neither the Committee nor any creditor can obtain derivative standing to prosecute claims against Alden as a matter of law.  As such, the 270-day challenge period is rendered meaningless because the only parties that would have standing to bring such claims (a chapter 11 trustee,  chapter 7 trustee, examiner, or a liquidating trustee under a Plan), do not currently exist.  The Alden Challenge Period effectively creates a hard deadline, well in advance of the expiration of 270 days, by which time an estate fiduciary must be appointed, then investigate, and assert such

claims.[3]  If, as the Debtors' milestones suggest, a plan were to be confirmed by June 28, 2019 and becomes effective 30 days later, a plan trustee would have only 110 days (not the proposed 270 days) to investigate and bring the claims.

28.     Specifically, recent decisions cast doubt on whether a creditors' committee can obtain standing to prosecute claims of a debtor LLC formed in Delaware against officers, directors, managers, and members.   In *CML V LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010), the Delaware Court of Chancery held that creditors of an LLC cannot be granted derivative standing to sue fiduciaries of the LLC for breach of fiduciary duty even if the LLC is insolvent.  The court relied on the language of Delaware Code title 6, sections 18-1001[4] and 18-1002.[5]  The decision creates a different rule for LLCs than for corporations; creditors of an insolvent corporation can obtain derivative standing to sue officers, directors, or controlling stockholders for breach of fiduciary duty.  *See N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).

29.     In *Official Comm. v. Comvest Grp. Holdings (In re HH Liquidation, LLC),*[6] the Delaware bankruptcy court concluded *post-trial* that a creditors' committee of an LLC debtor cannot obtain standing to sue the fiduciaries of the debtor for breach of duty even in the face of a court-approved stipulation between the debtor and the committee granting

---

[3] Although the Committee may move to extend the 270-day Challenge Period for cause under the Interim DIP Order, that same ability does not appear to exist under the Interim Cash Collateral Order.

[4] "A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed." 6 Del. Code § 18-1001.

[5] "In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and: (1) At the time of the transaction of which the plaintiff complains; or (2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction." 6 Del. Code § 18-1002.

[6] Nos. 15-11874, 16-51204, 2018 Bankr. LEXIS 140, at *180 (Bankr. D. Del. Jan. 22, 2018).

14

derivative standing to the committee to prosecute the claims. Relying on *Bax*, the court interpreted the language of section 18-1002, which prescribes the proper plaintiff in a derivative action against an LLC. The statute requires that "the plaintiff must be a member or an assignee of [an LLC] interest."[7] The court said, "The Committee is neither a member nor an assignee. Under the plain language of the statute, the Committee has no standing to bring a breach of fiduciary duty claim." *Comvest*, 590 B.R. at 284.

30. The *Comvest* court distinguished *Stanziale v. MILK072011, LLC (In re Golden Guernsey Dairy)*,[8] which allowed a chapter 7 trustee to sue fiduciaries of an LLC debtor for breach of fiduciary duty. Unlike a chapter 7 trustee, who is empowered by statute to act as "the sole representative of the estate with the authority to sue and be sued," a creditors' committee is a collection of unsecured creditors.[9] "Its rights to assert derivative claims are limited to the derivative standing of its members, none of whom have standing as creditors of a Delaware LLC to assert derivative claims of breach of fiduciary duty on behalf of the company."[10]

31. The Committee expects the DIP Lenders to argue that granting Alden a release was necessary in order to provide the DIP Lender with guarantor liens at Payless CA Management Ltd. and Payless CO Management Ltd on a *pari passu* basis with the Alden liens that exist at those entities as a result of the $44.5 million loan that those entities borrowed prepetition. While this may or may not be true, there is no reason why the Debtors' estates claims against Alden – which are unencumbered and, if valid, will inure to the benefit of general

---

[7] 6 Del. Code § 18-1002.
[8] 548 B.R. 410, 413 (Bankr. D. Del. 2015).
[9] 2018 Bankr. LEXIS 140, at *180.
[10] *Id.* citing *CML V, LLC v. Bax*, 6 A.3d 238, 242 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037 (Del. 2011).

unsecured creditors – should be restricted in any way to facilitate a liquidation process that only

benefits the DIP Lenders and the Prepetition Credit Parties.

