# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-40883-659 |
| | ) | Chapter 11 |
| PAYLESS HOLDINGS LLC, et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| MASON AVENUE HOLDING | ) | |
| CORPORATION, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Related Docket No. 613 |
| v. | ) | |
| | ) | |
| PAYLESS SHOESOURCE, INC., | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## DEBTORS' OPPOSITION TO THE MOTION FOR RELIEF FROM AUTOMATIC STAY

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Payless") respectfully submit this opposition (the "Opposition") to the *Motion for Relief from the Automatic Stay* (D.I. 613) (the "Motion") filed by Mason Avenue Holding Corporation ("Mason Avenue" or the "Movant").

## PRELIMINARY STATEMENT

1.      Movant seeks to lift the automatic stay to bring a third-party action against the Debtors for indemnification in connection with a personal injury claim that allegedly took place prior to the Debtors' first bankruptcy proceedings, which were commenced in April 2017. Movant received notice of the Debtors' first bankruptcy, including the proof of claim deadline, but failed to file a proof of claim for its alleged indemnification claim. As such, any claim for

indemnification by Movant arising from the alleged underlying injury is barred by the discharge and plan injunction granted in the 2017 proceedings.

2.      Movant is the landlord of a shopping center in Staten Island, New York, in which Payless leased retail space pursuant to a lease agreement.  According to a personal injury action filed against Mason Avenue (the "New York Action"), on March 31, 2017, Ariel Cruz, an HVAC technician, fell from a ladder as a result of a faulty roof access hatch in the loading dock, and was injured.

3.      Notwithstanding the prior bankruptcy, Movant seeks this Court's approval to lift the automatic stay to implead the Debtors in the New York Action on the basis of the Debtors' alleged duty to indemnify Mason Avenue for Cruz's injury.  The Motion should be denied.  First, the confirmation of the Plan in the Debtors' first bankruptcy bars Movant's claim in its entirety.  Second, even were Movant's claims not so barred, the plain language of the lease does not obligate the Debtors to indemnify Mason Avenue in connection with the alleged injury.  Third, assuming *arguendo* that the Debtors had any obligation to indemnify Movant, the Debtors are not a "necessary party" to the underlying action, and Movant can mount its own defense in that action and adjudicate its claim against the Debtors through the bankruptcy claims process.  There is no equitable need for estate resources to be wasted in ancillary involvement in a personal injury action to which the Debtors are not a named, nor necessary, party.

4.      Finally, Movant has not demonstrated adequate cause to lift the automatic stay.  Movant's conclusory statement that lifting the automatic stay would not interfere with the bankruptcy estates is false.  The Debtors' commercial general liability insurance policy and the proceeds thereof are property of the Debtors' estates.  Any defense costs or judgment paid under the policy will diminish estate assets to the detriment of the Debtors' other creditors.

## FACTUAL BACKGROUND

5.      On April 4, 2017, Payless filed for chapter 11 relief (the "2017 Bankruptcy Cases").  During the pendency of the 2017 Bankruptcy Cases, the Bankruptcy Court entered the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* (the "Bar Date Order") [2017 Bankruptcy Cases, D.I. 767], establishing June 19, 2017 at 11:59 p.m. (CT) as the deadline (the "General Bar Date") for which creditors were required to file proofs of claim. Mason Avenue received notice of the proof of claim deadline in the 2017 Bankruptcy Cases, but failed to file a proof of claim for its alleged indemnification claim.[1] *See* Affidavit of Service, 2017 Bankruptcy Cases, D.I. 847.

6.      Failure to file a proof of claim by the applicable deadline in the 2017 Bankruptcy Cases resulted in the following:

> EXCEPT AS OTHERWISE SET FORTH IN THE BAR DATE ORDER, ANY ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM WITH RESPECT TO A PARTICULAR CLAIM AGAINST A DEBTOR BUT THAT FAILS TO DO SO BY THE APPLICABLE BAR DATE DESCRIBED IN THIS NOTICE SHALL BE ESTOPPED AND ENJOINED FROM THE FOLLOWING: (A) ASSERTING ANY SUCH CLAIM AGAINST THE DEBTORS OR THEIR ESTATES OR PROPERTY THAT (I) IS IN AN AMOUNT THAT EXCEEDS THE AMOUNT, IF ANY, THAT IS IDENTIFIED IN THE SCHEDULES ON BEHALF OF SUCH ENTITY AS UNDISPUTED, NONCONTINGENT AND LIQUIDATED OR (II) IS OF A DIFFERENT NATURE OR CLASSIFICATION THAN ANY SUCH CLAIM IDENTIFIED IN THE SCHEDULES ON BEHALF OF SUCH ENTITY (ANY SUCH CLAIM IN THIS SUBPARAGRAPH (A) BEING REFERRED TO IN THIS NOTICE AS AN "UNSCHEDULED CLAIM"); (B) VOTING UPON, OR RECEIVING DISTRIBUTIONS UNDER, ANY CHAPTER 11 PLAN IN THESE CHAPTER 11 CASES IN RESPECT OF AN UNSCHEDULED CLAIM; OR (C) WITH RESPECT TO ANY ADMINISTRATIVE PRIORITY CLAIM COMPONENT OF ANY REJECTION DAMAGES CLAIM, ASSERTING ANY SUCH PRIORITY CLAIM AGAINST THE DEBTORS OR THEIR ESTATES OR PROPERTY.

---

[1] Mason Avenue had an unrelated scheduled general unsecured claim in the amount of $1,050.91 in the 2017 Bankruptcy Cases, which the Debtors later deemed satisfied. *See* Reorganized Debtors' First Notice of Designation of Satisfied Claims, 2017 Bankruptcy Cases, D.I. 2086.

*See* Notice of Deadlines for Filing Proofs of Claim, Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, 2017 Bankruptcy Cases, D.I. 767.

7.     The plan of reorganization (the "2017 Plan") in the 2017 Bankruptcy Cases was confirmed on July 26, 2017, *see* 2017 Bankruptcy Cases, D.I. 1676, and went effective on August 10, 2017, *see* 2017 Bankruptcy Cases, D.I. 1759.

8.     The Debtors leased retail space within Mason Avenue's shopping center in Staten Island, New York, pursuant to a lease agreement (the "Lease Agreement").  *See* Lease Agreement, attached hereto as **Exhibit A**.  Under the terms of the Lease Agreement, as amended from time to time, Mason Avenue is obligated to maintain, among other things, the "roof, exterior walls . . . and structural components of the Demised Premises . . . ."  *Id.* § 6.01.

9.     On August 9, 2017, prior to the effective date of the 2017 Plan, Ariel Cruz filed the New York Action, alleging that he was injured on March 31, 2017 at Mason Avenue's Staten Island shopping center as a result of falling from a ladder, after a roof access hatch closed unexpectedly on him while he was accessing the roof for repair work.  *See* Complaint, *Cruz v. Mason Ave. Holding Corp.*, Index No. 710985/2017, Dkt. No. 1 (N.Y. Sup. Ct. Aug. 9, 2017), attached hereto as **Exhibit B**.  Cruz seeks monetary damages from Mason Avenue, as landlord of the premises.  *Id.*

10.    The immediate motion seeks to lift the automatic stay so that Movant may file a third-party action against Payless in the New York Action, seeking indemnification for the alleged injury that arose prior to the filing of the 2017 Bankruptcy Cases.

11.    At the conclusion of the 2017 Bankruptcy Cases, the Court confirmed the 2017 Plan, which resulted in the Debtors' emergence from chapter 11 protection.  The 2017 Plan provided that:

The distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown . . . including demands, liabilities, and Causes of Action that arose before the Effective Date . . . , in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

2017 Plan, Article IX.C, attached in relevant part hereto as **Exhibit C**.

## <u>ARGUMENT</u>

12.     The automatic stay set forth in 11 U.S.C. § 362 "is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his [or her] creditors." *In re Vierkant*, 240 B.R. 317, 320 (B.A.P. 8th Cir. 1999). The automatic stay

stops all collection efforts, all harassment, and all foreclosure actions . . . . It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove the debtor into bankruptcy . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property, and those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally, and a race by creditors for the debtor's assets undermines this purpose.

*Id.*

13.     Notwithstanding the broad scope of the automatic stay, the Court may grant a creditor relief from the automatic stay (i) "for cause, including the lack of adequate protection" of the creditor's interest in property, or (ii) if the debtor has no equity in the property and it is not

necessary for a successful reorganization. 11 U.S.C. § 362; *In re Timmer*, 423 B.R. 870, 874 (Bankr. N.D. Iowa 2010).

14.     Cause under Bankruptcy Code § 362(d)(1) has been defined as "any reason whereby a creditor is receiving less than [its] bargain from a debtor and is without a remedy because of the bankruptcy proceeding." *In re Martens,* 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005). In making the determination of whether to grant relief from the stay for cause, the court must balance the potential prejudice to the debtor, to the bankruptcy estate, and to the other creditors against the hardship to the moving party if it is not allowed to proceed in state court. *See In re Blan*, 237 B.R. 737, 739 (B.A.P. 8th Cir. 1999) (internal citations omitted). The factors used to balance the hardships are: (1) judicial economy; (2) trial readiness; (3) the resolution of preliminary bankruptcy issues; (4) the creditor's chance of success on the merits; (5) the cost of defense or other potential burden to the bankruptcy estate; and (6) the impact of the litigation on other creditors. *In re Wiley*, 288 B.R. 818, 822 (B.A.P. 8th Cir. 2003). Mason Avenue has not met its burden to demonstrate adequate cause to lift the automatic stay.

**Mason Avenue Fails to Demonstrate Cause to Lift the Automatic Stay**

15.     Mason Avenue states that "[t]he most relevant and compelling" factor in favor of lifting the automatic stay is that it "would not materially interfere with the bankruptcy estate" because the Debtors maintain a commercial general liability policy with Zurich. Motion ¶ 18. Movant adds that the litigation would not prejudice other creditors because any judgment or settlement in the personal injury action "would not be enforced directly against the Debtor or its estate." *Id.* ¶ 19. This factor, however, weighs *against* Mason Avenue. First, Mason Avenue is asking the Court to permit it to commence new litigation against the Debtors in the forum of the existing New York Action. *See* Motion ¶ 24 ("Movant is likely to succeed on the merits of a

third-party action against [Debtors].").   Commencement of new litigation against a debtor in chapter 11 proceedings is disruptive, and circumvents the purpose of an orderly reorganization. Second, the commercial general liability policy and the proceeds thereof are property of the Debtors' estates.   Should the automatic stay be lifted for the purpose of impleading the Debtors in the New York Action, the Debtors' estates will be materially impacted since any defense costs incurred under the policy will erode available insurance proceeds.

16.     Despite Movant's averment to the contrary, judicial economy is not served by lifting the automatic stay to permit Movant to implead the Debtors in the New York Action. Should the Debtors be impleaded into the New York Action, the Debtors would be required to litigate whether their obligation to indemnify and defend Movants under the relevant lease agreement is implicated in the first instance.   Rather, judicial economy is best served by Movant seeking relief through the claims administration process in these proceedings.[2]

17.     Movant also asserts "considerable hardship and prejudice" on the basis that it will be "forced to litigate the pending personal injury action without the benefit of a full defense." Motion ¶¶ 25-26.   In fact, nothing prevents the Movant from robustly defending itself in the New York Action and subsequently asserting an indemnification claim in these bankruptcy proceedings.   If and when such claim is adjudicated, the Court will determine whether the Debtors had an obligation to indemnify Movant in the underlying action.[3]

**Movant's Claim Is Barred by the Prior Bankruptcy**

18.     Because Movant's claim arose prior to the 2017 Bankruptcy Cases, any obligation of the Debtors arising from a prepetition claim was extinguished upon confirmation of the 2017

---

[2] For the avoidance of doubt, the Debtors reserve all rights and defenses with respect to any proof of claim filed by Movant.

[3] It is the Debtors' position that the Debtors would prevail on the underlying claim. The alleged personal injury did not arise from the Demised Premises (as defined in the lease agreement), but rather from a roof hatch malfunction, for which the duty to maintain is the Movant's.  See Lease Agreement § 6.01.  As such, the Debtors are not obligated to indemnify Movant, and Movant is free to seek indemnification from its insurance provider.

Plan.  "Where an indemnification agreement is entered into prior to a bankruptcy filing, such an execution gives the indemnitee a contingent prepetition claim.  This is so even where the conduct giving rise to indemnification occurs post-petition . . . ."  *In re Food Barn Stores, Inc.*, 175 B.R. 723, 728-29 (Bankr. W.D. Mo. 1994) (quoting *In re Highland Grp., Inc.*, 136 B.R. 475 (Bankr. N.D. Ohio 1992); *see also In re Johns-Manville Corp.*, 57 B.R. 680, 690 (Bankr. S.D.N.Y. 1986) ("Procedural and extraneous factors such as the timing of the filing of a summons and complaint . . . should not determine the existence or nonexistence of a 'claim.' Rather the focus should be on the time when the acts giving rise to the alleged liability were performed.").  Movant was aware of the 2017 Bankruptcy Cases, and received notice of the proof of claim deadline, but failed to timely file a proof of claim for indemnification in the 2017 Bankruptcy Cases.  To the extent Movant had any viable claim against the Debtors related to the New York Action, any such claim was discharged by plan confirmation in the 2017 Bankruptcy Cases.  *See McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 740 (8th Cir. 1996) ("[C]onfirmation of a debtor's bankruptcy plan discharges debts arising prior to the date of confirmation.").

## CONCLUSION

19.    For all of the foregoing reasons, the Debtors respectfully request that the Motion be denied.

Dated:  July 10, 2019
St. Louis, Missouri

/s/   *Richard W. Engel, Jr.*

Richard W. Engel, Jr. MO 34641
Erin M. Edelman MO 67374
John G. Willard MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com
jwillard@armstrongteasdale.com

-and-

Ira Dizengoff (*admitted pro hac vice*)
Meredith A. Lahaie (*admitted pro hac vice*)
Kevin Zuzolo (*admitted pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
mlahaie@akingump.com
kzuzolo@akingump.com

- and -

Julie Thompson (*admitted pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
julie.thompson@akingump.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**LEASE AGREEMENT**



LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into this __ day of ___, 19__, by and between MASON AVENUE HOLDING CO., a New York corporation, hereinafter referred to as "Landlord," and PAYLESS SHOESOURCE, INC., a Missouri corporation, hereinafter referred to as "Tenant."

WITNESSETH:

IN CONSIDERATION of the mutual covenants herein contained and of good, lawful and valuable considerations moving to and received by each of the parties to be bound hereby, the parties agree as follows:

ARTICLE 1.00
GRANT AND COVENANTS

Section 1.01 Grant.  Landlord hereby demises and leases to Tenant, and Tenant hereby takes from Landlord, those certain premises (the "Demised Premises") now or hereafter to be erected and located within the City of Staten Island, County of Richmond, State of New York, more particularly described as follows:

> A storebuilding having a frontage of approximately forty (40) feet, a depth of approximately sixty-five (65) feet, a finished ceiling at least 11'0" from the finished floor, and containing a floor area of at least two thousand six hundred (2,600) square feet as shown on Exhibit B, and located within the Shop Rite Shopping Center.  The Demised Premises are shown crosshatched on the site or development plan attached hereto and incorporated herein by reference as Exhibit B.

The Demised Premises are leased to Tenant together with all rights, privileges, benefits, rights of way and easements now or hereafter appurtenant or belonging thereto, whether arising under any private or public grant or authority, including, without limitation, the direct right of ingress to and egress from the Demised Premises and the streets shown on Exhibit B through the entrances shown on Exhibit B.

Section 1.02 Development Defined. The parties agree that the Demised Premises comprise a portion of a shopping center or development (the "Development"), which for the purposes of this Lease, is defined as being a planned, organized and integrated group of retail facilities owned or managed by Landlord.

Section 1.03 Site Plan.  Landlord has provided Tenant with a precise site or development plan of the Development (the "Plan") which it warrants to be a complete and accurate depiction of the buildings, Common Area and Common Improvements shown thereon now completed or which

-2-

will be completed.  Said Plan, attached hereto as Exhibit B, illustrates the locations, relative sizes and position of the buildings noted thereon and the precise location of the Demised Premises.

Section 1.04 Common Area/Common Improvements.  The "Common Area" is hereby defined to include all parts of the Development not shown on the Plan as occupied by buildings.  Landlord warrants and covenants it has constructed, or will construct prior to the Completion Date specified in Section 2.04, the Common Improvements in the Common Area as illustrated by the Plan and hereby grants to Tenant, its agents, customers, licensees, invitees, employees, vendors and visitors, the right, privilege and easement to use such improvements in common with all other tenants granted similar rights by Landlord.  Such "Common Improvements" include, by illustration and not limitation, (i) paved malls, sidewalks, driveways and parking areas in a ratio of not less than one standard American ground level automobile space for each 250 square feet of gross leasable floor area within the buildings of the Development and in compliance with municipal code requirements, all properly lighted and landscaped and (ii) free and unobstructed access at street grade from public highways and streets and to the customer and freight entrances of the Demised Premises as shown on the Plan.

Section 1.05 Landlord's Covenants.  Landlord warrants and covenants (i) that the position, size and visibility of the Demised Premises within the Development, as well as the access thereto, shall not be changed from the conditions illustrated by the Plan; (ii) to maintain at all times within the Development the parking ratio specified in Section 1.04; (iii) to keep the Common Area and Common Improvements open, lighted, unobstructed and available for use during Tenant's business hours and for reasonable periods of time before and after Tenant's business hours; (iv) to maintain the layout of the Common Area as shown on the Plan and not change any of the Common Improvements shown on the Plan; (v) to maintain at all times during the primary and extended terms of the Lease a ratio of the gross leased and occupied floor area of the Development to the gross leasable floor area of the Development of not less than eighty percent (80%); (vi) that to the best of its current knowledge and belief, there are no plans, projections or proceedings of any governmental authority for a) the improvement, change, alteration or modification of the zoning of the Demised Premises or the Development or any adjoining property or any street upon which the Development is located or b) any construction, realignment, widening, alteration or modification of any street, highway, expressway, freeway, thruway or tollway, including any pending eminent domain proceedings, which would affect the use, access or visibility of the Demised Premises or the Development; (vii) that the Development and Demised Premises are properly zoned for the business Tenant contemplates operating therein,

-3-

and (viii) that the finished ceiling height within the Demised Premises is at least 11'0" from the finished floor (should Tenant's inspection thereof after delivery of possession disclose facts to the contrary, Tenant may, at its option, cancel this Lease).

Section 1.06 Landlord's Breach.  Landlord's breach of any of its covenants in Sections 1.02 through 1.05 shall constitute a material breach of this Lease.  Refer to Page 4a.

Section 1.07 Key Tenant.  As a material inducement leading Tenant to enter into this Lease, Landlord warrants and represents that it has entered into an Agreement with a certain Key Tenant, which Agreement provides for occupation of a portion of the Development as depicted on Exhibit B for the use and space of the Key Tenant indicated as follows:

| Key Tenant | Use | Approximate Square Feet |
|---|---|---|
| 1. Shop Rite | Supermarket | 61,050 |

Section 1.08 Absence of Key Tenant.  Notwithstanding anything to the contrary contained in Section 3.01 or Section 15.01, if at any time during the primary or extended terms of this Lease, the above-named Key Tenant ceases to operate its business in the Development (for any reason, including an event of casualty or condemnation) and (i) a lease agreement with a replacement tenant of comparable stature to, and occupying substantially the same amount of floor space as, the Key Tenant (such replacement shall thereafter be designated the "Key Tenant" for purposes of this Lease) has not been executed between Landlord and replacement tenant within six (6) months following the date Key Tenant has ceased to operate its business in the Development and (ii) such replacement tenant has not opened for business in the Development within twelve (12) months following the date Key Tenant has ceased to operate its business in the Development, Tenant may cease to operate its business in the Demised Premises or, in the event Tenant does not cease to operate its business in the Demised Premises due to the foregoing, Tenant's obligation to pay Base Rent shall immediately abate, and Tenant shall pay in lieu thereof, in arrears on or before twenty-five (25) days subsequent to the end of each calendar month, the lesser of Base Rent or six percent (6%) of Tenant's Gross Sales.  Tenant shall pay said lesser amount until such time as (a) the Key Tenant resumes its business operation in the Development or (b) a replacement tenant as described in this Section 1.08 opens for business in the Development.

Section 1.09 Landlord's Right to Cancel.  For a period of thirty (30) days following the end of the twelfth full consecutive month in which

-4-

Addition to:

Section 1.06  Landlord's Breach.  If at any time Landlord has committed a material breach and same is not cured within six (6) months from Tenant's notice of said breach, Tenant's obligation to pay Base Rent shall immediately abate at which time Tenant may (a) terminate the Lease or (b) pay in lieu of Base Rent, in arrears on or before twenty-five (25) days subsequent to the end of each calendar month, the lesser of Base Rent or six percent (6%) of Tenant's Gross Sales.  Tenant shall pay said lesser amount until such time as (a) Landlord cures said material breach to Tenant's reasonable satisfaction at which time Tenant's obligation to pay Base Rent shall resume or (b) the date Tenant exercises its right to terminate this Lease.  Upon such termination, neither party hereto shall have any further liability to the other under this Lease except for matters that shall have accrued prior to such termination.

Page 4a

Tenant has remitted six percent (6%) of Tenant's Gross Sales in lieu of Base Rent pursuant to the terms of Section 1.08 of this Lease, Landlord shall have the right to cancel this Lease upon thirty (30) days prior written notice to Tenant, provided Tenant's rental remittance during such twelve (12) month period has amounted to less than Tenant's Base Rent obligation (as specified in Section 3.01 of this Lease) would have been during such twelve (12) month period. Landlord's right to cancel this Lease as specified in this Section 1.09 shall be deemed void and of no force or effect in the event Tenant remits an amount to Landlord sufficient to cure the deficiency between Tenant's actual rental remittance and Tenant's Base Rent obligation as specified in Section 3.01 of this Lease during such twelve (12) month period prior to the end of Landlord's thirty (30) day notice period.

Section 1.10 Landlord as Trust. In the event Landlord is or becomes a trust, it is expressly agreed that any legal or equitable action brought to enforce any of the covenants, agreements, and undertakings of this Lease to be performed by Landlord may be brought against the Trustee of the trust estate, over whom personal jurisdiction is hereby expressly consented to and conferred. In such event, Trustee further covenants and represents that Trustee has been fully authorized and directed to execute this Lease on behalf of the Landlord, and to perform, or cause to be performed on behalf of the Landlord, all such covenants, agreements and undertakings to be performed by Landlord. For purposes of this Section 1.10, the words "Landlord" and "trust estate" are synonymous.

