# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 19-40883-659 |
|  | ) | Chapter 11 |
| Payless Holdings LLC, *et al.*, | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | **Objection Deadline**: July 31, 2019, |
|  | ) | 4:00 P.M. (prevailing Central Time) |
|  | ) | **Hearing Date**: August 7, 2019 |
|  | ) | **Hearing Time**: 10:00 a.m. (Central Time) |
|  | ) | **Hearing Location**: Courtroom 7 North |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

The above-captioned debtors and debtors in possession file this motion (the "Motion")
for entry of an order (the "Proposed Order")[1] pursuant to sections 105(a) and 363 of title 11 of
the United States Code, §§ 101-1532 (the "Bankruptcy Code") and Rules 2002 and 6004 of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing entry into and
performance under the Real Estate Contract between Debtor Payless Shoesource, Inc. ("Selling
Debtor") and Jennifer Duong ("Purchaser"), attached hereto as Exhibit A (the "Purchase
Agreement"); (ii) approving the sale and transfer of Selling Debtor's interest in the real property
commonly known as 5095 Stockton Boulevard in Sacramento, California (the "Property") in
accordance with the Purchase Agreement (the "Sale"); and (iii) and granting such other relief as
is just and proper.  In support of this Motion, the Debtors respectfully state as follows:

---

[1] A copy of the Proposed Order will be provided to the Notice Parties (as defined below) and made available on the
Debtors' case information website at https://cases.primeclerk.com/pss.

**JURISDICTION AND VENUE**

1.     The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a) and 363 and Bankruptcy Rules 2002 and 6004.

**BACKGROUND**

4.     On February 18, 2019 (the "Petition Date"), twenty-seven (27) of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Original Debtors").  On July 7, 2019, two (2) additional Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "July Debtors" and, together with the Original Debtors, the "Debtors").  A comprehensive description of the Debtors' businesses and operations, capital structure and events leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Stephen Marotta, Chief Restructuring Officer of Payless Holdings LLC, in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [Docket No. 22] (the "First Day Declaration") and the *Supplemental Declaration of Stephen Marotta in Support of Chapter 11 Petitions of the July Debtors* [Docket No. 1305] (the "Supplemental First Day Declaration") and  incorporated herein by reference.

5.     The Debtors' cases are being jointly administered for procedural purposes only and the Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107 and 1108.  On March 1, 2019, the Office of the United States

2

Trustee for the Eastern District of Missouri (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") pursuant to Bankruptcy Code section 1102 [Docket No. 359].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

6.     On the Petition Date, the Debtors filed the *Application of Debtors for Entry of an Order, Pursuant to 11 U.S.C. §327(a) and 328(a), Bankruptcy Rules 2014 and 2016, and Local Rules 2014A and 2016-2, Authorizing the Retention and Employment of A&G Realty Partners, LLC ("A&G") as the Debtors' Real Estate Advisor Nunc Pro Tunc to the Petition Date* [Docket No. 26] (the "A&G Retention Application").  The Court approved the A&G Retention Application on a final basis on March 21, 2019 [Docket No. 628].  As more fully described below, A&G has worked on the Debtors' behalf to market the Debtors' interests in real property, including soliciting interested purchasers with respect to the Property, and maximize the value recovered from any sales of said interests.

7.     Selling Debtor is the owner of the Property, a parcel of land located at 5095 Stockton Boulevard in Sacramento, California.  The Property is undeveloped and currently being used as a parking lot.  Selling Debtor originally owned the Property and the adjoining lot to the north as one parcel.  In late 1970, this single parcel was divided into two lots.  The Selling Debtor sold the northern lot, but leased back the store building located thereon and operated it for the next 47 years.  Selling Debtor retained ownership of the southern lot (the Property), which shared a common driveway with the northern lot and served to provide overflow parking for the store.  As more fully described below, Purchaser is also the owner of the adjoining northern lot containing the store building and, following a comprehensive marketing process, is the only party who has expressed interest in the property.

3

## RELIEF REQUESTED

8.      By this Motion, the Debtors request that the Court enter an order, substantially in the form of the Proposed Order, approving the Purchase Agreement and approving the Sale and transfer of Selling Debtor's interest in the Property.

## THE PURCHASE AGREEMENT AND SALE

9.      As referenced above, the Debtors, with the assistance of A&G engaged in an extensive marketing campaign with respect to the Debtors' unexpired leases and owned real property, including the Property.  In connection with the Debtors' Store Closing Sale[2], A&G disseminated a press release (the "Press Release") informing potentially interested purchasers that the Debtors had bestowed upon A&G the authority to market and sell the Debtors' vast interests in real property.  The Press Release contained a full list of information with respect to the marketed properties and contact information for interested parties to seek further information. In addition, A&G distributed marketing materials via Propertysend.com, a commercial real estate marketing solution that reaches over 120,000 commercial real estate buyers, brokers, agents, owners and developers nationwide.  According to A&G's records, these electronic solicitation materials were opened over 6,800 times.  The vast majority of interested persons contacted the Debtors within the first few weeks of these cases.