**C.      The Proposed Section 506(c)/552/ Marshaling Waivers Are Inappropriate.**

32.      The Budget fails to provide for payment of all administrative expenses

necessary to operate these cases.  In particular, the Debtors fail to provide for the payment of

February 2019 rent in the Budget, or the portion of stub rent that came due post-petition.

Similarly, the Budget fails to provide for 503(b)(9) claims that may exist in these cases.

However, certain administrative claims are accounted for in the Budget and do not have to wait

until the end of the case to be assured of payment, such as certain professional fees.

33.      Yet, the Debtors propose to grant a permanent section 506(c) surcharge

waiver as well as a section 552 "equities of the case" waiver for the benefit of the DIP Lenders

and the Prepetition Credit Parties.  Interim DIP Order ¶ 30; Interim Cash Collateral Order ¶¶ 25-

27.  The waiver of 506(c) surcharge rights would eliminate an important avenue of recovery for

the estates and will increase the risk that the costs of the GOB sale and liquidation will be borne

by unsecured creditors rather than the secured creditors that already are the primary or sole

beneficiaries of the process.  This contravenes the essential purpose of section 506(c).  *See*

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir.

1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . .  The rule

understandably shifts to the secured party . . . the costs of preserving or disposing of the secured

party's collateral, which costs might otherwise be paid from the unencumbered assets of the

bankruptcy estate . . .") (internal citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230

(Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and

16

expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs"); *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . .") (internal citation omitted); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (a secured party, and not other creditors, must bear the cost of preserving or disposing of its own collateral.); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").

34.     Unsecured creditors cannot be put in a position at the outset of the case that will potentially prejudice them and invade their recoveries.  Courts across the country, including in the 8th Circuit, have rejected the waiver of surcharge rights under section 506(c) under financing orders for this reason.[11]  The estates should retain their surcharge rights against the lenders' collateral, particularly where, as here, the Committee has not yet been provided with

---

[11]  *See, e.g., Hartford Fire Ins. Co. v. Northwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. BAP 1998) (holding that provision in financing order purporting to immunize the post-petition lender from Section 506(c) surcharges was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve post-petition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)); *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (rejecting cash collateral stipulation between Chapter 11 debtor and secured creditor that contained 506(c) waiver because such a provision is against public policy per se); *In re Brown Bros, Inc.,* 136 B.R. 470, 474 (W.D. Mich. 1991) (holding that a § 506(c) waiver "is not enforceable in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal.").

evidence that the Budget is adequate to fund the administrative costs of these cases. The right of

the Debtors to seek surcharge has proved to be an invaluable tool for other troubled retailers to

be able to surcharge the costs of administration against lenders' collateral including in the

Shopko cases pending in this Circuit. *See Debtors' Motion for an Order (I) Authorizing the*

*Debtors to Surcharge Certain Collateral, (ii) Allowing the Lenders' Secured Claim in an Amount*

*that Accounts for the Surcharge, and (III) Granting Related Relief,* Case No. 19-80064-TLS,

[Docket No. 656] (Bankr. D. Neb. 2019).

35.      The "equities of the case" exception in section 552(b) of the Bankruptcy

Code allows a debtor, committee or other party in interest to exclude postpetition proceeds from

prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund

the cost of a secured lender's foreclosure. "The purpose of the equity exception is to prevent a

secured creditor from reaping benefits from collateral that has appreciated in value as a result of

the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to

general creditors) to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558-559

(Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R.

824, 826 (E.D. Mich. 1989)). The Court should deny the Debtors' request to waive their rights

under section 552(b) of the Bankruptcy Code, which allows a court to disregard a postpetition

lien on proceeds based on the "equities of the case." *See* 11 U.S.C. § 552(b).

36.      The Court should not allow the Debtors to waive this remedy before

allowing parties in interest – including the Committee – to properly examine the "equities of the

case." If unencumbered assets are used to increase the value of secured creditors' collateral, then

unsecured creditors should be afforded the opportunity to argue that such value inures to them,

18

and not to secured creditors.  *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL

2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to

waive prospectively an argument that other parties in interest may make. If, in the event, the

Committee or any other party [in] interest argues that the equities of the case exception should

apply to curtail a particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v.