## ARTICLE 2.00
### TERM AND OPTIONS

Section 2.01 Term. The primary term of this Lease shall be for a period of ten (10) years, and Tenant's obligations shall begin on the commencement date (the "Commencement Date") which shall be subject to the operation of Section 2.03 hereof, the earlier of: (i) sixty (60) days after the Completion Date as herein defined; or (ii) the date on which Tenant opens the Demised Premises for business, except that in the event the commencement of the Lease term is a date other than a first day of a calendar month, said term shall be computed from the first day of the calendar month next following the date of commencement of the Lease term as stated herein.

Section 2.02 Lease Year. As used herein, the term "Lease Year" shall mean each successive period of twelve (12) calendar months, the first commencing with the first day of the first full calendar month of the term hereof and successive Lease years commencing on the succeeding anniversaries thereof.

-5-

Section 2.03 Completion Date. The "Completion Date" is hereby defined as the date on which all of the following conditions have been fulfilled:

(a) Tenant's receipt of written authorization from Landlord to enter the Demised Premises for the purpose of installing its fixtures and making them otherwise ready for the conduct of its business and Landlord's granting Tenant a minimum period of sixty (60) days after receipt of said authorization to complete said work without interference; and Tenant has obtained all necessary permits and approvals required by any governmental or quasi-governmental agency to allow commencement of its construction as provided in Section 4.01. Such authorization shall constitute Landlord's warranty that: (i) construction of the Demised Premises has been completed by Landlord in accordance with the plans and specifications prepared by Tenant's architects and the Demised Premises are vacant, broom clean and free of any items of personalty not belonging to Tenant; (ii) the building of which the Demised Premises are a part has been completed and is in operating condition, except for any interior work and fixturing to be done by any of the tenants; (iii) all water, natural gas, storm and sanitary sewer, electricity and other utilities necessary for the operation of the Development have been installed and connected in and to the buildings and the Demised Premises; (iv) the Common Improvements of the Development have been completed; and (v) any required certificate of occupancy has been issued by the local governmental authority or a certificate of Landlord's architect has been issued to Tenant warranting that the Demised Premises and the building in which they are contained each may be lawfully occupied.

(b) The Key Tenant shall have opened for business prior to or simultaneously with Tenant.

(c) Those permanent tenants who occupy at least seventy percent (70%) of the gross leasable floor area in the Development less the areas occupied by Tenant and the Key Tenant shall have opened for business prior to or simultaneously with Tenant.

Notwithstanding the aforementioned, Tenant may, at its sole and exclusive option, open for business prior to the Completion Date. If Tenant does so open before the Completion Date, such occupancy until the Completion Date shall be under all the terms, conditions and covenants of this Lease except as to Base Rent, which for the period from such opening until the date upon which all of the above conditions have been satisfied shall be abated and Tenant shall pay to Landlord monthly, in arrears on or before twenty-five (25) days subsequent to the end of each calendar month, a sum equal to the lesser of six percent (6%) of Gross Sales or the Base Rent, and Tenant shall pay to Landlord said lesser amount until all the aforementioned opening conditions have been fully satisfied, provided that Landlord's written notice is received by Tenant within thirty (30) days after the date the conditions constituting the

-6-

Completion Date have been satisfied. In the event that Landlord's written notice is not received by Tenant within said thirty (30) day period, Tenant's rent liability shall remain at the level of such lesser amount (i.e., the lesser of six percent (6%) of Tenant's Gross Sales or Base Rent) until such time as Tenant receives written notice from Landlord that said conditions have been fully satisfied, at which time Tenant's liability for Base Rent shall first accrue, subject to Tenant's prompt verification of the satisfaction of said conditions.

Section 2.04 Construction Commencement, Completion, Cancellation. Landlord agrees to cause construction of the Demised Premises to be completed on or before March 1, 1994. If the Completion Date occurs during either of the periods from May 15 to July 15 or from November 1 to January 31, Tenant may, at its option, either (i) delay opening for business and commencement of the primary term of this Lease until the expiration of such period or (ii) open for business, but in such event the Base Rent shall be abated and Tenant shall pay to Landlord monthly a sum equal to the lesser of six percent (6%) of Gross Sales or the Base Rent. Provided the Demised Premises are completed to the necessary extent, Landlord, as an accommodation to Tenant, agrees to allow Tenant or Tenant's agents and representatives to enter the Demised Premises prior to the sixty (60) day period specified in Section 2.03(a) hereof for the purposes of fixture installation and merchandising without acceleration of the commencement of the primary term hereof or imposition upon Tenant of the financial obligations hereunder. In the event the Completion Date is on or after October 1, 1994, Tenant may, at its option, cancel this Lease by written notice to Landlord.

Section 2.05 Addendum. Following the Commencement Date, Tenant shall forthwith prepare and execute an Addendum to this Lease, which shall establish, among other things, (i) acceptance of the Demised Premises by Tenant, subject to correction of any construction deficiencies, (ii) commencement and ending dates for the primary term in accordance with the terms hereof, and (iii) dates for the timely exercise of any extended terms provided herein. Landlord agrees to promptly execute and return a copy of said Addendum to Tenant.

Section 2.06 Hold Over. Should Tenant hold over the Demised Premises, or any part thereof, after the expiration of a term of this Lease, unless otherwise agreed in writing, such holding over shall constitute and be construed as a tenancy from month to month only. All obligations and duties imposed by this Lease upon Landlord and Tenant shall remain the same during any such period of occupancy except annual Base Rent which shall be increased to one hundred fifty percent (150%) of the annual Base Rent during the last year of the primary term of this Lease. Said holdover rent shall accrue on a per diem basis, and shall be

-7-

payable monthly on or before twenty-five (25) days subsequent to the end of each calendar month during said holdover period.  Said obligation for payment of holdover rent shall survive the expiration of this Lease.

## ARTICLE 3.00
### RENT

**Section 3.01 Base Rent.**  Provided all conditions of Article 2.00 have been satisfied, Tenant shall pay to Landlord Base Rent for the Demised Premises as follows:

#### PRIMARY TERM: TEN (10) YEARS

| Years | 1-5: | $56,000.04 | annually: | $4,666.67 monthly |
|-------|------|------------|-----------|-------------------|
| Years | 6-10: | $66,000.00 | annually: | $5,500.00 monthly |

Subject to Article 2.00, Tenant's liability for Base Rent shall accrue as of the Commencement Date.  Tenant's payments for Base Rent shall commence on the first of the month subsequent to the date Tenant opens for business, including a payment for any partial month calculated on a per diem basis for any period from the Commencement Date to the first day of the Lease term, and shall be paid thereafter in advance, each payment to be mailed on or before the first day of each calendar month during the term of this Lease.

**Section 3.02 Fractional Month.**  With respect to any fractional month occurring during the primary or extended terms hereof, Base Rent payable for such fractional month shall be prorated based on the ratio that the number of days in such fractional month bears to the number of days in that calendar month.

**Section 3.03 Percentage Rent.**  To determine Percentage Rent, if any, the following computation shall be made:  A sum which equals five percent (5%) of the Gross Sales (as herein defined) transacted from the Demised Premises shall be ascertained on or before the first day of the second month after the close of each Lease Year.  If said sum exceeds the amount of Rent as defined in Section 3.04, for each such preceding Lease Year, said excess amount shall be paid as Percentage Rent for such Lease Year.  If said amount exactly equals or is less than said amount, no Percentage Rent shall be paid.  Gross Sales for any period prior to commencement of the first Lease Year shall be added to the Gross Sales for the first Lease Year.  In no event shall the total of (i) Rent and (ii) the sum payable as Percentage Rent for any Lease Year exceed one hundred fifty percent (150%) of Base Rent as specified in Section 3.01 for such Lease Year.

Section 3.04 Components of Rent. The term "Rent" as used in Section 3.03 above means the amount of Base Rent under Section 3.01 hereof.

Section 3.05 Gross Sales. The term "Gross Sales" as used herein means the selling price of all merchandise and services sold or performed on all direct, mail or telephone order sales in, upon or from the Demised Premises including payments and deposits made for layaway sales. There shall be excluded from Gross Sales: (i) sales, use or excise taxes passed on as such to the customer; (ii) transfers of merchandise between stores or warehouses of Tenant; (iii) the selling price of all goods returned for refund; (iv) receipts from the sale of trade fixtures; (v) permitted rents from subtenants or assignees; (vi) discount sales to special classes of customers (e. g., sales to clergy, sales to employees of Tenant); (vii) any service charge or penalty charged by Tenant for a returned check; (viii) any charges paid to the issuers of credit cards; (ix) sums and credits received in the settlement of claims for loss of or damage to merchandise; (x) uncollected or uncollectible credit sales; and (xi) gift certificates, or similar vouchers until such time as the same have been converted into a sale by redemption at the Demised Premises.

Section 3.06 Books of Account, Annual Statement, Landlord Access. Tenant agrees to (i) keep at its principal office proper books of account of the business transacted in, upon and from the Demised Premises and to maintain the same for a period of at least two (2) years after the expiration of the Lease Year to which they pertain, (ii) furnish Landlord a true and accurate annual statement of the Gross Sales transacted in, upon and from the Demised Premises, certified to be correct by an executive officer of Tenant, and (iii) give Landlord access, during reasonable hours, to said books and records of the business transacted in, upon and from the Demised Premises.

Section 3.07 Confidentiality of Information. Landlord agrees that it will not disclose, but will keep in strict confidence, the information furnished to Landlord by Tenant pursuant to Section 3.06 above, but nothing herein shall prohibit Landlord from making such disclosures as necessary to Landlord's employees, agents, attorneys and accountants and to any prospective purchaser or mortgagee of Landlord's interest herein and their respective employees, agents, attorneys and accountants. The obligations expressed herein respecting treatment and disclosure of confidential information shall expressly survive the termination of this Lease.

ARTICLE 4.00

CONSTRUCTION AND ALTERATIONS

Section 4.01 General. Landlord shall, at its individual expense, construct the Demised Premises in accordance with Exhibits C-1 through C-7, attached hereto and incorporated herein by reference. All work shall be done in good workmanlike manner and shall be in compliance with all applicable insurance requirements and laws, codes, ordinances, rules, regulations and orders of federal, state and local governmental and public bodies and agencies having jurisdiction over the performance of such construction work. Landlord warrants to Tenant that, as of the date of delivery of the Demised Premises to Tenant, the subject Demised Premises and all components thereof shall be in (i) good working condition or order, structurally sound and (ii) in compliance with current building codes and all laws.

Section 4.02 Construction Deficiencies. In the event Tenant finds the Landlord's construction obligations as specified in Section 4.01 above have not in fact been completed as aforesaid, Tenant may, at its option, accept the Demised Premises and open for business subject to correction of such deficiencies as may be found by Tenant or its agent. Tenant shall notify Landlord in writing of said deficiencies and Landlord shall have a reasonable time (not to exceed 15 days) in which to take such corrective action as may be necessary, and shall notify Tenant in writing as soon as it deems such corrective action has been completed. If said deficiencies are not corrected as provided above, then Tenant may correct the same, and Landlord shall pay the cost thereof upon demand with interest at the rate of two percent (2%) above the prime rate quoted by Citibank, N.A. If not paid within thirty (30) days of receipt by Landlord of a statement from Tenant, Tenant may deduct said cost and interest from subsequent installments of rent.

Section 4.03 Compliance with Code. Following Landlord's completion of construction, Tenant's obligation to comply with all applicable insurance requirements, federal, state and local laws (including the Americans with Disabilities Act of 1990, as amended, and any regulations promulgated thereunder), codes, ordinances, rules, regulations and orders of any governmental or public agencies shall be limited to changes within the Demised Premises made necessary by: (i) any work performed by Tenant (unless the same is performed by Tenant on Landlord's behalf); or (ii) Tenant's use of the Demised Premises as a shoe store. All other changes shall be the sole responsibility of the Landlord.

Section 4.04 Completion of Landlord's Construction. The parties acknowledge and agree that: (i) Landlord's timely completion of its work

-10-

in the Demised Premises, in accordance with the plans and specifications prepared by Tenant's architects which are incorporated herein by reference, is a prerequisite to Tenant's commencement and completion of its work in the Demised Premises; and (ii) Landlord's completion of such work and delivery of the Demised Premises to Tenant on or before December 1, 1993, is a material inducement leading Tenant to enter into this Lease. In the event the Completion Date is on or after October 1, 1994, Tenant may, at its option, cancel this Lease by written notice to Landlord.

Section 4.05 Drawings and Elevations. Within five (5) days following execution of this Lease by both parties, Landlord shall forward to Tenant, for Tenant's review and written approval, a complete set of architectural drawings and elevations, including a grading plan of the Development, showing the Demised Premises. Tenant agrees to review said drawings promptly upon receipt from Landlord and to notify Landlord promptly of its approval or of any objections, with the understanding that the effectiveness of Tenant's obligations hereunder, including the obligation to pay rent, shall be contingent upon, among other things, Landlord obtaining such written approval from Tenant.

Section 4.06 Alterations. As used herein, the term "structural" shall mean of or relating to the supporting members of a building, such as bearing walls, columns, beams or girders and foundations. Tenant may, at its own cost and expense and in good workmanlike manner, make such interior nonstructural alterations and remodeling as it finds necessary or desirable for its purposes and as may be permitted by applicable governmental laws, ordinances, regulations and other requirements. Any exterior or structural alterations and remodeling may be made by Tenant only with the prior written consent of Landlord. All shelves, trade fixtures and equipment installed by Tenant may be removed by Tenant at the termination of this Lease; however, in no event shall Tenant remove the HVAC equipment. Such removal shall be made in good workmanlike manner so as not to damage the Demised Premises and any damage caused by such removal shall be promptly repaired by Tenant at its sole cost and expense.

Section 4.07 Liens. Tenant shall: (i) keep the Demised Premises at all times during the term hereof free from mechanics' liens and other liens of like nature created or claimed by reason of transactions made by Tenant; and (ii) at all times fully protect and indemnify Landlord against all such liens or claims which may ripen into such liens and all expenses arising from such liens or claims. If Tenant shall elect to contest any such claim or lien, it shall furnish Landlord a bond of a responsible corporate surety, in the amount claimed, conditioned on the discharge of said claim or lien. If a final judgment establishing the

-11-

validity of said lien or claim for any amount is entered, Tenant shall
pay and satisfy same at once. As to mechanics' liens and other liens of
like nature created or claimed by reason of transactions made by
Landlord, Landlord shall keep the Demised Premises free of same,
indemnify Tenant, furnish Tenant with a bond and pay and satisfy valid
liens all in accordance with the same requirements as are imposed upon
Tenant as aforesaid.

## ARTICLE 5.00
### USE

Section 5.01 General.  Tenant shall open and use the Demised Premises
for the purpose of conducting therein the business of a retail shoe
store and for incidental purposes related thereto, or for any other
legally permissible business or commercial venture with the prior
consent of Landlord, which shall not be unreasonably withheld or delayed
and subject to the operation of Article 12.00 hereof; provided, however,
that Tenant shall not use the Demised Premises in such a manner as to
violate any applicable law, rule, ordinance or regulation of any
governmental body.

Section 5.02 Closing of Store.  It is expressly understood and agreed
that, notwithstanding anything to the contrary contained in this Lease,
Tenant may close its store when in its sole judgment the operation of
the Demised Premises as provided herein cannot be economically
justified.  Such closing shall not release Tenant from any of its
obligations provided herein.  In the event Tenant shall cease the
conduct of business in the Demised Premises (other than for the purpose
of performing repairs, alterations or restoration or for other reasons
beyond its control) for more than one hundred eighty (180) consecutive
days during the term of this Lease, Landlord may elect to terminate this
Lease upon thirty (30) days prior written notice to Tenant; provided,
however, that such termination election shall be nullified in the event
that Tenant reopens for business prior to the expiration of said thirty
(30) days notice period.  Upon such termination, neither party hereto
shall have any further liability to the other under this Lease, except
for matters that shall have accrued prior to such termination.

Section 5.03 Adjacent Tenancy.  Landlord agrees and covenants that
during the term of this Lease or any extensions thereof, Landlord shall
not lease, directly or indirectly, any portion of the Development within
twenty-five (25) feet of the Demised Premises to other tenants for the
purpose of sale of food or beverage whether for consumption on or off
the premises, a pet shop, beauty salon, amusement arcade, adult book
store or movie theater.  The food and beverage restriction shall not

-12-

apply to a supermarket, grocery store, drug store or department store;
nor shall this Section 5.03 be operative if the Development is or is a
part of a retail development containing more than 200,000 square feet of
gross leasable floor area.

Section 5.04 Restrictive Covenant.  To the extent that Landlord may
lawfully do so, Landlord covenants and agrees that it will not directly
or indirectly, lease or rent any additional property within the
Development for principal use as a retail family shoe store excluding
any store whose primary use is the sale of branded athletic footwear.
If at any time during the primary or extended terms of this Lease, a
person, firm or corporation does so operate a retail family shoe store
excluding any store whose primary use is the sale of branded athletic
footwear within the Development, then Base Rent payable hereunder shall
be reduced by fifty percent (50%) while such condition continues to
exist.  Further, Tenant's obligation to pay percentage rent shall be
abated for the period such condition exists, i.e., Gross Sales and Base
Rent during that period shall be excluded from the Percentage Rent
calculation described in Section 3.03.  The foregoing shall not be
construed to limit Tenant's rights or remedies for any violation of this
section, which remedies shall specifically include the right to seek
injunctive relief and the right to terminate this Lease upon written
notice to Landlord.  This Section 5.04 shall not be operative if the
Development is or is part of a retail development containing more than
200,000 square feet of gross leasable floor area.

ARTICLE 6.00
MAINTENANCE

Section 6.01 Maintenance by Landlord.  Landlord shall keep or cause to
be kept at Landlord's sole cost and expense except as provided by
Section 7.01 hereof: (i) the roof, exterior walls, foundation, sprinkler
systems, exterior canopies, gutters and water spouts, truck loading
facilities and structural components of the Demised Premises, utility
services extending to the service connections within the Demised
Premises; (ii) the Common Area and Common Improvements of the
Development; and (iii) all other buildings of the Development in a neat,
clean and orderly condition, and shall promptly repair or replace any
damage to such improvements.  Additionally, at Landlord's sole cost and
expense Landlord shall be responsible for eradicating any termites or
other wood-destroying insects appearing within the Demised Premises; and
Landlord shall be solely liable and responsible for performing all
repairs and replacements to the Demised Premises reasonably necessitated
due to damage by termites or any wood-destroying insects.  In the event
Landlord fails to perform any of its obligations herein specified,
Tenant shall give written notice thereof to Landlord and if Landlord
fails to commence its work within thirty (30) days following receipt of
such notice or neglects to prosecute the completion of such work with

-13-

reasonable diligence, Tenant may perform such work on Landlord's behalf. The cost of Tenant's said maintenance, repair, or replacement, together with interest at the rate of two percent (2%) above the prime rate quoted by Citibank, N.A., shall be paid by Landlord to Tenant upon demand and if not paid to Tenant within thirty (30) days after receipt by Landlord of a statement therefor, Tenant may deduct such cost, together with interest at the rate of two percent (2%) above the prime rate quoted by Citibank, N.A., from subsequent installments of Base Rent and any other monies payable hereunder.

Section 6.02 Maintenance by Tenant. Except as damaged by fire or other casualty, Tenant shall keep or cause to be kept, at Tenant's sole cost and expense, in a neat, clean and orderly condition (including any necessary replacements) those nonstructural, interior improvements in the Demised Premises including, but not limited to, the plate glass, storefront and doors, heating and air conditioning system (including any exterior components thereof), interior plumbing and electrical systems and the interior of the Demised Premises generally, except for latent defects due to faulty construction which may exist at the time Tenant takes possession of the Demised Premises. Landlord agrees to assign to Tenant all of its warranties which relate to any items of construction or otherwise which Tenant is required to repair, including but not limited to the heating and air conditioning, interior plumbing and electrical systems. At the termination of this Lease, Tenant shall deliver the Demised Premises to Landlord in good repair and condition, reasonable wear and tear and damage by fire or other casualty excepted. Refer to Page 14a.

Section 6.03 Emergency Repairs. Tenant may, in the event of an emergency, immediately make those repairs reasonably necessary to secure the Demised Premises. Landlord shall reimburse Tenant upon written demand for the cost of such repairs for which Landlord bears responsibility and if not paid to Tenant within thirty (30) days after receipt by Landlord of a statement therefor, Tenant may deduct such cost, together with interest at the rate of two percent (2%) above the prime rate quoted by Citibank, N.A., from subsequent installments of Base Rent and any other monies payable hereunder.

ARTICLE 7.00
COMMON AREA MAINTENANCE

Section 7.01 General. Landlord shall operate, light, repair and maintain the Common Area and Common Improvements in good and safe order and repair. For the purposes of this Lease, the Common Area and Common Improvements are defined in Section 1.04 hereof and include that part of the Development for the common use of all tenants and their invitees and other parties entitled to the use thereof and including parking areas,

-14-

Addition to:

Section 6.02  Maintenance by Tenant.  Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders, and regulations of all state, federal, municipal, and local governments, departments, commissions, and boards regarding the collection, sorting, separation, and recycling of waste products, garbage, refuse and trash.  If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, which cost shall not exceed competitive rates charged by local refuse services.

sidewalks, landscaping, curbs, loading areas, alleys, driveways and lighting facilities. In consideration of Landlord's performance of its obligation to maintain the Common Area and Common Improvements, Tenant agrees to pay, as additional rent, its proportionate share of the costs thereof. Such costs shall be those incurred for lighting, painting, cleaning, policing, inspecting, landscaping, repairing, guarding, protecting the Common Area and Common Area Improvements and Landlord's "Standard All Risk" property insurance premium for the Development (as specified in Section 10.05 hereof), but shall exclude any costs not specified above and in particular shall exclude the following: (i) depreciation on equipment; (ii) ad valorem taxes and assessments; (iii) depreciation on Landlord's original investment in the Development; (iv) costs of replacement of any parking area more than once during any ten (10) year period occurring during the primary term or extensions of this Lease; (v) capital expenditures including, but not limited to, replacement of roofs; (vi) administrative costs; (vii) overhead in excess of five percent (5%)--the five percent (5%) overhead charge shall not include taxes, insurance, salaries and other benefits paid to employees and any other similar payments; (viii) profit; (ix) the removal of rubbish for other occupants; (x) net recoveries that reimburse or reduce the expenses incurred by Landlord in maintaining the Common Area and Common Improvements; (xi) such costs as may be offset by contributions to Common Area and Common Improvement costs by tenants or occupants of space that is excluded from the denominator of Tenant's proportionate share of such charges; and (xii) any reserves for future expenditures which would be incurred subsequent to the then current accounting year.