10.      Despite the comprehensive and extensive marketing process, A&G received only one offer with respect to the Property.  Notwithstanding the lack of interest, the Debtors and A&G engaged in arms-length negotiations with the Purchaser and, ultimately, the purchase price was increased by $5,000.  Further, as the lot is undeveloped and currently being used as a parking lot for the adjoined lot on which a Payless store was operated until July 29, 2017, the

---

[2] As defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales and (III) Granting Related Relief* [Docket No. 24].

Debtors have no use for the Property under their current reorganization strategy. It is unlikely that other purchasers for the Property could be found in the near term on similarly favorable terms, given the extensive marketing process already undertaken and the location and condition of the Property. Accordingly, the Selling Debtor has concluded, in the exercise of its sound business judgment, that the Sale (i) represents the highest and best value for the Property, (ii) is fair and reasonable, and (iii) is in the best interests of the Selling Debtor's estate and creditors.

11.     The principal terms of the Purchase Agreement are summarized in the following chart:[3]

| SUMMARY DESCRIPTION | |
|---|---|
| **Seller** | Payless Shoesource, Inc. |
| **Purchaser** | Jennifer Duong |
| **Sale/Purchase Price** | $35,000 |
| **Earnest Money Deposit** | $5,000 |
| **Real Estate Commission** | Seller will pay a real estate commission of 4% of the contract price to A&G Realty Partners LLC. |
| **Closing and Possession** | Closing shall be completed on or before the date that is ten (10) days after entry of the Proposed Order and Seller shall deliver possession of the Property to Purchaser upon closing. |
| **Conditions to Closing** | Entry by this Court of the Proposed Order, in form and substance acceptable to the Seller, in its sole discretion, that authorizes the Seller to sell the Property in accordance with Section 363 of the Bankruptcy Code. |

### BASIS FOR RELIEF

---

[3] Capitalized terms used but not otherwise defined in the summary chart shall have the meaning ascribed to such terms in the Purchase Agreement. This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Purchase Agreement, the latter governs in all respects.

## I.  The Sale of the Property Is an Appropriate Exercise of the Debtors' Sound Business Judgment and Should Be Approved.

12.    Pursuant to section 363(b)(1) of the Bankruptcy Code "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

13.    Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 does not provide explicit guidance as to when a sale or disposition of property of the estate should be authorized, courts generally authorize debtors' decisions to use, sell or lease assets outside the ordinary course of business if such use, sale or lease is based upon a sound business purpose.  *In re Equity Management Systems*, 149 B.R. 120, 124 (Bankr. S.D. Iowa 1993); *see In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010); *see also In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987), *appeal dismissed* 838 F.2d 59 (2d Cir. 1988) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); and *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason").

6

14.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis in original, internal alterations and quotations omitted)); *see also In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy").  Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) ("[w]here the [debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally grant approval as long as the proposed action appears to enhance the debtor's estate" (citing *Richmond Leasing Co. v. Capital Bank*, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985))); *In re Farmland Indus. Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (approving the rejection of employment agreements and noting that "[u]nder the business judgment standard, the question is whether the [proposed action] is in the Debtors' best economic interests, based on the Debtors' best business judgment in those circumstances" (citations omitted)).

15.    Here, the Selling Debtor's decision to proceed with the Sale in accordance with the terms set out in the Purchase Agreement is based upon its sound business judgment. The Selling Debtor believes that the Sale would generate value for its estate by relieving the Selling Debtor of an asset that neither it nor its affiliates plan to use in the future, and that it is unlikely that other purchasers for the Property could be found in the near term on similarly favorable terms, given the current market environment. After engaging in good-faith, arms'-length negotiations with the Purchaser, the Selling Debtor submits that the Purchase Agreement represents the highest or otherwise best offer for the Property and that the Sale will result in the maximum benefit to the Debtors' estates and creditors. Accordingly, the Selling Debtor has concluded, in the exercise of its sound business judgment, that the Sale is fair and reasonable, and that the Sale is in the best interests of the Selling Debtor's estate and creditors.

16.    Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Bankruptcy Rule 6004(f). By extension, a court should authorize a private sale, such as the Sale, as long as the decision to consummate such sale is made under sound business judgment. *See, e.g., In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving the private sale of the debtor's tire company because the debtor showed sound business judgment). Courts frequently have allowed chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Jul. 23, 2010) [ECF No. 3366]; *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 20, 2008) [ECF No. 258]; *In re Loral Space & Commc'ns Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sept. 30, 2005) [ECF No. 2393]; *In re International Wire Grp., Inc., et al.*,

Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) [ECF No. 176]; *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D. P.R. 1999) (upholding bankruptcy court approval of private sale); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

17.     Ample business justification exists in this case to approve the sale of the Property. The Debtors believe, in the exercise of sound business judgment, that the benefit of receiving immediate payment for the Property outweighs the potential benefits of retaining the Property. The Property is of *de minimus* in value in comparison to the amounts that will be recovered in these chapter 11 cases, and the costs associated with marketing and selling the Property at a public auction far outweigh the potential benefit to be derived therefrom.  Specifically, the costs of preparing and seeking approval of bidding procedures and retaining a professional to market the Property would diminish the net recovery to the Debtors' estates, particularly where the Property has already been extensively marketed and the Purchaser was the only party interested in the Property.  As such, the Debtors are not aware of any other potential buyer willing to pay more for the Property.  Accordingly, the Debtors submit that that the sale of the Property is appropriate and should be approved.