U. S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y.

2011) (request for section 552(b) waiver was premature because factual record not fully

developed).  Particularly here, where the Debtors had significant assets that were unencumbered

as of the Petition Date, this argument may be a valuable tool for unsecured creditors to argue that

the lenders' liens should not extend to the disposition of likely hundreds of leases in bankruptcy

under the equities of the case exception.

       37.    Equitable marshalling in this case also may be important to enable asset

values to be maximized for the estate.  *See Ramette v. United States (In re Bame)*, 279 B.R. 833

(8th Cir. BAP 2002) (marshaling doctrine invoked against taxing authorities to benefit of estate's

unsecured creditors); *Official Comm. v. Hudson United Bank* (*In re America's Hobby Center

Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).  Yet, the Prepetition Credit Parties are offering

the estate nothing that justifies any of these waivers.  They seek to have a case run for their

benefit, but have agreed to no carve out for the general administrative expenses of vendors or

landlords to be incurred before or after a termination event and want to take advantage of the

Bankruptcy Code to maximize the value of their collateral, while cutting off the estate's

surcharge and similar rights under sections 506(c) and 552(b) of the Bankruptcy Code and under

the doctrine of equitable marshalling.  For these reasons, these proposed waivers should be stricken.

38.     In the alternative, the Prepetition Credit Parties should be required to satisfy their claims from encumbered collateral and look to unencumbered assets (such as avoidance actions) last.  Such relief has been granted in Bankruptcy Courts across the country. *See, e.g., In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 9 (Bankr. D. N.J. Jan. 28, 2019); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15, 2018); *In re Samuel's Jewelers, Inc.*, Case No. 18-11818 (KJC), Docket No. 252 at ¶ 5 (Bankr. D. Del. Sept. 18, 2018); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr. S.D.N.Y. June 28, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 11(c) (Bankr. D. Del. Apr. 19, 2018); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12, 2018); *In re International Shipholding Corp.*, Case No. 16-12220 (SMB) at ¶ 13 (Bankr. S.D.N.Y. Sept. 21, 2016).

## D.     Other Objections

39.     ***Adequate Protection Too Rich for ABL Lenders***. Throughout the initial 13 weeks of these cases, the Debtors project an ending cash balance of over $30 million, while at the same time projecting $195 million of payments on account of the ABL Obligations.  Given the ABL Lenders' equity cushion and rapid paydown (indeed, Debtors' counsel at the second day hearing in these cases on March 14, 2019 that $85 million had already been paid down on account of the ABL Obligations), the full panoply of adequate protection proposed in favor of the ABL Lenders is simply unjustifiable (default interest, fees, indemnity account of $500,000).

20

40.     ***Discriminatory Carveout for Committee***.  The Debtors propose to cap the Committee professionals' fees, but not the Debtors'.  The Debtors also propose that their professionals are not subject to any budgeted line item, but the Committee's professionals must live within a budgeted line item.  *See* Interim Cash Collateral Order ¶ 18.  When examining the Budget, the Debtors propose a line item for the Committee's professionals that is less than half of the amount proposed for their claims agent, which is artificially low.  There is no basis to treat the Creditors' professionals differently and worse than the Debtors' professionals.

41.     ***Challenge Provisions for Non-Insider Lenders Inadequate***.  The Committee is given 60 days after appointment of the Committee to investigate the validity of the prepetition lenders' liens.  Interim Cash Collateral Order at ¶ 22.  This is an unreasonably short period under the circumstances of this case, where the Debtors have both domestic and international entities with 178 bank accounts (both domestic and foreign), several of whom have only partially pledged their assets.  Moreover, the Committee is given only a $75,000 investigation budget to investigate the validity and priority of the lenders' liens, and to investigate the existence of potential claims against the lenders in respect of their pre-petition facilities.  *Id.* at ¶ 19.  Given that the Debtors operate their businesses internationally, the lien searches alone will likely exhaust a significant portion of the $75,000 budget.  The Committee requests that this amount be increased to $150,000.