Section 7.02 Billing and Payment. Within thirty (30) days following the end of each Lease Year, Landlord shall submit an invoice together with supporting data, prepared in accordance with generally accepted accounting practices, which shall show in clear and sufficient detail: (i) all costs paid attributable to Common Area maintenance as herein-above defined and (ii) Tenant's proportionate share of such charges, which shall be computed on the ratio that the floor area of the Demised Premises bears to the gross leasable floor area of completed buildings within the Development from time to time. Tenant's initial share of Common Area maintenance charges shall be based upon the following fraction:

$$\frac{2,600}{126,550} \quad \begin{array}{l} \text{floor area of Demised Premises} \\ \text{gross leasable floor area of Development} \end{array}$$

Upon Tenant's review and approval of such invoice, it shall promptly remit its proportionate share of the Common Area maintenance charges. It is agreed that for any Lease year in which Tenant's proportionate share of such charges exceeds one hundred five percent (105%) of its

proportionate share of such charges for the immediately preceding Lease year, Tenant's proportionate share for said Lease year shall be conclusively deemed to be one hundred five percent (105%) of its proportionate share for the immediately preceding Lease Year. Landlord further agrees that Tenant's proportionate share of Common Area Maintenance charges shall not exceed $3,900.00 for the first Lease Year.

Section 7.03 Monthly or Quarterly Payment. Tenant agrees, upon request of Landlord, to pay its share of said charges monthly or quarterly, which share may be based upon an estimate agreed to by the parties; provided, however, that such monthly or quarterly prepaid charges shall be reconciled against the annual statement as provided hereinabove and that any difference be paid by the respective party promptly.

Section 7.04 Failure to Reconcile. In the event Landlord fails to submit an annual statement as provided hereinabove within ninety (90) days after the end of a lease year, Tenant may, upon written notice to Landlord, withhold further monthly or quarterly payments of Common Area Maintenance charges until such annual statement has been submitted and approved by Tenant. If no annual statement is submitted by Landlord within one (1) year following the end of a lease year, Tenant shall not be liable for any underpayment of Common Area Maintenance charges for that lease year; however, Landlord's failure to timely submit the annual statement shall not affect any right of Tenant to assert a claim for overpayment of Common Area Maintenance charges.

ARTICLE 8.00
UTILITIES

Section 8.01 Initial Connections. Landlord shall, at its expense, cause to be installed the necessary mains and conduits in order that water and sewer facilities, natural gas, electricity, telephone and any other utility necessary to Tenant's conduct of business be available to the Demised Premises. It is understood that all services hereunder shall be separately metered to the Demised Premises and furnished by public utilities and not by Landlord.

Section 8.02 Tenant's Obligation for Charges. Tenant shall be solely responsible for and shall promptly pay all charges, when due, for water, sewer, natural gas, electricity, telephone and any other utility used upon or furnished to the Demised Premises. Tenant's obligation to pay for such utilities shall commence as of the date of Tenant's entry into the Demised Premises or the date possession of the completed Demised Premises is delivered to Tenant.

-16-

Section 8.03 Landlord-Supplied Services.  If any utility services are supplied by Landlord, the charges payable therefor by Tenant shall not exceed Landlord's cost therefor.  Landlord shall submit to Tenant copies of all utility bills documenting the utility charges purchased from Landlord together with a statement showing in detail the method of calculating that portion of the utility charges billed to Tenant. Tenant may, at its option and expense, install check or test meters to monitor Tenant's actual consumption of such utilities.  Landlord shall adjust its billings to Tenant to reflect Tenant's actual consumption based on periodic readings of the check or test meters.

ARTICLE 9.00

TAXES AND ASSESSMENTS

Section 9.01 Initial Payment.
delinquent all taxes (both
governmental charges lawfully
or any part thereof; provided
cost and expense, dispute and
disputed item need not be pai
the conclusion of such contes
to the extent that they are l
interest and penalties relati

Section 9.02 Tax Lien or Notice of Tax Levy.  In the event Tenant is served with a tax lien or notice of tax levy by any governmental body which lien or levy: (i) pertains to Landlord, or any subsidiary, affiliate, partner or business of Landlord or (ii) in the event Landlord is deceased, pertains to Landlord's estate or heirs, then Tenant shall be entitled to reduce the monthly Base Rent and any other monies payable hereunder, by an amount equal to Tenant's costs, including reasonable attorney fees, in responding to and otherwise complying with such tax lien or levy regardless of whether the tax lien or levy is released. The term "Tenant's costs" for the purpose of this section expressly includes all expenses and reasonable attorney fees incurred by Tenant in commencing an interpleader action in a court or before an administrative body.

Section 9.03 Reimbursement by Tenant -- Pro Rata.  Tenant shall pay to Landlord, upon demand, its proportionate share of taxes, assessments and governmental charges (excluding penalties, interest and court costs) paid by Landlord pursuant to Section 9.01 hereof.  Tenant's proportionate share shall be computed by the ratio of the total floor area of the Demised Premises to the gross leasable floor area of completed buildings within the Development from time to time.  Tenant shall be responsible only for a pro-rated portion of such taxes,

-17-

assessments and charges for fractional years occurring at the
commencement and expiration of the term of this Lease. As a condition
of Tenant's liability hereunder, Landlord shall obtain copies of each
year's paid tax statement or bill, and shall forward the same to Tenant
with demand for payment hereunder within one (1) year of the due date of
such taxes, assessments or governmental charges. Notwithstanding the
foregoing, in no event shall Tenant's proportionate share of taxes
exceed $2,600.00 during the first Lease Year.

Section 9.03 Amounts Payable Over Extended Periods. In the event that
any taxes, assessments or governmental charges may, at the option of the
taxpayer, be paid in installments over a period longer than one (1)
year, then the same shall be deemed paid in installments over the
maximum period permitted by the taxing authority and Tenant's obligation
for any one (1) tax fiscal year to pay its proportionate share of such
taxes, assessments or governmental charges shall only apply to those
installments which become actually due and payable (i.e., failing which
payment the same would become delinquent), together with any non-penalty
interest charged thereon by the governmental authority, during that same
tax fiscal year, except, however, that Tenant shall not be obligated to
pay any portion of taxes, assessments or governmental charges or
installments thereof which become actually due and payable during any
period prior to or subsequent to the term of this Lease. Taxes,
assessments and governmental charges for any fraction of a tax year at
the commencement or expiration of the term shall be apportioned pro rata
between the parties.

Section 9.04 Change of Ownership Taxes. It is expressly understood and
agreed that, notwithstanding anything to the contrary contained in this
Lease, in the event that at any time (and from time to time) during the
term of the Lease there is a change of ownership (as defined by
applicable law) of the Development ("Change of Ownership") which results
in an increase in the assessed valuation of the Development (the "Change
of Ownership Assessment"), then Tenant shall not be liable for any
taxes, assessments or governmental charges attributable to the Change of
Ownership Assessment; and for purposes of computing Tenant's
proportionate share of the taxes, assessments or governmental charges
commencing with the tax year in which the Change of Ownership Assessment
is first reflected in the taxing authority's notice of assessment (the
"Change of Ownership Year") and continuing for all subsequent tax years,
the taxes, assessments and governmental charges attributable to such
Change of Ownership (the "Change of Ownership Taxes") shall not be
included in the calculation of Tenant's proportionate share.

-18-

ARTICLE 10.00

INSURANCE AND INDEMNITY

**Section 10.01 Indemnification.** Each of Landlord and Tenant shall indemnify and defend the other and the other's agents, servants and employees from and against third party claims for any death, injury to person or damage to property to the extent caused by its negligence or wanton act or that of its agents, servants or employees in the course of their agency and employment.

The indemnitee under this Section shall promptly tender such claims to the indemnitor, but failure to do so promptly shall not diminish the indemnitor's obligations except to the extent any actual prejudice results from the delay. Any indemnification obligation owed by either party to the other pursuant to the above shall include defending and saving the other harmless from all claims, demands, actions, damages, losses, judgments, liabilities, and expenses (including reasonable attorney fees and expert witness fees).

**Section 10.02 Liability Insurance.** Tenant shall at all times during the term hereof, maintain and pay for Commercial General Liability insurance written on an occurrence basis and covering bodily injury, personal injury and property damage arising out of incidents or accidents occurring in the Demised Premises and specifically including coverage for products liability, completed operations, personal injury, advertising injury and contractual liability (insuring the indemnities under this agreement) in the amount of $1,000,000 per occurrence. Tenant agrees to provide a certificate of insurance evidencing coverage with a responsible domestic carrier with an A.M. Best's rating of at least A IX, showing Landlord as an additional insured but only as respects claims arising out of Tenant's negligence and the negligence of Tenant's agents, servants and employees, and providing that the insurance company will endeavor to give ten (10) days notice to Landlord prior to cancellation. Despite the fact that Landlord shall be named as an additional insured on Tenant's general liability insurance policy, in the event of any allegation of negligence or wrong-doing against Landlord, its agents, contractors or employees, including any allegation that Landlord has provided inadequate security to the Development, there shall be no duty of Tenant or its insurer to indemnify or defend.

**Section 10.03 Hazardous Use.** Tenant will not permit the Demised Premises to be used for any purpose which would render the insurance thereon void or the insurance risk more hazardous, it being understood and agreed that the use of the Demised Premises in the proper and ordinary conduct of Tenant's business for the purposes set forth herein shall not be considered in violation of this Section.

-19-

Section 10.04 Waiver of Subrogation.  Landlord and Tenant hereby waive any rights each may have against the other on account of any loss or damage occasioned to the respective property of the Landlord or the Tenant, as the case may be, including the Demised Premises or its contents or any other portions of the Development, arising from a loss covered or which would generally be covered by Fire and Extended Coverage insurance; and Landlord and Tenant each covenant that they will obtain for the benefit of the other a waiver of any right of subrogation which their insurer may acquire against the other party by virtue of the payment of any such loss covered by such insurance.

Section 10.05 Landlord's Insurance.  Landlord shall at all times during the primary and extended terms of this Lease maintain in effect a "Standard All Risk" property policy or policies covering on a replacement cost basis physical loss or damage to all buildings within the Development and the Demised Premises except for Tenant's improvements in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of any co-insurance and with a deductible not to exceed $25,000. Said "all risk" policy should include but not be limited to the following perils: fire, lightning, windstorm, cyclone, tornado, hail, explosion, earthquake, subsidence, flood, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, collapse of building or roof, boiler and machinery equipment, aircraft, vehicle, smoke damage, sprinkler leakage, and water damage other than flood and sprinkler leakage. Such insurance shall contain a waiver of subrogation against Tenant and be provided on a "primary basis" regardless of any other insurance tenant may elect to purchase and maintain.

Additionally, Landlord shall maintain a Commercial General Liability policy written on an occurrence basis covering bodily injury, personal injury and property damage arising out of incidents or accidents occurring in or around any part of the Development and the specifically including coverage for products liability, completed operations, personal injury, advertising injury and contractual liability (insuring the indemnities under this Agreement) in the amount of $5,000,000 per occurrence. Such policy will insure Tenant as an additional insured but only as respects claims arising out of Landlord's negligence and the negligence of Landlord's agent, servants and employees.

All insurance coverage required of Landlord shall be written with a domestic carrier with an A.M. Best's rating of at least A IX. Prior to the execution of this Agreement and immediately upon all renewals thereof, Landlord shall provide Tenant with certificates of insurance showing insurance is in force, providing that the insurance company will endeavor to give ten (10) days notice to Tenant prior to cancellation.

-20-

Section 10.06 Standard All Risk Property Insurance Reimbursement -- Pro Rata. Tenant shall pay to Landlord, upon demand, the amount of premium costs for standard all risk property insurance on the Demised Premises. If such premium shall not be assessed and charged separately but shall be included within a billing for the entire Development, said premium shall be fairly apportioned to determine Tenant's share thereof. Tenant's proportionate share shall be computed by the ratio of the total floor area of the Demised Premises to the gross leasable floor area of completed buildings within the Development from time to time. Tenant shall be responsible only for a pro-rated portion for fractional years occurring at the commencement and expiration of the term of this Lease. As a condition of Tenant's liability hereunder, Landlord shall obtain a paid copy of each premium statement and shall forward the same, along with a certificate of insurance evidencing said coverage, to Tenant with demand for any payment hereunder. Notwithstanding the foregoing, Landlord's billing for such insurance premium costs shall be included in Landlord's invoice for Common Area Maintenance charges pursuant to Article 7.00 hereof.

ARTICLE 11.00
SIGNS

Section 11.01 General. Tenant shall have the right, at its sole cost and expense, to install those signs as shown marked on the schedule of signs below, a copy of each pertinent exhibit having been attached hereto and incorporated herein by reference, as well as its professionally-prepared standard window banners, window decals, promotional banners and a pre-opening announcement sign. Tenant's installations and removals of such signs shall be made in such manner as to avoid injury, defacement and structural overloading of the Demised Premises or other improvements.

Tenant shall have the right to display the aforementioned signs notwithstanding anything to the contrary contained in any sign criteria for the Development which is now in effect or which is hereinafter modified, amended or replaced or which is established after the execution of this Lease. Landlord shall have no right or interest in Tenant's signs as marked on the schedule of signs below, and Landlord shall have no right whatsoever to remove, alter, replace or store Tenant's exterior sign(s) without first obtaining in each instance Tenant's prior written consent, which consent may be withheld at Tenant's sole discretion.

In the event Landlord contemplates any renovation, remodeling or expansion of the Development that necessitates removal of Tenant's

-21-

exterior signage (which signage shall include Tenant's exterior storefront sign(s) and, if applicable, any under-canopy sign or ribbon sign), upon a minimum of thirty (30) days prior written notice to Tenant, at Tenant's sole discretion and subject to the following limitations, Tenant may consent to such renovation, remodeling or expansion, such consent to be given to Landlord in writing by an authorized representative of Tenant. Landlord shall reasonably consider the retail selling season that would occur during any such renovation, remodeling or expansion and shall, to the extent reasonably possible, avoid any such work during the Easter, "Back to School" and Christmas holiday selling seasons. Landlord shall be solely liable for all costs, expenses, damages and liabilities resulting from the removal, storage, and reinstallation of Tenant's exterior signage. Landlord shall properly store Tenant's exterior signage and properly reinstall Tenant's exterior signage at the earliest possible date subsequent to the completion, or if reasonably possible, partial completion of any such renovation, remodeling or expansion work. Any damages to Tenant's exterior signage during Landlord's removal, storage or reinstallation thereof shall be repaired by Landlord at Landlord's sole expense. If during Landlord's removal process Tenant's exterior signage is damaged to the extent the signage reasonably requires replacement, or in the event that Landlord's renovation, remodeling or expansion of the Development causes the application of a new local governmental sign criteria, Landlord shall replace Tenant's signage at Landlord's sole expense and cooperate with Tenant and Tenant's sign manufacturer in the manufacture of new signage incorporating Tenant's standard corporate colors, style of letters and technical specifications, as specified in the sign exhibits marked on the schedule of signs below. In the event such new governmental sign criteria forbids the installation of Tenant's standard corporate colors or style of letters or significantly reduces the size of the letters of Tenant's originally installed sign(s), Tenant may elect not to allow Landlord to effect such renovation, remodeling or expansion to the Demised Premises and Tenant's original signage shall remain fully intact and shall not be removed or altered.

Schedule of Signs

__2__    Exhibit S-4A Standard ribbon sign
__3__    Exhibit S-5A Standard individual letters

ARTICLE 12.00

ASSIGNMENT AND SUBLETTING

Section 12.01 General. Tenant shall have the right to assign this Lease or to sublease the whole or any part of the Demised Premises with the

-22-

prior written consent of Landlord.  Tenant shall at all times remain
fully responsible and liable for compliance with all its obligations
under the terms, provisions, and covenants of this Lease, notwith-
standing any assignment or sublease.  Notwithstanding anything to the
contrary contained herein, Landlord hereby consents to an assignment or
subletting by Tenant of its interest in this Lease to (a) any wholly
owned subsidiary of Tenant so long as such subsidiary remains wholly
owned by Tenant; (b) any wholly owned subsidiary of the corporation (the
"Parent Corporation") owning all of the stock of Tenant so long as such
subsidiary continues to be owned by such Parent Corporation; (c) the
purchaser of all or substantially all of the assets of Tenant; (d) the
successor corporation in the event of the merger or consolidation of
Tenant; (e) to a corporation under common control with the Parent
Corporation or another subsidiary; (f) to a corporation with which the
Parent Corporation consolidates or pools its assets; and (g) Tenant's
Parent Corporation.

Section 12.02 Landlord's Right to Cancel.  For a period of fifteen (15)
days following receipt from Tenant of a request for consent to a
sublease or assignment to a person, firm, corporation or entity other
than a subsidiary or affiliate of Tenant, Landlord shall have the right
to cancel this Lease upon written notice to Tenant.

Section 12.03 Exclusives or Covenants.  Tenant agrees not to assign this
Lease or sublease the Demised Premises to a tenant whose conduct of
business would violate any existing exclusives or covenants granted
other tenants within the Development.  In consideration of Tenant's
abstention, Landlord agrees to furnish copies of said exclusives and
covenants to Tenant upon Tenant's written request.

## ARTICLE 13.00
## RIGHT OF ENTRY

Section 13.01 General.  Landlord shall have the right to enter the
Demised Premises during reasonable business hours for the purpose of
inspecting the same or upon prior reasonable notice for the purpose of
making those repairs required to be made by Landlord hereunder;
provided, however, all rights of Landlord hereunder shall be exercised
in a reasonable manner and so as to cause no or minimal interference
with Tenant's business.

## ARTICLE 14.00
## CONDEMNATION

Section 14.01 General Condemnation.  If the whole or any substantial
part (25% or more) of the Common Area and Common Improvements, as herein

-23-

defined, or any portion of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by voluntary sale or conveyance in lieu of condemnation, but under the threat of condemnation, then, at Tenant's option, this Lease shall terminate, effective when the physical taking shall occur. If the Lease is not terminated after the taking of any portion of the Demised Premises, Tenant's financial obligations shall be reduced in proportion to the percentage of gross leasable floor area of the Demised Premises so taken, effective when the physical taking shall occur, and Landlord shall diligently replace or repair the Demised Premises. If the Lease is not terminated after the taking of (i) the whole or any substantial part of the Common Area and Common Improvements or (ii) a combination of such portion(s) of the Common Area and Common Improvements and any portion of the Demised Premises, Tenant's rent payable hereunder during the unexpired portion of the term shall be reduced to such extent as may be fair and reasonable under all of the circumstances, effective when the physical taking shall occur, and Landlord shall diligently repair or replace the Common Areas and Common Improvements and, if necessary, the Demised Premises. Although the size of the Demised Premises and/or the Common Area and Common Improvements will be reduced, when Landlord is required herein to replace or repair the Demised Premises and/or the Common Area and Common Improvements, it is understood and agreed between the parties that Landlord shall have the responsibility to replace or repair to the same condition as existed prior to the taking.

Section 14.02 Limited Condemnation. If less than a substantial part of the Common Area and Common Improvements is taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain, or by voluntary sale or conveyance in lieu of condemnation, but under the threat of condemnation, this Lease shall not be terminated but the rent payable hereunder during the unexpired portion of the term shall be reduced to such extent as may be fair and reasonable under all of the circumstances.

Section 14.03 Damage Award. All damages awarded for the taking of said premises, or any part thereof, shall be payable in the full amount thereof to and the same shall be the property of Landlord; however as between Landlord and Tenant, if the condemnation award to Landlord is a lump sum award or Landlord's award is inclusive of damages to Tenant for any of the following, Tenant shall be entitled to that portion of Landlord's award reasonably allocated to Tenant for its loss of business, moving expenses, the loss of value or cost of removal of stock, furniture, and fixtures owned by Tenant, and the unamortized value of Tenant's leasehold improvements using the straight-line method of amortization over the primary term of this Lease; otherwise, Tenant

-24-

shall make direct claim against the condemning authority for any of the foregoing, as applicable.

Section 14.04 Temporary Access Reduction. If the access to the Demised Premises as illustrated by Exhibit B is temporarily substantially reduced, Base Rent shall be abated during such period of reduced accessibility and Tenant shall pay to Landlord monthly the lesser of four percent (4%) of Gross Sales or the Base Rent until full access is restored. If possible, Landlord shall supply substitute access during such period of reduced accessibility.

ARTICLE 15.00

CASUALTY

Section 15.01 Destruction by Casualty. In the event the Demised Premises or the Development are damaged or destroyed by fire or other casualty, this Lease shall terminate, at Tenant's option, under any of the following circumstances:

    (i)    damage to the Demised Premises to the extent of fifty percent (50%) or more of its replacement cost; or

    (ii)    damage to the Demised Premises to the extent that it appears, in Tenant's reasonable judgment, that rebuilding or repair cannot be completed within one hundred eighty (180) days of the date of the casualty; or

    (iii)    damage to the Demised Premises to the extent of twenty percent (20%) or more of its replacement cost occurring during the last two (2) years of the Lease Term; or

    (iv)    damage to the Development to the extent of fifty percent (50%) or more of its replacement cost, regardless whether the Demised Premises are affected by such fire or other casualty.

If Tenant elects to terminate this Lease under any provision of subsections (i) through (iv) above, it shall so notify Landlord in writing within ninety (90) days after said casualty occurs. Landlord shall have the co-extensive right to terminate this Lease under the provisions of subsection (iv) above, provided that Landlord also terminates, simultaneously with its election to terminate this Lease, the leases of all other tenants in the Development which are similarly affected and further provided that Landlord give written notification to Tenant of such termination within ninety (90) days after said casualty occurs. Upon notice by either party, this Lease and all unaccrued obligations of Tenant and Landlord shall terminate.