**II.     The Sale Should Be Approved Free and Clear Under Section 363(f) of the Bankruptcy Code.**

18.     The Debtors requests that the Court authorize the Debtors to take all actions necessary to sell the Property free and clear of any and all liens, claims and encumbrances (the "Encumbrances"), in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1)  applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in *bona fide* dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

19.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Property "free and clear" of such Encumbrances. *See, e.g.*, *In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) ("The five conditions enumerated in section 363(f) are disjunctive and, as such, a sale thereunder can be authorized if the trustee can prove the existence of any one of the five conditions.").

20.    Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see In re Trans World Airlines, Inc.,* 2001 WL 1820325, at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

21.    The Debtors submit that section 363(f) permits the Sale of the Property free and clear of all Encumbrances.  The Debtors do not believe there are any liens, claims or encumbrances on the Property.  However, to the extent there are unknown liens, claims or

encumbrances, the Debtors submit that the proposed sale satisfies the requirements of section 363(f) of the Bankruptcy Code.  The Debtors believe that any party holding a lien on the Property could be compelled to accept a monetary satisfaction of such interest.  Moreover, the Proposed Order provides that any lien, claim or encumbrance on the Property, if any, will attach to the net proceeds of the sale of the Property.

22.    Accordingly, the Debtors believe that the proposed sale of the Property satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code and should be approved free and clear of all liens, claims and encumbrances.

### III.    The Purchaser Should Be Afforded the "Good Faith" Purchaser Protections of Section 363(m) of the Bankruptcy Code.

23.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that authorization of the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

24.    Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m)

11

furthers the policy of finality in bankruptcy sales . . . [and] assists bankruptcy courts in maximizing the price for assets sold in such proceedings.").

25.     While the Bankruptcy Code does not define "good faith," courts in the Eighth Circuit have held that "[l]ack of good faith is shown by misconduct surrounding the sale. Typically, the requisite misconduct necessary to establish a lack of good faith involves 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *In re Burgess*, 246 B.R. 352, 255–56 (B.A.P. 8th Cir. 2000) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m)); *see also In re Agriprocessors, Inc.*, 465 B.R. 822, 835 (Bankr. N.D. Iowa 2012) (citing *In re Burgess*, 246 B.R. at 355-56).

26.     The Debtors submit that the Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Purchase Agreement is the product of good faith, arm's-length negotiations between the Selling Debtor and the Purchaser.  The consideration to be received is fair and reasonable.  Selling Debtor is not aware of any fact that renders the Purchaser other than a good faith purchaser.  Accordingly, the Debtors request that the Court make a finding that, upon the closing of the Sale, the Purchaser will have purchased the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

27.     The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h). Selling Debtor and the Purchaser desire to close the Sale of the Property as soon as is practicable to allow the Selling Debtor to realize the proceeds of the Sale and to

preserve  any value for the Selling Debtor's estate.  Accordingly, the Debtors request that the Court waive the fourteen (14) day stay under Bankruptcy Rules 6004(h).

<u>**NOTICE**</u>

28.      The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) counsel to the Prepetition ABL Administrative Agent, (i) Choate Hall & Stewart LLP (Attn: Kevin Simard, Douglas Gooding and Jonathan Marshall) and (ii) Thompson Coburn LLP (Attn: Mark Bossi); (c) counsel to the FILO Agent, Greenberg Traurig, LLP (Attn: Jeffrey M. Wolf); (d) counsel to certain Prepetition Term Loan Lenders (i) Kramer Levin Naftalis & Frankel LLP (Attn: Stephen D. Zide), (ii) Doster, Ullom & Boyle, LLC (Attn: Gregory D. Willard), (iii) Stroock & Stroock & Lavan LLP (Attn: Kristopher M. Hansen and Daniel A. Fliman) and (iv) Lewis Rice LLC (Attn: Sonette T. Magnus); (e) counsel to the Prepetition Term Loan Agent, Norton Rose Fulbright US LLP (Attn: Stephen Castro and David Rosenzweig); (f) the Monitor, FTI Consulting Canada, Inc. (Attn: Paul Bishop, Greg Watson and Jim Robinson); (g) counsel to the Monitor, Bennett Jones LLP (Attn: Sean Zweig, Kevin Zych and Aiden Nelms); (h) counsel to the Committee (i) Pachulski Stang Ziehl & Jones LLP (Attn: Robert Feinstein and Bradford Sandler) and (ii) Polsinelli LLP (Attn: Matthew Layfield); (i) the United States Attorney's Office for the Eastern District of Missouri; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general for all states in which the Debtors conduct business; (m) the Purchaser; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>")  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

<u>**CONCLUSION**</u>

29.     WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Order granting the requested relief and such further relief as this Court deems just and proper.