42.     ***DIP Milestones Too Short***.  The Debtors are required to comply with certain case milestones set forth in Schedule 7.17 of the DIP Credit Agreement.  These provisions are inappropriate because they do not provide adequate time for the Debtors to commence a sale of the Latin American business, develop a complex transition plan and preserve

21

the planned royalty streams therefrom and relating to the franchise business.  Further, the GOB

sales at the North American stores are not expected to conclude until the end of June 2019.  Each

of these processes must be either concluded or sufficiently developed to determine their values

and any Term Lenders' deficiency claim before a plan can be negotiated.  The Committee,

therefore, objects to any case milestones, but if any are imposed, would propose the following

extended deadlines:

| Event | Deadline | Revised Deadline |
| --- | --- | --- |
| Delivery to the DIP Lenders of a transition services plan relating to the operation or sale of the LatAm Business and the Debtors' information technology and intellectual property | March 31, 2019 | July 15, 2019 |
| File Acceptable Plan | May 3, 2019 | August 15, 2019 |
| Disclosure Statement Order Entered | May 31, 2019 | September 15, 2019 |
| GOB Sales Conclude | June 15, 2019 | |
| Confirmation Order Entered | June 28, 2019 | October 15, 2019 |

43.    ***Credit Bid Not Appropriate in Order***.  The Debtors propose to grant the

Prepetition Credit Parties/DIP Lenders ("Lenders") an automatic and unlimited credit bid.

Interim Cash Collateral Order at ¶ 34; Interim DIP Order at ¶ 43.  Such provisions are over-

reaching and may chill bids in the future.

44.    ***Additional Insureds***.  The Lenders should not be added as additional

insureds on D&O policies and other commercial tort policies as those underlying assets were

unencumbered as of the Petition Date.  Interim DIP Order at ¶ 38; Interim Cash Collateral Order

at ¶ 36.

DOCS_LA:319778 69405/001

45.     ***Lender Liability***.  The Lenders should not be absolved from pre-petition conduct until the expiration of the Challenge Period.  Interim DIP Order at ¶ 37; Interim Cash Collateral Order at ¶ 35.  Alden should be excluded from the benefits of this paragraph.

46.     ***Reporting***.  The Committee should be provided with reporting concurrently with the Lenders.  Interim DIP Order at ¶ 26; Interim Cash Collateral Order at ¶ 12.

47.     ***Modifications***.  The Debtors should not be permitted to modify the Budget absent advance notice to the Committee.  Interim DIP Order at ¶ 13; Interim Cash Collateral Order at ¶ 6.

## IV. <u>RESERVATION OF RIGHTS</u>

48.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motions and the forms of final orders, and to introduce evidence prior to or at any hearing regarding the Motions in the event that the Committee's objections are not resolved prior to such hearing.

49.     Contrary to the requirements of Federal Rule of Bankruptcy Procedure 4001(c)(1)(A), the Committee notes that the DIP Credit Agreement was not filed with the DIP Motion, but was rather filed late on March 15, 2019 (14 days after the DIP Motion was filed).

DOCS_LA:319778 69405/001

# V. **CONCLUSION**

50.     For all of the foregoing reasons, the Committee respectfully requests that

the Court deny final approval to the Cash Collateral Motion and DIP Motion on the terms

proposed in the final orders without substantial modification as set forth above.

Dated:  March 25, 2019                    POLSINELLI P.C.

                                          */s/ Matthew S. Layfield*
                                          Matthew S. Layfield, Esq.
                                          100 S. Fourth Street, Suite 1000
                                          St. Louis, MO 63102
                                          Telephone: (314) 889-8000

                                          *Proposed Local Counsel for the Official Committee
                                          of Unsecured Creditors*

                                          PACHULSKI STANG ZIEHL & JONES LLP

                                          Robert J. Feinstein, Esq. (admitted *pro hac vice*)
                                          Bradford J. Sandler, Esq. (admitted *pro hac vice*)
                                          780 Third Avenue, 34th Floor
                                          New York, NY 10017
                                          Telephone:  (212) 561-7700

                                          Jeffrey N. Pomerantz, Esq. (admitted *pro hac vice*)
                                          Ira D. Kharasch, Esq. (admitted *pro hac vice*)
                                          Shirley S. Cho, Esq. (admitted *pro hac vice*)
                                          10100 Santa Monica Boulevard, 13th Floor
                                          Los Angeles, CA 90067-4100
                                          Telephone:  (310) 227-6910

                                          *Proposed Lead Counsel for the Official Committee
                                          of Unsecured Creditors*