If not terminated as provided above, this Lease shall remain in full force and effect and Landlord shall proceed with due diligence to repair

-25-

or restore the Demised Premises to substantially the same condition as existed before the casualty, provided that Tenant's financial obligations hereunder shall be abated in proportion to the greater of the percentage of the Demised Premises rendered untenantable or the percentage of gross leasable floor area of the Development rendered untenantable. The abatement shall continue until the earlier of sixty (60) days after the Demised Premises have been repaired or restored or the date Tenant reopens the Demised Premises for business, or if the Demised Premises are unaffected by such casualty, the date upon which Landlord has substantially restored the Development to its condition prior to such casualty. Anything to the contrary in this Lease notwithstanding, Landlord's failure to complete repair or restoration of the Demised Premises, or the Development, within one hundred eighty (180) days of such casualty shall entitle Tenant, at its option, to terminate this Lease by written notice to Landlord delivered within fifteen (15) days following the expiration of the 180 day period, whereupon this Lease and all unaccrued obligations of Tenant and Landlord shall terminate.

Section 15.02 Extent of Obligation to Repair or Rebuild. If Landlord is required or elects to repair or rebuild the Demised Premises as herein provided, Landlord's obligation hereunder shall be limited to that work specifically designated in Tenant's construction plans and specifications as being Landlord's responsibility. It is understood and agreed between the parties that Landlord shall have the responsibility to rebuild and restore the Demised Premises to the condition existing at the time Landlord originally delivered possession of the Premises to Tenant. Tenant shall repair or replace its merchandise, trade fixtures, furnishings, equipment and those items specifically designated in Tenant's construction plans and specifications as being Tenant's responsibility. It is expressly agreed that should any event of casualty cause damage to or destroy Tenant's exterior signage specified in Article 11, Tenant shall be allowed to repair or replace said signage, including black background, incorporating Tenant's standard corporate colors, style of letters, size of letters and technical specifications as reflected in Tenant's sign exhibits attached hereto.

## ARTICLE 16.00
### SUBORDINATION AND ESTOPPEL CERTIFICATES

Section 16.01 Subordination. This Lease is subject and subordinate to the lien of any mortgage, deed of trust or other security instrument (hereinafter referred to collectively as "mortgage") now or hereafter in force regarding the Demised Premises or the Development and to all advances, renewals, replacements and extensions made or hereafter to be made upon the security thereof; provided, however, so long as no default

exists hereunder on the part of Tenant after the expiration of all applicable grace periods, Tenant's tenancy and its rights under the terms and conditions of this Lease shall not be disturbed, nor shall this Lease be affected by any default under such mortgage and any successor to Landlord shall be bound by the obligations of Landlord under this Lease. In the event of foreclosure or enforcement of any such mortgage, the rights of Tenant and its tenancy hereunder shall survive and this Lease shall in all respects continue in full force and effect. This subordination is self-operative without the need for any further document or instrument. In the event Landlord or any mortgagee requests in writing that Tenant execute an instrument to additionally evidence such subordination, Tenant agrees to execute such an instrument in form acceptable to Tenant, provided the requesting party pays Tenant a fee of $250.00 to reimburse Tenant for administrative and legal expenses associated with the review, preparation and processing of same.

Section 16.02 Estoppel Certificates. Landlord and Tenant shall, at any time during the primary term or any extension thereof, within twenty (20) days of either Landlord's or Tenant's written notice to the other, certify that this Lease is unmodified and in full force and effect (or, if there have been any modifications, that this Lease is in full force and effect as modified and stating the modifications), and the dates to which the Base Rent and other charges have been paid in advance, if any. Each party agrees to exercise reasonable diligence in determining whether there are then existing any breaches, setoffs or defenses regarding any of the agreements, terms or conditions hereof upon the part of either Landlord or Tenant to be performed or complied with (and, if so, specifying the same.) Except in the event Landlord or Tenant, as the case may be, fail to exercise reasonable diligence in determining whether there are then existing any breaches, setoffs or defenses regarding the obligations of either Landlord or Tenant, neither party's failure in the estoppel certificate to so specify any breach or violation of this Lease Agreement then existing shall be construed or implied as a waiver of that party's rights against the other party for any such breach, setoff or defense. If demanded by the party receiving any such request, the requesting party shall join in the execution of any such estoppel certificate. Subject to the foregoing, it is hereby intended that any such statement delivered pursuant to this clause may be relied upon by any prospective purchaser, assignee, mortgagee or other successor to any ownership or security interest in the Development or Tenant's leasehold interest. In the event that Landlord or Tenant, as the case may be, should fail to timely comply with this provision, such failure shall be deemed an acknowledgement by such party that the statement as submitted is true and correct.

ARTICLE 17.00

DEFAULT OF TENANT

**Section 17.01 Events of Default.** The following events shall be deemed to be events of default by Tenant under this Lease:

(i)   Tenant shall fail to pay any installment of the rent hereby reserved and such failure shall continue for a period of ten (10) days after Tenant's receipt of written demand therefor from Landlord.

(ii)  Tenant shall fail to comply with any term, provision, or covenant of this Lease, other than the payment of rent, and such failure shall continue for a period of thirty (30) days after Tenant's receipt of written notice thereof from Landlord (or, if the cure cannot be effected within said thirty (30) day period, then within such additional period of time as may be required to cure such default provided Tenant is diligently and continuously pursuing the cure to completion).

(iii) Tenant shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(iv)  Tenant shall file a petition under any section or chapter of the Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof; or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder.

(v)   A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant.

(vi)  Tenant shall abandon any substantial portion of the Demised Premises. Assignment or subletting by Tenant (in accordance with the terms hereof) shall not be considered an act of default.

**Section 17.02 Remedies of Landlord.** Upon the occurrence of any of said events of default, Landlord shall have the right to elect any one of the following remedies, which remedy shall be Landlord's sole and exclusive remedy, by the giving of ten (10) days prior written notice to Tenant at any time during the continuance of the event of default:

(i)   Terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails so to do, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor; and Tenant agrees to pay to Landlord

-28-

on demand the amount of all accrued financial liabilities of Tenant hereunder through the date of surrender of the Demised Premises only, plus all costs and expenses of Landlord including reasonable attorneys fees incurred in obtaining possession of the Demised Premises.

(ii)     Enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor, and Landlord shall make all commercially reasonable efforts to relet the Demised Premises and receive the rent therefor; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting. In any event, there shall be no liability or obligation on the part of Tenant to pay any Base Rent or other monies payable pursuant to this Lease prior to the date the same would otherwise have become due, it being understood that Landlord shall have no right to accelerate (i.e. declare the same immediately due and payable) any such Base Rent or other monies which would have become due hereunder.

(iii)    Enter upon the Demised Premises by force if necessary without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease, except that in no event shall Landlord be allowed to operate Tenant's business as a retail family shoe store, and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in this effecting compliance with Tenant's obligations under this Lease. In any event, there shall be no liability or obligation on the part of Tenant to pay any Base Rent or other monies payable pursuant to this Lease prior to the date the same would otherwise have become due, it being understood that Landlord shall have no right to accelerate (i.e. declare the same immediately due and payable) any such Base Rent or other monies which would have become due hereunder.

## ARTICLE 18.00
### QUIET ENJOYMENT

Section 18.01 General. Landlord warrants that it is the owner of the Development as illustrated by Exhibit B and that it has the full right and authority to enter into and perform this Lease and to grant the estate herein demised, and covenants and agrees that at all times during the term of this Lease, including any extension thereof, when Tenant is not in default beyond any term provided herein for the curing of such default, Tenant's quiet and peaceful enjoyment of the Demised

-29-

Premises and of all rights, easements, appurtenances and privileges belonging or otherwise appertaining thereto shall not be disturbed or incerfered with by Landlord or any person. In the event Landlord breaches its covenant of quiet enjoyment owed to Tenant, the same shall constitute a material breach of this Lease and Tenant shall be entitled to all remedies available at any law or in equity and further, in the event Landlord fails to remedy any such breach within thirty (30) days receipt of written notice from Tenant, Tenant may terminate this Lease effective upon a minimum of five (5) days prior written notice.

Landlord covenants, agrees and warrants that neither the execution nor the provisions of this Lease violate or breach or will violate or breach any term or provision of any agreement, written or oral, with any other person, and that in the event legal proceedings are instituted by any person to prohibit the use, operation or enjoyment of the Demised Premises, or any part thereof, as provided in this Lease, Landlord will assume the defense of any such legal proceedings and will indemnify and save Tenant harmless from all costs of suit, including attorneys' fees, and consequential damages to Tenant in any manner whatsoever arising from or out of any such legal proceedings and/or the total or partial loss of the use, operation or enjoyment of the Demised Premises, or any part thereof, as provided in this Lease.

Landlord further covenants, warrants and represents that there are no claims or other parties, encumbrances, mortgages or other liens, restrictions, reservations or defects in Landlord's title which could interfere with or impair or result in any interference with or impairment of Tenant's use, occupancy and enjoyment of the Demised Premises or with Tenant's other rights hereunder, all in accordance with the terms of this Lease; and that it will indemnify and hold harmless Tenant from and against any loss and expense, including, without limitation, attorney fees and consequential damages, incurred on account of any breach of its warranties.

## ARTICLE 19.00
### RENT PAYMENT AND NOTICE

Section 19.01 General. Each provision of this instrument or of any applicable governmental laws, ordinances, regulations and other requirements with reference to the sending, mailing or delivery of any notice or the making of any payment by Landlord to Tenant or with reference to the sending, mailing, or delivery of any notice or the making of any payment by Tenant to Landlord shall be deemed to be complied with when and if the following steps are taken:

(i)     All rent and other payments required to be made by Tenant to Landlord hereunder shall be payable to Landlord at the address hereinbelow set forth or at such other address as Landlord may specify from time to time by written notice delivered in accordance herewith.

(ii)    All payments required to be made by Landlord to Tenant hereunder shall be payable to Tenant at the address hereinbelow set forth, or at such other address as Tenant may specify from time to time by written notice delivered in accordance herewith.

(iii)   In the event Landlord is comprised of multiple parties, such parties agree to stipulate one party (named below) for receipt of notice and payments hereunder.

(iv)    Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not: (i) when sent by Western Union Mailgram or equivalent; (ii) sent by Airborne, Federal Express, or a comparably reliable national air courier service (i.e., one which delivers service in at least 48 states) provided that any such courier service provides written evidence of delivery; or (iii) when deposited in the United States Mail, postage prepaid, Registered or Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out opposite their names below, or at such other addresses as they have theretofore specified by written notice delivered in accordance herewith:

LANDLORD: Mason Avenue Holding Co.
          80 Fahy Avenue
          Staten Island, NY 10314

WITH A COPY TO: Goldberg & Pines
                501 Fifth Avenue
                New York, NY 10017

TENANT: PAYLESS SHOESOURCE, INC.
        ATTN: Lease Administration
        Store #4813
        P. O. Box 3560
        Topeka, Kansas 66601-3560

WITH A COPY TO:  Chief Real Estate Counsel
                 PAYLESS SHOESOURCE, INC.
                 Store #4813
                 P. O. Box 3591
                 Topeka, Kansas 66601-3591

ARTICLE 20.00

MISCELLANEOUS

Section 20.01 Changes by Interlineation. The parties agree that no changes have been made by either party or their respective agents to any page unless the change is clearly visible by interlineation, not by obliteration, and initialed by both parties.

Section 20.02 Captions and Section Numbers. The captions and section and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections or articles of this Lease or in any way affect this Lease.

Section 20.03 Gender. In this Lease the use of gender references is not meant to be a limitation, and the use of a particular gender shall be interpreted to include the other of masculine, feminine and neuter where the situation so demands; similarly, the use of the singular shall be interpreted to include the plural where the situation so demands, and vice versa.

Section 20.04 Consent. Except as specifically provided for elsewhere herein, whenever the consent of either party is required to an action under the terms of this Lease, such consent shall not be unreasonably withheld nor delayed. In the event any such consent is unreasonably withheld or delayed, the same shall constitute a material breach of this Lease.

Section 20.05 Most Favored Nation. Tenant shall be entitled to no lesser benefit(s) or right(s) than any other tenant in the Development, exclusive of the Key Tenant, including but not limited to the following: (i) the calculation of Tenant's pro rata share of taxes, insurance and Common Area Maintenance; and (ii) Landlord's application and enforcement of any Development rules and regulations.

Section 20.06 Expenses and Attorneys' Fees. If either party incurs any expense, including reasonable attorney fees, in connection with any action or proceeding instituted by either party reasonably necessary to protect, enforce or defend rights and obligations under this Lease, the prevailing party in such action or proceeding shall be entitled to recover its said reasonable expenses from the other party.

Section 20.07 Brokerage Commissions and Finder's Fees. Each of the parties represents and warrants that it has engaged no broker or finder, except as stated below, and that no claims for brokerage commissions or finder's fees will arise in connection with the execution of this Lease and each of the parties agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claim arising on account of its acts or omissions (including, without limitation, the cost of attorneys' fees in connection therewith).

| BROKER | FEES PAID BY: |
|---|---|
| VIP Realty<br>1860 Clove Road<br>Staten Island, New York | Landlord |

Welco Realty            Landlord
1865 Palmer Avenue
Larchmont, NY  10538

Section 20.08 Right to Audit.  Tenant shall have the right to audit Landlord's books and records with respect to any expenses which are passed through to Tenant, including but without limitation, taxes, insurance and Common Area Maintenance charges.  If any audit discloses an overpayment, Landlord shall reimburse Tenant upon written demand for the overpayment and if not paid to Tenant within thirty (30) days after receipt by Landlord of a statement therefor, Tenant may deduct such overpayment, together with interest at the rate of two percent (2%) above the prime rate quoted by Citibank, N.A., from subsequent installments of Base Rent and any other monies payable hereunder.

Section 20.09 Removal of Personal Property; Waiver of Distraint.  At any time during the term of this Lease, Tenant may remove any or all trade fixtures, furniture, furnishings, signs, equipment, cash registers, inventory and any and all items of personal property placed in, on or about the Demised Premises by Tenant or by Tenant's subtenants, licensees or concessionaires.  Tenant agrees to repair any damage to the Demised Premises occasioned by the removal of any such items, but such obligation shall not extend to painting or redecorating the Demised Premises.  Title of all of such trade fixtures, furniture, furnishings, signs, equipment, machinery, cash registers, inventory and any and all items of personal property shall remain in Tenant and Tenant alone shall be entitled to claim depreciation therefor. Landlord hereby waives, releases and relinquishes any and all rights of distraint, levy, attachment or recourse to the trade fixtures, furnishings, signs, equipment, machinery, cash registers, inventory and personal property in the Demised Premises.  Although the foregoing waiver, release and relinquishment shall be self-operative without the necessity for any further instrument or document, Landlord hereby agrees to furnish Tenant or any vendor or other supplier under any conditional sale, chattel mortgage or other security arrangement, any consignor, and holder of reserved title or any holder of a security interest, upon written request from time to time, waivers of Landlord's right to distraint, levy, attachment or recourse with respect thereto and exempting the same from distraint, levy, attachment or recourse.

Section 20.10 Remedies Cumulative.  Subject to Section 17.02, the various rights, options, elections, powers and remedies contained in this Lease, including the rights herein granted to terminate this Lease, shall be construed as cumulative and no one of them shall be exclusive of any of the others, or of any other legal or equitable remedy which either party might otherwise have in the event of breach

-33-

or default in the terms hereof, and the exercise of one right or remedy by such party shall not impair its right to any other right or remedy until all obligations imposed upon the other party have been fully performed. It is intended that each of the agreements and covenants of Landlord and Tenant set forth herein be deemed by both a covenant and a condition.

Section 20.11 Governing Law. This Lease shall be interpreted and construed under the laws of the State in which the Demised Premises are situate.

Section 20.12 No Partnership. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, and neither the method of computation of rent nor any other provision contained in this Lease nor any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

Section 20.13 No Waiver. No waiver of any default hereunder shall be implied from any omission by either party to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver, and then only for the time and to the extent therein stated. No delay or omission by either party hereto to exercise any right or power accruing upon any noncompliance or default by the other party with respect to any of the terms hereof, or otherwise accruing hereunder shall impair any such right or power or be construed to be a waiver thereof. One or more waivers of any breach of any covenant, term or condition of this Lease shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent by a party to or of any act by the other party requiring the former party's consent shall not be deemed to waive or render unnecessary such former party's consent to or of any subsequent similar acts by the other party.

Section 20.14 Entire Agreement; Amendment. As of the execution hereof, this Lease contains all covenants and agreements between Landlord and Tenant exclusively relating in any manner to the rental, use and occupancy of the Demised Premises and the other matters set forth in this Lease. No prior agreement or understanding pertaining to the same shall be valid or of any force or effect, and the covenants and agreements of this Lease cannot be altered, changed, modified or added to, except in writing signed by Landlord and Tenant.

-34-

-35-

Section 20.15 Severability. Any provision or provisions of this Lease which shall prove to be invalid, void or illegal, shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect.

Section 20.16 Assumption Agreement. Landlord agrees to deliver to Tenant an agreement signed by any person or persons who may purchase all or any part of Landlord's interest in the Demised Premises and/or the remainder of the Development, which agreement shall formally recognize the obligations of such person or persons as purchasers from Landlord and the assumption by such person or persons as purchasers of all of Landlord's obligations, responsibilities and duties hereunder. Such agreement shall be in a form satisfactory to the counsel of Tenant and shall be delivered to Tenant before any such sale by Landlord can become final.

Section 20.17 Environmental. Landlord warrants and represents that any use, storage, treatment or transportation of Hazardous Substances which has occurred in or on the Development prior to the date hereof has been in compliance with all applicable federal, state and local laws, regulations and ordinances. Landlord additionally warrants and represents that no release, leak, discharge, spill, disposal or emission of Hazardous Substances has occurred in, on or under the Demised Premises and that the Development is and shall continue to be maintain free of Hazardous Substances as of the date hereof. As used herein, "Hazardous Substance" means any substance which is toxic, ignitable, reactive, or corrosive and which is regulated by any local government, the State in which the Development is located, or the United States government. "Hazardous Substance" includes any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to state, federal or local governmental law. "Hazardous Substance" includes but is not restricted to asbestos, polychlorobiphenyls ("PCB's") and petroleum.

Landlord agrees to indemnify and hold harmless the Tenant from any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses (including, without limitation, any and all sums paid for settlement of claims, attorneys' fees, consultant and expert fees) arising during or after the Lease Term from or in connection with the presence or suspected presence of Hazardous Substances in or on the Development, unless the Hazardous Substances are present solely as a result of negligence, willful misconduct of Tenant, Tenant's agents, employees, contractors or invitees. Without limitation of the foregoing, this indemnification shall include any and all costs

incurred due to any investigation of the site or any cleanup, removal or restoration mandated by a federal, state or local agency or political subdivision, unless the Hazardous Substances are present solely as a result of negligence or willful misconduct of Tenant, Tenant's agents, employees, contractors or invitees. This indemnification shall specifically include any and all costs due to Hazardous Substances which flow, diffuse, migrate or percolate into, onto or under the Development prior to, during or after the Lease Term commences.

The provisions of this Section 20.17 shall be in addition to any other obligations and liabilities Landlord may have to Tenant at law or in equity and shall survive the transactions contemplated herein and shall survive the termination of this Lease.

Section 20.18 **Time of the Essence.** Time is of the essence with respect to all matters provided in this Lease.

Section 20.19 **Locative Adverbs.** The locative adverbs "herein," "hereunder," "thereto," "hereby," "hereinafter" and like words wherever the same appear herein, mean and refer to this Lease in its entirety and not to any specific article, section or subsection hereof.

Section 20.20 **Interpretation.** It is agreed that in the construction and interpretation of the terms of this Lease, the rule of construction that a document is to be construed most strictly against the party who prepared the same shall not be applied, it being agreed that both parties hereto have participated in the preparation of the final form of this Lease.

Section 20.21 **Recording of Lease.** The parties agree that this Lease shall not be recorded; provided however, upon the request of either party hereto, the other party shall join in the execution of a Memorandum or so called "short-form" of Lease for the purpose of recording. Said Memorandum shall describe the parties, the Demised Premises and the Lease term and shall incorporate this Lease by reference. The party requesting execution of said Memorandum shall pay all expenses of recording.

Section 20.22 **Memorandum Required.** If the Common Improvements of the Development or the building in which the Demised Premises are situate are not existing on the date of this Lease, then this Lease Agreement shall not be considered fully executed until Landlord shall have delivered to Tenant an executed Memorandum, as provided in Section 20.21 above, in recordable form.

Section 20.23 Authority. If Landlord is a corporation, each individual executing this Lease on behalf of said corporation hereby covenants, represents and warrants that: (i) Landlord is a duly incorporated or duly qualified (if foreign) corporation and is authorized to do business in the State where the Development is located; and (ii) he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation, and that this Lease is binding upon said corporation in accordance with its terms. If Landlord is a partnership, each individual executing this Lease on behalf of said partnership represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said partnership, in accordance with the partnership agreement for said partnership.

Section 20.24 Garnishment. In the event Tenant is served with an order or writ of garnishment based upon a judgment or lien against Landlord or Landlord's accounts receivables, Tenant shall be entitled to a credit against its Base Rent and other monetary obligations to the extent of any payment into court by Tenant, along with any costs, attorney fees and expenses incurred by Tenant in complying with any such order of garnishment.

Section 20.25. Limitation on Landlord's Liability. If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, Tenant hereby releases Landlord from any personal liability for monetary damages arising out of such default. Should Tenant, its successors or assigns, as a consequence of such default, recover a money judgment against Landlord, such judgment shall be satisfied solely and exclusively only out of Landlord's interest in the Development and improvements thereon which include (i) the rents or other income from such property receivable by Landlord, and (ii) the consideration received by Landlord from the sale of all or any part of such interest and Landlord shall not be liable for any deficiency. The provisions of this section are not designed to relieve Landlord of the performance of any of its obligations hereunder, but rather to limit Landlord's liablity in the case of a recovery of a money judgment against it, as aforesaid, which judgment shall constitute Tenant's sole remedy at law. The foregoing limitation shall not apply to or limit (i) any attorney's fees and litigation costs, (ii) any injunctive or other equitable declaratory or other forms of relief to which Tenant may be entitled (notwithstanding that such actions are in personam in nature) or (iii) any other remedy or action against Landlord which does not involve the personal liability of Landlord for monetary damages from property as aforesaid.