[*Remainder of page intentionally left blank.*]

Dated:  July 17, 2019
        St. Louis, Missouri

/s/ Richard W. Engel, Jr.
Richard W. Engel, Jr. MO 34641
Erin M. Edelman MO 67374
John G. Willard MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com
jwillard@armstrongteasdale.com

-and-

Ira Dizengoff (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
mlahaie@akingump.com
kzuzolo@akingump.com

- and -

Julie Thompson (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K. Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email:  julie.thompson@akingump.com

*Counsel to the Debtors and Debtors in Possession*

8

## Exhibit A

**Purchase Agreement**

## REAL ESTATE SALE CONTRACT
*Sacramento, California*

THIS REAL ESTATE SALE CONTRACT ("**Contract**") is made as of July 15. 2019 (the "**Effective Date**"), by and between **PAYLESS SHOESOURCE, INC.**, a Missouri corporation ("**Seller**"), and **JENNIFER DUONG,** an individual ("**Purchaser**"; Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**").  Seller and Purchaser agree as follows:

1. ### PURCHASE AND SALE

Seller is the owner of a parcel of land including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), located at 5095 Stockton Boulevard in the City of Sacramento (the "**City**"), Sacramento County ("**County**"), State of California, Parcel Number 023-0111-029-0000, legally described on **Exhibit "A"** attached hereto and made a part hereof ,together with any and all buildings, improvements, structures and fixtures located on the Real Property, and all rights and appurtenances pertaining to the Real Property (collectively, the "**Improvements**"). The Real Property and the Improvements are sometimes collectively called the "**Property**".  Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract.  On the Closing Date set forth in Section 9 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 6(c) of this Contract).

2. ### PURCHASE PRICE

(a) **Purchase Price.**  The Purchase Price of the Property shall be Thirty-Five Thousand and No/100 Dollars ($35,000.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b) **Options Consideration**.  Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract.  This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

3. ### EARNEST MONEY DEPOSIT

Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 725 South Figueroa Street, Suite 200, Attention: Nko Justin, Telephone: (213) 488-4330, Email: Nko.Justin@ctt.com ("**Escrow Agent**") the sum of Five Thousand and No/100 Dollars ($5,000.00) United States currency (the "**Earnest Money Deposit**") by means of a certified check, cashier's check or wire transfer, to be held

1

by the Escrow Agent in an interest bearing account in accordance with the terms and conditions of this Contract.  Any and all escrow fees will be paid by Purchaser.  Purchaser may elect to direct the Escrow Agent to invest the Earnest Money Deposit on its behalf in compliance with the Escrow Agent's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Escrow Agent.  Subject to the terms and conditions as otherwise set forth in this Contract, any and all interest accrued on the Earnest Money Deposit shall be paid to Purchaser at Closing. The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 9:00 am (Los Angeles time) on the Closing Date, by wire transfer of immediately available funds.  If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **DUE DILIGENCE**

Seller has delivered or made available to Purchaser copies of any material contracts and leases, surveys, title policies or title reports related to the Property to the extent the same are in Seller's possession and control.

In the event this Contract is terminated, all materials provided by or on behalf of Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING (i) THE TRUTH, ACCURACY OR COMPLETENESS OF ANY OF THE DUE DILIGENCE MATERIALS, (ii) THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME, (iii) ANY DATA OR INFORMATION DELIVERED BY SELLER OR THE SOURCES THEREOF, (iv) WHETHER ANY OF THE DUE DILIGENCE MATERIALS REPRESENT ALL OF THE NECESSARY OR RELEVANT INFORMATION RELATING TO THE PROPERTY, OR (v) THE ENFORCEABILITY OR VALIDITY OF ANY OF THE DUE DILIGENCE MATERIALS. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF THE DUE DILIGENCE MATERIALS SHALL BE AT THE SOLE RISK OF PURCHASER AND WITHOUT ANY REPRESENTATIONS, WARRANTIES, OR GUARANTIES OF SELLER, AND PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH DUE DILIGENCE MATERIALS. NEITHER SELLER, NOR ANY AFFILIATE OF SELLER ("**SELLER'S AFFILIATES**"), NOR THE PERSON OR ENTITY WHICH PREPARED ANY OF THE DUE DILIGENCE MATERIALS SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY, OR OMISSION, IN ANY OF THE DUE DILIGENCE MATERIALS. THE FAILURE TO DELIVER ANY REPORT, FINDINGS, RESULTS, FACTS, INFORMATION, OR DUE DILIGENCE MATERIALS SHALL NOT BE