-37-

Section 20.26 Offer to Lease. Tenant's execution and delivery of this Lease to Landlord shall be deemed an Offer to Lease, which may be revoked by Tenant, at its option, upon written notice, if Landlord has failed to execute and deliver to Tenant two (2) fully executed leases in counterpart by October 29, 1993.

IN WITNESS WHEREOF, the parties have caused this Lease Agreement to be duly executed.

LANDLORD

MASON AVENUE HOLDING CO., a New York corporation

Date of execution: _____

Witness or Attest:

_Linda Rizzo_                         By: _____
                                          Pres.

TENANT

PAYLESS SHOESOURCE, INC., a Missouri corporation

Date of execution: 10/25/93

Attest:

_____                      By _____
Assistant Secretary                      Vice President

ACKNOWLEDGEMENT OF LANDLORD
(Individual or Partnership)

STATE OF            )
                    ) ss:
COUNTY OF           )

On this 10 day of December, 19__, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Neil Simon, who is/are personally known to me to be the same person(s) who executed the foregoing Lease Agreement and they acknowledged the execution of the same as their free and voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last above written.

_____
Notary Public

My Commission expires: _____

MARK H. GOLDBERG
Notary Public, State of New York
No. 6G 1075
Qualified in Westchester County
Commission Expires July 31 1994

-38-

ACKNOWLEDGEMENT OF LANDLORD
(Corporate)

STATE OF New York )
                      ) ss:
COUNTY OF New York )

On this 10 day of Dec_____, 19 93 before me, the
undersigned, a Notary Public in and for the County and State aforesaid,
came Neil Simon_____, and _____, of
_____, who are personally known to me to be the same
person(s) who executed the foregoing Lease Agreement as _____
and President_____, respectively, of said corporation, and
said _____ duly acknowledged the execution of the
same as an act of said corporation and said _____
duly acknowledged the attestation of the same for and on behalf of said
corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial
seal the day and year last above written.

_____
MARK H. GOLDBERG
Notary Public State of New York

Notary Public
Qualified in Westchester County
My Commission expires:_____ Commission Expires July 31 1994


ACKNOWLEDGEMENT OF TENANT


STATE OF KANSAS      )
                      ) ss:
COUNTY OF SHAWNEE    )

On this 26th day of October, 1993, before me, the undersigned, a Notary
Public in and for the County and State aforesaid, came James J. Romanek,
Vice President, and Aaron G. Hove, Assistant Secretary, of PAYLESS
SHOESOURCE, INC., a Missouri corporation, who are personally known to me
to be the same persons who executed the foregoing Lease Agreement as
Vice President and Assistant Secretary, respectively, of Payless
ShoeSource, Inc., and said Vice President duly acknowledged the
execution of the same as an act of Payless ShoeSource, Inc., and said
Assistant Secretary duly acknowledged the attestation of the same for
and on behalf of Payless ShoeSource, Inc.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial
seal the day and year last above written.

_____
Notary Public

My Commission expires:  11/20/94


Rebecca R. Ott
NOTARY PUBLIC
State of Kansas
MY APPT. EXPIRES

-39-

**EXHIBIT B**

**COMPLAINT**

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM
NYSCEF DOC. NO. 1

INDEX NO. 710985/2017
RECEIVED NYSCEF: 08/09/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

-----------------------------------------------------------------------X

ARIEL CRUZ,

                         Plaintiff,

              -against-

MASON AVENUE HOLDING CORPORATION,

                      Defendant.

-----------------------------------------------------------------------X

Index No.:
Date Filed:

**VERIFIED COMPLAINT**

Plaintiff, ARIEL CRUZ, by her attorneys, ROSENBERG MINC FALKOFF & WOLFF, LLP, as and for her Verified Complaint, alleges, upon information and belief, as follows:

    **FIRST:**    Upon information and belief, that at all times hereinafter mentioned, the defendant, Mason Avenue Holding Corporation, was and is a domestic business corporation

    **SECOND:**    Upon information and belief, that at all times hereinafter mentioned, the defendant, owned the building, lands and premises located at 965 Richmond Avenue, County of Richmond, City of New York, State of New York.

    **THIRD:**    Upon information and belief, that at all times hereinafter mentioned, and at some time prior to March 31, 2017, December 31, 2009, the defendant, Mason Avenue Holding Corporation, entered into a lease agreement with Payless Shoe Store for a portion of the building and premises located at 965 Richmond Avenue, County of Richmond, City of New York, State of New York.

    **FOURTH:**    Upon information and belief, that at all times hereinafter mentioned, Bayside Refrigeration was the H.V.A.C. contractor in connection with the construction, alteration, repair and erection of a portion of the premises located at 965 Richmond Avenue, County of Richmond, City of New York, State of New York.

    **FIFTH:**    Upon information and belief, that at all times hereinafter mentioned,

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM          INDEX NO. 710985/2017
NYSCEF DOC. NO. 1                                      RECEIVED NYSCEF: 08/09/2017

the defendant, Mason Avenue Holding Corporation, did contract and/or hire the Bayside

Refrigeration for construction, alteration, repair and erection of the premises located at 965

Richmond Avenue, County of Richmond, City of New York, State of New York.

SIXTH:        Upon information and belief, that at all times hereinafter mentioned, the

defendant, Mason Avenue Holding Corporation entered into an agreement with Bayside

Refrigeration for the performance of certain work, labor and services and the furnishing of

certain materials for the purposes of painting, altering, repairing, maintaining, constructing

and/or erecting at the aforementioned premises located at 965 Richmond Avenue, County of

Richmond,. City of New York, State of New York.

SEVENTH:    That on March 31, 2017, the plaintiff, Ariel Cruz, was employed by

Bayside Refrigeration at the construction site located at 965 Richmond Avenue, County of

Richmond, City of New York, State of New York.

EIGHTH:      That on March 31, 2017, the plaintiff, Ariel Cruz, was at the

aforementioned premises located at 965 Richmond Avenue, County of Richmond, City of

New York, State of New York, on the permanently affixed ladder to the roof at said premises.

NINTH:        That on March 31, 2017, at approximately 3:05 P.M., the plaintiff, Ariel

Cruz, was caused to sustain severe and serious personal injuries at the aforementioned

premises located at 965 Richmond Avenue, County of Richmond, City of New York, State of

New York, when she fell from a ladder that slid and collapsed.

TENTH:        That the aforesaid occurrence was caused solely and wholly through

and by reason of the negligence, carelessness and recklessness of the defendants, by their

agents, servants and/or employees, and without any negligence on the part of the plaintiff

contributing thereto,   in that defendants deprived the plaintiff of a safe place to work; in that

defendants violated Section 240 of the Labor Laws; in that defendants violated Section 200

2

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM    INDEX NO. 710985/2017
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 08/09/2017

of the Labor Laws; in that defendants violated Section 241(6) of the Labor Laws; in that

defendants violated the various Rules and Regulations of the Administrative Code of the City

of New York; in that defendants violated the various Rules and Regulations of the Board of

Standards and Appeals more commonly known as Rule 23; in that defendants permitted and

allowed a dangerous, hazardous and defective condition to exist in the aforementioned area

in which the plaintiff was working; in that the defendants directed, permitted and allowed the

plaintiff to work in an area which was dangerous, hazardous and unsafe; in failing to provide

proper safety and maintenance procedures so as to ensure the safety of the area in which

the plaintiff was working; in failing to have sufficient and/or efficient personnel in and about

the premises; in failing to properly and adequately supervise   the progress of work at the

aforementioned premises, and more particularly, the area of the premises in which the

plaintiff was working; in failing to give warning or notice of the hazardous and dangerous

conditions, although said conditions existed for a long enough period of time so that the

defendants by their agents, servants and/or employees should have had or did have actual

knowledge of the said hazardous and dangerous condition, and neglected and failed to

remedy same; in that the defendants were further negligent in that defendants created and

maintained an absolute nuisance under the circumstances; in failing to provide this plaintiff

with a safe and unobstructed place to work; in failing to provide a proper and safe surface

under this plaintiff for him to do his work; in that the defendants were further negligent in

failing to properly guard the hazardous and dangerous condition; in permitting, allowing and

maintaining the hazardous and dangerous condition to exist therein; in failing to provide

protective barriers in or about the area where the plaintiff was caused to be injured; in failing

to provide warnings, barricades or other protective devices in and about the area where the

plaintiff was caused to be injured; in failing to construct, equip, operate, arrange and conduct

3

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM
NYSCEF DOC. NO. 1

INDEX NO. 710985/2017
RECEIVED NYSCEF: 08/09/2017

the worksite so as to provide proper protection to workers thereat; in failing to furnish or erect, and/ or improperly furnishing and erecting scaffolds, ropes, hoists, ladders, pulleys, braces and other safety devices which were so constructed, placed and operated so as to provide reasonable and adequate protection to workers thereat; in violation of Rule 23 1.5 and 23-1.21(e); in failing to insure that the ladder upon which the plaintiff was working remained upright; in failing to tie, lash, hold or otherwise secure the ladder upon which the plaintiff was working to prevent it from wobbling, shaking, sliding and falling; in permitting and allowing the hatchway to the roof on the loading dock to be and to become in a dangerous condition; in allowing the roof hatch to suddenly close; in failing to have periodic inspection policies to the roof hatch; in permitting the hydraulic devises that hold the roof hatch up to be and remain in a negligent and defective condition; in failing to provide reasonable and adequate hinges to allow the hatch to stay open; in failing to inspect said hinges; in permitting a dangerous condition for a period of time prior to this accident; that with reasonable inspections, and the use of ordinary care, that the hatch's failure to stay open would have been detectable long enough before this accident; and the defendant was otherwise negligent herein.

**ELEVENTH:** Section 1602 of the CPLR is applicable as this action is within the exemption set forth in said Section, including but not limited to Section 1602 (2) & (8).

4

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM                INDEX NO. 710985/2017
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 08/09/2017

**TWELFTH:** That by reason of the aforesaid, this plaintiff in addition to the injuries he has suffered, still suffers and may in the future continue to suffer great pain; he was compelled to seek medical care, attention and treatment in an effort to be cured of his said injuries and may in the future be so required; he was compelled to seek medical care, attention and treatment in an effort to be cured of his said injuries and may in the future be so required; that he was disabled from attending to his usual duties and activities and may in the future be so disabled; that he was confined to his bed, home and hospital for a period of time and may in the future be so confined.

**THIRTEENTH:** That by reason of the aforesaid, this plaintiff has sustained damages which exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

**WHEREFORE**, plaintiff, Ariel Cruz, demands judgment against the defendant in a sum which exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction, together with the cost and disbursements of this action.

DATED: New York, New York
August 7, 2017

ROSENBERG, MINC FALKOFF & WOLFF, LLP
Attorneys for Plaintiff

BY: _____
Gary Silverstein

122 East 42nd Street
New York, New York 10168
(212) 697-9280
Our File No.: 31208

5

FILED: QUEENS COUNTY CLERK 08/09/2017 03:58 PM          INDEX NO. 710985/2017
NYSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 08/09/2017

## ATTORNEY VERIFICATION

GARY SILVERSTEIN, an attorney duly admitted to practice law before the Courts in the State of New York, and a member of the law firm of ROSENBERG, MINC FALKOFF & WOLFF LLP, attorneys for the plaintiff herein, makes the following affirmation pursuant to CPLR 2106:

That I have read the foregoing Complaint and know the contents thereof; that the same is true to my own knowledge, except as to those matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

That the reason this verification is not made by plaintiff is because plaintiff is not within the County of New York, where your affirmant maintains his office.

That the source of affirmant's knowledge is based upon investigations, reports and communications had with plaintiff.

Dated: New York, New York
      August 7, 2017

Gary Silverstein

6

## **EXHIBIT C**

**PLAN**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) Case No. 17-42267-659 |
|  | ) CHAPTER 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | ) |
|  | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

---

## FIFTH AMENDED JOINT PLAN OF REORGANIZATION OF PAYLESS HOLDINGS LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Cristine F. Pirro (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

Steven N. Cousins (MO 30788)
Erin M. Edelman (MO 67374)
John G. Willard (MO 67049)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone:       (314) 621-5070
Facsimile:       (314) 621-2239

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc. 3231 SE 6th Avenue Topeka, KS 66607 United States.

KE 46471280

# **TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION  OF TIME, GOVERNING LAW, AND
    DEFINED TERMS ................................................................................................................1
    A.      Rules of Interpretation, Computation of Time, and Governing Law ..................................1
    B.      Defined Terms .....................................................................................................................2

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, ABL DIP CLAIMS, TERM DIP
    FACILITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEE.......................19
    A.      Administrative Claims .......................................................................................................20
    B.      Administrative Claims Bar Date ........................................................................................20
    C.      Professional Compensation ................................................................................................21
    D.      Priority Tax Claims ............................................................................................................22
    E.      ABL DIP Claims ................................................................................................................22
    F.      Term DIP Facility Claims ..................................................................................................22
    G.      United States Trustee Statutory Fees .................................................................................22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............23
    A.      Summary ............................................................................................................................23
    B.      Classification and Treatment of Claims and Interests .......................................................24
    C.      Special Provision Governing Unimpaired Claims .............................................................28
    D.      Acceptance or Rejection of the Plan ..................................................................................29
    E.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................29
    F.      Elimination of Vacant Classes ..........................................................................................29

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..................................................................30
    A.      General Settlement of All Claims ......................................................................................30
    B.      Restructuring Transactions .................................................................................................30
    C.      The New Credit Facilities and Approval of the New Credit Facilities...............................31
    D.      Corporate Existence ...........................................................................................................32
    E.      Vesting of Assets in the Reorganized Debtors ..................................................................32
    F.      Cancellation of Prepetition Credit Agreements and Equity Interests..................................32
    G.      Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors ..........................33
    H.      Payment of Commitment Fees ...........................................................................................34
    I.      Effectuating Documents and Further Transactions ...........................................................34
    J.      Issuance of New Equity ......................................................................................................34
    K.      Section 1145 Exemption ....................................................................................................35
    L.      New Organizational Documents .........................................................................................35
    M.      Exemption from Certain Transfer Taxes and Recording Fees ...........................................36
    N.      Directors and Officers of Reorganized Holdings and Other Reorganized Debtors......................36
    O.      Avoidance Actions .............................................................................................................36
    P.      Preservation of Causes of Action ......................................................................................36
    Q.      Directors and Officers Insurance Policies and Agreements ...............................................37
    R.      Compensation and Benefits Programs ...............................................................................38
    S.      Gift Card Programs ............................................................................................................39

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................39
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .......................39
    B.      Indemnification Obligations................................................................................................39
    C.      Directors and Officers Insurance Policies and Agreements ...............................................40
    D.      Insurance Policies and Surety Bonds .................................................................................40
    E.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .....................41
    F.      Claims Based on Rejection of Executory Contracts and Unexpired Leases ......................42
    G.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ..........42

i

| | | |
|---|---|---|
| H. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 42 |
| I. | Contracts and Leases Entered Into After the Petition Date | 43 |
| J. | Reservation of Rights | 43 |
| K. | Nonoccurrence of Effective Date | 43 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ....... 43

| | | |
|---|---|---|
| A. | Distributions for Claims Allowed as of the Effective Date | 43 |
| B. | Unsecured Claims Payments Escrow and Reserve Procedures | 44 |
| C. | Distributions on Account of Claims Allowed After the Effective Date | 45 |
| D. | Timing and Calculation of Amounts to Be Distributed | 45 |
| E. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 46 |
| F. | Compliance with Tax Requirements/Allocations | 49 |
| G. | Setoffs | 50 |
| H. | Foreign Currency Exchange Rate | 50 |
| I. | Claims Paid or Payable by Third Parties | 50 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ....... 51

| | | |
|---|---|---|
| A. | Allowance of Claims | 51 |
| B. | Claims Administration Responsibilities | 52 |
| C. | Estimation of Claims | 52 |
| D. | Adjustment to Claims Without Objection | 52 |
| E. | Time to File Objections to Claims | 52 |
| F. | Disallowance of Claims | 53 |
| G. | No Distribution Pending Allowance | 53 |
| H. | Distribution After Allowance | 53 |

**ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....... 53

| | | |
|---|---|---|
| A. | Conditions Precedent to the Confirmation of the Plan | 53 |
| B. | Conditions Precedent to Effective Date | 54 |
| C. | Waiver of Conditions | 54 |
| D. | Substantial Consummation | 55 |
| E. | Effect of Non Occurrence of Conditions to the Effective Date | 55 |

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....... 55

| | | |
|---|---|---|
| A. | Compromise and Settlement | 55 |
| B. | Subordinated Claims | 55 |
| C. | Discharge of Claims and Termination of Equity Interests | 56 |
| D. | Release of Liens | 56 |
| E. | Debtor Release | 56 |
| F. | Third-Party Release | 58 |
| G. | Exculpation | 59 |
| H. | Injunction | 60 |
| I. | No Release of Any Claims Held by the United States | 60 |

**ARTICLE X. RETENTION OF JURISDICTION** ....... 60

**ARTICLE XI. MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN** ....... 63

| | | |
|---|---|---|
| A. | Modification of Plan | 63 |
| B. | Effect of Confirmation on Modifications | 63 |
| C. | Revocation of Plan | 63 |

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ....... 64

| | | |
|---|---|---|
| A. | Immediate Binding Effect | 64 |

ii

B.     Additional Documents ...................................................................................... 64
C.     Reservation of Rights ....................................................................................... 64
D.     Successors and Assigns ..................................................................................... 64
E.     Service of Documents ....................................................................................... 64
F.     Term of Injunctions or Stays ............................................................................ 65
G.     Entire Agreement .............................................................................................. 65
H.     Governing Law .................................................................................................. 65
I.     Exhibits ............................................................................................................. 66
J.     Nonseverability of Plan Provisions Upon Confirmation ................................. 66
K.     Closing of Chapter 11 Cases ............................................................................ 66
L.     Conflicts ............................................................................................................ 66
M.     Dissolution of Creditors' Committee ............................................................... 66
N.     Post-Effective Date Claims Oversight Committee ........................................... 67
O.     Section 1125(e) Good Faith Compliance .......................................................... 67
P.     Further Assurances ............................................................................................ 68
Q.     No Stay of Confirmation Order ........................................................................ 68
R.     Waiver or Estoppel ............................................................................................ 68
S.     Payment of Restructuring Support Advisor and DIP Document Fees ............. 68

iii

## PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## PAYLESS HOLDINGS LLC AND ITS DEBTOR AFFILIATES

Payless Holdings LLC and 28 of its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors")[2] propose the following joint plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Debtors. These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and contemplated future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan. Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

### ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION
### OF TIME, GOVERNING LAW, AND DEFINED TERMS

A.  *Rules of Interpretation, Computation of Time, and Governing Law*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the terms of such document or exhibit and subject to the Restructuring Support Agreement; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular

---

2    The Debtors (as defined herein) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, LLC [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179].  The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is:  c/o Payless ShoeSource Inc., 3231 SE 6th Avenue, Topeka, KS 66607, United States.

portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### B.    Defined Terms

The following terms shall have the following meanings when used in capitalized form herein:

1.    "<u>ABL DIP Agents</u>" means Wells Fargo Bank, National Association, as Administrative Agent, and TPG Specialty Lending, Inc. as Tranche A-1 Agent under the ABL DIP Facility.

2.    "<u>ABL DIP Claims</u>" means any claims arising from the Debtors' ABL DIP Facility, including all Obligations (as defined therein), interest due and owing as of the Effective Date, and, to the extent not otherwise paid in full, all fees, expenses, and other costs.

3.    "<u>ABL DIP Credit Agreement</u>" means that certain debtor-in-possession credit agreement, dated as of April 5, 2017 (as may be amended, restated, supplemented, or otherwise modified from time to time), by and among (a) certain of the Debtors, (b) Wells Fargo Bank, National Association as Collateral Agent, Administrative Agent, and Swing Line Lender (c) TPG Specialty Lending, Inc. as Tranche A-1 Agent, (d) Bank of America N.A. as Syndication Agent, (e) Wells Fargo Bank, National Association and Merrill Lynch, Pierce, Fenner & Smith Incorporated as Joint Lead Arrangers and Joint Bookrunners, and (f) the other ABL DIP Lenders.

4.    "<u>ABL DIP Facility</u>" means that certain $305 million postpetition debtor-in-possession financing facility, comprised of a senior secured superpriority revolving credit facility pursuant to the terms and conditions of the ABL DIP Credit Agreement.

5.    "<u>ABL DIP Lenders</u>" means those lenders party to the ABL DIP Credit Agreement.

6.    "<u>Accrued Professional Compensation</u>" means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330, 331, or 363 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any Retained Professional in the Chapter 11 Cases, (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (b) after applying any retainer that has been provided to such Retained Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts shall no longer

2

constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Retained Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Bankruptcy Court or any higher court of competent jurisdiction.

7.    "Administrative Claim" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code other than a Professional Fee Claim, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

8.    "Administrative Claims Bar Date" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

9.    "Affiliate" has the meaning set forth at section 101(2) of the Bankruptcy Code.

10.    "Allowed" means, with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

11.    "Avoidance Actions" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

12.    "Backstop Lenders" means those certain Prepetition First Lien Lenders who executed the Restructuring Support Agreement and, pursuant to the terms thereof, shall backstop the Term DIP Commitments, as defined therein.

13.    "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their

acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

14.  "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

15.  "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Missouri.

16.  "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

17.  "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.  "<u>Canadian Debtors</u>" means, collectively, Payless ShoeSource Canada Inc., Payless ShoeSource Canada GP Inc., and Payless ShoeSource Canada LP.

19.  "<u>Canadian General Unsecured Claim</u>" means an unsecured, non-priority claim at any of the Canadian Debtors.

20.  "<u>Cash</u>" means the legal tender of the United States of America or the equivalent thereof.

21.  "<u>Cash Incentive Program</u>" means that certain cash incentive program for employees, the terms of which are set forth in the term sheet attached as Exhibit H to the Disclosure Statement and the form agreement of which will be set forth in the Plan Supplement.

22.  "<u>Causes of Action</u>" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

23.  "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the

4

Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.  "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

25.  "Claims Bar Date" means, as applicable, (a) 11:59 p.m. prevailing Central Time on June 19, 2017, (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order or such other order entered by the Bankruptcy Court.

26.  "Claims Bar Date Order" means that certain *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* entered by the Bankruptcy Court on May 16, 2017 [Docket No. 767], as may be amended from time to time.