2

ACTIONABLE BY PURCHASER AND SELLER SHALL HAVE NO LIABILITY IN CONNECTION THEREWITH. PURCHASER ACKNOWLEDGES THAT THE DUE DILIGENCE MATERIALS PROVIDED BY SELLER MAY NOT NECESSARILY REPRESENT ALL OF THE DOCUMENTATION AND INFORMATION IN EXISTENCE (OR IN SELLER'S POSSESSION OR CONTROL) WITH RESPECT TO THE PROPERTY, BUT, RATHER, REPRESENTS DOCUMENTATION MADE AVAILABLE BY SELLER AS A CONVENIENCE FOR PURCHASER. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DUE DILIGENCE MATERIALS MAY HAVE BEEN OBTAINED BY SELLER FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE (AND IS UNDER NO DUTY TO MAKE) ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF ANY DUE DILIGENCE MATERIALS. PURCHASER WAIVES, RELEASES AND FORFEITS ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER AGAINST SELLER OR THIRD PARTIES ARISING OUT OF PURCHASER'S USE OF THE DUE DILIGENCE MATERIALS. AS USED HEREIN, (1) "**AFFILIATE(S)**" SHALL MEAN, WITH RESPECT TO ANY PERSON (AS DEFINED BELOW), ANY OTHER PERSON THAT, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLS OR IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, SUCH PERSON, AND THE TERM "CONTROL" (INCLUDING THE TERMS "CONTROLLED BY" AND "UNDER COMMON CONTROL WITH") MEANS THE POSSESSION, DIRECTLY OR INDIRECTLY, OF THE POWER TO DIRECT OR CAUSE THE DIRECTION OF THE MANAGEMENT AND POLICIES OF SUCH PERSON, WHETHER THROUGH OWNERSHIP OF VOTING SECURITIES, BY CONTRACT OR OTHERWISE; AND (2) "**PERSON**" SHALL MEAN, ANY INDIVIDUAL, CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY, JOINT VENTURE, ASSOCIATION, JOINT-STOCK COMPANY, TRUST, UNINCORPORATED ORGANIZATION, OR OTHER ENTITY. THIS SECTION 4 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT.

5. **INSPECTION**

(a) **Right of Inspection**. Subject to all limitations hereinafter specified, Purchaser and its representatives and consultants (collectively, "**Purchaser's Consultants**") shall have the continuing right through the Closing Date, to investigate the Property; provided that, in no event shall Purchaser or Purchaser's Consultants make any intrusive, subsurface or physical testing (environmental, structural or otherwise) at the Property. In all instances, Purchaser shall leave the Property in a neat, orderly and safe condition following any such inspections and shall restore any damage to the Property caused by such inspections to substantially the same condition as existing before such damage. Purchaser agrees to indemnify and hold Seller harmless from and against any and all damages, liens, claims, costs, liabilities and expenses, including without limitation court costs and reasonable attorneys' fees, and all damage that may occur to the Property and all injuries to all persons, as a

3

result of Purchaser's inspections.  The indemnification set forth in the immediately preceding sentence shall survive the termination of this Contract. Purchaser shall have no right to terminate this Contract on the basis of its inspections permitted pursuant to this <u>Section 5(a)</u>.

(b)     **Insurance**.  As a condition precedent to Purchaser's physical inspection of the Property pursuant to this <u>Section 5</u> and prior to Purchaser's entry on the Property for the purpose of conducting any such inspection, Purchaser shall have delivered to Seller a certificate of insurance, reasonably satisfactory to Seller, evidencing that Purchaser or Purchaser's Consultants, as applicable, have adequate commercial general liability insurance. Seller shall be named as an additional insured on such commercial general liability policy.

6.      **TITLE AND SURVEY**

(a)     **Title Exceptions**.  Should Buyer so request, Chicago Title Insurance Company ("**Title Insurer**") shall use commercially reasonable efforts to deliver to Purchaser, within ten (10) business days of written request therefor, a title commitment for an ALTA standard form of owner's policy of title insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property.  Any fees related thereto shall be paid by Purchaser. Purchaser acknowledges that such Title Commitment is being delivered for informational purposes only. Seller shall have no obligation to remove any items disclosed by the Title Commitment and Purchaser shall have no right to terminate this Contract as a result of any exceptions included in the Title Commitment or information reflected thereon.

(b)     **Survey**.  Pursuant to <u>Section 4</u>, Seller has made available to Purchaser, to the extent available, Seller's existing survey of the Real Property (the "**Existing Survey**"). Purchaser, may, at Purchaser's sole cost and expense, obtain a new ALTA/NSPS land title survey, or an update to the Existing Survey, with such Table A inclusions as indicated by Purchaser (excepting any Table A inclusions which would be disruptive to any ongoing use of the Property, relate to rights of any third parties, or are otherwise invasive) (the "**Survey**").

(c)     **Acceptance of Title and Survey**.  Purchaser acknowledges and agrees that Purchaser hereby accepts and the state of title to the Property in all respects, including any and all exceptions recorded against the Property (all such exceptions to title herein, the "**Permitted Title Exceptions**") and any easements, rights-of-way, or other conditions that would be shown by a survey or physical inspection of the Property, and waives any objections thereto.

(d)     **No Obligation of Seller to Remove Exceptions**.  Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer.