27.  "Claims Objection Bar Date" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court.

28.  "Claims Register" means the official register of Claims maintained by the Clerk of the Court for the United States Bankruptcy Court for the Eastern District of Missouri.

29.  "Class" means a category of Holders of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.  "Commission" or "SEC" means the United States Securities and Exchange Commission.

31.  "Compensation and Benefits Programs" means all employment and severance policies, and all compensation and benefit plans, policies, and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and employees, former employees, and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans.

32.  "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article VIII.A of the Plan having been: (a) satisfied; or (b) waived pursuant to Article VIII.C of the Plan.

33.  "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34.   "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35.   "Confirmation Order" means the order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

36.   "Consenting Lenders" has the meaning ascribed to such term in the Restructuring Support Agreement.

37.   "Consummation" means the occurrence of the Effective Date.

38.   "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Eastern District of Missouri in the Chapter 11 Cases on April 14, 2017, pursuant to section 1102 of the Bankruptcy Code, comprising the Creditors' Committee Members, as may be reconstituted from time to time.

39.   "Creditors' Committee Members" means the members of the Creditors' Committee, as may be reconstituted from time to time, in each case, solely in their respective capacities as such, namely:   (a) Moda Shoe, Ltd.; (b) GGP Limited Partnership; (c) Qingdao Doublestar Mingren Imp. And Exp. Co.; (d) C and C Accord, LTD.; (e) Simon Property Group, Inc.; (f) The Asean Corporation, Ltd.; and (g) Brixmor Property Group, Inc.

40.   "Cure" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

41.   "Cure Claim" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

42.   "Cure Notice" means a notice of a proposed amount of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

43.   "Debtor" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

44.    "Debtors in Possession" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

6

45.   "<u>Definitive Documents</u>" means all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by the Plan and that are otherwise necessary or desirable to implement, effectuate, or otherwise relate to the restructuring contemplated by the Plan, and which shall be in form and substance reasonably acceptable to the Requisite Consenting Lenders, including, without limitation: (a) the Plan, (b) the Plan Supplement, (c) the Disclosure Statement, (d) the motion seeking approval of the Disclosure Statement and the Disclosure Statement Order, (e) the Confirmation Order, (f) any documentation relating to the use of cash collateral and the DIP Facilities, including orders of the Bankruptcy Court related thereto, (g) the New Credit Facilities Documents, (h) the New Organizational Documents, and (i) the Shareholders Agreement.

46.   "<u>Definitive Document Restructuring Support Agreement Requirements</u>" means that the Definitive Documents shall (a) contain terms and conditions consistent in all material respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the DIP Documents and (b) shall otherwise be reasonably satisfactory in all respects to the Debtors and the Requisite Consenting Lenders, including with respect to any modifications, amendments, deletions, or supplements to such Definitive Documents.

47.   "<u>DIP Agents</u>" means the ABL DIP Agents and the Term DIP Agent, collectively.

48.   "<u>DIP Documents</u>" means, collectively, the ABL DIP Credit Agreement, the Term DIP Credit Agreement, and any documents related thereto.

49.   "<u>DIP Facilities</u>" means, collectively, the ABL DIP Facility and the Term DIP Facility.

50.   "<u>DIP Facility Claims</u>" means, collectively, any ABL DIP Claims or Term DIP Facility Claims.

51.   "<u>DIP Lenders</u>" means the banks, financial institutions, and other lenders under the DIP Facilities.

52.   "<u>Disclosure Statement</u>" means the *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

53.   "<u>Disclosure Statement Order</u>" means the order of the Bankruptcy Court approving the Disclosure Statement.

54.   "<u>Disputed</u>" means, with respect to any Claim, any Claim that is not yet Allowed.

55.   "<u>Distribution Agent</u>" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the Noticing and Claims Agent, to make or to facilitate distributions required by the Plan.

56.    "Distribution Record Date" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

57.    "D&O Liability Insurance Policies" means all insurance policies for current and former director and officer liability maintained by the Debtors as of the date of the Restructuring Support Agreement.

58.    "Effective Date" means the day that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.B of the Plan have been:  (i) satisfied; or (ii) waived pursuant to Article VIII.C of the Plan.

59.    "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

60.    "Equity Interest" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interest of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing; *provided*, *however*, that Equity Interest does not include any Intercompany Interest.

61.    "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

62.    "Exculpated Parties" means, collectively, the Reorganized Debtors and the Released Parties.

63.    "Exculpation" means the exculpation provision set forth in Article IX.G of the Plan.

64.    "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

65.    "Existing Equity Interests" means the Equity Interests in Payless Holdings LLC.

66.    "Exit Commitment Fee" means New Equity of a value equal to 2.5% of the amount of the Allowed Term DIP Facility Claims as of the Effective Date.

67.    "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date, compounded annually.

68.    "Final DIP Order" means that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting*

8

*Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief,* entered by the Bankruptcy Court on May 17, 2017 [Docket No. 778], as may be amended from time to time in accordance with the terms thereof and the DIP Documents.

69.   "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

70.   "<u>General Unsecured Claims</u>" means any other Claims against any Debtor that are not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and are not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an ABL DIP Claim; (d) a Term DIP Facility Claim; (e) an Other Priority Claim; (f) an Other Secured Claim; (g) a Prepetition First Lien Credit Agreement Claim; (h) a Prepetition Second Lien Credit Agreement Claim; (i) an Intercompany Claim; or (j) a Section 510(b) Claim; *provided*, *however*, that, for the avoidance of doubt, Prepetition First Lien Deficiency Claims and Prepetition Second Lien Credit Agreement Claims shall <u>not</u> constitute General Unsecured Claims at any applicable Debtor.

71.   "<u>Governmental Bar Date</u>" means 11:59 p.m. prevailing Central Time on October 2, 2017, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

72.   "<u>Governmental Unit</u>" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

73.   "<u>Holder</u>" means an Entity holding a Claim against or an Interest in any of the Debtors.

74.    "<u>Impaired</u>" means any impaired Claim or Interest in an Impaired Class within the meaning of section 1124 of the Bankruptcy Code.

75.   "<u>Impaired Class</u>" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

76.   "<u>Indemnification Obligation</u>" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers,

employees, or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporations, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

77.    "<u>Initial Distribution Date</u>" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

78.    "<u>Insurance Policies</u>" means all insurance policies that have been issued at any time to or that provide coverage to any of the Debtors (excluding any D&O Liability Insurance Policies) and all agreements, documents, or instruments related thereto.

79.    "<u>Intercompany Claim</u>" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor; *provided*, *however*, that Claims held by any of the LatAm JV Entities on account of the rejection of an agreement by a Debtor pursuant to section 365(g) of the Bankruptcy Code shall not be Intercompany Claims.

80.    "<u>Intercompany Interest</u>" means an Equity Interest in a Debtor held by another Debtor.

81.    "<u>Interest</u>" means, collectively, Equity Interests and Intercompany Interests.

82.    "<u>Interim Compensation Order</u>" means that certain *Order (I) Pursuant to Section 330 of the Bankruptcy Code, Bankruptcy Rule 2016(a), and Local Rules 2016-1 and 2016-2, Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals and (II) Granting Related Relief*, entered by the Bankruptcy Court on May 17, 2017 [Docket No. 784], as may be amended from time to time, including by an order entered by the Bankruptcy Court approving the retention of a specific Retained Professional.

83.    "<u>LatAm JV Partners</u>" means, collectively, (a) PLP, S.A., (b) South America Local Partners, S.A., (c) Pataya Inc., (d) Bluestone Financial, Inc., and (e) Patagonia Capital Limited, and with respect to each of the foregoing entities in clauses (a) through (e), such entities' predecessors, successors, and assigns, wholly-owned subsidiaries, managed accounts, or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case, solely in their capacity as such.

84.    "<u>LatAm JV Entities</u>" means, collectively, (a) Payless ShoeSource (BVI) Holdings, Ltd.; (b) Payless ShoeSource Andean Holdings; (c) Payless Colombia (BVI) Holdings, LTD.; (d) Payless ShoeSource Peru Holding/Holdings, S.L.; (e) Payless ShoeSource Honduras S. de R.L.; (f) Payless ShoeSource, Limitada; (g) Payless ShoeSource de Guatemala Ltda, S.A.; (h) Payless ShoeSource de la Republica Dominicana, S.R.L.; (i) Payless ShoeSource of St. Lucia, Ltd; (j)

10

Payless ShoeSource Overseas S.R.L.; (k) Payless ShoeSource of El Salvador Ltda. De C.V.; (l) Payless ShoeSource (Panama) S.A.; (m) Payless ShoeSource Trinidad Unlimited; (n) Payless ShoeSource Jamaica Limited; (o) Payless ShoeSource (Barbados) SRL; (p) Payless ShoeSource Dominica Ltd.; (q) Payless ShoeSource St. Kitts Ltd.; (r) Payless ShoeSource Uruguay SRL; (s) Payless ShoeSource Ecuador CIA Ltda; (t) Payless Ecuador CIA Ltda.; (u) Payless ShoeSource PSS de Colombia S.A.S.; (v) Payless ShoeSource Peru S.R.L.; (w) Payless ShoeSource PSS de Colombia Ltda; (x) Payless ShoeSource Limitada & Compania Limitada (Nicaragua); (y) Payless ShoeSource of Trinidad Unlimited; (z); Payless ShoeSource (Barbados) SRL Antigua Branch; (aa) Payless ShoeSource (Barbados) SRL Grenada Branch; (bb) Payless ShoeSource (Barbados) SRL St. Lucia Branch; (cc) Payless ShoeSource (Barbados) SRL St. Vincent Branch; (dd) Payless ShoeSource (Barbados) SRL-AG BR; (ee) Payless ShoeSource (Barbados) SRL-GD BR; (ff) Payless ShoeSource (Barbados) SRL-LC BR; (gg) Payless ShoeSource (Barbados) SRL-VC BR; (hh) Payless ShoeSource of El Salvador Ltda.; (ii) Payless ShoeSource of Jamaica c/o of GT.; (jj) Payless ShoeSource de la Republica Dominicana SA; (kk) Payless ShoeSource de Guatemala Limitada; and (ll) Payless ShoeSource Ltda. (Costa Rica), and such entities' predecessors, successors, and assigns, wholly-owned subsidiaries, managed accounts, or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case, solely in their capacity as such.

85.   "Letters of Credit" means the letters of credit referenced in paragraph G(ii) of the Final DIP Order.

86.   "Local Bankruptcy Rules" means the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri.

87.   "Management Equity Incentive Plan" means that certain post-Effective Date director and employee compensation program to be approved and implemented by the New Board as set forth in Article IV.R hereof.

88.   "MSCS Swap Claim" means any Claim arising from or related to that certain ISDA Master Agreement dated as of October 2, 2013, by and between Morgan Stanley Capital Services LLC and Payless Inc., as supplemented by those three certain Confirmations thereunder, dated as of April 4, 2014.

89.   "New ABL Credit Agreement" means that certain credit agreement related to the New ABL Facility, the form of which shall be included in the Plan Supplement.

90.   "New ABL Facility" means up to a $305 million senior secured asset-based revolving credit facility.

91.   "New ABL Facility Documents" means, in connection with the New ABL Facility, the New ABL Credit Agreement and other loan documents related to or evidencing the loans and obligations thereunder.

11

92. "<u>New Board</u>" means the initial board of directors of Reorganized Holdings, which board of directors shall be selected by the Requisite Consenting Lenders and disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

93. "<u>New Credit Facilities</u>" means, collectively, the New ABL Facility and the New First Lien Term Loan Facility.

94. "<u>New Credit Facilities Documents</u>" means, collectively, the New ABL Facility Documents and the New First Lien Term Loan Facility Documents.

95. "<u>New Equity</u>" means the common equity in Reorganized Holdings to be authorized, issued, or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

96. "<u>New First Lien Term Loan A-1 Tranche</u>" means the first-out amortizing tranche of the New First Lien Term Loan Facility, which term loan shall (i) be in an amount equal to the outstanding balance of the Term DIP Facility on the Effective Date, (ii) mature 4.5 years after the Effective Date, and (iii) not contain call or prepayment protections.

97. "<u>New First Lien Term Loan A-2 Tranche</u>" means a last-out amortizing term loan tranche of the New First Lien Term Loan Facility, which term loan shall (i) be in an amount of $280 million less the amount of the outstanding balance of the Term DIP Facility on the Effective Date, (ii) mature 5 years after the Effective Date, and (iii) not contain call or prepayment protections.

98. "<u>New First Lien Term Loan Credit Agreement</u>" means that certain credit agreement related to the New First Lien Term Loan Facility.  The New First Lien Term Loan Credit Agreement will be included in the Plan Supplement.

99. "<u>New First Lien Term Loan Facility</u>" means a $280 million first lien senior secured term loan facility, composed of (i) the New First Lien Term Loan A-1 Tranche and (ii) the New First Lien Term Loan A-2 Tranche, the material terms of which are set forth in **<u>Exhibit I</u>** to the Disclosure Statement and the forms of which shall be included in the Plan Supplement.

100. "<u>New First Lien Term Loan Facility Documents</u>" means, in connection with the New First Lien Term Loan Facility, the New First Lien Term Loan Credit Agreement and other loan documents related to or evidencing the loans and obligations thereunder.

101. "<u>New Organizational Documents</u>" means the forms of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, which forms shall be included in the Plan Supplement.

102. "<u>Noticing and Claims Agent</u>" means Prime Clerk LLC, in its capacity as notice and claims agent for the Debtors, pursuant to that certain *Order (I) Authorizing and Approving the Appointment of Prime Clerk LLC as Notice and Claims Agent Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief*, entered by the Bankruptcy Court on April 14, 2017 [Docket No. 237], as may be amended from time to time.

KE 46471280

103. "Other General Unsecured Claim" means any unsecured, non-priority Claim against one or more of the Debtors (other than a Worldwide General Unsecured Claim or a Canadian General Unsecured Claim); *provided*, *however*, that, for the avoidance of doubt, Prepetition First Lien Deficiency Claims and Prepetition Second Lien Credit Agreement Claims shall not constitute Other General Unsecured Claims hereunder.

104. "Other General Unsecured Claims Recovery Pool" means $28,658,000 in Cash.

105. "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

106. "Other Secured Claim" means any secured Claim against the Debtors not specifically described in the Plan.

107. "Periodic Distribution Date" means the first day of the month immediately following the month in which a Claim becomes Allowed, when distributions shall be made to Holders of any such then-Allowed Claims.

108. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

109. "Petition Date" means April 4, 2017, the date on which the Debtors commenced the Chapter 11 Cases.

110. "Plan" means the *Fourth Amended Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated June 23, 2017, as amended, supplemented, or modified from time to time in accordance with its terms, including, without limitation, by the Plan Supplement, which is incorporated in the Plan by reference, subject to the terms of the Restructuring Support Agreement.

111. "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits, in each case, in a form reasonably satisfactory to the Requisite Consenting Lenders and the ABL Lenders, to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the Shareholders Agreement; (b) the New First Lien Term Loan Credit Agreement; (c) the New ABL Credit Agreement; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases; (e) the Schedule of Rejected Executory Contracts and Unexpired Leases; (f) a list of retained Causes of Action; (g) the New Organizational Documents; and (h) the documents and agreements necessary to implement the Cash Incentive Program.

112. "Plan Supplement Filing Date" means July 10, 2017.

113. "Post-Effective Date Claims Oversight Committee" means a committee or other body appointed by the Creditors' Committee that will be established on the Effective Date.

KE 46471280

114.  "Prepetition ABL Credit Agreement" means that certain credit agreement, dated as of October 9, 2012 (as amended, restated, modified, or supplemented from time to time prior to the date of the Restructuring Support Agreement), among certain of the Debtors, the Prepetition ABL Facility Lenders, the Prepetition ABL Facility Agent, and the other parties thereto.

115.  "Prepetition ABL Facility Agents" means Wells Fargo Bank, National Association, in its capacity as administrative and collateral agent with respect to the Prepetition ABL Credit Agreement, and TPG Specialty Lending, Inc., in its capacity as tranche A-1 agent with respect to the Prepetition ABL Credit Agreement.

116.  "Prepetition ABL Facility Lenders" means those lenders party to the Prepetition ABL Credit Agreement from time to time.

117.  "Prepetition Agents" means, collectively, the Prepetition ABL Facility Agents, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent.

118.  "Prepetition Credit Agreements" means, collectively, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition ABL Credit Agreement.

119.  "Prepetition Credit Agreement Claims" means, collectively, the Prepetition First Lien Credit Agreement Claims and the Prepetition Second Lien Credit Agreement Claims.

120.  "Prepetition First Lien Agent" means Cortland Products Corp., in its capacity as administrative and collateral agent with respect to the Prepetition First Lien Credit Agreement (as successor to Morgan Stanley Senior Funding, Inc. in such capacity).

121.  "Prepetition First Lien Credit Agreement" means that certain First Lien Term Loan and Guarantee Agreement, dated as of March 11, 2014 (as amended, restated, modified, or supplemented from time to time prior to the date of the Restructuring Support Agreement), among certain of the Debtors, the Prepetition First Lien Lenders, and Cortland Products Corp., in its capacity as administrative agent and collateral agent thereunder.

122.  "Prepetition First Lien Credit Agreement Claims" means all claims arising under or in connection with the Prepetition First Lien Credit Agreement and any related documents, including any MSCS Swap Claim.

123.  "Prepetition First Lien Deficiency Claims" means the portion of the Prepetition First Lien Credit Agreement Claims constituting unsecured Claims under section 506(a) of the Bankruptcy Code.

124.  "Prepetition First Lien Lenders" means those lenders party to the Prepetition First Lien Credit Agreement from time to time.

125.  "Prepetition Lenders" means, collectively, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders.

14

126.  "Prepetition Second Lien Agent" means Wilmington Savings Fund Society, FSB, in its capacity as administrative and collateral agent with respect to the Prepetition Second Lien Credit Agreement (as successor to Morgan Stanley Senior Funding, Inc. in such capacity).

127.  "Prepetition Second Lien Credit Agreement" means that certain Second Lien Term Loan and Guarantee Agreement, dated as of March 11, 2014 (as amended, restated, modified or supplemented from time to time prior to the date of the Restructuring Support Agreement), among certain of the Debtors, the Prepetition Second Lien Lenders, and Morgan Stanley Senior Funding, Inc., in its capacity as administrative agent and collateral agent thereunder.

128.  "Prepetition Second Lien Credit Agreement Claims" means all claims arising under or in connection with the Prepetition Second Lien Credit Agreement and any related documents.

129.  "Prepetition Second Lien Lenders" means those lenders party to the Prepetition Second Lien Credit Agreement from time to time.

130.  "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

131.  "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

132.  "Professional Fee Claim" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

133.  "Professional Fee Escrow Account" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

134.  "Professional Fee Reserve Amount" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.C.3 hereof.

135.  "Proof of Claim" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

136.  "Record Date" means June 14, 2017 for all Claims filed before such date, or, for any Claims filed after such date, the Claims Bar Date.

137.  "Reinstated" or "Reinstatement" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

15

138. "Released Parties" means, collectively, (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the Creditors' Committee; (d) the Prepetition Agents; (e) the Prepetition Lenders (and Morgan Stanley Capital Services LLC as Holder of the MSCS Swap Claim); (f) the Prepetition ABL Facility Lenders; (g) the DIP Agents; (h) the DIP Lenders; (i) the Sponsor Entities; (j) the parties to the Restructuring Support Agreement; and (k) with respect to each of the foregoing entities in clauses (a) through (j), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such entities' respective heirs, executors, estates, servants and nominees, in each case, solely in their capacity as such.

139. "Releasing Parties" means, collectively, (a) the Debtors; (b) the Consenting Lenders; (c) the Prepetition Agents; (d) the DIP Lenders; (e) the DIP Agents; (f) the Sponsor Entities; (g) all Holders of Claims and Interests that are deemed unimpaired and presumed to accept the Plan; (h) all Holders of Claims who either (1) vote to accept or (2) receive a Ballot providing them the right to opt out of any applicable releases but abstain from voting on the Plan or otherwise do not elect pursuant to such Ballot to opt out of the Third-Party Release; (i) all Holders of Claims and Interests who are not entitled to vote on the Plan but receive a notice advising them of their ability to opt out of the Third-Party Release but who do not elect to opt out of the Third-Party Release; (j) all Holders of Claims entitled to vote who vote to reject the Plan and do not elect on their Ballot to opt out of the Third-Party Release; (k) all other Holders of Claims and Interests to the maximum extent permitted by law; and (l) with respect to the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (k), each such Entity's current and former Affiliates, and each such Entity's and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however* that any opt out of the Third-Party Release by a Holder of a Claim or Interest shall not affect the releases of the Sponsor Entities or the Prepetition Lenders by such Holder of a Claim or Interest.

140. "Reorganized Debtors" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

141. "Reorganized Holdings" means Payless Holdings LLC, as reorganized pursuant to and under the Plan, or a new corporation or limited liability company that may be formed to directly or indirectly acquire all of the assets and/or stock of the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

142. "Requisite Consenting Lenders" means, as of the relevant date, Consenting Lenders that collectively hold at least a majority of the aggregate outstanding principal amount of Prepetition First Lien Credit Agreement Claims held by all of the Consenting Lenders as of such date and are party to the Restructuring Support Agreement.

16

143. "Restructuring Support Agreement" means that certain restructuring support agreement, dated as of April 4, 2017, among certain of the Debtors and the Consenting Lenders, as amended, supplemented, or otherwise modified from time to time subject to the terms thereof.

144. "Restructuring Term Sheet" means the term sheet annexed as Exhibit A to the Restructuring Support Agreement.

145. "Retained Professional" means any Entity:  (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

146. "Schedule of Assumed Executory Contracts and Unexpired Leases" means the schedule, in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time prior to the Confirmation Date.

147. "Schedule of Rejected Executory Contracts and Unexpired Leases" means the schedule, in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders (including any amendments or modification thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time prior to the Confirmation Date.

148. "Schedules" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors on May 10, 2017, pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

149. "Section 510(b) Claim" means any Claim against the Debtors arising from the rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

150. "Secured" means, when referring to a Claim, a Claim:  (a) secured by a lien on property in which the applicable Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

17

151. "<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

152. "<u>Shareholders Agreement</u>" means the stockholders' agreement with respect to the New Equity or the second amended and restated limited liability company agreement of the Company (as applicable), the form of which shall be set forth in the Plan Supplement.