4

7.    **PRORATIONS AND EXPENSES**

(a)    **Prorations.**    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (the "**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    Taxes.    All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property.  All prorations shall be final.  Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser.  The term "general real estate taxes" as used in this Section 7(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)    Miscellaneous.  If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing as of the Proration Date. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)    **Closing-related Costs.**  At Closing, Purchaser shall pay (i) the cost of the Closing Escrow (as defined in Section 10 of this Contract; (ii) the cost of the title policy (including both standard and any extended coverage) and any endorsements to the title policy and the costs of any updated Survey; (iii) the amount of any stamp or transfer tax or other similar fees and amounts imposed by any municipality and any county ordinance, and the state in which the Property is located (the "**State**"); (iv) any costs related to any inspections by any municipality and repairs necessitated by any municipal, county and/or State inspections ("**Repairs**"), if any, and shall meet any other requirements as established by any municipal, county and/or State ordinance with regard to the transfer of real estate; (v) all financing related fees; and (vi) all recording charges for the Deed and all documents pertaining to any Purchaser financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable by the Purchaser at Closing. Except as otherwise provided for in this Contract, the Parties shall each

5

be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

8. **CONDITIONS TO CLOSING**

    (a)    **Conditions to Seller's Obligation to Close.** In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to sell the Property to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

        (i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; and

        (ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

    (b)    **Conditions to Purchaser's Obligation to Close**.  In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

        (i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; and

        (ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed in all material respects.

    (c)    **Conditions to Closing of Both Parties**:  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is subject to entry by the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**") of an order, in form and substance acceptable to Seller, in its sole discretion, that authorizes Seller to sell the Property in accordance with section 363 of the United States Code (the "**Approval Order**"):

9. **CLOSING**

    (a)    **Closing Date**.  Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Escrow Agent within ten (10) days of entry of the Approval Order, or such later date as reasonably requested by Seller (the "**Closing Date**").

(b)   **Seller Closing Deliverables**.  On or before the Closing Date, Seller shall deliver or use commercially reasonable efforts to cause to be delivered to the Escrow Agent the following Closing documents:

  (i)   A Special Warranty Deed (or its State equivalent) executed in proper form for recording so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject to the Permitted Title Exceptions;

  (ii)   A FIRPTA Affidavit in customary form duly executed by Seller; and

  (iii)   A file-stamped copy of the Approval Order.

(c)   **Purchaser Closing Deliverables**  No later than 9:00 am Los Angeles time on the Closing Date, Purchaser shall deliver or cause to be delivered to the Escrow Agent the following for Closing:

  (i)   The full amount of the Purchase Price, as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and deliver to Escrow Agent instructions to immediately release the full amount to Seller; and

  (ii)   Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the City, County and State.

(d)   On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered a closing proration statement and State, county and municipal transfer tax declarations, in each case duly approved by Seller and Purchaser, which approval by both parties shall not be unreasonably withheld or conditioned, and all other documents required by the Escrow Agent in order to consummate the Closing as contemplated in this Contract.

## 10.   <u>CLOSING ESCROW</u>

The Closing shall take place through a deed and money escrow at the Escrow Agent in accordance with the standard deed and money escrow agreement utilized by the Escrow Agent ("**Closing Escrow**") to be opened with the Escrow Agent on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Escrow Agent, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not

7

later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

11. **REPRESENTATIONS AND WARRANTIES**

(a) **Seller Representations**. Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i) Subject to Section 8(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to Section 8(c) of this Contract.

(ii) To Seller's knowledge, Seller has not received any written notice from any governmental authority of any material violation of any applicable federal, state and local laws, including zoning or similar type restrictions, with respect to the Property.

(iii) To Seller's knowledge, Seller has not received any written notice from any governmental authority of any existing, pending, contemplated, or threatened condemnation of any part of the Property.

(iv) Except as set forth on **Exhibit "B"** attached hereto, to Seller's knowledge, Seller has received no written notice of any pending material litigation against the Property, which litigation is not otherwise covered by insurance.

(b) **Purchaser Representations.** Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i) Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

8

(ii)     Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the United States Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)     Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 11 shall merge with the transfer of title and shall not survive Closing. If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.

12.    **AS IS/NO WARRANTIES**

(a)     **As-Is Condition.**  Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to all aspects of the Property without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates (as defined below), contractors subcontractors, successors and assigns (the "**Indemnified Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. As used in this Contract, the term "**Hazardous Material(s)**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a)

9

the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any federal, state or local law, statute, ordinance or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and the Indemnified Parties with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Effective Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)     **No Warranties, Representations**.  Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price.  Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 11 of this Contract:

       (i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

       (ii)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

       (iii)     Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the

Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)    **WAIVER/RELEASE OF PURCHASER CLAIMS**.  WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING <u>SECTIONS 12(a) AND 12(b)</u>, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORSEEN OR UNFORSEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    **No Representations as to Condition/Full Investigation**.  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Indemnified Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof.  The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto.  Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained

or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

13.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

14.    **DEFAULT AND REMEDIES**

(a)    **Termination Events:**

(i)    <u>Termination by Either Party</u>:  Notwithstanding anything to the contrary set forth herein, if the Bankruptcy Court fails to issue the Approval Order within thirty (30) days following the filing of the Debtor's Motion for Entry of an Order Approving the Sale of Certain Assets (the "**Outside Court Approval Date**"), then this Contract can be terminated by either party at any time after the Outside Court Approval Date by delivery of written notice to the other Party and Escrow Agent, provided, however, that the right to terminate this Contract pursuant to this <u>Section 14(a)</u> shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in Closing failing to occur.