153. "<u>Sponsor Payment</u>" means $5.44 million of the Cash on the balance sheet of Payless Holdings LLC (in which certain of the Sponsor Entities claim a beneficial interest) plus an additional $15.750 million in Cash (for a total of $21.190 million) that will be contributed to the Debtors and shall be distributed under the Plan.

154. "<u>Sponsors</u>" means, collectively, (a) Golden Gate Capital Inc., (b) Blum Capital Partners, L.P., and (c) funds and entities advised by each such Entity, and each such Entity's current and former Affiliates, who own or owned any equity in the Debtors.

155. "<u>Sponsor Entities</u>" means, collectively, (a) the Sponsors, (b) Golden Gate Private Equity, Inc., GGC Administration, L.P., GGC Administration, LLC, Multi-Channel Opportunity Holdings LLC, Angel Island Capital Management, L.L.C., AIC Finance Partnership, L.P., Blum Capital Partners, L.P., Blum Strategic Partners IV, L.P., BCP IV AIV PL, L.P. and BCP V AIV PL, L.P., and (c) any current or former employees, officers, managers, partners, operating executives, and directors of the foregoing Entities.

156. "<u>Standing Motion</u>" means the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates*, which the Creditors' Committee sought authority to file under seal pursuant to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to 11 U.S.C. § 107(b)(1) Authorizing Committee to File Motion and Exhibit Under Seal* [Docket No. 1073].

157. "<u>Term DIP Agent</u>" means Cortland Products Corp., in its capacity as administrative agent and collateral agent pursuant to the Term DIP Facility.

158. "<u>Term DIP Credit Agreement</u>" means that certain debtor-in-possession term loan and guarantee agreement, dated April 5, 2017, by and among: (a) certain of the Debtors, (b) the Term DIP Agent, and (c) the Term DIP Lenders (as may be amended, restated, supplemented, or otherwise modified from time to time).

159. "<u>Term DIP Facility</u>" means that certain postpetition debtor-in-possession financing facility, comprised of an up to $80 million secured superpriority term loan pursuant to the terms and conditions of the Term DIP Credit Agreement.

160. "<u>Term DIP Lenders</u>" means the several lenders from time to time party to the Term DIP Credit Agreement.

161. "<u>Term DIP Facility Claims</u>" means any claims arising from the Debtors' Term DIP Facility, including any accrued but unpaid interest and fees due and owing under the DIP

Facilities as of the Effective Date pursuant to the terms of the DIP Documents, the Final DIP Order, and/or any related documents.

162.   "Third-Party Release" means the releases set forth in Article IX.F.

163.   "Tranche A-1 Agent" means TPG Specialty Lending, Inc., in its capacity as tranche A-1 agent pursuant to the ABL DIP Facility.

164.   "Unencumbered Property" means all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the Petition Date.

165.   "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

166.   "Unimpaired" means any unimpaired Claim or Interest in an Unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

167.   "Unimpaired Class" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

168.   "United States Trustee" means the United States Trustee for the Eastern District of Missouri.

169.   "Unsecured Claims Payments Escrow" means an escrow account established by the Reorganized Debtors with a third-party escrow agent reasonably acceptable to the Debtors and the Creditors' Committee to hold funds to be distributed in accordance with the terms of the Plan to Holders of Allowed Claims in Class 5A (Other General Unsecured Claims) and Class 5B (Worldwide General Unsecured Claims).

170.   "Voting Classes" means, collectively, Classes 3, 4, 5A, and 5B.

171.   "Voting Deadline" means 4:00 p.m. prevailing Central Time on July 18, 2017.

172.   "Worldwide General Unsecured Claim" means any General Unsecured Claim against Payless ShoeSource Worldwide, Inc.; *provided*, *however*, that for the avoidance of doubt, Prepetition First Lien Lender Deficiency Claims and Prepetition Second Lien Credit Agreement Claims shall not constitute Worldwide General Unsecured Claims hereunder.

173.   "Worldwide GUC Claims Recovery Pool" means $3,658,000 in Cash.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, ABL DIP CLAIMS, TERM DIP FACILITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEE

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, ABL DIP Claims, and Term DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III.

19

A.     *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims and ABL DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:   (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.   Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.   Notwithstanding any provision of the Plan to the contrary, no Governmental Unit shall be required to file a request for the payment of an expense described in 11 U.S.C. § 503(b)(1)(B) or (C) as a condition of it being allowed as an administrative expense.

B.     *Administrative Claims Bar Date*

All requests for payment of an Administrative Claim (other than Prepetition Credit Agreement Claims or Professional Fee Claims) that accrued on or before the Effective Date that were not accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date.   Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

Subject to Article VII.B.2, the Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.   The Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.   Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested.   In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

C.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for Professional Fee Claims shall be filed no later than 30 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.    <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor and Reorganized Debtor (as applicable) shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Debtors and Reorganized Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable). If the Debtors or Reorganized Debtors (as applicable), dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for

21

a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.   Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

      5.     <u>Substantial Contribution Compensation and Expenses</u>

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

D.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.     *ABL DIP Claims*

On the Effective Date, except to the extent that a Holder of an Allowed ABL DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed ABL DIP Claim, each Holder of an Allowed ABL DIP Claim shall indefeasibly receive payment in full, in Cash.

F.     *Term DIP Facility Claims*

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Term DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Term DIP Facility Claim, each such Holder of an Allowed Term DIP Facility Claim shall receive, on a dollar-for-dollar-basis, its Pro Rata share of the New First Lien Term Loan A-1 Tranche.

G.     *United States Trustee Statutory Fees*

The Debtors shall timely pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors'

businesses, until the entry of a Final Order, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Following Confirmation, the Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

*A.      Summary*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, ABL DIP Claims, and Term DIP Facility Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

1.    Summary of Classification and Treatment of Classified Claims and Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition First Lien Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Second Lien Credit Agreement Claims | Impaired | Entitled to Vote |
| 5A | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 5B | Worldwide General Unsecured Claims | Impaired | Entitled to Vote |
| 5C | Canadian General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Unimpaired/ Impaired | Deemed to Accept/Deemed to Reject |
| 7 | Existing Equity Interests | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |

23

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 9 | Section 510(b) Claims | Impaired | Deemed to Reject |

B.    *Classification and Treatment of Claims and Interests*

1.  <u>Class 1 – Other Priority Claims</u>

(a)    *Classification*:   Class 1 consists of Other Priority Claims against the Debtors.

(b)    *Treatment*:   On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Other Priority Claim has already been paid during the Chapter 11 Cases or such Holder of an Allowed Other Priority Claim, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim.

(c)    *Voting*:   Unimpaired.  Each Holder of an Allowed Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan.

2.  <u>Class 2 – Other Secured Claims</u>

(a)    *Classification*:   Class 2 consists of Other Secured Claims against the Debtors.

(b)    *Treatment*:   On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim has already been paid during the Chapter 11 Cases or such Holder, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive: (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) other treatment, as decided by the Debtors and the Requisite Consenting Lenders to their mutual satisfaction, such that the Other Secured Claim shall be rendered unimpaired.

(c)    *Voting*:   Unimpaired.  Each Holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed

24

Other Secured Claim will not be entitled to vote to accept or reject the
Plan.

3.   Class 3 – Prepetition First Lien Credit Agreement Claims

    (a)   *Classification*:  Class 3 consists of Prepetition First Lien Credit Agreement
Claims against the Debtors.

    (b)   *Allowance*:  The Prepetition First Lien Credit Agreement Claims shall be
allowed in the aggregate amount of $506.3 million (including $633,433.66
(plus accrued and unpaid interest and any reasonable, actual, and
documented fees) on account of the Allowed MSCS Swap Claim).

    (c)   *Treatment*:  On the Effective Date or as soon as reasonably practicable
thereafter, except to the extent that a Holder of an Allowed Prepetition
First Lien Credit Agreement Claim agrees to less favorable treatment, in
full and final satisfaction, settlement, release, and discharge of and in
exchange for its Allowed Prepetition First Lien Credit Agreement Claim,
each Holder of an Allowed Prepetition First Lien Credit Agreement Claim
shall receive its Pro Rata share of:  (i) the New First Lien Term Loan A-2
Tranche; and (ii) 91.0% of the New Equity, subject to dilution from the
Management Equity Incentive Plan and the Exit Commitment Fee.

    (d)   *Voting*:  Impaired.  Each Holder of an Allowed Prepetition First Lien
Credit Agreement Claim will be entitled to vote to accept or reject the
Plan.

4.   Class 4 – Prepetition Second Lien Credit Agreement Claims

    (a)   *Classification*:  Class 4 consists of Prepetition Second Lien Credit
Agreement Claims against the Debtors.

    (b)   *Allowance*:  The Prepetition Second Lien Credit Agreement Claims shall
be allowed in the aggregate amount of $145 million.

    (c)   *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition
Second Lien Credit Agreement Claim agrees to less favorable treatment,
in full and final satisfaction, settlement, release, and discharge of and in
exchange for its Allowed Prepetition Second Lien Credit Agreement
Claim (including the unsecured deficiency claim of its Prepetition Second
Lien Credit Agreement Claim), each Holder of an Allowed Prepetition
Second Lien Credit Agreement Claim shall receive its Pro Rata share of
9.0% of the New Equity, subject to dilution from the Management Equity
Incentive Plan and the Exit Commitment Fee.

25

    (d)    *Voting*:  Impaired.  Each Holder of an Allowed Prepetition Second Lien Credit Agreement Claim will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5A – Other General Unsecured Claims</u>

    (a)    *Classification*:  Class 5A consists of Other General Unsecured Claims against the Debtors.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of an in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive (i) its Pro Rata share of $3.658 million of the Other General Unsecured Claims Recovery Pool, which shall be shared Pro Rata only among Holders of Allowed Other General Unsecured Claims and (ii) its Pro Rata share of the remaining $25 million of the Other General Unsecured Claims Recovery Pool, which shall be shared Pro Rata only among Holders of Allowed Other General Unsecured Claims (based on the amount of Allowed Other General Unsecured Claims after reduction by payments received under Article III.B.5(b)(i)) and Holders of Allowed Worldwide General Unsecured Claims (based on the amount of Allowed Worldwide General Unsecured Claims after reduction by payments received under Article III.B.6(b)(i)).

    (c)    *Voting*:  Impaired.  Each Holder of an Allowed Other General Unsecured Claim will be entitled to vote to accept or reject the Plan.

6.    <u>Class 5B – Worldwide General Unsecured Claims</u>

    (a)    *Classification*:  Class 5B consists of Worldwide General Unsecured Claims against Debtor Payless ShoeSource Worldwide, Inc.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Worldwide General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of in exchange for its Allowed Worldwide General Unsecured Claim, each Holder of an Allowed Worldwide General Unsecured Claim shall receive (i) its Pro Rata share of the Worldwide GUC Claims Recovery Pool of $3.658 million, which shall be shared Pro Rata only among Holders of Allowed Worldwide General Unsecured Claims and (ii) its Pro Rata share of the remaining $25 million of the Other General Unsecured Claims Recovery Pool, which shall be shared Pro Rata only among Holders of Allowed Other General Unsecured Claims (based on the amount of Allowed Other General Unsecured Claims after reduction by payments received under Article III.B.5(b)(i)) and Holders of Allowed Worldwide

KE 46471280

General Unsecured Claims (based on the amount of Allowed Worldwide General Unsecured Claims after reduction by payments received under Article III.B.6(b)(i)).

(c)     *Voting*: Impaired. Each Holder of an Allowed Worldwide General Unsecured Claim will be entitled to vote to accept or reject the Plan.

7.   <u>Class 5C – Canadian General Unsecured Claims</u>

(a)     *Classification*: Class 5C consists of Canadian General Unsecured Claims against the Canadian Debtors.

(b)     *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of a Canadian General Unsecured Claim has already been paid during the Chapter 11 Cases or a Holder of a Canadian General Unsecured Claim, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Canadian General Unsecured Claim, each Holder of a Canadian General Unsecured Claim shall have its Claim Reinstated; *provided,* however*,* that nothing in this Plan shall affect any of the Debtors' rights and defenses, whether legal, equitable, or otherwise, in respect of such claims and all such rights and defenses of all Debtors (including any right of counterclaims or right of set off) shall continue following the Effective Date.

(c)     *Voting*: Unimpaired. Each Holder of a Canadian General Unsecured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of a Canadian General Unsecured Claim will not be entitled to vote to accept or reject the Plan.

8.   <u>Class 6 – Intercompany Claims</u>

(a)     *Classification*: Class 6 consists of all Intercompany Claims.

(b)     *Treatment*: To preserve the Debtors' corporate structure, as of the Effective Date, Intercompany Claims shall be Reinstated, cancelled, or compromised as determined by the Debtors, with the consent of the Requisite Consenting Lenders; *provided* that an Intercompany Claim held by one of the LatAm JV Entities shall not be cancelled or compromised without the consent of the Holder of such Intercompany Claim.

(c)     *Voting*: Impaired or Unimpaired. Each Holder of an Intercompany Claim will be conclusively deemed to have (a) rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan or (b) accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.

9.  Class 7 – Existing Equity Interests

    (a)  *Classification*:  Class 7 consists of Existing Equity Interests.

    (b)  *Treatment*:  On the Effective Date, all Existing Equity Interests shall be discharged, cancelled, released, and extinguished.

    (c)  *Voting*:  Impaired.  Each Holder of an Existing Equity Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Existing Equity Interest will not be entitled to vote to accept or reject the Plan.

10. Class 8 – Intercompany Interests

    (a)  *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)  *Treatment*:  To preserve the Debtors' corporate structure, on the Effective Date, all Intercompany Interests shall be cancelled or Reinstated, as determined by the Debtors, with the consent of the Requisite Consenting Lenders, which consent shall not be unreasonably withheld.

    (c)  *Voting*:  Unimpaired.  Each Holder of an Intercompany Interest will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.

11. Class 9 – Section 510(b) Claims

    (a)  *Classification*:  Class 9 consists of Section 510(b) Claims against the Debtors.

    (b)  *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled without any distribution.

    (c)  *Voting*:  Impaired.  Each Holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

C.  *Special Provision Governing Unimpaired Claims*

    Subject to Article IV.O, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.      *Acceptance or Rejection of the Plan*

      1.      <u>Presumed Acceptance of Plan</u>

      Classes 1, 2, 5C and 8, and certain Class 6 Claims are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

      2.      <u>Voting Classes</u>

      Each Holder of an Allowed Claim in each of Classes 3, 4, 5A, and 5B shall be entitled to vote to accept or reject the Plan.

      3.      <u>Presumed Rejection of Plan</u>

      Class 7 Existing Equity Interests, Class 9 Section 510(b) Claims, and certain Class 6 Claims shall receive no distribution under the Plan on account of their Existing Equity Interests and Claims, and are, therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

      4.      <u>Controversy Concerning Impairment</u>

      If a controversy arises as to whether any Claims or Interests, or any Class thereof, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

      Acceptance of the Plan by either Class 3, 4, 5A, or 5B will satisfy section 1129(a)(10) of the Bankruptcy Code.  The Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any rejecting class of Claims or Equity Interests.

F.      *Elimination of Vacant Classes*

      Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

# ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of All Claims*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

For the avoidance of doubt, the Sponsor Payment is made as a settlement, without admitting any wrongdoing of any kind, of any potential claims, including without limitation claims for breach of fiduciary duty arising in connection with the authorization and payment of certain dividends in 2013 and 2014, that could be asserted against the Sponsor Entities, any of their subsidiaries, affiliates, managed accounts or funds, current or former officers and directors, and certain other related parties, the Debtors' current and former officers and directors, the Prepetition Lenders, and all individuals and entities named as defendants in the draft complaint attached as an exhibit to the Standing Motion.

B.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate; *provided*, *however*, that no such restructuring transactions may violate the terms of any Unexpired Lease or Executory Contract assumed by the Debtors.

C.    *The New Credit Facilities and Approval of the New Credit Facilities*

Confirmation of the Plan shall be deemed to constitute approval of the New Credit Facilities and the New Credit Facilities Documents (including all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New Credit Facilities Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the New Credit Facilities Documents.

On the Effective Date, the New Credit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Credit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the liens and security interests to be granted in accordance with the New Credit Facilities Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Credit Facilities Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New Credit Facilities Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.  To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the New Credit Facilities Documents that are necessary to cancel and/or extinguish such liens and/or security interests.

31

### D.      Corporate Existence

Subject to any restructuring transactions as permitted under Article IV.B, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other similar formation and governance documents) are amended by or in connection with the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### E.      Vesting of Assets in the Reorganized Debtors

Subject to Article IV.O, and except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances. For the avoidance of doubt, the Reorganized Debtors shall have no property interest in the funds in the Unsecured Claims Payments Escrow and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, or other encumbrances granted under the Plan shall not extend to an interest in the funds held in the Unsecured Claims Payments Escrow. On and after the Effective Date, subject to Article VII.B.2 and except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### F.      Cancellation of Prepetition Credit Agreements and Equity Interests

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreements and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing

32

indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease that (i) has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, except that:

- the Prepetition Credit Agreements, the ABL DIP Credit Agreement, and the Term DIP Credit Agreement shall continue in effect solely for the purpose of: (i) allowing Holders of the ABL DIP Claims, Prepetition First Lien Credit Agreement Claims, and Prepetition Second Lien Credit Agreement Claims, as applicable, to receive the distributions provided for under the Plan; (ii) allowing the Prepetition Agents to receive distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the rights of the Prepetition Agents, DIP Agents, and DIP Lenders to indemnification pursuant and subject to the terms of the Prepetition Credit Agreements, the ABL DIP Credit Agreement, and the Term DIP Credit Agreement, as applicable, in respect of any Claim or Cause of Action asserted against the Prepetition Agents, DIP Agents, and DIP Lenders, as applicable; *provided* that any Claim or right to payment on account of such indemnification shall be an Administrative Claim; and

- the foregoing shall not affect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor.

G.   *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

The Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded from three sources: (1) proceeds from the New ABL Facility, (2) the Sponsor Payment, and (3) Cash on hand as of the Effective Date. Specifically, the Debtors expect that the New ABL Facility[3] will provide sufficient Cash to pay all ABL DIP Claims. Additionally, prior to the Effective Date, the Debtors may draw remaining available proceeds, if any, under the Term DIP Facility (subject to and in accordance with the Final DIP Order). The Debtors will rely on this draw under the Term DIP Facility, the Sponsor Payment, and Cash on hand to fund other payments required for emergence.

In making such Cash payments, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority

---

[3]   The New ABL Facility is expected to include guarantees from the Canadian Debtors.

KE 46471280

without further order of the Bankruptcy Court, to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### H.  Payment of Commitment Fees

On the Effective Date, to the extent any portion of the commitments under the Term DIP Facility are not borrowed, the Reorganized Debtors shall pay a Cash fee equal to 3% of the commitments under the Term DIP Facility that are not borrowed to each Backstop Lender in accordance with the DIP Documents.

On the Effective Date, to the extent any portion of the commitments under the Term DIP Facility are not borrowed, the Reorganized Debtors shall pay a Cash fee equal to 2% of the commitments under the Term DIP Facility that are not borrowed to each lender under the Term DIP Facility in accordance with the DIP Documents.

On the Effective Date, the Reorganized Debtors shall pay the Exit Commitment Fee to lenders under the Term DIP Facility in accordance with the DIP Documents.

### I.  Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.  Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors, or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers, or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

### J.  Issuance of New Equity

#### 1.  New Equity

On the Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.  The issuance of such documents is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests.  Distributions of New Equity will be made only through broker accounts via electronic issuance and Reorganized Holdings will not issue separate stock certificates.

### 2. Shareholders Agreement

On the Effective Date, Holders of New Equity shall be parties to a Shareholders Agreement, in substantially the form included in the Plan Supplement, and which shall otherwise be satisfactory to the Requisite Consenting Lenders.  On the Effective Date, Reorganized Holdings and the Requisite Consenting Lenders shall enter into and deliver the Shareholders Agreement to each Entity that is intended to be a party thereto and such Shareholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

### 3. Private Companies

On the Effective Date, the Reorganized Debtors shall be private, non-SEC reporting companies.

### K.  *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities.  In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Equity contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### L.  *New Organizational Documents*

On or immediately prior to the Effective Date, the organizational documents of each of the Debtors shall be amended and restated, as may be necessary to effectuate the transactions contemplated by the Plan, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be satisfactory to the Requisite Consenting Lenders.  Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

KE 46471280

M.      *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Directors and Officers of Reorganized Holdings and Other Reorganized Debtors*

The initial directors and officers of the Reorganized Holdings shall be selected by the Requisite Consenting Lenders. Unless otherwise set forth in the Plan Supplement, the existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors. The identity of each of the members of the New Board will be disclosed prior to the Confirmation Hearing and any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to and to the extent necessary to satisfy section 1129(a)(5) of the Bankruptcy Code.

O.      *Avoidance Actions*

The Debtors waive all rights to commence or otherwise pursue any and all Avoidance Actions, including, without limitation, to assert or use any such Avoidance Actions for defensive purposes, and such Avoidance Actions shall be released on the Effective Date.

P.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX below, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date,

36

and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (i) Avoidance Actions released by the Debtors pursuant to Article IV.O and (ii) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including Article IX. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IV.O and Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article IV.O and Article IX of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

*Q.* *Directors and Officers Insurance Policies and Agreements*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

37

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

R.      *Compensation and Benefits Programs*

Unless otherwise provided herein or in the Plan Supplement, the Confirmation Order, or any applicable agreements binding on the Debtors, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

1.   Management Equity Incentive Plan

Promptly on or as soon as practicable after the Effective Date, the New Board will adopt and implement the Management Equity Incentive Plan whereby equity awards for 6–10% of the New Equity (on a fully diluted basis) of Reorganized Holdings will be granted to continuing employees of the Debtors and members of the New Board with pricing, vesting and exercise terms to be determined by the New Board upon consultation with the Chief Executive Officer of Reorganized Holdings.

2.   Cash Incentive Program

Promptly on or as soon as practicable after the Effective Date, the Reorganized Debtors will assume the Cash Incentive Program.

3.   Continuation of Retiree Benefits

The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.

4.   Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance, including without limitation, any Insurance Policies providing workers' compensation insurance coverage to the Debtors.