(ii)    <u>Termination by Purchaser.</u>  If Seller fails or refuses to comply with the terms of this Contract, Purchaser shall have as its sole and exclusive remedy the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract.

(iii)    <u>Termination by Seller.</u>  If Purchaser fails or refuses to comply with the terms of this Contract, Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall terminate with neither Party having any further rights or liabilities hereunder, except as those specifically provided to survive the termination of this Contract; provided, however, that this <u>Section 14(a)(iii)</u> shall not limit Seller's claims pursuant to any of Purchaser's indemnification obligations in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest

12

Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

(b) **Effect of Termination.** In the event of a termination of this Contract pursuant to this <u>Section 14</u> (other than a termination of this Contract pursuant to <u>Section 14 (a)(iii)</u>, Seller and Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Purchaser the Earnest Money Deposit by wire transfer of immediately available funds and the return thereof shall constitute the sole and exclusive remedy of Purchaser in the event of a termination hereunder.

15. **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| | |
|---|---|
| **To Seller:** | Payless ShoeSource, Inc.<br>Kevin Evans<br>3231 S.E. 6th Avenue,<br>Topeka, Kansas 66607<br>Phone: (785) 295-6646<br>E-mail: Kevin.Evans@payless.com |
| **With copies to:** | Akin Gump Strauss Hauer & Feld LLP<br>1999 Avenue of the Stars<br>Los Angeles, California 90067<br>Attn: David Phelps<br>Phone: (310) 229-1040<br>E-mail: DPhelps@akingump.com |
| **To Purchaser:** | Jennifer Duong<br>1005 Timothy Drive<br>San Jose, California 95133<br>Phone: (408) 509-7933<br>E-mail:<br>Jenniferduong@showproentertainment.com |
| **With copies to:** | Victor Duong<br>1005 Timothy Drive<br>San Jose, California 95133 |

13

Phone: (408) 391-2663
E-mail: victorduong@calwaste.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 15.

**16.**    **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

**17.**    **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

**18.**    **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

**19.**    **CONFIDENTIALITY**

Without limiting the terms of any other confidentiality agreements entered into by or between Purchaser and Seller (or any of Seller's Affiliates), if any, Purchaser agrees that (i) the results of all inspections, analyses, studies, and similar reports relating to the Property prepared by, for, or on behalf of Purchaser on, after or before the Effective Date, (ii) all terms of this Contract and any and all drafts of this Contract, if any, and all documents and instruments executed in connection therewith, (iii) all information or materials provided to or obtained (from whatever source) by Purchaser on, after or before the Effective Date, whether written or oral, in any way related to or pertaining to Seller, Seller's Affiliates, and/or the Property, including, without limitation, the Due Diligence Materials (as defined above) and any other electronic files and other documents in Seller's electronic online data room, and (iv) all information regarding the Property of whatsoever nature, whether written or oral, and regardless of when obtained (collectively, the "**Confidential Information**") is strictly confidential and shall remain confidential and shall not be disclosed to any Person by Purchaser or its employees, agents, consultants and contractors, (collectively, the "**Purchaser Entities**") without the prior written consent of Seller, which consent may be withheld, conditioned, or delayed in Seller's sole and

14

absolute discretion, including, but not limited to, any federal, state and/or local governmental entity, except that Purchaser may disclose the Confidential Information without Seller's prior written consent to Purchaser's respective officers, Affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) (collectively, the "**Permitted Parties**") so long as Purchaser informs the Permitted Parties of the confidential nature of the Confidential Information and directs the Permitted Parties to treat the Confidential Information confidentially in accordance with the terms of this <u>Section 19</u>. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of the Confidential Information, as applicable, shall be provided or disclosed by Purchaser, the Purchaser Entities, or the Permitted Parties to any Person not subject to the same confidentiality obligation as Purchaser, the Purchaser Entities, or the Permitted Parties. If Purchaser, the Purchaser Entities, or the Permitted Parties breach (or threaten the breach of) the terms of this <u>Section 19</u>, Purchaser acknowledges and agrees that (a) Purchaser shall be liable and responsible for any breach of this Contract by any of the Purchaser Entities or Permitted Parties, and (b) Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of the terms of this <u>Section 19</u>, in addition to all other rights and remedies available at law or in equity. Notwithstanding the foregoing, the Parties agree that the term "Confidential Information" shall not include any material or information that (1) is or becomes generally available to the public other than as a direct or indirect result of a disclosure of any such information by Purchaser, the Purchaser Entities, or the Permitted Parties, (2) becomes available to Purchaser, the Purchaser Entities, or the Permitted Parties on a non-confidential basis from a source other than Seller or any of the Indemnified Parties and the source of such information was not bound by any contractual or other obligation of confidentiality to Seller or to any other Person with respect to any of such information, or (3) any information that is developed by or on behalf of Purchaser independently of the disclosure of Confidential Information and without reference to or use of the Confidential Information.  Purchaser acknowledges that Seller may file this Contract and any related matters with the Bankruptcy Court and thus make this Contract publicly available.  The terms of this <u>Section 19</u> shall survive termination of this Contract.