All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

S.       *Gift Card Programs*

The Reorganized Debtors will honor and satisfy all of the Debtors' prepetition and postpetition obligations related to their Gift Card Program, as set forth and defined in the *Final Order (I) Authorizing the Debtors to (A) Honor Certain Prepetition Obligations to Customers and Partners and (B) Otherwise Continue Certain Customer and Partner Programs in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 638]. Nothing in the Confirmation Order shall alter the Debtors' or Reorganized Debtors' obligations with respect to the Gift Card Program.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the date of the Confirmation Hearing, except as otherwise provided in the Plan or by other Bankruptcy Court order, each Executory Contract or Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code. The Debtors will not assign any Executory Contracts or Unexpired Leases pursuant to the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, unless otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease, and except as such terms are modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

B.       *Indemnification Obligations*

On the Effective Date, except as otherwise provided herein, all indemnification provisions, consistent with applicable law, in place as of the date of the Restructuring Support Agreement (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current directors, officers, managers,

39

employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed, which assumption shall be irrevocable, and shall survive the Effective Date.

C.     *Directors and Officers Insurance Policies and Agreements*

Pursuant to Article IV.Q hereof, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

D.     *Insurance Policies and Surety Bonds*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the New Credit Facility Documents, the Confirmation Order, the Claims Bar Date Order, any claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (1) on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Insurance Policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.C of the Plan) and all obligations thereunder, regardless of when they arise; and (2) except as set forth in Article V.C of the Plan, nothing (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (b) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a Cure objection or a request, application, Claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Claims or Claims.

Notwithstanding any other provision of the Plan, on the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond provider, including without limitation, obligations under any related indemnity agreements, shall be deemed reaffirmed and shall be continuing obligations of the Reorganized Debtors; (2) all bonded obligations of the Debtors for which such surety bonds secure performance by the Debtors shall be deemed assumed by the Debtors and shall be unimpaired by the Plan or Confirmation Order; and (3) to the extent any of the obligations and commitments set forth in this provision are secured by collateral, such collateral shall remain in place. Nothing in the Plan or Confirmation Order shall be deemed to (1) modify or impair the rights of any party under the Debtors' surety bonds, related indemnity agreements, or applicable law; (2) require any surety bond provider to issue any new surety bonds or extensions or renewals of any surety bonds; or (3) affect the sureties' respective rights (only to the extent such rights exist with respect to the surety bonds, indemnity agreements or under applicable law) to require the Reorganized Debtors to execute and deliver to the Sureties new indemnity agreements containing such new or additional terms as the Sureties may require in their discretion.

E.       *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute between the Debtors and a counterparty to any Executory Contracts or Unexpired Leases that is not resolved between the parties regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date.

The Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases (including the proposed Cure Claim amounts) with the Plan Supplement, which schedule will not be modified with regard to any Unexpired Leases without the consent of any affected parties.  The Debtors will cause notices of proposed assumption and proposed Cure Claims to be served by overnight delivery service upon the applicable contract counterparty affected by such notices and by email upon counsel of record for the applicable contract counterparty, if any.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed, served, and actually received by the Debtors no later than fourteen (14) days after the Plan Supplement Filing Date.  Any such objections will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.  To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.  Notwithstanding the foregoing, all landlords' rights to recover amounts which have accrued or come due between the Cure objection deadline and the effective date of assumption are reserved.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of any one of the following:  (1) amounts listed on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases (if no objections to the Cure Claim is filed within the applicable objection period), (2) amounts agreed to by the Debtors and the applicable counterparty, or (3) amounts as ordered by the Court; *provided*, *however*, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**Any Proofs of Claim filed with respect to an Executory Contract, Unexpired Lease, or Insurance Policy that has been assumed pursuant to the provisions of the Plan shall be deemed satisfied upon the Debtors' curing of any and all defaults related thereto, without further notice to or action, order, or approval of the Bankruptcy Court.**

F.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

The Debtors shall file the Schedule of Rejected Executory Contracts and Unexpired Leases with the Plan Supplement, which schedule will not be modified with regard to any Unexpired Leases without the consent of any affected parties.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

G.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses,

permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, and any agreements entered into with creditors pursuant to the interim and final orders authorizing the Debtors to pay prepetition claims of critical vendors, carriers, warehousemen, and section 503(b)(9) claimants [Docket Nos. 94, 642], will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

J.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

K.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments on account of Other General Unsecured

43

Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date; *provided* further that all payments under this Article VI shall be subject to the reserves for Disputed Other General Unsecured Claims and Disputed Worldwide General Unsecured Claims established pursuant to Article VI.B.

B.     *Unsecured Claims Payments Escrow and Reserve Procedures*

On the Effective Date, funds for the Other General Unsecured Claims Recovery Pool and the Worldwide GUC Claims Recovery Pool, in the aggregate amount of $32.316 million, shall be deposited into the Unsecured Claims Payments Escrow.  The Confirmation Order shall provide that the Reorganized Debtors shall not have a property interest in the Unsecured Claims Payments Escrow and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, or other encumbrances granted under the Plan shall not extend to an interest in the funds held in the Unsecured Claims Payment Escrow.

From and after the Effective Date, and until such time as all Disputed Other General Unsecured Claims and Disputed Worldwide General Unsecured Claims have been compromised and settled or determined by order of the Bankruptcy Court, for the benefit of each Holder of such Disputed Other General Unsecured Claims and Disputed Worldwide General Unsecured Claims, Cash in the Unsecured Claims Payments Escrow shall be reserved, in an amount equal to the lesser of:  (i) the amount of the applicable Disputed Other General Unsecured Claim or Disputed Worldwide General Unsecured Claim; (ii) the amount in which the applicable Disputed Other General Unsecured Claim or Disputed Worldwide General Unsecured Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim; and (iii) such other amount as may be agreed upon by the Holder of such applicable Disputed Other General Unsecured Claim or Disputed Worldwide General Unsecured Claim.

Any amount of the Cash in the Unsecured Claims Payments Escrow reserved and held for the benefit of a Holder of a Disputed Other General Unsecured Claim or Disputed Worldwide General Unsecured Claim, as applicable, shall be treated as a payment and reduction on account of such Other General Unsecured Claim or Worldwide General Unsecured Claim for purposes of computing any additional amounts to be paid to such Holder if the Other General Unsecured Claim or Worldwide General Unsecured Claim, as applicable, ultimately becomes an Allowed Claim.  Such amount of the Cash in the Unsecured Claims Payments Escrow shall be reserved for the benefit of the applicable Holders pending determination of their entitlement thereto under the terms of the Plan.

Any amount remaining in the Unsecured Claims Payments Escrow being held for the benefit of Holders of Disputed Other General Unsecured Claims or Disputed Worldwide General Unsecured Claims after reconciliation of all General Unsecured Claims asserted against the Debtors shall be distributed to Holders of Allowed Other General Unsecured Claims and Allowed Worldwide General Unsecured Claims in accordance with the provisions of the Plan.

The Reorganized Debtors are authorized to make distributions to Holders of Allowed Other General Unsecured Claim or Allowed Worldwide General Unsecured Claim out of the

Unsecured Claims Payments Escrow based on the reserve amount established pursuant to this Article VI.B.  The Reorganized Debtors will consult with the Post-Effective Date Claims Oversight Committee with respect to the Allowed amounts of other General Unsecured Claims and Worldwide General Unsecured Claims and the timing of such distributions to Holders of Class 5A (Other General Unsecured Claims) and Allowed Class 5B (Worldwide General Unsecured Claims).

C.    *Distributions on Account of Claims Allowed After the Effective Date*

1.  <u>Payments and Distributions on Disputed Claims</u>

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.  Payments to Holders of Allowed Other General Unsecured Claims or Allowed Worldwide General Unsecured Claims shall be made out of the Unsecured Claims Payments Escrow.

Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.  <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

D.    *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided herein, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as practicable after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in this Article VI.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

E.      *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

        1.  Record Date for Distributions

        On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

        2.  Delivery of Distributions in General

        Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and *provided further*, that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

        3.  Delivery of Distributions to Prepetition First Lien Credit Agreement Claims

        Except as set forth in this Article VI.3, the Prepetition First Lien Agent shall be deemed to be the Holder of all Prepetition First Lien Credit Agreement Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition First Lien Credit Agreement Claims shall be made to or on behalf of the Prepetition First Lien Agent.  The Prepetition First Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Prepetition First Lien Credit Agreement Claims, as applicable; *provided*, *however*, that Morgan Stanley Capital Services LLC shall be deemed to be the Holder of the MSCS Swap Claim for all purposes hereunder and any distributions to be made under the Plan on account of the MSCS Swap Claim shall be made to Morgan Stanley Capital Services LLC directly.  As soon as practicable following compliance with the requirements set forth in this Article VI of the Plan, the Prepetition First Lien Agent shall arrange to deliver or direct the delivery of such distributions for which it is the deemed Holder to or on behalf of such Holders of Allowed Prepetition First Lien Credit Agreement Claims.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition First Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition First Lien Agent.

        4.  Delivery of Distributions to Prepetition Second Lien Credit Agreement Claims

        The Prepetition Second Lien Agent shall be deemed to be the Holder of all Prepetition Second Lien Credit Agreement Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition Second Lien Credit Agreement

46

Claims shall be made to or on behalf of the Prepetition Second Lien Agent. The Prepetition Second Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Prepetition Second Lien Credit Agreement Claims, as applicable. As soon as practicable following compliance with the requirements set forth in this Article VI of the Plan, the Prepetition Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of such Holders of Allowed Prepetition Second Lien Credit Agreement Claims. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition Second Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Second Lien Agent. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented (in summary form) fees, costs, and expenses incurred by the Prepetition Second Lien Agent prior to the Effective Date, which shall include the reasonable and documented fees and expenses of Pryor Cashman LLP (including for services, if any, provided prior to the Petition Date) without the need for the Prepetition Second Lien Agent to file a fee application with the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented fees, costs, and expenses incurred by the Prepetition Second Lien Agent (including the reasonable and documented fees and expenses of Pryor Cashman LLP for services rendered on or after the Effective Date) in connection with distributions to Holders of Allowed Prepetition Second Lien Credit Agreement Claims in accordance with the Plan.

5.   Distributions by Distribution Agents (if any)

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety bond, or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts

47

requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

6.  Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar or fractional share of New Equity under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity (up or down), with half dollars and half shares of New Equity or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if:  (a) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value of less than $10, which shall be treated as an undeliverable distribution under Article VI.E.7 below.

7.  Undeliverable Distributions

(a)  Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VI.E.7(b) hereof, until such time as any such distributions become deliverable; *provided,* that undeliverable distributions out of the Unsecured Claims Payments Escrow shall be returned to the Unsecured Claims Payments Escrow for subsequent distribution to Holders of Allowed Other General Unsecured Claims or Allowed Worldwide General Unsecured Claims.  Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b)  Failure to Claim Undeliverable Distributions

No later than 120 days after the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long

48

as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.

In such cases, (i) any Cash or New Equity held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto; *provided*, that any Cash held for payment on account of Allowed Other General Unsecured Claim or Allowed Worldwide General Unsecured Claim shall be returned to the Unsecured Claims Payments Escrow for subsequent distribution to Holders of Allowed Other General Unsecured Claim or Allowed Worldwide General Unsecured Claims. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

*F.     Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary

49

or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

G.      *Setoffs*

Subject to Article IV.O, the Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, Equity Interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

H.      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

I.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of

50

such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.  If the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.   Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including any insurer(s) under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the Insurance Policies.

# ARTICLE VII.

# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.   *Allowance of Claims*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately before the Effective Date.

B.    *Claims Administration Responsibilities*

Subject to Article VII.B.2, and except as otherwise specifically provided in the Plan, including, without limitation, Article XII.N hereof, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding Article VII.B.1, the Reorganized Debtors shall not consent or agree to the allowance or reclassification of any Claim as a Class 5A (Other General Unsecured Claim) or Class 5B (Worldwide General Unsecured Claim) without the prior written consent of the Post-Effective Date Claims Oversight Committee or order of the Bankruptcy Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors, Reorganized Debtors, or Post-Effective Date Claims Oversight Committee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    *Adjustment to Claims Without Objection*

Any Claim or Interest that has been paid or satisfied, or any such Claim or Interest that has been cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

Any objections to Claims shall be filed on or before the Claims Objection Bar Date; *provided*, however, that the Post-Effective Date Claims Oversight Committee shall have standing to seek an extension of the Claims Objection Bar Date with respect to Class 5A (Other General Unsecured Claims) and Class 5B (Worldwide General Unsecured Claims).

F.     *Disallowance of Claims*

All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

G.     *No Distribution Pending Allowance*

If an objection to a Claim or portion thereof is filed as set forth in Article VII.E, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

H.     *Distribution After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to the Confirmation of the Plan*

The following shall be satisfied or waived as conditions precedent to the Confirmation of the Plan:

1.     The Plan must be, in form and substance, reasonably acceptable to the Debtors, the Requisite Consenting Lenders, and the ABL DIP Lenders.

2.     The Debtors shall have achieved 85% of the projected rent savings from landlord concessions on ongoing lease obligations on an annual run-rate, which projected rent savings were agreed to prior to the Petition Date by (a) the Backstop Lenders and (b) the Debtors.

3.      The Definitive Documents shall satisfy the Definitive Document Restructuring Support Agreement Requirements.

4.      The proposed form of order confirming the Plan shall be, in form and substance, reasonably acceptable to the Debtors, the Requisite Consenting Lenders, and the ABL DIP Lenders.

B.      *Conditions Precedent to Effective Date*

The following shall be satisfied or waived as conditions precedent to the Effective Date:

1.      The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The Definitive Documents shall satisfy the Definitive Document Restructuring Support Agreement Requirements.

3.      The Confirmation Order shall have been entered and become a Final Order.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing, and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan.

4.      All documents and agreements necessary to implement the Plan, including, without limitation, the New Credit Facilities Documents, shall have (a) been tendered for delivery and (b) been effected or executed.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, and the commitment fees described in Article IV.H of this Plan shall have been paid.

5.      All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the Sponsors' payment of the Sponsor Payment to the Debtors, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

6.      The Professional Fee Escrow Account shall have been established and funded.

7.      The Unsecured Claims Payment Escrow shall be established and funded.

C.      *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in this Article VIII may be waived by the Debtors, with the written consent of the Creditors' Committee, the Requisite Consenting Lenders, and the ABL DIP Lenders, without notice to parties in interest and without any further notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

54

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.    *Effect of Non Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, including the releases set forth in this Article IX, shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### C.    Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

### D.    Release of Liens

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Articles II.E and III hereof and, in the case of (i) the ABL DIP Claims, indefeasible payment in full in Cash of such ABL DIP Claims, and (ii) a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### E.    Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the**

implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary herein, the "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release, or document delivered pursuant to the Plan, including, without limitation, the New ABL Facility Documents, the New First Lien Term Loan Facility Documents, or the Shareholders Agreement or documents, agreements, or instruments executed in connection therewith, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Debtor Release includes a release of the Sponsor Entities and the Prepetition Lenders of any claim or Cause of Action whatsoever that was or could have been raised in the draft complaint attached to the Standing Motion, including without limitation any claims, Causes of Action or liabilities arising out of or related to the Sponsors' equity ownership of Payless Holdings LLC, the 2012 transaction in which the Sponsors became the majority equity owners of Payless Holdings LLC, any dividends or fees paid to the Sponsor Entities or Prepetition Lenders, any loans incurred by the Debtors, and any role by any of the Sponsor Entities in managing the Debtors. The consideration provided by the Prepetition Lenders under the Plan and the Sponsor Payment being made by the Sponsors are in settlement of any and all potential claims, Causes of Action, or liabilities against any of the Sponsor Entities and the Prepetition Lenders arising out of or relating to any act or

57

omission, transaction, or occurrence relating to the Debtors or the Debtors' Estates taking place on or before the Effective Date of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

F.      *Third-Party Release*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct, or gross negligence.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

KE 46471280

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Third-Party Release includes a release of the Sponsor Entities and the Prepetition Lenders of any claim or Cause of Action whatsoever that was or could have been raised in the draft complaint attached to the Standing Motion, including without limitation any claims, Causes of Action or liabilities arising out of or related to the Sponsors' equity ownership of Payless Holdings LLC, the 2012 transaction in which the Sponsors became the majority equity owners of Payless Holdings LLC, any dividends or fees paid to the Sponsor Entities or Prepetition Lenders, any loans incurred by the Debtors, and any role by any of the Sponsor Entities in managing the Debtors.  The consideration provided by the Prepetition Lenders under the Plan and the Sponsor Payment being made by the Sponsors are in settlement of any and all potential claims, Causes of Action, or liabilities against any of the Sponsor Entities and the Prepetition Lenders arising out of or relating to any act or omission, transaction, or occurrence relating to the Debtors or the Debtors' Estates taking place on or before the Effective Date of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Third-Party Release against any of the Released Parties.

G.    *Exculpation*

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement, or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing, and/or effecting the Restructuring Support Agreement, the DIP Documents, the Disclosure Statement, and the Plan (including the Plan Supplement and any related contract, instrument, release, or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan; and/or any other prepetition or postpetition act taken or omitted to be taken in

59

connection with or in contemplation of the restructuring of the Debtors. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its respective duties under, pursuant to, or in connection with the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages, or ultra vires acts as determined by a Final Order.

H.    *Injunction*

The satisfaction, release, and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

I.    *No Release of Any Claims Held by the United States*

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any

60

request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

61

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the New ABL Credit Agreement, the New First Lien Term Loan Credit Agreement and any intercreditor agreement relating thereto, and the Shareholders Agreement, which disputes shall be adjudicated in accordance with the terms of such agreements);

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

KE 46471280

# ARTICLE XI.

## MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Subject to the limitations contained in the Plan, the Restructuring Support Agreement, the ABL DIP Facility, and the Term DIP Facility, and in accordance with the Restructuring Support Agreement:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon the order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided*, however, that the Debtors or the Reorganized Debtors, as the case may be, shall not amend or modify the Plan in a manner that affects the treatment of Class 5A (Other General Unsecured Claims) or Class 5B (Worldwide General Unsecured Claims) without the prior written consent of the Creditors' Committee or the Post-Effective Date Claims Oversight Committee, as the case may be; *provided further*, however, that the Debtors or the Reorganized Debtors, as the case may be, shall not amend or modify the Plan in a manner that adversely affects the Sponsor Entities without the prior consent of the Sponsors or in a manner that adversely affects the Prepetition Lenders without the prior consent of the Prepetition Lenders.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan*

Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.   *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.   *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.   *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

D.   *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

E.   *Service of Documents*

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed renewed requests for service.

64

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve a notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with notice of the Confirmation Hearing; *provided*, *however*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors served the notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

To supplement the notice described in the preceding sentence, within twenty (20) days of the date of the Confirmation Order the Debtors shall publish notice of the Confirmation Hearing on one occasion in the national editions of *The Wall Street Journal* and *USA Today*. Mailing and publication of the notice of the Confirmation Hearing in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

## F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## G.    *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## H.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated or organized in New York shall be governed by the laws of the place of incorporation or organization of the applicable Debtor or Reorganized Debtor, as applicable.

65

I.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at https://cases.primeclerk.com/payless or the Bankruptcy Court's website at www.moeb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.    *Nonseverability of Plan Provisions Upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

K.    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

M.    *Dissolution of Creditors' Committee*

The Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided*, that the Creditors' Committee shall be deemed to remain in existence

solely with respect to, and shall not be heard on any issue except, applications filed by the Retained Professionals pursuant to sections 330 and 331 of the Bankruptcy Code. The Reorganized Debtors shall not be responsible for paying fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

N.    *Post-Effective Date Claims Oversight Committee*

On the Effective Date, the Creditors' Committee shall appoint and establish the Post-Effective Date Claims Oversight Committee pursuant to the Plan. The Post-Effective Date Claims Oversight Committee may in their sole discretion retain professionals, including professionals previously retained by the Creditors' Committee, without any further notice to or action, order, or approval by the Bankruptcy Court.

On the Effective Date, funds of the Debtors in the amount of $500,000 shall be set aside in a segregated account for exclusive use by the Post-Effective Date Claims Oversight Committee. All costs and expenses of the Post-Effective Date Claims Oversight Committee and its members, including reasonable professional fees will be paid exclusively from such funds without any further notice to or action, order, or approval by the Bankruptcy Court. Any unused portion of the funds set aside for the Post-Effective Date Claims Oversight Committee at the time of the entry of a final decree closing these Chapter 11 Cases, or such earlier time as the Reorganized Debtors may be advised by the Post-Effective Date Claims Oversight Committee, will revert to the Reorganized Debtors.

From and after the Effective Date, the Reorganized Debtors and the Post-Effective Date Claims Oversight Committee shall have the authority to prosecute and settle or compromise Claims in Class 5A or Class 5B. The Reorganized Debtors and the Post-Effective Date Claims Oversight Committee will work together in good faith to prosecute objections to Claims in Class 5A or Class 5B and compromise or settle Claims in Class 5A or Class 5B. The Reorganized Debtors shall make their employees and books and records reasonably available to the Post-Effective Date Claims Oversight Committee to assist them with respect to these matters.

If there is a dispute between the Reorganized Debtors and the Post-Effective Date Claims Oversight Committee regarding any proposed objection, settlement, or compromise of a Claim in Class 5A or Class 5B, the parties shall endeavor to resolve any such dispute informally, and either party shall be entitled to seek a hearing before the Bankruptcy Court on an expedited basis to resolve such dispute if it cannot be informally resolved before such proposed objection, settlement, or compromise becomes effective. The Bankruptcy Court shall have jurisdiction to decide any such disputes.

O.    *Section 1125(e) Good Faith Compliance*

The Debtors, Reorganized Debtors, the Prepetition Agents, the DIP Agents, and the Creditors' Committee, and each of their respective representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

KE 46471280

*P.*      *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder, and all other parties-in-interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

*Q.*      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

*R.*      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

*S.*      *Payment of Restructuring Support Advisor and DIP Document Fees*

Prior to the occurrence of the Effective Date of the Plan, the Debtors will indefeasibly pay in full, in Cash all fees and expenses due and owing (or good-faith estimates thereof) to lenders or advisors pursuant to the terms of the Restructuring Support Agreement, the Final DIP Order, or the Definitive Documents that have not previously been paid.

68

Respectfully submitted,

Date:  July 21, 2017

By:     /s/ Michael Schwindle
Name:   Michael Schwindle
Title:  Chief Financial Officer, Payless ShoeSource,
        Inc.

KE 46471280