20. **BROKERAGE**

Except A&G Realty Partners, LLC ("**A&G**") representing the Seller (the "**Broker**"), each party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction.  Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including the Broker), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.  Any commission or other compensation due the Broker shall be the responsibility of the Seller and same shall be paid to the Broker at the Closing in accordance with separate agreements between Broker and Seller.

15

21. **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has sole ownership interest provided that (i) written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing and (ii) any such assignee executes an assumption of this Contract, if requested by and in form and substance reasonably acceptable to Seller. No transfer or assignment by Purchaser shall relieve Purchaser of its obligations hereunder. No such transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

22. **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns and, except for any of the Indemnified Parties, no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

23. **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this Section 23 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it), or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

24. **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

16

25.  **COUNTERPARTS**

This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Contract by signing any such counterpart delivery of an executed signature page of this Contract by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

26.  **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 21 of this Contract.

27.  **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract.  Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28.  **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.  The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State are authorized or required to be closed.

29.  **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30.  **CONDEMNATION AND CASUALTY**

In the event of any taking of, or if notice is given of the intention to take, by the exercise of the power of eminent domain, all or a substantial portion of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation.  If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser.  If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned (A) all interest of Seller in and to any insurance proceeds

17

actually received by Seller (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date) or (B) condemnation awards payable to Seller on account of that event, in the case of both (A) and (B), less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price. A portion of the Real Property will be deemed "substantial," for purposes of this <u>Section 30</u> to the extent the taking of such portion would materially impair or otherwise materially affect Purchaser's intended use of the Real Property.

31.    **SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

32.    **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

33.    **GOVERNING LAW, JURISDICTION & VENUE**

This Contract will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ANY AND ALL DISPUTES ARISING OUT OF OR OTHERWISE RELATING TO THIS CONTRACT.    SHOULD THE BANKRUPTCY COURT ABSTAIN FROM EXERCISING ITS JURISDICTION OR BE FOUND NOT TO HAVE JURISDICTION OVER A MATTER RELATING TO THIS CONTRACT, SUCH MATTER SHALL BE ADJUDICATED IN EITHER A FEDERAL DISTRICT COURT IN THE STATE OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, NEW YORK.  Without limiting other means of service of process permissible under applicable law, the Parties hereby agree that service of any process, summons, notice or document by U.S. registered mail to the addresses set forth in <u>Section 15</u> of this Contract shall be effective service of process for any suit or proceeding in connection with this Contract.

34.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments

18

and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

35. **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

36. **PATRIOT ACT**

Seller certifies that its name is Payless ShoeSource, Inc., a Missouri corporation, and Seller is not (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is Jennifer Duong, an individual, and to Purchaser's knowledge, neither Purchaser or affiliated entities or individuals are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

37. **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this Section 37 shall survive the expiration of the term or any earlier termination of this Contract.

38. **SELLER'S KNOWLEDGE**

When used in this Contract, the term "to Seller's knowledge" or terms of similar import shall mean and be limited to the actual (and not imputed, implied or constructive) current knowledge of Michael Welch. Notwithstanding anything to the contrary set forth in this Contract, (a) in no event shall the knowledge of any other individual, or any other officer or employee of Seller, be imputed to or deemed to constitute the knowledge of Seller

hereunder, and (b) the foregoing individual shall have no personal liability or liability whatsoever with respect to any matters set forth in this Agreement or any of Seller's representations and/or warranties herein being or becoming untrue, inaccurate or complete.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**PAYLESS SHOESOURCE, INC.,**
a Missouri corporation

By: _____
Name:  Neil G. Hansen
Its:   Executive Vice President

**PURCHASER:**

_____

**JENNIFER DUONG**

## EXHIBITS

Exhibit "A":    Legal Description
Exhibit "B":    Litigation

21

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**PAYLESS SHOESOURCE, INC.,**
a Missouri corporation

By:_____

Name:_____

Its:_____

**PURCHASER:**

*Jennifer Duong*

**JENNIFER DUONG**

**EXHIBITS**

Exhibit "A":   Legal Description
Exhibit "B":   Litigation

**EXHIBIT "A"**

**LEGAL DESCRIPTION OF PROPERTY**

All that certain real property situated in the State of California, City of Sacramento, County of Sacramento, more particularly described as follows:

All that portion of the West one-half of the Southwest one-quarter of Section 21, Township 8 North, Range 5 East, M.D.B.&M., described as follows:

COMMENCING at the Southwest corner of Lot 110 of Amended Plat of No. 1 Colonial Heights, according to the official plat thereof, filed in the office of the Recorder of Sacramento County, California, on October 21, 1914, in Book 15 of Maps, Map No. 11, said corner being marked by a 3 inch iron pipe monument set in the Easterly line of Stockton Boulevard; thence South 20° 25' 30" East, along said Easterly line, a distance of 275.00 feet to the point of beginning; thence continuing along said Easterly line, South 20° 25' 30" East a distance of 125.00 feet; thence North 89° 16' East, a distance of 200.00 feet to a point; thence North 09° 00' 30" West, a distance of 118.93 feet, to a point; thence South 89° 16' West, a distance of 225.00 feet, to the point of beginning.

**EXHIBIT "B"**

**LITIGATION**

NONE