# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Payless Holdings LLC, *et al.*, | ) Case No. 19-40883-659 |
|  | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF PAYLESS HOLDINGS LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

Ira Dizengoff (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Telephone:        (212) 872-1000
Facsimile:        (212) 872-1002

-and-

Julie Thompson (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street N.W.
Washington, D.C. 20006
Telephone:        (202) 887-4000
Facsimile:        (202) 887-4288

-and-

David Staber (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:        (214) 969-2800
Facsimile:        (214) 969-4343

*Co-Counsel to the Debtors and Debtors in Possession*

Richard W. Engel, Jr. (MO 34641)
Erin M. Edelman (MO 67374)
John G. Willard (MO 67049)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone:        (314) 621-5070
Facsimile:        (314) 621-2239

John R. Ashmead (admitted *pro hac vice*)
Robert J. Gayda (admitted *pro hac vice*)
Catherine V. LoTempio (admitted *pro hac vice*)
**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to the Debtors and Debtors in Possession, acting at the direction of the Special Committee*

**IMPORTANT INFORMATION FOR YOU TO READ**

**THE DEADLINE TO VOTE ON THE PLAN IS [OCTOBER 14, 2019], AT 4:00 P.M. CENTRAL TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

This Disclosure Statement provides information regarding the Debtors' Plan, which the Debtors seek to have confirmed in the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise noted, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to go effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including Article VIII hereof entitled "**Plan-Related Risk Factors**") and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Equity Interests for purposes of soliciting votes to accept or reject the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Plan-Related Risk Factors described in Article VIII.

The Debtors urge each Holder of a Claim or Equity Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan, attached hereto and/or incorporated by reference herein. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

i

The Debtors have prepared this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Bankruptcy Rule 3017, and this Disclosure Statement is not necessarily prepared in accordance with U.S. federal or state securities laws, or other similar laws.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained in this Disclosure Statement or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

This Disclosure Statement does not constitute, and should not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, the terms of the Plan and the restructuring transactions contemplated by the Plan will bind the Debtors, any Person acquiring property under the Plan, all Holders of Claims and Interests (including those Holders of Claims and Interests that do not submit Ballots to accept or reject the Plan or that are not entitled to vote on the Plan), and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

## SPECIAL NOTICE REGARDING U.S. SECURITIES LAWS

Neither this Disclosure Statement nor the Plan have been filed with the United States Securities and Exchange Commission (the "SEC") or any state or provincial authority. The Plan has not been approved or disapproved by the SEC or any state or provincial securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal, state or provincial securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws") and such securities may be issued pursuant to applicable exemptions under the federal securities laws. To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

This Disclosure Statement contains "forward looking statements". Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

<u>Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative.</u> The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact:

Prime Clerk LLC regarding the Chapter 11 Cases by (a) calling the Debtors' restructuring hotline at 844-339-4268; (b) emailing pssinfo@primeclerk.com; (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/pss; and/or (d) writing to Prime Clerk LLC at Payless Balloting Center c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite #1440, New York, NY 10165.

The Canadian Debtors are not plan proponents under the Plan. The Canadian Debtors intend to file a motion for dismissal of the Canadian Debtors' Chapter 11 Cases to be effective upon implementation of the Plan and intend to separately bring forward a motion in the Canadian Court for approval of a plan of compromise or arrangement under the *CCAA*, all as outlined in further detail below. For information regarding the Canadian Debtors, please visit: http://cfcanada.fticonsulting.com/paylesscanada/.

**TABLE OF CONTENTS**

**Page**

I.  EXECUTIVE SUMMARY ...................................................................................................1

    A.  Introduction ..............................................................................................................1

    B.  Key Constituent Support for the Plan and Global Settlement ..................................2

    C.  Plan Overview...........................................................................................................2

    D.  Treatment of Claims and Interests Under the Plan ..................................................4

    E.  Plan Timeline and Related Contingencies ...............................................................5

II.  BACKGROUND TO THESE RESTRUCTURING PROCEEDINGS...........................6

    A.  Corporate History and Current Structure .................................................................6

    B.  Prepetition Businesses And Operations ...................................................................6

    C.  Prepetition Organizational Structure, Capitalization, and Indebtedness .................7

    D.  Events Leading up to the Chapter 11 Filing ............................................................8

III.  ADMINISTRATION OF THE RESTRUCTURING PROCEEDINGS.......................12

    A.  Overview of the Cross Border Restructuring Proceedings.....................................12

    B.  First and Second Day Relief ..................................................................................13

    C.  Other Material Events in These Chapter 11 Cases .................................................15

IV.  SUMMARY OF THE PLAN............................................................................................20

    A.  General Basis for the Plan ......................................................................................20

    B.  Proposed Treatment of Each Class of Claims and Interests ..................................20

    C.  Post-Emergence Capital Structure .........................................................................24

    D.  Certain Means for Implementation of the Plan ......................................................24

    E.  Treatment of Executory Contracts and Unexpired Leases ....................................32

    F.  Distributions on Account of Claims .......................................................................36

    G.  Resolution of Contingent, Unliquidated, or Disputed Claims................................43

    H.  The Debtor Release, Third-Party Release, Injunction, and Exculpation ...............44

    I.  Modification, Revocation, or Withdrawal of the Plan ...........................................48

    J.  Important Securities Law Disclosure .....................................................................49

V.  VALUATION AND FINANCIAL PROJECTIONS .......................................................51

    A.  Estimation of Payless' Enterprise Value ...............................................................51

    B.  Financial Projections ..............................................................................................51

    C.  Liquidation Analysis ..............................................................................................51

VI.  SOLICITATION AND VOTING PROCEDURES ........................................................52

VII.  CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................55

    A.  Statutory Requirements for Confirmation of the Plan ...........................................55

    B.  Conditions for Consummation of the Plan .............................................................59

|  | C. | Alternatives to Confirmation and Consummation of the Plan | 60 |
| VIII. | | **PLAN-RELATED RISK FACTORS** | **61** |
|  | A. | Risks Relating to Confirmation of the Plan | 61 |
|  | B. | Risks Relating to Recoveries Under the Plan | 63 |
|  | C. | Risks Relating to the Debtors' Businesses | 64 |
|  | D. | Disclosure Statement Disclaimer | 67 |
| IX. | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **69** |
|  | A. | Brief Overview and Disclosure | 69 |
|  | B. | Consequences to the Debtors and reorganized debtors | 70 |
|  | C. | Consequences to U.S. Holders of Allowed Claims | 73 |
|  | D. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims | 77 |
|  | E. | Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein | 79 |
|  | F. | Information Reporting and Backup Withholding | 81 |
| X. | | **RECOMMENDATION** | **83** |

## **EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Corporate Structure Chart

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Financial Projections

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Estimation of Payless' Enterprise Value

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH
HEREIN.

# I.
# EXECUTIVE SUMMARY

## A.   INTRODUCTION

Payless ShoeSource Inc., a Missouri corporation, together with 26 of its affiliates as debtors and debtors in possession (collectively, the "Original Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri on February 18, 2019 (the "Original Petition Date" and the "Original Chapter 11 Cases").  Two of the Original Debtors' affiliates[1] (the "July Debtors" and, together with the Original Debtors, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri on July 7, 2019 (the "July Petition Date," the "July Petition Date," the "July Debtors Chapter 11 Cases" and, together with the Original Chapter 11 Cases, the "Chapter 11 Cases").  The Debtors' Chapter 11 Cases are jointly administered under lead case name Payless Holdings LLC and lead case number 19-40883-659.

On February 19, 2019 (the "Filing Date"), Payless ShoeSource Canada Inc. and Payless ShoeSource Canada GP Inc. sought and obtained an initial order (the "Initial Order") under the *Companies' Creditors Arrangement Act* (Canada) (the "CCAA") from the Canadian Court.  The Initial Order's protections extend to Payless ShoeSource Canada LP (collectively, with Payless ShoeSource Canada Inc. and Payless ShoeSource Canada GP Inc., the "Canadian Debtors").  The Canadian Debtors were among the Original Debtors in the Original Chapter 11 Cases.  The Canadian Debtors are not plan proponents under the Plan (as defined below).  The Canadian Debtors intend to file a motion for dismissal of the Canadian Debtors' Chapter 11 Cases to be effective upon implementation of the Plan and intend to separately bring forward a motion in Canada for approval of a plan of compromise or arrangement under the *CCAA*.  For purposes of the Plan and this Disclosure Statement (as defined below), "Debtors" refers to the July Debtors and the Original Debtors, excluding the Canadian Debtors.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Payless Holdings LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. X], dated August 12, 2019, as amended, supplemented, or modified from time to time in accordance with its terms.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

On [__], 2019, the Bankruptcy Court entered an order [Docket No. [__]] (the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures, and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan, and (d) scheduling the Confirmation Hearing.  The Disclosure Statement Order is attached hereto as **Exhibit C**.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable Kathy A. Surratt-States at [X], October ___, 2019 at the Bankruptcy Court, Thomas F. Eagleton U.S. Courthouse, 111 S. 10th Street, 4th Floor, Courtroom 7 North, St. Louis, MO 63102.  Additional information with respect to Confirmation is provided in Article VII of this Disclosure Statement.

This Disclosure Statement includes information about, without limitation, (i) the Debtors' business, prepetition operations, financial history, and events leading up to these Chapter 11 Cases, (ii) the significant events that occurred thus far in these Chapter 11 Cases, (iii) the anticipated recoveries of Creditors under the Plan, (iv) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (v) the Plan Confirmation process, (vi) certain risk factors to be considered before voting on the Plan, and (vii) discussions relating to certain securities

---

[1] Specifically, Collective Brands Logistics Limited and Payless Sourcing, LLC.

registration and tax consequences of the Plan.  The descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors relate to the Plan filed with the Bankruptcy Court on August 12, 2019.  The Plan remains subject to ongoing negotiations between the Debtors and their stakeholders and may be modified.

***This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  The Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement (including the Plan) and the Plan Supplement.  The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement, the Plan, and the Plan Supplement.***

**B.      KEY CONSTITUENT SUPPORT FOR THE PLAN AND GLOBAL SETTLEMENT**

The Debtors believe that there are substantial reasons to vote to **ACCEPT** the Plan.

The liquidation of the Debtors' North America brick and mortar business has been completed and this liquidation led to greater returns than expected.  Although the result of the liquidation of the North America brick and mortar business was positive, the Debtors acknowledge that the continuation of these Chapter 11 Cases will drain finite estate resources, which may make a reorganization more difficult to achieve.  Further, the Debtors believe that the Plan should be approved expeditiously in order to preserve the Company's remaining business channels, which is an important component of the going-forward business, and value preservation and creation.

Consummation of the Plan will significantly de-lever the Debtors' capital structure and serve to preserve the Company's profitable business segments.  The Reorganized Debtors will be well positioned to compete in the retail industry with the segments of the Company best primed to do so.

**C.      PLAN OVERVIEW**

**1.      Purpose and Effect of the Plan**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Estates.  Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases.  Holders of Allowed Claims against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business.  The Reorganized Debtors' financial projections are set forth on **Exhibit D**.[2]  Although the Debtors believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty.  Actual results may differ from the projections, and the differences may be material.

---

[2] The Debtors' business plan and projections also incorporate forecasts of operating performance for the foreign franchise and joint venture businesses that relate to entities that are not Debtors in these Chapter 11 Cases.

2.        **Financial Restructurings Under the Plan**

As of the Petition Date, the Debtors' capital structure included approximately $470 million in aggregate principal amount of outstanding debt, primarily consisting of: (a) approximately $156.7 million in aggregate principal amount revolving loans and FILO loans under the Prepetition ABL Credit Facility (as defined below) as well as approximately $36 million of undrawn letters of credit outstanding under the Prepetition ABL Credit Facility (the "Standby Letters of Credit"); and (b) approximately $277.2 million in secured debt under a term loan credit agreement (the "Term Loan Facility").

If the Plan is confirmed, Payless (as defined herein) will emerge from these Chapter 11 Cases with approximately [89]% less funded debt. Payless' pro forma exit capital structure will consist of a New First Lien Facility, and New Common Units in Reorganized Holdings, as set forth below (in millions):[3]

Specifically, the Plan contemplates the following restructuring transactions:

- New First Lien Facility.

- Each Holder of a Tranche A-1 Term Loan Claim will receive Cash in an amount equal to [%] of its Allowed Tranche A-1 Term Loan Claim.

- Each Holder of a Tranche A-2 Term Loan Secured Claim will receive its Pro Rata share of 100% of New Common Units.

- Each Holder of a General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust.

- All Equity Interests in Payless Holdings LLC will be extinguished with no consideration paid.

3.        **Recovery Analysis**

In developing the Plan, the Debtors gave due consideration to various alternatives and engaged in significant discussions with representatives and/or professionals of the senior secured lenders under their prepetition term loans, whom the Debtors believe will be the primary economic stakeholders in the Reorganized Debtors. With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, prospects as an ongoing business, financial projections, and the go-forward business plan developed by management. Based on this analysis, the Debtors concluded that recoveries to the Debtors' stakeholders will be maximized by reorganization as two businesses: (i) an IPCo, which will license the Payless brand and related intellectual property, manage source for and expand the Company's existing Amazon channel and provide sourcing for the LatAm Business;[4] and (ii) the LatAm Business, which will continue to be majority owned by IPCo and will continue to operate retail operations in Latin America and South America.

During the Chapter 11 Cases and as described herein, the Debtors and their advisors, at the direction of the Special Committee and as outlined further below, facilitated discussions among, and negotiated with, the Debtors' secured creditor constituencies and their respective advisors, regarding a potential global settlement of any and all Claims, including any Causes of Action or potential Cause of Action related to the Debtors' business and capital structure. While those negotiations continue, the Plan sets forth the basic framework for a global settlement. Absent a global settlement among stakeholders, litigating confirmation, including litigating who has standing to pursue Causes of Action and the actual pursuit of such claims, the Debtors' Plan confirmation timeline could be derailed, which would lead to increased expenses and a possible liquidation. **Accordingly, the Debtors believe, as supported by the analysis underlying the estimate of the Debtors' enterprise value set forth in Exhibit F, that the Plan is in the best interest of all creditors.**

---

[3] The Debtors will also assume some existing capital leases and similar obligations.

[4] Pursuant to the Plan, "LatAm Business" means the business operations of the LatAm JV entities as coordinated by Payless ShoeSource Worldwide, Inc. through Collective Brands Cooperatief U.A. and the LatAm JV Partners.

The Debtors also believe that any alternative to Confirmation of the Plan, such as an attempt by another party to file a competing plan or any plan that does not contemplate a global settlement of all potential claims related to, among others, the Debtors' business, capital structure, and Claims, would result in significant delays, litigation, and additional costs, could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, and could potentially lead to a liquidation by the Debtors, in which case substantially all Holders of Claims would do materially worse or receive no recovery at all.  In the event that the parties are unable to reach a consensus for global settlement among all constituencies, the Debtors reserve the right to pursue any and all Causes of Action.

**ACCORDINGLY, FOR ALL OF THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE YOU TO TIMELY RETURN YOUR BALLOT ACCEPTING THE PLAN.**

**D.      TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

The table below summarizes the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see Section IV.B hereof.

The table below also sets forth the estimated percentage recovery for Holders of Claims and Interests in each Class and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors (as modified by the Bankruptcy Court through certain hearings), and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.

Because the Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Claim/Equity Interest | Status | Estimated Amount of Allowed Claims[5] | Estimated Percent Recovery Under the Plan[6] |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | [-] | |
| 2 | Other Secured Claims | Unimpaired | [0] | |
| 3 | Tranche A-1 Term Loan Claims | Impaired | [$82,921,000] | |
| 4 | Tranche A-2 Term Loan Secured Claims | Impaired | [$208,181,000] | |
| 5 | General Unsecured Claims | Impaired | [$337,196,586][7] | |
| 6 | Intercompany Claims | Impaired | [-] | |

---

[5] All dollar amounts in millions.

[6] Recoveries are based on the estimated midpoint enterprise value and do not take into account dilution caused by the Management Equity Incentive Plan.

[7] This amount does not include unsecured deficiency claims asserted by the Holders of Tranche A-2 Term Secured Claims.

**SUMMARY OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Claim/Equity Interest | Status | Estimated Amount of Allowed Claims[5] | Estimated Percent Recovery Under the Plan[6] |
|-------|----------------------|--------|----------------------------------------|----------------------------------------------|
| 7 | Existing Equity Interests in Payless | Impaired | N/A | |
| 8 | Intercompany Interests | Impaired | N/A | |

## E.     PLAN TIMELINE AND RELATED CONTINGENCIES

Although the Debtors believe that the restructuring proposed in the Plan is the best option for maximizing stakeholder recoveries, the Plan is subject to a number of conditions and there are certain material risks to the Debtors' ability to implement the Plan and consummate near-term creditor distributions.  The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with Article VIII of the Plan, including:

- The Plan must be, in form and substance, reasonably acceptable to the Debtors.

- The Plan Supplement documents must be, in form and substance, reasonably acceptable to the Debtors.

- The proposed form of order confirming the Plan shall be, in form and substance, reasonably acceptable to the Debtors.

In addition, the Plan is subject to certain contingencies and risk factors, which are set forth in Article VIII hereof.

## II.
## BACKGROUND TO THESE RESTRUCTURING PROCEEDINGS

### A.   CORPORATE HISTORY AND CURRENT STRUCTURE

Founded in 1956, Payless Holdings LLC is the parent company for each other Debtor in these Chapter 11 Cases and certain direct and indirect Affiliates which are not debtors in these Chapter 11 Cases (collectively, the "Company" or "Payless").  Headquartered in Topeka, Kansas, Payless is an iconic footwear retailer selling quality shoes at affordable prices in a self-select environment.  As of the Petition Date, Payless had nearly 3,400 stores in more than 40 countries across the world and was a globally-recognized brand.  As of the Petition Date, Payless operated through its three business segments (North America, Latin America, and franchised stores).

Historically, Payless offered its budget-conscious customers outstanding value on basic, on-trend and special occasion footwear through a national assisted-service store footprint, localized assortment, and a low-cost integrated-sourcing business model, including a significant online presence.  This business model depended upon (a) identifying and developing on-trend merchandise, (b) developing strong relationships with branding partners, and (c) maintaining an overseas sourcing network that could develop and produce products at a scale and cost necessary to serve Payless' customers.

Payless historically had a strong seasonal cadence, as evidenced by its four key selling seasons:  Easter, sandals, back-to-school, and Holiday.  Because these periods fall relatively evenly throughout the course of the year, Payless' selling periods create a broad, even flow of business throughout the year, even though the composition of the business varies widely depending on the time of the year.  This has served over many years to create a largely continuous overall flow of product from overseas suppliers through Payless' supply chain to customers.

Like many retailers, in the last five years the Debtors have faced challenging market conditions.  As outlined in further detail below, these challenges, among others, led to the commencement of chapter 11 cases (the "Prior Cases") by the Debtors' and the Canadian Debtors' predecessors in interest (the "Prior Debtors") in this Court, which were jointly administered under the caption *In re Payless Holdings LLC*, No. 17-42667.

### B.   PREPETITION BUSINESSES AND OPERATIONS

The Debtors are headquartered in Topeka, Kansas, but their operations were historically extensive and spanned across Asia, Africa, the Middle East, Latin America, Europe, and the United States.

#### 1.   North America

Historically, Payless' North American business represented a majority of the Debtors' store base.  As of the Petition Date, the North America business included more than 2,500 wholly-owned stores in the United States, Puerto Rico, and Canada.

Due to the industry-wide shift away from brick-and-mortar stores, the North America business (brick and mortar and e-commerce businesses) experienced a precipitous decline in EBITDA, with 2018 EBITDA totaling negative $63 million and 2017 EBITDA totaling negative $4 million.  Payless North America also provides an extensive range of operational and corporate services to the Latin America and franchise business segments, including product development and sourcing, retail operations, marketing, IT, finance, tax, and legal assistance.  In connection with the GOB Sales (as defined below) for the North America business, the Debtors are in the process of strategically transitioning certain of the operational and corporate services that Payless North America currently provides to the Latin America and franchise segments.

Prior to the Petition Date, the Company and its advisors analyzed the Company's capital structure and potential alternatives, including the impact of reducing the store footprint in North America to various levels depending on store profitability.  This analysis showed that achieving any profitable North America store base would require meaningful improvements in merchandizing margin, stabilized comparable store sales, and significant capital investment.  As a result, the Company determined to prepare for an orderly wind down of the North America business through the store closing sales (the "GOB Sales"), as described in further detail below.

6

### 2.        Latin America

Nineteen years after opening its first store in Latin America, Payless has become the largest specialty footwear retailer in the region.  Payless Latin America has experienced stable growth since its inception, opening 15-20 new stores per year and averaging 6% annual revenue growth since 2013.  It is also highly profitable, contributing approximately $23 million to Payless' overall EBITDA despite accounting for less than 12% of Payless' historic store footprint.  Payless currently operates approximately 420 stores in Latin America and enjoys leadership positions in each relevant market.

Many of Payless' Latin America operations are governed by joint venture agreements and related ancillary agreements, pursuant to which Payless receives certain sourcing and other corporate fees, as well as dividends, on a periodic basis, in exchange for use of the Debtors' intellectual property, sourcing, operational management and information technology.  In exchange, the joint venture agreements have allowed Payless to utilize its partners' significant local market knowledge to buy, plan, and distribute their products.  The Latin America business continues to perform well notwithstanding the challenges that faced the North America brick and mortar business.

### 3.        Franchised Store Segment

Finally, Payless' franchise segment consists of stores operated by franchisees in several countries in Africa, Asia, and the Middle East.  Since opening their first franchise stores in 2009, the Debtors' franchise business has grown to approximately 371 stores.  The franchise stores are held to the same high standards as the Company's wholly-owned and joint venture stores and provide a similar customer experience.  The Company receives royalty fees, which typically range from 6% to 8% of the franchisee's net revenue, pursuant to applicable franchise agreements.  The franchise business requires minimal upfront risk, capital requirements, and overhead expenses, as it has historically leveraged the existing North America operations and sourcing capabilities to support the business segment.

### 4.        Procurement and Global Supply Chain

Payless depends heavily on its supply chain and has unique relationships with its vendors, primarily based out of China and Vietnam.  The Company has developed long-standing relationships (in some cases extending over 15 years) and highly streamlined processes with key supplier factories.  Coordination across factories, distributors, shippers, carriers, warehousemen and stores is vital to the ability of the Company's remaining business segments to operate.  The Company has worked tirelessly during these Chapter 11 Cases to preserve relationships and, thereby, the global supply chain in order to preserve the ability of the Debtors' Latin American and franchise business segments to operate.

## C.        PREPETITION ORGANIZATIONAL STRUCTURE, CAPITALIZATION, AND INDEBTEDNESS

Payless was first traded publicly in 1962, and was taken private in May 2012.  As set forth in the structure chart attached hereto as **Exhibit B**, Payless Holdings LLC currently owns, directly or indirectly, each other Debtor.

### 1.        Prepetition Capital Structure and Indebtedness

As of the Petition Date, Payless' prepetition capital structure included approximately $470 million in aggregate principal amount of outstanding debt as of the Petition Date, primarily consisting of:  (a) approximately $156.7 million in aggregate principal amount revolving loans and FILO loans under the Prepetition ABL Credit Facility (as defined below) as well as approximately $36 million through the Standby Letters of Credit; and (b) approximately $277.2 million in secured debt under the Term Loan Facility.  Certain non-debtor affiliates or subsidiaries included in the capital structure have additional outstanding indebtedness, including:  (x) Payless CA Management Limited, which owes approximately $45.4 million in aggregate principal amount of secured debt outstanding under a first lien term loan (the "CA Credit Agreement"); (y) Payless ShoeSource of Trinidad Unlimited, which owes approximately $900,000 in aggregate principal amount pursuant to a demand loan (the "Trinidad Demand Loan"); and (z) Payless ShoeSource Ecuador Cia. Ltda., which owes approximately $5.7 million in aggregate principal amount pursuant to a credit agreement (the "Ecuador Loan").

(a)    The Prepetition ABL Credit Facility

As of the Petition Date, Payless Inc., Payless Finance, Inc., Payless ShoeSource, Inc. and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Wells Fargo Bank, National Association ("Wells Fargo"), as collateral agent and administrative agent, Wells Fargo as FILO agent, and the lenders party thereto from time to time were parties to that certain Credit Agreement (the "Prepetition ABL Credit Facility Lenders"), dated as of August 10, 2017 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "Prepetition ABL Credit Facility"). The Prepetition ABL Credit Facility provided for (x) a senior secured revolving credit facility, with a maximum availability of $250 million, subject to borrowing base limitations and (y) a $35 million FILO loan. The Prepetition ABL Credit Facility was secured by a first priority lien over certain of the Debtors' assets including, among other things and subject to certain limitations, accounts, cash, inventory, and real property (such collateral package, the "ABL Priority Collateral"). The Prepetition ABL Credit Facility was also secured by a junior lien on the remaining assets of the Debtors including, among other things and subject to certain limitations, equipment and intellectual property (such collateral package, the "Term Priority Collateral"). As of the Petition Date, an aggregate balance of approximately $156.7 million remained outstanding under the Prepetition ABL Credit Facility as well as approximately $36 million in Standby Letters of Credit. The Prepetition ABL Credit Facility was paid off on April 10, 2019.

(b)    The Term Loan

Payless Inc., Payless Finance, Inc., Payless ShoeSource, Inc., and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Cortland Products Corp., as administrative and collateral agent, and the lenders party thereto from time to time are parties to that certain Term Loan and Guarantee Agreement, dated as of August 10, 2017 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "Term Loan Agreement"). The Term Loan Agreement originally provided for $280 million of term loans secured by a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral. The Term Loan Agreement is comprised of two tranches: Tranche A-1 in an original principal amount of $80 million and Tranche A-2 in an original principal amount of $200 million, which bear interest at different rates and mature on different dates. Tranche A-1 bears interest at LIBOR (as defined in the Term Loan Agreement) plus 8.00% per annum and matures on February 10, 2022 and Tranche A-2 bears interest at LIBOR (as defined in the Term Loan Agreement) plus 9.00% per annum and matures on August 10, 2022. An aggregate principal amount of $277.2 million was outstanding as of the Petition Date under the Term Loan Facility.

(c)    Intercreditor Agreements

The Debtors' prepetition indebtedness under the Prepetition ABL Credit Facility and the Term Loan Agreement was also subject to an intercreditor agreement, generally referred to as the ABL/Term Loan Intercreditor Agreement.[8] The ABL/Term Loan Intercreditor Agreement governed the relative contractual rights of lenders under the Prepetition ABL Credit Facility and the Term Loan Facility.

(d)    Unsecured Claims

As of the Petition Date, the Debtors estimated that they owed approximately $225 million to unsecured creditors, consisting primarily of amounts owed to vendors and suppliers. Additional unsecured claims have been filed for, among other things, rejection of executory contracts and unexpired leases.

## D.    EVENTS LEADING UP TO THE CHAPTER 11 FILING

### 1.    The Prior Cases

On April 4, 2017, the Prior Debtors commenced the Prior Cases in this Court. All of the Prior Cases closed before the Petition Date except for the Prior Cases of Payless Holdings LLC (Case No. 17-42267) and Payless

---

[8] The "ABL/Term Loan Intercreditor Agreement" means that certain intercreditor agreement dated as of August 10, 2017 (as amended, supplemented, restated, amended and restated or otherwise modified from time to time) by and among Wells Fargo Bank, National Association, as administrative agent for the lenders under the Prepetition ABL Credit Agreement and Cortland Products Corp., the administrative agent and collateral agent under the Term Loan, and acknowledged by the Debtors.

ShoeSource Worldwide Inc. (Case No. 17-42288). As of the Petition Date, the Prior Cases were limited to final claims reconciliation and the administration of distributions to unsecured creditors.

Beginning in early 2015, the Prior Debtors experienced a top-line sales decline driven primarily by (a) a set of significant and detrimental non-recurring events, (b) foreign exchange rate volatility, and (c) challenging retail market conditions. These pressures led to the Prior Debtors' inability to both service their prepetition secured indebtedness and remain current with their trade obligations. Industry-wide declines in sales and traffic during 2015 and 2016 compounded these challenges. The Prior Debtors' weaker-than-anticipated financial performance forced management to curtail certain capital and marketing investments required to combat the broader challenges facing the retail industry. To address these challenges, the Prior Debtors took steps to evaluate and implement cost-reduction initiatives.

In early 2017 (prior to the commencement of the Prior Cases), the Prior Debtors negotiated a restructuring support agreement with the support of a majority of their prepetition secured lenders. On July 27, 2017, the Court confirmed the *Debtors' Fifth Amended Plan of Reorganization*, No. 17-42267 [Docket No. 1507] (Bankr. E.D. Mo. 2017) (as supplemented, the "Prior Plan") and on July 28, 2017, the Canadian Court granted an order recognizing and enforcing the Prior Plan in Canada. The Prior Plan effective date occurred on August 10, 2017.

The Prior Cases accomplished three main objectives: (a) approximately $435 million in funded debt was eliminated; (b) approximately 675 underperforming brick and mortar stores were closed and liquidated; and (c) approximately $50 million in annual expenditure savings was realized through landlord concessions and modification of existing leases.

## 2.      Challenges Subsequent to the 2017 Plan Effective Date

Upon emergence from the Prior Cases, the Debtors sought to capitalize on the deleveraging of their balance sheet with additional cost-reduction measures, including reviewing marketing expenses, downsizing their corporate office, reevaluating the budget for every department, and reducing their capital expenditures plan. Notwithstanding these measures, the Debtors have continued to experience a top-line sales decline driven primarily by inventory flow disruption during the 2017 holiday season, same store sales declines resulting in excess inventory, and challenging retail market conditions.

In the year following the Prior Debtors' emergence from chapter 11, the Debtors faced unanticipated delays from key supplier factories. Given the significant volume of made-to-order shoes, the Debtors depended heavily on receiving regular shipments of product from their existing vendors. Due to interruptions in production during the Prior Cases, the Debtors' key supplier factories took longer than expected to procure the raw materials and workers required for the Debtors to deliver their products in a timely manner. The delayed production caused a major inventory flow disruption during the 2017 holiday season and a computer systems breakdown in the summer of 2018 significantly affected the back to school season, leading to diminished sales and same store sales declines.

The Debtors also faced an oversupply of inventory in the fall of 2018 leading into the winter of 2019. As a result, the Debtors were forced to sell merchandise at steep markdowns, which depressed margins and drained liquidity. Customers filled their closets with these deeply discounted products, which served to reduce customer demand for new product. In total, millions of pairs of shoes were sold at below market prices in order to realign inventory and product mix. These challenges, and the general trend toward online shopping, contributed to a decline in EBITDA for Payless' North America brick and mortar stores for 2018 at negative $66 million compared to negative $11 million in 2017 and $51 million in 2016.

Moreover, Payless was unable to fulfill its plan for omni-channel development and implementation, *i.e.*, the integration of physical store presence with online digital presence to create a seamless, fully integrated shopping experience for customers. As of the Petition Date, the completion of this unified customer experience had been limited to approximately two hundred stores. Without a robust omni-channel offering, Payless was unable to keep up with the shift in customer demand and preference for online shopping versus the traditional brick-and-mortar environment. In addition, the Debtors' liquidity constraints prevented the Debtors from investing in their store portfolio to open, relocate, or remodel targeted stores to keep up with competitors. All of the foregoing pressures prevented the Payless North America business from achieving profitability in eighteen months pre-petition.

### 3.        Efforts to Address Liquidity Challenges

The Debtors negotiated with their prepetition lenders for additional credit under their existing Prepetition ABL Credit Facility and the strategic infusion of capital through a debt offering to lenders under their Term Loan Facility to build liquidity reserves in light of mounting operational issues.  In March 2018, the Debtors executed that certain First Amendment and Joinder to Credit Agreement dated as of March 1, 2018, which among other things increased the aggregate FILO commitment under the Prepetition ABL Credit Facility from $10 million to $35 million (the "ABL Amendment").

Subsequently, in August 2018, the Debtors began to explore potential transaction structures that would enable the Debtors to obtain capital, manage their vendor issues, and right size their balance sheet.  Initially, the Debtors pursued an equity offering open to all of the current equity holders of Payless.  Due to the Company's declining financial performance, none of the equity holders participated in the equity offering.  As such, the Debtors sought to develop an alternative transaction structure including a combined equity-debt offering.  Alden, which holds approximately 66.5% of the total outstanding equity of Payless, agreed to explore alternative financing options with the Company.  On October 2, 2018, Alden provided an approximately $45.5 million delayed draw term loan to non-debtor affiliate, Payless CA Management Limited, which was offered to all Term Loan Lenders pursuant to the terms of the Term Loan Facility.  All of the Term Loan lenders declined to participate in the transaction, except for Alden.  The funds from this loan, which were ultimately upstreamed to fund ordinary-course business operations of the Debtors and their subsidiaries, provided a much-needed injection of capital.

After emerging from the Prior Cases, the Debtors also engaged in employee reduction measures in light of their financial performance and operational needs.  In the fall of 2017, the Debtors reduced their headquarters staff by approximately 170 employees located at the Debtors' corporate headquarters in Topeka.  In the winter of 2018, the Debtors terminated an additional 49 employees in field organization positions.  Between August 2018 and the Petition Date, the Debtors eliminated approximately 37 employees in their finance department and almost 50 employees in their merchandising and design department.  Finally, the Debtors eliminated 65 store leaders and 10 group leaders in certain of their retail locations.

In October 2018, the Debtors also explored opportunities to sell their corporate headquarters located at 3231 S.E. 6th Avenue, Topeka, Kansas.  Following an auction, the Debtors agreed on terms with a proposed buyer and, on December 27, 2018, entered into purchase and sale agreement to sell the headquarters for approximately $2 million.  The purchase and sale agreement provided the Debtors with a leaseback on a portion of the building, including their data center, dock area, and limited office space, with extensions as needed as the Debtors wind down their North America business.  The sale closed on February 14, 2019 after the requisite consents and releases from the Debtors' lenders were obtained.

### 4.        Exploration of Strategic Alternatives and Restructuring Initiatives

Notwithstanding the measures taken above, Payless was unable to return to profitability.  While the Latin America and franchise businesses continued to perform well, the Debtors' North America brick and mortar business suffered from same store sales declines and declining store productivity.  As a result, in December 2018, the Company engaged PJ Solomon, L.P. ("Solomon"), as investment banker to perform a review of the go forward business plan and explore strategic alternatives.  The Company also engaged Ankura Consulting Group, LLC ("Ankura") as financial advisor.  Solomon and Ankura worked together with Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), to develop a restructuring strategy for the Company's businesses.

The Company and its advisors analyzed the Company's capital structure and potential alternatives, including the impact of reducing the store footprint in North America to various levels depending on store profitability.  The analysis showed that achieving any profitable North America store base would require meaningful improvements in merchandising margin, stabilized comparable store sales, and significant capital investment.  The Company's efforts shifted to preparing for an orderly wind down of the North America business.

### 5.        Appointment of Independent Managers

In January 2019, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of managers of Payless Holdings LLC (the "Board") appointed Patrick Bartels and Scott

Vogel to the Board as disinterested managers (the "Independent Managers").[9]  Both of the Independent Managers have extensive experience serving on boards in distressed situations.  The Independent Managers were delegated the exclusive power and authority of the Board to conduct a full and complete review and analysis of all transactions entered into by the Debtors (including their subsidiaries and affiliates), on the one hand, and Alden and its affiliates, on the other and any other matters delegated to the Independent Managers by the Board.  The Independent Managers subsequently retained Seward & Kissel LLP ("S&K") as independent counsel to assist the Independent Managers in their review.  As set forth below, in connection with the *Order With Respect to the Retention and Appointment of Akin Gump Strauss Hauer & Feld and Seward & Kissel as Counsel to the Debtors Settling Application to Employ* (the "Akin and S&K Retention Order") [Docket No. 983] a special committee of the Board of Managers comprised solely of the Independent Managers (the "Special Committee") was appointed and a negotiated and filed protocol was implemented for the investigation of insider transactions, review and handling of transactions involving insiders and information sharing.  This is all set forth in further detail below at Article III.C.7.  Following the entry of the Akin and S&K Retention Order, the Special Committee retained FTI Consulting, Inc. ("FTI") as its financial advisor.

---

[9] Following their initial term, the Independent Managers were elected to serve as members of the Board pursuant to the written consent of the majority of the outstanding Class A shares of Payless Holdings LLC, dated February 11, 2019.

### III.
### ADMINISTRATION OF THE RESTRUCTURING PROCEEDINGS

**A.    OVERVIEW OF THE CROSS BORDER RESTRUCTURING PROCEEDINGS**

**1.    Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and interests, subject to the priority of distributions prescribed by the Bankruptcy Code.  Commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of a chapter 11 petition.

The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any entity acquiring property under the plan, any holder of a claim against or interest in a debtor and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  The order approving confirmation of a plan prohibits creditors and equity holders of a debtor from seeking to pursue claims and interests against or in a debtor except as provided for in the confirmed plan.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as a bankruptcy court has approved a disclosure statement as containing adequate information.  Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement in satisfaction of the applicable disclosure requirements under section 1125 of the Bankruptcy Code.

**2.    Overview of CCAA**

The CCAA is a federal statute of Canada that allows a company facing financial trouble, or a group of affiliated companies, the opportunity to restructure their affairs.  By allowing the company to restructure its financial affairs through a plan of compromise or arrangement, the CCAA provides the company with an opportunity to avoid bankruptcy and settle with its creditors.

The CCAA process begins with an application to the Canadian Court by the company requesting protection under the CCAA.  The Canadian Court may grant an order ordering a stay of proceedings, which provides the company with a period of time to restructure its affairs (the "Stay of Proceedings").  The Canadian Court may extend the Stay of Proceedings upon the company's application to the Canadian Court.  Typically, the Canadian Court will extend the Stay of Proceedings if it considers it appropriate in the circumstances and if the company can demonstrate that it is acting in good faith and is diligently pursuing its restructuring efforts.  During the Stay of Proceedings, the company will often continue operating in the ordinary course in addition to its restructuring activities.

A monitor is an independent and impartial third party appointed by the Canadian Court to monitor the company's ongoing operations and report to the Canadian Court on the restructuring process and developments.  The monitor's duties are set out in an order granted by the Canadian Court.  The monitor must report to the Canadian Court and stakeholders, the company's activities and financial affairs, certain significant restructuring initiatives and assist the company in its restructuring efforts and preparation of a plan of compromise or arrangement.

The CCAA provides that with the approval of the Canadian Court, a debtor company may propose a plan of compromise or arrangement to its creditors and in some cases, its shareholders.  For the plan to be effective, a majority of the creditors in each class by number and with 2/3 by dollar value (in each case, determined by stakeholders actually voting), must approve the plan.  If the debtor company's stakeholders vote in favor of the plan, the company will present the plan to the Canadian Court in what is known as a "sanction hearing."  If a plan is

sanctioned by the Canadian Court, the debtor company may implement the plan and undertake the transactions set out therein.

### 3. Cross Border Implications

The Restructuring Proceedings involve both Canadian and U.S. Debtors. Stays were sought and obtained under the Bankruptcy Code and the CCAA. There was a protocol approved given the cross-border nature of the Restructuring Proceedings (the "Cross-Border Protocol") and there were and are stakeholders in Canada, the U.S. and elsewhere. The proceedings under Chapter 11 and those under the CCAA are intended to be coordinated to the fullest possible extent.

As noted in further detail below, the Canadian Debtors are not plan proponents under the Plan. The Canadian Debtors intend to file a motion for dismissal of the Canadian Debtors' Chapter 11 Cases to be effective upon implementation of the Plan and intend to separately bring forward a motion in the Canadian Court for approval of a plan of compromise or arrangement under the CCAA.

## B. FIRST AND SECOND DAY RELIEF

On or around the Petition Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "First Day Motions") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital, and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. At the first day hearing conducted on February 19, 2019 and in the days that followed, the Bankruptcy Court entered several orders approving the First Day Motions. An additional hearing was held on March 14, 2019 at which the Bankruptcy Court considered the approval of the First Day Motions on a final basis and certain additional relief requested by the Debtors.

On the Filing Date, the Canadian Debtors obtained the Initial Order, which granted an initial stay of proceedings in favor of the Canadian Debtors until and including March 21, 2019 (the "Stay Period") and appointed FTI Consulting Canada Inc. as monitor in the CCAA proceedings. The Stay Period has been extended twice, most recently to September 20, 2019, and is subject to further extension. The Initial Order also granted relief similar to the relief requested in a number of the First Day Motions.

### 1. Procedural Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases; (b) scheduled an expedited first day hearing; (c) granted leave to exceed the page limitation in the Debtors' First Day Motions; (d) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors; (e) approved an extension of time to file their Schedules; and (f) approved certain procedures for the rejection and assumption of contracts and leases.

### 2. Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, and GOB Sales, the Debtors sought and obtained orders authorizing them to:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses, and employee medical and similar benefits [Docket No. 627];

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance [Docket No. 582];

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary [Docket No. 583];

- continue and renew their surety bond program [Docket No. 601];

- establish procedures for certain transfers and declarations of worthlessness with respect to common stock [Docket No 782];

- begin the orderly liquidation of North American stores and set forth procedures for ongoing liquidation efforts [Docket No 619];

- maintain their existing cash management systems [Docket No. 783];

- continue their relationship with certain prepetition vendors in order to ensure the continuation of vital supply services during the aforementioned liquidation [Docket No. 600]; and

- remit and pay certain taxes and fees [Docket No. 584].

    **3.**    **Postpetition Financing and Use of Cash Collateral**

Following the First Day Hearing, the Court entered an interim order (i) authorizing use of cash collateral, (ii) granting adequate protection, and (iii) modifying the automatic stay (the "Interim Cash Collateral Order") [Docket No. 138]. Specifically, the Interim Cash Collateral Order authorized the Debtors to use Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) on the terms described in the Interim Cash Collateral Order to administer the Chapter 11 Cases and fund their operations in accordance with a budget.[10] The Court entered an order (the "Final Cash Collateral Order") [Docket No. 795] granting the relief provided for in the Interim Cash Collateral Order on a final basis, subject to the terms and conditions of the Final Cash Collateral Order, on April 4, 2019.

On February 22, 2019 the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) granting Liens and Providing Superpriority Administrative Expense Status, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (v) Granting Related Relief* [Docket No. 216] (the "DIP Motion"). The Court granted the relief sought in the DIP Motion on an interim basis on February 25, 2019 (the "Interim DIP Order") [Docket No. 265] and on a final basis on April 4, 2019 (the "Final DIP Order") [Docket No. 797]. The relief granted in the Interim DIP Order and the Final DIP Order does not apply to the Canadian Debtors.

The Interim DIP Order and the Final DIP Order authorized the Debtors to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of $25,390,710.66 (the "DIP Facility," and the term loans thereunder, the "DIP Loans"). The DIP Facility and DIP Loans were subject to the terms and conditions of that certain Senior Secured Superpriority Priming Debtor-in-Possession Term Loan and Guarantee Agreement, dated as of March 24, 2019, by and among Payless Inc., as borrower, Payless Holdings LLC and certain of its subsidiaries party thereto, as guarantors, the financial institutions from time to time party thereto, as lenders, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (the "DIP Credit Agreement"). The Canadian Debtors were not borrowers or guarantors under the DIP Credit Agreement.

The DIP Facility consisted of (a) a $17 million initial draw; (b) an additional $4 million draw upon entry of the Interim DIP Order; and (c) an additional $4 million draw upon entry of the Final DIP Order. The proceeds of the DIP Facility allowed the Debtors to administer these Chapter 11 Cases and fund their operations, including preserving critical vendor relationships and suppliers in order to preserve the Debtors' Latin America and franchise businesses. The Debtors repaid the DIP Facility in full on May 3, 2019.

    **4.**    **Employment and Compensation of Professionals**

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases: (a) Akin Gump, as restructuring counsel [Docket No. 1115]; (b) Armstrong Teasdale LLP, as co-counsel [Docket No. 602]; (c) Solomon, as investment banker [Docket No. 606]; (d) Ankura, as restructuring advisor, which provided the Debtors with a Chief Restructuring Officer (Stephen Marotta of Ankura) and a Restructuring Officer

---

[10] A summary of which was attached to the Interim Cash Collateral Order.

(Adrian Frankum of Ankura) [Docket No. 605]; (e) A&G Realty Partners, LLC as real estate advisor [Docket No. 628]; (f) Malfitano Advisors, LLC as asset disposition advisor and consultant [Docket No. 604]; (g) S&K, as counsel acting at the direction of the Independent Managers [Docket No. 1114]; (h) Reevemark, LLC, as corporate communications consultants [Docket No. 603]; (i) Ernst & Young LLP as tax services provider; and (j) FTI, as financial advisor acting at the direction of the Independent Managers [Docket No. 1276].

The Debtors also sought and received approval of Prime Clerk LLC ("Prime Clerk") as the Noticing and Claims Agent [Docket No. 572] and filed an application to retain Prime Clerk LLC as Solicitation and Administrative Agent for the Prior Cases [Docket No. 829].

Pursuant to the Cross Border Protocol approved by this Court and the Canadian Court, the Debtors' Canadian Counsel, Cassels, Brock & Blackwell LLP, and Ankura, in its capacity as Chief Restructuring Organization of the Canadian Debtors, have been retained pursuant to the Canadian Court's retention procedures.

## C.   OTHER MATERIAL EVENTS IN THESE CHAPTER 11 CASES

### 1.   July Filing

As described above, on the Original Petition Date, the Original Debtors commenced the Original Chapter 11 Cases with the goal of maximizing value for all stakeholders by conducting an orderly wind-down of the North American brick and mortar business and pursuing a reorganization of the Latin America and franchise business segments.  In connection with this strategy, the Original Debtors completed the GOB Sales on June 30, 2019 and shifted their attention to resizing and restructuring the Company's operations to efficiently support the go-forward Latin America and franchise businesses.  As a result, the Debtors commenced the July Chapter 11 cases in order to facilitate the reorganization efforts and to provide the creditors of the July Debtors with the opportunity to participate in the Chapter 11 Cases.

On the July Petition Date, the July Debtors filed certain motions, specifically:  (a) the *Debtors' Motion Seeking Entry of an Order (I) Directing Supplemental Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "July Debtors' Joint Administration Motion") [Docket No. 1304]; (b) the *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code for an Order Directing that Certain Orders in the Chapter 11 Case of Payless Holdings LLC Be Made Applicable to the Debtors in Subsequently Filed Cases* (the "Deeming Motion") [Docket No. 1306]; and (c) the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof Solely With Respect to the July Debtors* (the "July Debtors' Bar Date Motion") [Docket No. 1307], as well as the *Supplemental Declaration of Stephen Marotta in Support of Chapter 11 Petitions of July Debtors* [Docket No. 1305].

The July Debtors' Joint Administration Motion requested that the Court enter an order directing the supplemental joint administration of the July Chapter 11 Cases with the Original Chapter 11 Cases.  The Court granted the relief requested in the July Debtors' Joint Administration Motion on July 19, 2019 [Docket No. 1363]. The Deeming Motion requested that the Court enter an order directing that the relief requested and granted pursuant to the First Day Motions apply to the July Chapter 11 Cases.  The Court granted the relief requested in the Deeming Motion on July 19, 2019 [Docket No. 1364].  The July Debtors' Bar Date Motion requested that the Court enter an order establishing certain bar dates for filing proofs of claim and approving the form and manner of notice thereof with respect to the July Debtors.  The Court granted the relief requested in the July Debtors' Bar Date Motion on July 19, 2019 [Docket No. 1366].

### 2.   Claims Bar Date and the Debtors' Schedules

On April 4, 2019, the Original Debtors (excluding the Canadian Debtors) filed the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 774], (the "Bar Date Motion") seeking to establish June 7, 2019, as the deadline by which all persons and entities must file and serve Proofs of Claim[11] against the Original Debtors in these Chapter 11 Cases (the "Original Debtors' General Bar Date").  Additionally, the Debtors' requested that the Court establish August 19,

---

[11] As used herein, the "Proofs of Claim" constitute all Proofs of Claim asserting claims that arose on or prior to the Petition Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code.

2019, as the deadline by which all governmental units must file and serve Proofs of Claim asserting prepetition claims against any of the Original Debtors (excluding the Canadian Debtors) in these Chapter 11 Cases (the "Original Debtors' Government Bar Date").  The Bankruptcy Court granted the Bar Date Motion on May 3, 2019 [Docket No. 969].

As outlined above, the July Debtors sought separate relief under the July Debtors' Bar Date Motion, and therefore claims solely against the July Debtors are to be filed pursuant to the Supplemental Bar Date and the Supplemental Governmental Bar Date.  The Bankruptcy Court granted the July Debtors' Bar Date Motion on July 19, 2019 [Docket No. 1366].

Further, pursuant to the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof Solely With Respect to the July Debtors*, any claims against a July Debtor that arose or is deemed to have arisen prior to the July Petition Date must be filed on or before 11:59 p.m., prevailing Central Time on August 30, 2019 (the "Supplemental Bar Date").  Any governmental unit asserting a claim against the July Debtors must file such proof of claim on or before 11:59 p.m., Central Time, on January 3, 2020 (the "Supplemental Governmental Bar Date").

The Original Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs and related declarations on April 1, 2019 [Docket Nos. 732 – 741 and 743-760].  The July Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs and related declarations on July 15, 2019 [Docket Nos. 1330 and 1331].

To facilitate a parallel claims process in Canada, the Canadian Debtors sought and obtained an order of the Canadian Court dated April 24, 2019 (the "Claims Procedure Order") to undertake a claims procedure to solicit and identify claims against the Canadian Debtors and their present and former directors and officers.  Subject to certain exceptions, the deadline to file Proofs of Claim or to dispute a claim statement delivered under the Claims Procedure Order was June 7, 2019, unless otherwise extended pursuant to the Claims Procedure Order.

### 3.    Executory Contracts and Unexpired Leases

As set forth in the *Debtors' Motion For Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 772] (the "Lease Rejection Extension Motion"), as of the Petition Date, the Debtors were a party to approximately 2,400 unexpired non-residential real property leases, most of which related to the Debtors' brick and mortar retail stores across North America.  Further, the Debtors were and are party to a substantial number of executory contracts.  In connection with their restructuring efforts, the Debtors are working to maximize the value of their estates, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases and supply chain.  The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases in addition to those rejected or to be rejected in connection with the GOB Sales.

The Canadian Debtors have disclaimed all of their real property leases.  No contract counterparty has timely filed an application to contest a disclaimer with the Canadian Court and therefore, under the CCAA, the Canadian Debtors have not requested or obtained any relief from the Canadian Court in connection with the lease disclaimers.

### 4.    Lease Renegotiation and Store Closing Process

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 24] (the "Store Closing Motion") seeking to implement a key component of their liquidation strategy by closing their North American retail locations.  The Bankruptcy Court approved the Store Closing Motion on an interim basis on February 20, 2019 [Docket No. 119] and on a final basis on March 20, 2019 [Docket No. 619], pursuant to which the Debtors began the liquidation of all North American stores.  On May 8, 2019, the Debtors filed a motion seeking approval to extend the store closing sales as to certain locations [Docket No. 987] (the "Supplemental Store Closing Motion").  The Bankruptcy Court approved the

Supplemental Store Closing Motion on May 31, 2019 [Docket No. 1121].  The Supplemental Store Closing Motion does not apply to the Canadian Debtors, as the liquidation sales in Canada terminated prior to May 1, 2019.

On February 21, 2019, the Canadian Court granted an order approving the liquidation consulting agreement in Canada.  The liquidation sales in Canada concluded on April 30, 2019.  As of May 31, 2019, the Payless Canada Entities have vacated all of the Canadian locations.

Pursuant to the Final Cash Collateral Order, the Debtors have agreed to treat an amount equal to 85% of the rent for the period from February 18 to February 28, 2019 (the "Stub Rent") as an Administrative Claim ("Allowed Stub Rent Claim") and to pay the amount of the Allowed Stub Rent Claim that exceeds any overpayment for rent received by the Debtors' landlords for the then-current billing cycle, calculated on a *per diem* basis, on account of the remaining days after the effective date of the rejection of the unexpired lease of non-residential real property ("Rejection Date") in the then-current billing cycle ("Reimbursement Rent").  The Debtors agreed to pay the amount of the Allowed Stub Rent Claim that exceeds the Reimbursement Rent within fifteen (15) days of the later of (a) the effective date of the stub rent agreement or (b) the Rejection Date.  As Administrative Claims, the amount of the Allowed Stub Rent Claims that exceeds the respective amount of Reimbursement Rent is required to be paid in full under the Plan.

### 5.        Appointment of the Creditors' Committee and Retention of Professionals

On March 1, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 359].  As of the date hereof, the Creditors' Committee consists of (a) Moda Shoe, Ltd.; (b) Xiamen C&D Light Industry Co, Ltd.; (c) Huge Development, Ltd.; (d) C and C Accord, LTD.; (e) Simon Property Group, Inc.; (f) Brookfield Property REIT, Inc.; and (g) Yaquelin Garcia.

With authorization from the Bankruptcy Court, the Creditors' Committee retained the following professional advisors to assist the Creditors' Committee in carrying out its duties and to represent their interests in the Chapter 11 Cases:  (a) Pachulski Stang Ziehl & Jones LLP, as lead counsel [Docket No. 962]; (b) Polsinelli P.C. as co-counsel [Docket No. 964]; and (c) Province, Inc., as financial advisor [Docket No. 963].

### 6.        Meeting of Creditors

The meeting of creditors to the Original Debtors pursuant to Bankruptcy Code section 341 was held on April 8, 2019.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined by the United States Trustee and other attending parties in interest), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the United States Trustee and other parties in interest present at the meeting.

A meeting of creditors to the July Debtors has been scheduled for August 14, 2019 pursuant to Bankruptcy Code section 341 [Docket No. 1365].

### 7.        Special Committee Appointment

As outlined above, the Independent Managers were appointed pursuant to a unanimous written consent of the Board on January 29, 2019 (the "January Consent").  The January Consent delegated to the Independent Managers the exclusive power and authority of the Board to conduct a full and complete review and analysis of all transactions between the Debtors, on the one hand, and the Alden Entities, on the other (the "Insider Investigation").  Following the filing of the bankruptcy cases, S&K continued to work with the Independent Managers in conducting the Insider Investigation, and also coordinated with the newly appointed Committee with respect to its investigation of potential estate causes of action.

While the Insider Investigation was in its early stages, certain creditor parties raised questions about the scope of the investigation and the role of various parties with respect to the investigation.  Those issues were resolved in the context of the retention of Akin Gump and S&K.  The Akin and S&K Retention Order provided, among other things, that the Special Committee consisting of the Independent Managers be established by the

Board, and that the Special Committee's mandate with respect to Insider Investigation was expanded to investigate, prosecute, release or settle any claim or causes of action in which the Alden Entities or any past or current manager of the Board are or may be implicated. In addition, pursuant to the Akin and S&K Retention Order, the Special Committee was also granted the exclusive authority on behalf of the Board to review, consider, negotiate, adopt or approve any document, action or transaction (including this plan of reorganization) in which the Alden Entities or any manager of the Board is or may be interested or implicated (the "Insider Transactions"). The role of the Special Committee, as contemplated by the Akin and S&K Retention Order, was contemporaneously enacted by unanimous written consent of the Board on May 8, 2019. The Special Committee subsequently retained FTI as its financial advisor to advise it with respect of the Insider Investigation and the Insider Transactions.

(a)    Insider Investigation

As stated, beginning in February 2019, and continuing throughout the pendency of the Chapter 11 Cases, the Independent Managers, including, as of May 8, 2019, in the form of the Special Committee, and their advisors have been diligently conducting the Insider Investigation. Throughout the process, S&K and FTI (from and after May 7, 2019) have regularly met with and advised the Special Committee concerning the information gathered during the Insider Investigation, as well as near- and long-term steps concerning the Insider Investigation.

Prior to the Petition Date, at the direction of the Independent Managers, S&K requested materials from the Debtors on matters related to the Insider Investigation and conducted initial interviews of key persons with knowledge of the Debtors' prepetition activities and transactions. Thereafter and throughout the Chapter 11 Cases, S&K has requested supplemental materials from the Debtors and served informal and/or formal document requests on [8] additional entities and persons involved in the Debtors' prepetition activities and significant related-party transactions, including the Debtors' equity owners and current and former managers and officers. In that regard, the Special Committee also sought and obtained an order pursuant to Rule 2004 of the Bankruptcy Code authorizing expedited discovery, which was entered by the Bankruptcy Court on May 20, 2019. As of the date hereof, the Special Committee's advisors have received and reviewed more than 440,000 pages of documents.

In addition, as part of the Insider Investigation, the Special Committee's advisors have spoken with or interviewed some eighteen persons with knowledge of the Debtors' prepetition activities and significant related party transactions, including certain of the Debtors' advisors, employees and current and former managers, officers and employees. The Insider Investigation is an iterative process and is continuing. The Special Committee is scheduled to conduct several additional interviews of key persons, including the Alden Entities, in order to complete the Insider Investigation.

The Special Committee and the Committee have cooperated on matters related to the Insider Investigation. Specifically, the Special Committee shared with the Committee's advisors non-privileged materials that it has collected and has coordinated with and included the Committee's advisors on witness interviews. To facilitate that process, the Special Committee and the Committee, among others, negotiated a confidentiality agreement and protective order to facilitate and expedite the production, exchange and treatment of any confidential material in connection with the Insider Investigation, as well as the Chapter 11 Cases more broadly. The Special Committee will continue to provide the Committee advisors with additional non-privileged materials it may receive and coordinate and include the Committee advisors on interviews it conducts.

Given the ongoing nature of the Insider Investigation, the Debtors (at the direction of the Special Committee) reserve all rights, in the reasonable exercise of their business judgment, to pursue, prosecute, settle, release, abandon or otherwise resolve any potential claims or causes of action that are identified by the Insider Investigation. For the avoidance of doubt, the Debtors' release of the Released Parties, as well as the propriety of any exculpation or third-party release provisions, are subject to the conclusion of the Insider Investigation and all of the Debtors' rights (at the direction of the Special Committee) are reserved.

(b)    Informational Barrier Protocol

In connection with its appointment, the Special Committee negotiated and adopted written protocols to ensure that appropriate informational barriers were established and enforced to prevent the inappropriate disclosure of insider information to certain Board members and the Alden Entities (the "Informational Barrier Protocols"). The Informational Barrier Protocols were filed with the Bankruptcy Court on May 22, 2019, and provide that the Special

18

Committee has the exclusive authority to determine what information is considered insider information and if and when such information can be disclosed to screened parties, and put in place procedures for the disclosure of both insider and non-insider information.  In compliance with the Informational Barrier Protocols, S&K and FTI have routinely met with and advised the Special Committee about the sharing of information throughout the cases.

(c)    Insider Transactions/Plan

Further to the authority granted to the Special Committee in connection with Insider Transactions, the Special Committee has led the consideration of, and negotiations related to, the formulation of the terms of the Plan. The Special Committee's advisors, together with the Debtors' advisors, worked together to prepare the business plan, valuation and recovery analyses that were presented to the Special Committee for review and consideration, and which comprise the foundation for the terms of the Plan.  Relevant analyses and materials were also provided to the various creditor constituencies in furtherance of discussions toward a consensual Plan.

**IV.**
**SUMMARY OF THE PLAN**

**THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.   THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

**A.      GENERAL BASIS FOR THE PLAN**

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan and make the distributions contemplated under the Plan.  Under the Plan, Claims against and Interests in the Debtors are divided into separate Classes according to their relative seniority, legal nature, and other criteria, and the Plan proposes recoveries for Holders of Claims against and Equity Interests in the Debtors in such Classes, if any.  The Debtors believe that the Plan maximizes value for all stakeholders.

**B.      PROPOSED TREATMENT OF EACH CLASS OF CLAIMS AND INTERESTS**

As set forth in Articles II and III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Priority Tax Claims and Professional Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**1.      Administrative, Priority Tax and Professional Fee Claims**

| Unclassified Claim | Plan Treatment | Estimated Percent Recovery Under the Plan |
|---|---|---|
| Administrative Claims | Unimpaired | 100% |
| Priority Tax Claims | Unimpaired | 100% |
| Professional Fee Claims | Unimpaired | 100% |

(a)      <u>Administrative Claims</u>

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed

Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order. Notwithstanding any provision of the Plan to the contrary, no Governmental Unit shall be required to file a request for the payment of an expense described in 11 U.S.C. § 503(b)(1)(B) or (C) as a condition of it being allowed as an administrative expense.

(b)      Administrative Claims Bar Date

All requests for payment of an Administrative Claim (other than Professional Fee Claims) that accrued on or before the Effective Date must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date, provided, however, pursuant to the Original Debtors Claims Bar Date Order and the July Debtors Claims Bar Date Order, Administrative Claims related to executory contracts or unexpired leases that have been rejected by the Debtors are required to be filed by the later of (a) the Original Debtors Bar Date or the Supplemental General Bar Date (as applicable) and (b) 11:59 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the relevant order or deemed effective date of the rejection of such rejected contract or unexpired lease. Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

(c)      Professional Compensation

(i)      *Final Fee Applications*

All final requests for Professional Fee Claims shall be filed no later than 30 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(ii)      *Professional Fee Escrow Account*

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(iii)      <i>Professional Fee Reserve Amount</i>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date.  If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(iv)      <i>Post-Effective Date Fees and Expenses</i>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Debtor and Reorganized Debtor (as applicable) shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  The Debtors and Reorganized Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable).  If the Debtors or Reorganized Debtors (as applicable), dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(v)      <i>Substantial Contribution Compensation and Expenses</i>

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

(d)      <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

(e)      <u>United States Trustee Statutory Fees</u>

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order, dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

2.      <b>Classified Claims and Interests</b>

(a)      <u>Proposed Distributions to Holders of Allowed Claims and Equity Interests</u>

The Plan contemplates the following distributions to Holders of Allowed Claims and Equity Interests, among other recoveries:

22

| Class 1 –Other Priority Claims | **Treatment**.  On the Effective Date, or in the ordinary course of business as and when due, except to the extent a Holder of an Administrative, Priority Tax, or Allowed Other Priority Claim has already been paid during the Chapter 11 Cases or such Holder of an Administrative, priority Tax, or Allowed Other Priority Claim, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Administrative, Priority Tax, or Allowed Other Priority Claim, each Holder of an Administrative, Priority Tax, or Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Administrative, Priority Tax, or Allowed Other Priority Claim. <br><br>**Voting**.  Unimpaired.  Each Holder of an Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
|---|---|
| **Class 2 – Other Secured Claims** | **Treatment**.  On or after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Other Secured Claim, each holder or any such Claim (i) shall receive payment in Cash in an amount equal to such Claim, (ii) shall receive the collateral underlying such Claim, or (iii) shall receive such other treatment so as to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. <br><br>**Voting**.  Unimpaired; not entitled to vote to accept or reject the Plan. |
| **Class 3 – Tranche A-1 Term Loan Claims** | **Treatment**.  On the Effective Date, each holder of an Allowed Tranche A-1 Term Loan Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such Claim, Cash in an amount equal to [%] of its Allowed Tranche A-1 Term Loan Claim. <br><br>**Voting**.  Impaired; entitled to vote to accept or reject the Plan. |
| **Class 4 – Tranche A-2 Term Loan Secured Claims** | **Treatment**.  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Tranche A-2 Term Loan Secured Claim, each holder of Tranche A-2 Term Loan Secured Claim shall receive its *pro rata* share of 100% of the New Common Units (as defined below).  Holders of Class 4 Claims shall be deemed to waive any distributions under Class 5 on account of their Tranche A-2 Term Loan Unsecured Claims. <br><br>**Voting**.  Impaired; entitled to vote to accept or reject the Plan. |
| **Class 5 –General Unsecured Claims** | **Treatment**.  On or as soon as reasonably practicable after the Effective Date (and subject to the allowance, objection, and distribution procedures set forth in the Plan and the Liquidating Trust Agreement), except to the extent that a holder agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed General Unsecured Claim, each holder of any such Claim shall receive its Pro Rata share of the Liquidating Trust.  These distributions will be made by the Liquidating Trustee pursuant to the Liquidating Trust Agreement. <br><br>**Voting**.  Impaired; entitled to vote to accept or reject the Plan. |
| **Class 6 – Intercompany Claims** | **Treatment**.  Each Intercompany Claim shall either be (a) reinstated as of the Effective Date or (b) cancelled, in which case no distribution shall be made on |

| | |
|---|---|
| | account of such Intercompany Claim, in each case as determined by the Debtors.<br><br>**Voting**. Deemed to accept the Plan; not entitled to vote to accept or reject the Plan. |
| **Class 7 – Existing Equity Interests in Payless** | **Treatment**. All Existing Equity Interests in Payless, whether represented by stock, preferred share purchase rights, warrants, options, membership units or otherwise, will be cancelled, released, and extinguished and the Holders of such Existing Equity Interests will receive no distribution under the Plan on account thereof.<br><br>**Voting**. Impaired; deemed to reject the Plan. |
| **Class 8 –Intercompany Interests** | **Treatment**. Each Intercompany Interest shall either be (a) reinstated as of the Effective Date or (b) cancelled, in which case no distribution shall be made on account of such Intercompany Interest, in each case as determined by the Debtors.<br><br>**Voting**. Deemed to accept the Plan; not entitled to vote to accept or reject the Plan. |

## C.    POST-EMERGENCE CAPITAL STRUCTURE

The Debtors' capital structure at emergence will consist of:

- **New First Lien Facility** of [$50,000,000].

- **New Common Units** of [x] units of Reorganized Payless.

## D.    CERTAIN MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    Restructuring Transactions

The Plan provides that, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements, certificates or other documents or instruments of merger, consolidation, conversion, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, merger, conversion, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate.

Under the Plan the Debtors are authorized but not directed to, in an orderly manner, abandon, dissolve, liquidate or cause to be liquidated any Debtor entities, subsidiaries or Affiliates as the Debtors decide would be in the best interests of the Estates.

### 2.    The New First Lien Facility

On the Effective Date, the Reorganized Debtors will enter into definitive documentation, with respect to the New First Lien Facility in an aggregate amount up to $[50] million. The Debtors shall seek a third-party lender financing for the New First Lien Facility (as well as engage in discussions for funding same with existing creditors).

Confirmation of the Plan shall be deemed to constitute approval of the New First Lien Facility and the New First Lien Facility Documents (including all transactions contemplated thereby and all actions to be taken,

undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New First Lien Facility Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the New First Lien Facility Documents.

On the Effective Date, the New First Lien Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New First Lien Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the liens and security interests to be granted in accordance with the New First Lien Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New First Lien Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law. The Reorganized Debtors and the Entities granted such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the New First Lien Facility Documents that are necessary to cancel and/or extinguish such liens and/or security interests.

### 3.    The CA Loan

Pursuant to the Plan, the CA Credit Agreement and any other applicable documentation related to the CA Loan shall be amended to ensure that interest in all Interest Periods (as defined in the CA Credit Agreement) following October 2, 2019 shall be paid in cash as currently provided in the CA Credit Agreement.

Further, amortization of the CA Loan shall occur following the Effective Date, payable on the first anniversary of the Effective Date and every six (6) months thereafter (or, if such date is not a business day, the business day immediately preceding such date), in an aggregate annual amount equal to 5% of the original principal amount in the year beginning with the first anniversary after the Effective Date and 10% for each year thereafter. The remaining aggregate principal amount of the CA Loan will be payable in full at maturity.

Covenants, events of default, and representations under the CA Credit Agreement will also be modified pursuant to the Plan.

### 4.    Corporate Existence

Subject to any restructuring transactions as permitted under Article IV.B of the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other similar formation and governance documents) are amended by or in

connection with the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

As further provided in Article IV.B of the Plan, the Debtors are authorized to, in an orderly manner, abandon, dissolve, liquidate or cause to be liquidated any Debtor entities, subsidiaries or Affiliates as the Debtors decide would be in the best interests of the Estates.

5.    **Vesting of Assets in the Reorganized Debtors**

Subject to Article IV.G of the Plan, and except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all causes of action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances.  For the avoidance of doubt, the Reorganized Debtors shall have no property interest in the funds in the Liquidating Trust and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, or other encumbrances granted under the Plan shall not extend to an interest in the funds held in the Liquidating Trust.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.    **Cancellation of Prepetition Term Loan Facility, Prepetition ABL Credit Facility, DIP Credit Agreement and Equity Interests**

On the Effective Date, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtors under the Prepetition Term Loan Facility, the Prepetition ABL Credit Facility, the DIP Credit Facility, and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and all documentation in respect of those enumerated facilities is terminated, except as expressly provided below, and the Reorganized Debtors and their Affiliates shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, any options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing:

- The Prepetition Term Loan Facility shall continue in effect solely for the purpose of:  (i) allowing Holders of the Prepetition Term Loan Claims to receive the distributions provided for under the Plan; (ii) allowing the Prepetition Term Loan Agent to receive distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, including any potential distributions based on liens that Holders of Class 4 Claims hold over intercompany receivables with the Canadian Debtors; and (iii) preserving the Prepetition Term Loan Agents' right to indemnification pursuant and subject to the terms of the Prepetition Term Loan Facility in respect of any Claim or Cause of Action asserted against the Prepetition Term Loan Agents; *provided* that any Claim or right to payment on account of such indemnification shall be an Administrative Claim; and the Canadian Debtors shall cancel any post-petition intercompany receivables payable by the Debtors unless the Debtors elect to repay such receivable, subject to the lien of the Holders of Class 4 Claims.

- The Prepetition ABL Credit Facility and the DIP Facility shall continue solely for the purpose of preserving the rights of Wells Fargo, the DIP Agent and DIP Facility Agent and the DIP Lenders to indemnification pursuant to and subject to the respective agreements.

26

- The Prepetition Term Loan Facility Agent, the DIP Agent, and Wells Fargo, as collateral agent and administrative agent, for the Prepetition ABL Credit Facility, are authorized to execute any and all documentation necessary or desirable to evidence the termination of the Prepetition Term Loan Facility, the DIP Facility and the Prepetition ABL Credit Facility.

- The Debtors are authorized to file any necessary security interest and/or lien releases or terminations to evidence the termination of the Prepetition Term Loan Facility, the DIP Facility and the Prepetition ABL Credit Facility.

- The foregoing shall not affect the cancellation of units issued pursuant to the Plan nor any other units held by one Debtor in the capital of another Debtor.

### 7. Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors

The Cash necessary for the Reorganized Debtors to make Cash payments required pursuant to the Plan will be funded from two sources: (1) proceeds from the New First Lien Facility and (2) Cash on hand as of the Effective Date.

In making such Cash payments, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### 8. Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions. Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors, or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 9. Issuance of New Equity

(a)     <u>New Common Units</u>

On the Effective Date, Reorganized Payless shall issue New Common Units in accordance with the terms of the Plan and the New Organizational Documents, without the need for any further corporate or member action.

Pursuant to the New Organizational Documents, Reorganized Payless will further be authorized, but not required, to issue New Incentive Units pursuant to the Management Incentive Plan.

Upon the Effective Date, (i) the New Common Units shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors will be a reporting company under the Exchange Act. The New Common Units will be issued pursuant to section 1145 or another available exemption from registration under the Securities Act by the recipients thereof, subject to certain

restrictions under the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, if applicable, and affiliates under applicable securities laws. Transfers of New Common Units will not otherwise require approval of the New Board (as defined below) or be subject to other restrictions except for the obligation of transferees to become party to the New Operating Agreement.

The distribution of New Common Units pursuant to the Plan may be made by delivery of one or more certificates representing such new units as described herein, by means of book entry registration on the books of the transfer agent of New Common Units or by means of book entry exchange through the facilities of a transfer agent satisfactory to the Debtors in accordance with the customary practices of such agent, as and to the extent practicable.

      (b)    <u>Tag, Drag and Preemptive Rights</u>

Significant Holders shall have customary tag-along rights on transfers by either the Alden Entities (and their transferees) or the Axar Entities (and their transferees) of 25% or more of the Alden Entities or the Axar Entities respective holdings of New Common Units in a single transaction. The tag-along rights of any Significant Holder shall be with respect to the percentage of its holdings equal to the percentage of the holdings of the Alden Entities or the Axar Entities that the Alden Entities or the Axar Entities seek to transfer. A Significant Holder shall retain its right to these customary tag-along rights so long as such Significant Holder owns at least 51% of the New Common Units that it owned as of the Effective Date (or acquired following the Effective Date at which time it became the holder of 5% or more of the New Common Units.)

All Holders of New Common Units shall have customary preemptive rights and other minority protections. Customary drag-along rights shall apply to the sale in a single transaction of a majority of the New Common Units which drag-along rights may be exercised in the first three years following the Effective Date by Holders of at least 75% of the issued and outstanding New Common Units and following the third anniversary of the Effective Date by Holders of a majority of the issued and outstanding New Common Units.

      (c)    <u>Private Companies</u>

On the Effective Date, the Reorganized Debtors shall be private, non-SEC reporting companies.

**10.**    **Simultaneous and Future Transactions**

      (a)    <u>LatAm Business</u>

Under the Plan, the LatAm Business shall be retained as property of the Reorganized Debtors as of the Effective Date, and all obligations of the Debtors' direct or indirect non-Debtor subsidiaries that own or control the LatAm Business shall remain outstanding and continue in effect.

      (b)    <u>Royalty, Licensing, Service and Sourcing Agreements</u>

All of the Debtors' royalty, licensing, services and sourcing agreements shall be assumed and retained as property of the Reorganized Debtors as of the Effective Date.

      (c)    <u>Canadian Debtors</u>

The Canadian Debtors are not plan proponents under the Plan. The Debtors or Reorganized Debtors shall cause the Canadian Debtors to bring forward a motion for approval of a plan of compromise or arrangement under the *CCAA* (the "CCAA Plan") in the Canadian Court. The CCAA Plan shall be in form and substance acceptable to the Prepetition Term Loan Agent and the Canadian Debtors. In connection with implementation of the CCAA Plan: (a) the Prepetition Term Loan Agent shall consent to release its security over funds held by the Canadian Debtors in an amount to be determined, but which amount will provide a recovery to unsecured creditors of the Canadian Debtors on a similar *pro rata* basis as the recovery received by General Unsecured Creditors of the Debtors (the "<u>Canadian GUC Amount</u>"); (b) the Canadian Debtors will consent to the appointment of a receiver, upon application by the Prepetition Term Loan Agent, over the proceeds of the Canadian Postpetition Loans, once received by the Canadian Debtors, and any other funds provided therefore pursuant to the CCAA Plan, but excluding the Canadian GUC Amount; and (c) the Canadian Debtors will cancel the claims of the Debtors against the Canadian Debtors, or

28

otherwise resolve such intercompany claims in a manner acceptable to the Debtors or the Reorganized Debtors and the Canadian Debtors.

        (d)        <u>Collective Brands Logistics Limited</u>

Collective Brands Logistics Limited is authorized, but not directed, to commence or continue the liquidation process of its business and assets in the Asian courts or proceed as is otherwise appropriate in the subject jurisdictions.  In exchange for the treatment of the Holders of General Unsecured Claims of Collective Brands Logistics Limited pursuant to Class 5 of this Plan, Collective Brands Logistics Limited shall be authorized (i) to assume and assign any executory contracts pursuant to Section V, (ii) transfer any shares of its direct or indirect subsidiaries, and (iii) transfer any de minimis assets, in each instance free and clear of all liens, claims and encumbrances, to Dynamic Assets Limited under the Plan.

Collective Brands Logistics Limited is further authorized under the Plan to reject that certain Restated Joint Business Agreement dated December 21, 2016 between Payless Sourcing, LLC and Collective Brands Logistics Limited.  Further, Collective Brands Logistics Limited is authorized, but not directed, to abandon and/or liquidate Collective Brands Services Limited as well as Collective Brands Holdings Limited and the China and Vietnam Subsidiaries of Collective Brands Holdings Limited.  By the Plan, Collective Brands Logistics Limited is authorized to transfer any employees to Dynamic Assets Limited.

All Intercompany Claims between Collective Brands Logistics Limited and Payless Sourcing, LLC on the one hand, and the remaining Debtors on the other hand, are released pursuant to the Plan.

        (e)        <u>Transactions with Affiliates</u>

There shall be no Affiliate Transactions (as defined in the Plan) unless approved by all members of the New Board, excluding the New Board member designated by the applicable member (or its affiliate) that is party to the Affiliate Transaction.  In addition, the New Board member designated by such applicable member shall be excluded from all deliberations on any such Affiliate Transaction.

        (f)        <u>Compelled Sale of the Company</u>

After the third anniversary of the Effective Date, either the Alden Entities or the Axar Entities (so long as the Alden Entities and the Axar Entities, respectively, own at least 51% of the New Common Units that it owned as of the Effective Date) may compel the Reorganized Debtors to sell all of their remaining assets through a competitive process managed by independent third-party financial advisors or investment bankers.  After the fourth anniversary of the Effective Date, the Holders of at least 25% of the New Common Units (without regard to New Incentive Units) may compel the Reorganized Debtors to sell all of their remaining assets through a competitive process managed by independent third-party financial advisors or investment bankers.

The Axar Entities, the Alden Entities, the Invesco Entities, and the Octagon Entities shall have any right of first refusal or similar right to purchase any or all of the assets of the Reorganized Debtors, but each may submit proposals to purchase such assets, *provided, however*, that if any of the Axar Entities, the Alden Entities, the Invesco Entities, or the Octagon Entities participate in the sale process, such participant or participants shall be excluded from management of the process and will not have access to any advisors retained in connection with the process other than in its capacity as a bidding party.  Any sale to any of the Axar Entities, the Alden Entities, the Invesco Entities, or the Octagon Entities will require the delivery of a fairness option by the third party financial advisor or investment bank retained to manage such sale.

**11.**      **Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code and/or, to the extent that section 1145 of the Bankruptcy Code is unavailable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering,

issuance, distribution, or sale of securities. In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, to the extent applicable, any and all New Common Units contemplated by the Plan will be freely tradable and transferable by any initial recipient thereof, subject to certain exceptions if the recipient (x) is an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has been such an "affiliate" within 90 days of such transfer, and (z) is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### 12. New Organizational Documents

On or immediately prior to the Effective Date, the organizational documents of each of the Debtors shall be amended and restated, as may be necessary to effectuate the transactions contemplated by the Plan, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be satisfactory to the Requisite Consenting Lenders. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

### 13. Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer of property from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral as security for any or all of the New First Lien Facility, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 14. Directors and Officers of Reorganized Payless and Other Reorganized Debtors

On the Effective Date, the board shall consist of the following Initial Directors: (i) one director and/or manager appointed by Axar, (ii) one director and/or manager appointed by Alden, (iii) one director and/or manager jointly appointed by Invesco and Octagon, and (iv) an Independent Director and/or manager jointly appointed by Axar, Alden, Octagon, and Invesco no later than ten (10) days prior to the deadline to object to confirmation of this Plan (the "New Board"). In the event Invesco and Octagon, together with their respective affiliates, cease to hold any New Common Units, the Independent Director's seat on the New Board shall be filled through annual election by the Holders of a majority of the New Common Units, and such director shall have industry experience, and shall be independent and have no prior or current relationship with any of the remaining original designees.

The processes for election of directors/managers and replacement of directors/managers will be provided for in the New Operating Agreement. For so long as the New Board is composed of four directors, to the extent a decision or action of the Reorganized Debtors is approved by two members of the New Board, and two members of the New Board oppose a decision or action, such decision or action may, at the request of the members of the New Board approving such action, be put to a vote of Holders of issued and outstanding New Common Units, and if approved by Holders of at least 90% of the issued and outstanding New Common Units, shall be deemed approved;

provided that, in the event Invesco and Octagon collectively cease to hold any New Common Units but the New Board continues to be comprised of four directors the foregoing reference to 90% shall be reduced to 75%.

The following are decisions and actions that, if approved by the New Board acting by less than unanimous consent, will require approval of holders of at least 75% of the issued and outstanding New Common Units: (i) the sale of the LatAm Business, (ii) the consummation by Reorganized Payless of a transaction resulting in a change of control of Reorganized Payless, (iii) the acquisition by Reorganized Payless of another unaffiliated entity or business, whether via merger, the acquisition of equity or the assets of such entity, which transaction has a purchase price in an amount greater than 25% of the equity value of Reorganized Payless at such time (prior to consummation of such transaction), (iv) the sale or disposition by Reorganized Payless of assets of Reorganized Payless outside of the ordinary course of business for a sale price greater than 25% of the equity value of Reorganized Payless at such time (prior to consummation of such sale or disposition), (v) a fundamental change to the nature of Reorganized Payless's business, and (vi) the issuance of more than 20% of New Common Units (subject to certain customary issuance exceptions as apply to preemptive rights referenced above), provided, however that the foregoing approvals shall not apply to a compelled sale of Reorganized Payless as set forth in the Plan.

15.    **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including Article IX.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IV.P and Article IX of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

16.    **Directors and Officers Insurance Policies and Agreements**

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

On the Effective Date, the Reorganized Debtors shall purchase a customary D&O tail policy.

### 17.     Compensation and Benefits Programs

Unless otherwise provided herein or in the Confirmation Order, or any applicable agreements binding on the Debtors, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(a)     Management Incentive Plan

Promptly on or as soon as practicable after the Effective Date, the New Board will adopt and implement the Management Incentive Plan (the "Management Incentive Plan"), the terms of which shall be approved by the New Board.  The New Board will determine the number of New Incentive Units to be available for award under the Management Incentive Plan and the allocation of New Incentive Units, if any.

(b)     Continuation of Retiree Benefits

The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.

(c)     Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance, including without limitation, any Insurance Policies providing workers' compensation insurance coverage to the Debtors. Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to object to Claims asserted pursuant to applicable workers' compensation programs and to seek to reduce any bonds, letters of credit, or other security related to such programs.

All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however,* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; *provided, further,* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

### E.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.     Assumption and Rejection of Executory Contracts and Unexpired Leases, Generally

On the Effective Date, executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases filed with the Plan Supplement shall be assumed.  The Debtors are deemed to reject any contracts not expressly assumed on the Schedule of Assumed Executory Contracts and

Unexpired Leases.  The Debtors shall have the right to remove any executory contracts and unexpired leases from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date, and any such removed executory contracts and unexpired leases shall be deemed rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court shall be vested in and be fully enforceable by the Reorganized Debtors in accordance with its terms, unless otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease, and except as such terms are modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

### 2.        Indemnification Obligations

On the Effective Date, except as otherwise provided by the Plan, all indemnification provisions, consistent with applicable law and in effect as of the Petition Date, (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed, which assumption shall be irrevocable, and shall survive the Effective Date.

### 3.        Directors and Officers Insurance Policies and Agreements

Pursuant to Article IV.Q of the Plan, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

### 4.        Insurance Policies and Surety Bonds

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the New First Lien Facility Documents, the Confirmation Order, the Claims Bar Date Order, any Claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):  (a) on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Insurance Policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.C of the Plan) and all obligations thereunder, regardless of when they arise; and (b) except as set forth in Article V.C of the Plan, nothing (x) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (y) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a Cure objection or a request, application, Claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Claims or Claims.

Notwithstanding any other provision of the Plan, on the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond provider, including without limitation, obligations under any related indemnity agreements, shall be deemed reaffirmed and shall be continuing obligations of the Reorganized Debtors; (2) all bonded obligations of the Debtors for which such surety bonds secure performance by the Debtors shall be deemed assumed by the Debtors and shall be unimpaired by the Plan or Confirmation Order; and (3) to the extent any of the obligations and commitments set forth in this provision are secured by collateral, such collateral shall remain in place. Nothing in the Plan or Confirmation Order shall be deemed to (1) modify or impair the rights of any party under the Debtors' surety bonds, related indemnity agreements, or applicable law; (2) require any surety bond provider to issue any new surety bonds or extensions or renewals of any surety bonds; or (3) affect the sureties' respective rights (only to the extent such rights exist with respect to the surety bonds, indemnity agreements or under applicable law) to require the Reorganized Debtors to execute and deliver to the Sureties new indemnity agreements containing such new or additional terms as the Sureties may require in their discretion.  Notwithstanding the

33

foregoing, the Debtors and Reorganized Debtors reserve the right to object to the Claims secured by such surety bond and seek to reduce such surety bonds in accordance with the objections.

**5.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Claims Based on Rejection of Executory Contracts and Unexpired Leases**

The Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases (including the proposed Cure Claim amounts) with the Plan Supplement.  Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute between the Debtors and a counterparty to any Executory Contracts or Unexpired Leases that is not resolved between the parties regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date.

The Debtors will cause notices of proposed assumption and proposed Cure Claims to be served by overnight delivery service upon the applicable contract counterparty affected by such notices and by email upon counsel of record for the applicable contract counterparty, if any.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed, served, and actually received by the Debtors no later than fourteen (14) days after service of the notice of proposed assumption and proposed Cure Claims.  Any such objections will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.  To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.  To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.  Notwithstanding the foregoing, all landlords' rights to recover amounts which have accrued or come due between the Cure objection deadline and the effective date of assumption are reserved.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of any one of the following:  (1) amounts listed on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases (if no objections to the Cure Claim is filed within the applicable objection period), (2) amounts agreed to by the Debtors and the applicable counterparty, or (3) amounts as ordered by the Bankruptcy Court; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Effective Date.

**Any Proofs of Claim filed with respect to an Executory Contract, Unexpired Lease, or Insurance Policy that has been assumed pursuant to the provisions of the Plan shall be deemed satisfied upon the Debtors' curing of any and all defaults related thereto, without further notice to or action, order, or approval of the Bankruptcy Court.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

### 6.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

### 7.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 8.      Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, and any agreements entered into with creditors pursuant to the interim and final orders authorizing the Debtors to pay prepetition claims of critical vendors, carriers, warehousemen, and section 503(b)(9) claimants, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 9.      Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

10.    **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## F.    DISTRIBUTIONS ON ACCOUNT OF CLAIMS

1.    **Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Allowed Claims other than Class 5 Claims on the Effective Date on or as soon as practicable after the Initial Distribution Date.

2.    **The Liquidating Trust**

(a)    <u>Formation of the Liquidating Trust</u>

(i)    On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement and become effective for the sole purpose of liquidating and administering the Liquidating Trust Assets and making distributions to holders of Class 5 Claims as provided for under the terms of the Plan in accordance with Treas. Reg. § 301.7701-4(d).

(ii)    The Liquidating Trust shall have a separate existence from the Debtors.  On the Effective Date, the Liquidating Trust Assets shall be deposited into the Liquidating Trust.  The Confirmation Order shall provide that the Reorganized Debtors shall not have a property interest in the Liquidating Trust and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, or other encumbrances granted under the Plan shall not extend to an interest in the funds held in the Liquidating Trust.  The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

(iii)    Subject to, and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court pursuant to, or in furtherance of, the Plan), the Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.   The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

(iv)    The Liquidating Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Liquidating Trust Agreement.

(v)    On the Effective Date, the Liquidating Trustee, on behalf of the Debtors, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan.

*(vi)*    The Liquidating Trust and the Liquidating Trustee will each be a representative of the Estates with respect to the Liquidating Trust Assets under Bankruptcy Code section 1123(b)(3)(B), and the Liquidating Trustee will be the trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Liquidating Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Liquidating Trust Assets.

*(vii)*    On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all title and interest in all of the Liquidating Trust Assets, as well as the rights and powers of each Debtor in such Liquidating Trust Assets, shall automatically vest in the Liquidating Trust, free and clear of all Claims and Interests for the benefit of the Liquidating Trust Beneficiaries. Upon the transfer of the Liquidating Trust Assets, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors and assigns, shall be discharged and released from all liability with respect to the delivery of such distributions and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement.

(b)    <u>The Liquidating Trustee</u>

The Liquidating Trustee will be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate of each of the Debtors appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The duties and powers of the Liquidating Trustee shall include all powers necessary to implement the Plan and to administer the Liquidating Trust Assets, including, without limitation, the duties and powers listed within the Plan. The powers, rights and responsibilities of the Liquidating Trustee will be specified in the Liquidating Trust Agreement. The Liquidating Trustee will have the right and authority, without the need for Bankruptcy Court approval (unless otherwise indicated), to distribute the Liquidating Trust Assets and to carry out and implement other actions in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

(c)    <u>Fees and Expenses of the Liquidating Trust</u>

The Liquidating Trust Expenses will be paid from the Liquidating Trust Assets. The Liquidating Trustee, on behalf of the Liquidating Trust, may, without further order of the Bankruptcy Court, retain third-party professionals to assist in carrying out its duties hereunder and may compensate and reimburse the expenses of these professionals without further order of the Bankruptcy Court from the Liquidating Trust Assets.

(d)    <u>Tax Treatment</u>

The Liquidating Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d), for the benefit of the Holders of Class 5 Claims entitled to distributions, and otherwise as one or more disputed ownership funds within the meaning of Treasury Regulations section 1.468B-9(b)(1). Accordingly, for all federal income tax purposes the transfer of the Liquidating Trust Assets to the Liquidating Trust will be treated as: (a) to the extent of pending payments, a transfer of the pending payments directly from the Debtors to the Holders of such Allowed Claims followed by the transfer of such pending payments

37

by the Holders of Allowed Claims to the Liquidating Trust in exchange for rights to distributions from the Liquidating Trust; and (b) to the extent of amounts that are not pending payments, as a transfer to one or more disputed ownership funds. The Holders of Allowed Claims entitled to distributions will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidating Trust Assets in the amounts of the pending payments and any earnings thereof. The Liquidating Trustee will be required by the Liquidating Trust Agreement to file federal tax returns for the Liquidating Trust as a grantor trust with respect to pending payments and as one or more disputed ownership funds with respect to all other funds or other property held by the Liquidating Trust pursuant to applicable Treasury Regulations, and any income of the Liquidating Trust will be treated as subject to tax on a current basis. The Liquidating Trust Agreement will provide that the Liquidating Trustee will pay such taxes from the Liquidating Trust Assets. The Liquidating Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension upon a finding that such an extension is necessary for the Liquidating Trust to complete its aims.

(e)     Indemnification

The Liquidating Trustee (and each of its agents and professionals) shall be indemnified in accordance with the terms of the Liquidating Trust Agreement.

(f)     Payment

Unless an alternate fee arrangement has been agreed to, the fees and expenses of the Liquidating Trustee, including fees and expenses incurred by professionals retained by the Liquidating Trustee shall be paid from the net proceeds of Liquidating Trust Assets.

3.     **Distributions on Account of Claims Allowed After the Effective Date**

(a)     Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim. Payments to Holders of Allowed General Unsecured Claims shall be made pursuant to the Liquidating Trust.

Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

(b)     Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors or Liquidating Trustee as applicable, shall establish appropriate reserves for potential payment of such Claims.

4.     **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as practicable after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VI of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

5.      **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)      Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

(c)      Delivery of Distributions to Prepetition Term Loan Claims

Except as set forth in Article VI.E of the Plan, the Prepetition Term Loan Agent shall be deemed to be the Holder of all Prepetition Term Loan Claims, including Tranche A-1 Term Loan Claims and Tranche A-2 Term Loan Secured Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition Term Loan Claims shall be made to or on behalf of the Prepetition Term Loan Agent. The Prepetition Term Loan Agent shall hold or direct such distributions for the benefit of the Holders of Prepetition Term Loan Claims, as applicable. As soon as practicable following compliance with the requirements set forth in this Article VI of the Plan, the Prepetition Term Loan Agent shall arrange to deliver or direct the delivery of such distributions for which it is the deemed Holder to or on behalf of such Holders of Allowed Term Loan Claims. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition Term Loan Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Term Loan Agent.

(d)      Distributions by Distribution Agents (if any)

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors, the Reorganized Debtors and/or the Liquidating Trust, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety bond, or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable.

The Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors, the Reorganized Debtors, or the Liquidating Trust as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, deem to be unreasonable. In the event that the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice,

the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(e)     <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, the Reorganized Debtors or the Liquidating Trust, as applicable, shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a dollar or fractional share of New Common Units under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Units (up or down), with half dollars and half shares of New Common Units or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value of less than $10, which shall be treated as an undeliverable distribution under Article VI.E of the Plan.

(f)     <u>Undeliverable Distributions</u>

(i)     <i>Holding of Certain Undeliverable Distributions</i>

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors or the Liquidating Trust, as applicable (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, or the Liquidating Trust, as applicable (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Liquidating Trust, as applicable, subject to Article VI.E of the Plan, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(ii)     <i>Failure to Claim Undeliverable Distributions</i>

No later than 120 days after the Effective Date, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors or the Liquidating Trustee, as applicable, for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors or the Liquidating Trust, as applicable, of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or the Liquidating Trust, as applicable, or their property.

In such cases, (i) any Cash or New Common Units held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  For the avoidance of doubt, any undeliverable distributions out of the Liquidating Trust shall be returned to the Liquidating Trust and will not go to the Reorganized Debtors.  Nothing contained herein shall require the Reorganized Debtors or the Liquidating Trust, as applicable, to attempt to locate any Holder of an Allowed Claim.

40

(iii)     *Failure to Present Checks*

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors or the Liquidating Trustee, as applicable, for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors or the Liquidating Trust, as applicable, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

**6.    Compliance with Withholding and Reporting Tax Requirements/Allocations**

(a)    <u>Withholding Rights</u>

In connection with the Plan, any party issuing any instrument or making any Distributions described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Moreover, the Reorganized Debtors or the Liquidating Trustee, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

(b)    <u>Forms</u>

Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Liquidating Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8. If such request is made by the Liquidating Trustee, the Disbursing Agent, or such other Entity designated by the Liquidating Trustee or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of Distribution, the amount of such Distribution shall irrevocably revert to the applicable Liquidating Trustee and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Liquidating Trustee or its respective property.

41

(c)      Allocation of Distributions between Principal and Interest

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

**7.      Setoffs**

Subject to Article IV of the Plan, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim.  In the event that any Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors or the Liquidating Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, of any such Claims, Equity Interests, rights, and Causes of Action that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable may possess against any such Holder, except as specifically provided herein.

**8.      Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Petition Date.

**9.      Claims Paid or Payable by Third Parties**

(a)      Claims Paid by Third Parties

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor or the Liquidating Trust.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution from the Debtors, Reorganized Debtors or the Liquidating Trust, as applicable, on account of such Claim and also receives payment from a party that is not a Debtor, a Reorganized Debtor or the Liquidating Trust on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Liquidating Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.

If the Debtors become aware of the payment by a third party, the Debtors, Reorganized Debtors or the Liquidating Trustee, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

(c)      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including any insurer(s) under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the Insurance Policies.

## G.      RESOLUTION OF CONTINGENT, UNLIQUIDATED, OR DISPUTED CLAIMS

### 1.      Allowance of Claims

After the Effective Date, the Reorganized Debtors or the Liquidating Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately before the Effective Date.

### 2.      Claims Administration Responsibilities

Subject to the Liquidating Trust Agreement, and except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors or the Liquidating Trust, as applicable, shall have the authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

The Reorganized Debtors shall not consent or agree to the allowance or reclassification of any Claim as a Class 5 (General Unsecured Claim) without the prior written consent of the Liquidating Trust or order of the Bankruptcy Court.

### 3.      Estimation of Claims

Before or after the Effective Date, the Debtors, Reorganized Debtors, or Liquidating Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### 4. Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any such Claim or Interest that has been cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 5. Time to File Objections to Claims

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

### 6. Disallowance of Claims

All Claims filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

### 7. No Distribution Pending Allowance

If an objection to a Claim or portion thereof is filed as set forth in Article VII.E of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### 8. Distribution After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

## H. THE DEBTOR RELEASE, THIRD-PARTY RELEASE, INJUNCTION, AND EXCULPATION

### 1. Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

2.        **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

3.        **Discharge of Claims and Termination of Equity Interests**

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

4.        **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

5.        **Debtor Release**[12]

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate**

---

[12] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action belonging to the Estates is ongoing.  The releases by the Debtors are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any such Claims and Causes of Action pending completion of the Insider Investigation.

representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Canadian Proceedings, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan.

Notwithstanding anything to the contrary herein, the "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor:  (1) arising under any contract, instrument, agreement, release, or document delivered pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.

The parties acknowledge that the compromise and release of direct and estate causes of action against the Released Parties under the Plan results in the distributions available to unsecured creditors.

Any claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 551 and 553(b) of the Bankruptcy Code, shall be retained by the Reorganized Debtors except to the extent expressly released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

6.    **Third-Party Release**[13]

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties as defined in the Plan (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract,

---

[13] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing.  The releases by the Releasing Parties are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any Claims and Causes of Action pending completion of the Insider Investigation.

violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from or in, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Canadian Proceedings, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Third-Party Release against any of the Released Parties.

7.    Exculpation[14]

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement, or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases or the Canadian Proceedings, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing, and/or effecting the DIP Documents, the Disclosure Statement, and the Plan (including the Plan Supplement and any related contract, instrument, release, or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan; and/or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its respective duties under, pursuant to, or in connection with, the Plan.

---

[14] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any Claims or Causes of Action pending completion of the Insider Investigation.

**8.    Injunction**

The satisfaction, release, and discharge pursuant to Article IX of the Plan shall also act as an injunction against any Person commencing any action, employment of process or act to collect, offset, or recover any claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

**9.    No Release of Any Claims Held by the United States**

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

## I.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 1.    Modification of Plan

Subject to the limitations contained in the Plan:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon the order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## J.      IMPORTANT SECURITIES LAW DISCLOSURE

### 1.      General Disclosure

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan of the New Common Units will be exempt from registration under the Securities Act and Blue Sky Laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.  Accordingly, such New Common Units may be resold without registration under the Securities Act, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code. In addition, such New Common Units governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective securities laws of those states; however, the availability of such exemptions cannot be known unless individual Blue Sky Laws are examined.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a Claim or Interest;

- offers to sell securities offered under a plan of reorganization for the Holders of those securities;

- offers to buy those securities from the Holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.  You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtors' or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Units issued to Holders deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of such New Common Units who are deemed to be "underwriters" may be entitled to resell their New Common Units pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to such New Common Units would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Units issued to Holders and, in turn, whether any Person may freely resell such New Common Units.

### 2.        Management Incentive Plan

Pursuant to the Plan, promptly on or as soon as practicable after the Effective Date, the New Board will adopt and implement the Management Incentive Plan, the terms of which shall be approved by the New Board.  The New Board will determine the number of New Incentive Units to be available for award under the Management Incentive Plan and the allocation of New Incentive Units, if any.

PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

# V.
## VALUATION AND FINANCIAL PROJECTIONS

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE OF THE NEW COMMON UNITS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

## A.       ESTIMATION OF PAYLESS' ENTERPRISE VALUE

In connection with developing the Plan, the Debtors directed Solomon to perform various indicative financial analyses to assess the estimated enterprise value of Payless on a going-concern basis upon emergence from chapter 11 pursuant to the Plan.  A summary of Solomon's estimation of Payless' enterprise value is attached hereto as **Exhibit F** (the "Estimation of Payless' Enterprise Value").

The Estimation of Payless' Enterprise Value is subject to various important qualifiers and assumptions that are set forth in **Exhibit F**.

## B.       FINANCIAL PROJECTIONS

As discussed more fully in Article VII.A.5 herein, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "feasibility" standard, the Debtors, with the assistance of Ankura, prepared the financial projections for the fiscal years of 2019 through 2021 set forth on **Exhibit D** (the "Financial Projections").  In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will operate a successful business with sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are subject to various important qualifiers and assumptions that are set forth in the Financial Projections.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.**

**The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.**

## C.       LIQUIDATION ANALYSIS

As discussed more fully in Article VII.A.4, hereof, the Debtors believe that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "best interest" test, the Debtors, with the assistance of Solomon and Ankura, prepared the Liquidation Analysis attached here to as **Exhibit E** (the "Liquidation Analysis").  In general, as illustrated by the Liquidation Analysis, the Debtors believe that the Plan provides all Holders of a Claim or Interest property of a value that is equal to or greater than such Holder would receive in a liquidation.

The Liquidation Analysis is subject to various important qualifiers and assumptions that are set forth in the Liquidation Analysis.

**VI.**
**SOLICITATION AND VOTING PROCEDURES**

On [October__], 2019, the Bankruptcy Court entered the Disclosure Statement Order by which the Bankruptcy Court approved, among other things, procedures and documents for the solicitation of acceptances on the Plan, certain key dates and deadlines relating to the voting and Confirmation and procedures for tabulating votes. For purposes of this Article VI, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  The procedures and instructions for voting on the Plan are set forth in the exhibits annexed to the Disclosure Statement Order.  The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

**This discussion of the Solicitation and Voting PROCESS is a summary**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED AS **EXHIBIT c**
FOR A MORE COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

**1.**      **Solicitation Packages**

Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (the "General Solicitation Package"), including:

- a copy of the Solicitation Procedures;

- the Confirmation Hearing Notice;

- a cover letter, describing the contents of the General Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- an appropriate form of Ballot for Holders of Claims;

- the approved Disclosure Statement (with all exhibits attached thereto, including the Plan and the exhibits attached thereto); and

- a letter from the Creditors' Committee with a recommendation on how unsecured creditors should vote on the Plan.

The Solicitation Packages will provide the Disclosure Statement and Plan in electronic format (*i.e.*, CD ROM or flash drive) and all other contents of the Solicitation Packages, including Ballots, in paper format.  Any Holder of a Claim or Interest may obtain, at no charge, a paper copy of the documents otherwise provided by (a) accessing Prime Clerk's website at https://cases.primeclerk.com/pss.

**2.**      **Voting Rights**

**Classes Entitled to Vote**.  Under the provisions of the Bankruptcy Code, not all Holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3, 4 and 5 (the "Voting Classes") because Holders of Claims in the Voting Classes are Impaired under the Plan and, may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  If your Claim or Interest is not included in one of these Classes, you are not entitled to vote and you will not receive a Solicitation Package.

Each of the Voting Classes will have accepted the Plan if:  (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan; and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan.  Additionally, if Prime Clerk receives no votes to accept or reject the Plan with respect to any particular Class of Claims, the Debtors may seek to deem such class as having accepted the Plan.

52

The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 3 | Tranche A-1 Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Tranche A-2 Term Loan Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |

**Classes not Entitled to Vote**.  Under the Bankruptcy Code, Holders of Claims or Interests are not entitled to vote if such Claims or Interests are Unimpaired under the Plan or if they will receive no distribution of property under the Plan.  Based on this standard, the following Classes of Claims and Interests for each Debtor, as applicable, will not be entitled to vote on the Plan and the Holders of such Claims and Interests will not be solicited to vote on the Plan.

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Impaired | Deemed to Accept |
| 7 | Existing Equity Interests in Payless | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Deemed to Accept |

3.      **Record Date**

**The Record Date is August 30, 2019 for all Claims filed before such date, or, for any Claims filed after such date, the Claims Bar Date**.  This means that it will be determined (a) which Holders of Claims in Classes 3, 4 and 5 are entitled to vote to accept or reject the Plan and (b) whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim by the Record Date.

4.      **Voting Deadline**

**The Voting Deadline is 4:00 p.m. prevailing Central Time on [October 14, 2019]**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that each Ballot is *actually received* on or before the Voting Deadline by either the Noticing and Claims Agent or the Solicitation and Subscription Agent at the applicable address:

**Payless Balloting Center**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite #1440**
**New York NY 10165**

5.      **Ballots Not Counted**

**The following Ballots will not be counted toward Confirmation of the Plan:**  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or transmitted by facsimile or other electronic means; (b) any Ballot cast by an entity that is not entitled to vote on the Plan; (c) any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (d) any Ballot cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (e) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Noticing and Claims Agent), the Indenture Trustee or the Debtors' financial or legal advisors; (e) any unsigned Ballot; or (f) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICING AND CLAIMS AGENT OR THE SOLICITATION AND SUBSCRIPTION AGENT, AS APPLICABLE.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

# VII.
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

**1.   Confirmation Hearing**

**The Confirmation Hearing is scheduled to commence on [October [X], 2019], at 10:00 a.m. prevailing Central Time**.  The Confirmation Hearing will be held before the Honorable Kathy A. Surratt-States, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Missouri, Thomas F. Eagleton U.S. Courthouse, 111 S. 10th Street, 4th Floor, Courtroom 7 North, St. Louis, MO 63102.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice.  Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [October [X], 2019], at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing, attached to the Disclosure Statement Order as **Exhibit 2** and incorporated herein by reference.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

**The "Plan Objection Deadline" is 4:00 p.m. prevailing Central Time on [October [X], 2019]**.  This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served on all parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002, so as to be *actually received* on or before the Plan Objection Deadline by such parties.

**2.   Effect of Confirmation**

Following Confirmation, subject to Article VIII of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.  **Additionally, for a more detailed description of the provisions set forth in Article IX of the Plan, please refer to Section IV.I herein.**

**PLEASE TAKE NOTICE that, the "Third-Party Release"[15] set forth in Article IX.F of the Plan is a consensual release as to most of the Released Parties.  The Releasing Parties are bound by the "Third-Party Release" pursuant to Article IX.F of the Plan.  "Releasing Parties" means, collectively, (a) the Debtors, (b) the DIP Lenders, (c) the DIP Agents, [(d) the Prepetition Term Loan Lenders and Prepetition Term Loan Agent] (e) the Prepetition ABL Credit Facility Lenders and Wells Fargo, (f) all Holders of Claims and Interests that are deemed unimpaired and presumed to accept the Plan, (g) all Holders of Claims who either (1) vote to accept or (2) receive a Ballot providing them the right to opt out of any applicable releases but abstain from voting on the Plan or otherwise do not elect pursuant to such Ballot to opt out of the Third-Party Release, (h) all Holders of Claims and Interests who are not entitled to vote on the Plan but receive a notice advising them of their ability to opt out of the Third-Party Release but who do not elect to opt out of the Third-Party Release, (i) all other Holders of Claims and Interests to the maximum extent permitted by law, and (j) with respect to the Debtors, the Reorganized Debtors, and each of the Entities in clauses (a) through (i), each such Entity's current and former Affiliates, and each such Entity's and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and each of the foregoing Entities in clauses (a) through (k), each such Entity's current and former Affiliates, and each such Entity's and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity Holders**

---

[15] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing. The Releases by the Releasing Parties are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any Claims or Causes of Action pending the outcome of the Insider Investigation.

(regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

### 3.      Confirmation Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- With respect to each Class, each Holder of a Claim or an Equity Interest in the Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value that is not less than the amount that the Holder would receive or retain if the Debtors liquidated under chapter 7.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### 4.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the Holder would receive or retain if the debtors liquidated under chapter 7.

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit E**.

Thus, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

### 5.    Feasibility Requirements

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization). To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared certain Financial Projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit D**. These Financial Projections relate to the expected performance of the Reorganized Debtors under the Plan. Based on these Financial Projections and the fact that the Debtors will have sufficient funds upon Confirmation to make all payments required under the Plan, the Debtors believe that the deleveraging contemplated by the Plan meets the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 6.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims and Interests in Classes 6 and 8 are deemed to have accepted the Plan. Holders of Claims and Interests in Class 7 are deemed to have rejected the Plan.

Claims in Classes 3, 4, and 5 are Impaired under the Plan, and, as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 7. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided, however*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

### (a) No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (b) Fair and Equitable

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan:

- **Secured Claims.**  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- **Unsecured Claims.**  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

- **Equity Interests.**  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property;

## B.    CONDITIONS FOR CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with the Article VIII.A-B of the Plan, including:

- The Bankruptcy Court shall have approved this Disclosure Statement as containing adequate information with respect to the Plan within the meaning of Bankruptcy Code section 1125.

- The Confirmation Order shall have been entered and become a Final Order.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing, and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan.

- The Definitive Documents must be, in form and substance, reasonably acceptable to the Debtors.

- All documents and agreements necessary to implement the Plan, shall have (a) been tendered for delivery and (b) been effected or executed.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, and the commitment fees described in Article IV.H of the Plan shall have been paid.

- All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

- The Professional Fee Escrow Account shall have been established and funded.

- The Liquidating Trust Agreement has been executed.

- To the extent necessary, an order of the Canadian Proceedings shall have been obtained, in form and reasonably satisfactory to the Debtors and the Canadian Debtors, permitting the treatment of the Intercompany Claims set out herein with respect to the Canadian Debtors.

59

### C.        ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

#### 1.        Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section VII.A herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets, and (iv) major tax liabilities that result from taxable income recognized due to excess loss accounts, as discussed below in "IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – B. Consequences to the Debtors and Reorganized Debtors – 3. Excess Loss Accounts"

#### 2.        Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors. In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in New Common Units (if issued).

## VIII.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  WHILE NUMEROUS, THESE RISK FACTORS SHOULD NOT BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN.

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### A.    RISKS RELATING TO CONFIRMATION OF THE PLAN

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### 3.    Nonconsensual Confirmation

In the event that any impaired class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Equity Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### 5. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection.  Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gave the Debtors the exclusive right to propose the Plan and prohibited creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to

priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**8.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**9.      Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations.  All of the releases, injunctions, and exculpations provided in the Plan, if any, are subject to objection by parties in interest and may not be approved.  If they are not approved, the Plan may lose the support of certain parties and likely cannot be confirmed and likely cannot go effective.  Moreover, the Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing.  The releases and exculpation set forth in the Plan are subject to the conclusion of that investigation and determination with respect to any potential Claims or Causes of Action belonging to the Estates, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any such Claims or Causes of Action pending completion of the Insider Investigation.

**B.      RISKS RELATING TO RECOVERIES UNDER THE PLAN**

**1.      The Recovery to Holders of Allowed Claims Cannnot be Stated With Absolute Certainty.**

This Disclosure Statement contains various projections concerning the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control.  Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.  Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

Further, because the Claims Bar Date has not yet occurred, the Claims estimates set forth herein are based on various assumptions and the best information available to the Debtors at this time.  Accordingly, they are estimates.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect.  Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely.  Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

2.        **Risk of Non-Occurrence of the Effective Date**

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Article VIII.B of the Plan, including, among others, those relating to Consummation of the Plan, as well as the receipt of certain regulatory approvals.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

## C.        RISKS RELATING TO THE DEBTORS' BUSINESSES

1.        **Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.**

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

2.        **The Value of New Common Units Cannot Be Stated With Absolute Certainty.**

Despite the Debtors' best efforts to value the New Common Units, various uncertainties, including market conditions, the Debtors' inability to implement their business plan, and lack of a market for the New Common Units may cause fluctuations or variations in value of the New Common Units not fully accounted for herein.

In addition, the value of the New Common Units may be impacted by changes to the Reorganized Debtors' post-emergence capital structure.

3.        **The Chapter 11 Cases May Affect the Tax Liability of Reorganized Debtors.**

In connection with the Debtors' emergence from these Chapter 11 Cases, it is likely that the Debtors' tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to limitation under Sections 382 and 383 of the IRC.

4.        **The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes**

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years.  As of the tax year ending February 2, 2019, the Debtors had approximately $251 million of U.S. federal NOLs, $341 million of U.S. state NOLs, $88 million of federal tax credits, and $48 million of 163(j) Deductions.  The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions.  In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the IRC or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions.  In addition, if the Debtors experience an "ownership change," as defined in section 382 of the IRC, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5% or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the IRC, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to annual limitation.

The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced, eliminated, or limited in connection with the restructuring transactions, through a combination of one or more of the above factors.

5.      **The Reorganized Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors.  In the future, the Reorganized Debtors may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such ligation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

6.      **The Debtors May Not Perform in Accordance with the Financial Projections**

As set forth in **Exhibit D**, the Financial Projections are inherently subject to risks and uncertainties.  Such risk factors, many of which are beyond the control of the Company, could cause actual results to differ materially from the Financial Projections.  A material deviation from the Financial Projections may have a negative impact on the Debtors' ongoing business performance.  If the Debtors do not achieve the projected levels of same store sales, they may have inadequate capital to operate their business and service their debt during the periods covered by the Financial Projections, and there could be a need for further restructuring.

7.      **Changes in U.S. Trade Policy, Including the Imposition of Tariffs and the Resulting Consequences, May Have a Material Adverse Impact on the Debtors' Business and Results of Operations**

The Debtors rely on manufacturers located in foreign countries, including China, for significant amounts of merchandise.  The Debtors' business may be materially adversely affected by risks associated with international trade, including the impact of tariffs recently imposed by the U.S. with respect to certain consumer goods imported from China.

Global sourcing of many of the products sold by the Debtors is an important factor in driving higher operating profit.  During 2018, the Debtors purchased approximately 70% of their products directly from overseas vendors, including 28% from vendors located in China.  Additionally a significant amount of the Debtors' merchandise is manufactured abroad.  The Debtors' ability to identify qualified vendors and to access products in a timely and efficient manner is a significant challenge, especially with respect to goods sourced outside the U.S.  Global sourcing and foreign trade involve numerous risks and uncertainties beyond the Debtors' control, including increased shipping costs, increased import duties, more restrictive quotas, loss of most favored nation trading status, currency and exchange rate fluctuations, work stoppages, transportation delays, economic uncertainties such as inflation, foreign government regulations, political unrest and protests, natural disasters, war, terrorism, trade restrictions and tariffs (including retaliation by the U.S. against foreign practices or by foreign countries against U.S. practices), the financial stability of vendors, or merchandise quality issues.  U.S. policy on trade restriction is ever-changing and may result in new laws, regulations or treaties that increase the costs of importing goods and/or limit the scope of available foreign vendors.  These and other issues affecting the Debtors' international venders could materially adversely affect the Debtors' business and financial performance.

On March 22, 2018, President Trump, pursuant to section 301 of the Trade Act of 1974, directed the U.S. Trade Representative ("USTR") to impose tariffs on $50 billion worth of imports from China.  On June 15, 2018, the USTR announced its intention to impose an incremental tariff of 25% on $50 billion worth of imports from China comprised of (1) 818 product lines valued at $34 billion ("List 1") and (2) 284 additional product lines valued at $16 billion ("List 2").  The List 1 tariffs went into effect on July 6, 2018 and the List 2 tariffs went into effect on August 23, 2018 (with respect to 279 of the 284 originally targeted product lines).  On July 10, 2018, the USTR announced its intention to impose an incremental tariff of 10% on another $200 billion worth of imports from China comprised of 6,031 additional product lines ("List 3") following the completion of a public notice and comment

period.  On August 1, 2018, President Trump instructed the USTR to consider increasing the tariff on the List 3 products from 10% to 25%.  On September 17, 2018, the USTR released the final List 3 covering 5,745 full or partial lines of the 6,031 originally targeted product lines and announced that the List 3 tariffs will be implemented in two phases.  On September 24, 2018, a 10% incremental tariff went into effect with respect to the List 3 products.  The List 3 tariff was scheduled to increase to 25% on January 1, 2019.  However, on December 1, 2018, there was a delay in the implementation of the List 3 tariff increase until March 1, 2019, to allow Chinese and U.S. leaders to begin negotiations on various policy issues.  On March 5, 2019, the USTR further delayed the implementation of List 3 tariff increase until further notice.  The List 3 tariffs increased to 25% on May 10, 2019.  On May 17, 2019, USTR announced its intention to impose additional ad valorem tariffs of up to 25% on approximately $300 billion worth of imports of products of China comprised of 3,805 full and partial tariff subheadings ("List 4") following the completion of a public notice and comment period.  List 4 covers essentially all products not currently covered by Lists 1, 2 and 3, but excludes pharmaceuticals, certain pharmaceutical inputs, select medical goods, rare earth materials, and critical minerals.  President Trump has stated that the tariffs on List 4 will go into effect on September 1, 2019.

Certain of the Debtors' products and components of the Debtors' products that are imported from China are currently included in the product lines subject to the tariffs currently in effect or proposed.  As a result, the Debtors are evaluating the potential impact of the tariffs currently in effect or proposed on their supply chain, costs, sales and profitability and are considering strategies to mitigate such impact, including reviewing sourcing options, filing requests for exclusion from the tariffs with the USTR for certain product lines and working with the Debtors' vendors and merchants.  Given the uncertainty regarding the scope and duration of the tariffs, as well as the potential for additional trade actions by the U.S. or other countries, the impact on the Debtors' operations and results is uncertain and could be significant.  The Debtors can provide no assurance that any strategies the Debtors implement to mitigate the impact of such tariffs or other trade actions will be successful.  To the extent that the Debtors' supply chain, costs, sales or profitability are negatively affected by the tariffs or other trade actions, the Debtors' business, financial condition and results of operations may be materially adversely affected.

8.  **The Debtors' Business is Subject to the Risks of International Operations**

The Debtors have material international operations.  Compliance with applicable U.S. and foreign laws and regulations, such as import and export requirements, anti-corruption laws, tax laws, foreign exchange controls and cash repatriation restrictions, data privacy and data localization requirements, environmental laws, labor laws and anti-competition regulations, increases the costs of doing business in foreign jurisdictions.  Although the Debtors have implemented policies and procedures to comply with these laws and regulations, a violation by the Debtors' employees, contractors or agents could nevertheless occur.  In some cases, compliance with the laws and regulations of one country could violate the laws and regulations of another country.  Violations of these laws and regulations could materially adversely affect the Debtors' brand, international growth efforts and business.  The Debtors also could be significantly affected by other risks associated with international activities including, but not limited to, economic and labor conditions, increased duties, taxes and other costs, political instability, protests, and unrest, and international trade disputes.

9.  **The Debtors Rely on Third Parties to Manufacture and Distribute Their Products**

The Debtors depend on third party manufacturers to manufacture the merchandise that they sell.  If these manufacturers are unable to secure sufficient supplies of raw materials, produce products that meet the Debtors' quality standards or maintain adequate manufacturing and shipping capacity, they may be unable to provide the Debtors with timely delivery of products.  In addition, if the prices charged by these third parties increase for reasons such as increases in the price of raw materials, increases in labor costs or currency fluctuations, the Debtors' cost of manufacturing would increase, adversely affecting their results of operations.  The Debtors also depend on third parties to transport and deliver their products.  Due to the fact that the Debtors do not have any independent transportation or delivery capabilities of their own, if these third parties are unable to transport or deliver the Debtors' products for any reason, or if they increase the price of their services, the Debtors' operations and financial performance would be adversely affected.

**Holders of Claims should carefully review Article IX hereof, to determine how the tax implications of the Chapter 11 Cases and treatment of Allowed Claims under the Plan could adversely affect the Reorganized Debtors and such Holders.**

D.    **DISCLOSURE STATEMENT DISCLAIMER**

1.    **No Representations Made Outside this Disclosure Statement Are Authorized.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the United States Trustee.

2.    **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Common Units under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Units or any shares reserved for issuance under the Management Equity Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 701 promulgated under the Securities Act, or a "no sale" under the Securities Act as described herein.

3.    **The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.**

The Debtors have used their reasonable business judgment to ensure the accuracy of the information, including financial information, provided in this Disclosure Statement, the Plan and related documents. Nonetheless, the Debtors cannot, and do not, confirm the current accuracy of every statement appearing in this Disclosure Statement.

Statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. **Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

4.    **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or

Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.        No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.  The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

**IX.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.    BRIEF OVERVIEW AND DISCLOSURE**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the U.S. Internal Revenue Service (the "IRS") and any other published administrative rules and pronouncements of the IRS, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations of applicable tax law may have retroactive effect and could significantly affect the U.S. federal income tax consequences describe below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the IRC, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or who will hold the New Common Units or the New First Lien Term Loan Facility, as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the IRC).  This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.  For the avoidance of doubt, this summary does not discuss the treatment of the receipt of the New Incentive Units pursuant to the Management Incentive Plan.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the IRC) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).  In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax

treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.  If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

The following discussion assumes that each Holder of a Claim holds its Claim as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.    CONSEQUENCES TO THE DEBTORS AND REORGANIZED DEBTORS**

**1.    Cancellation of Indebtedness Income and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the adjusted issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.  The amount of COD Income, if any, and, accordingly, the amount of tax attributes required to be reduced, will depend on the fair market value (or, in the case of debt instruments, the adjusted issue price) of various forms of consideration to be received by Holders of Claims under the Plan.  These amounts cannot be known with certainty until after the Effective Date and, as a result, the total amount of attribute reduction as a result of the Plan cannot be determined until after the Effective Date.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, as would be the case if the Plan were approved.  Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs") and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtor remains subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC**,** though it has not been determined whether the Debtors would make this election.  The applicable Treasury Regulations do not currently treat the carryforward of disallowed interest deductions under section 163(j) of the IRC as subject to attribute reduction.  Except as provided below in "3. Excess Loss Accounts", any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In the context of an affiliated group of corporations filing a consolidated return, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.  Treasury Regulations applicable to an affiliated group of corporations, like the Debtors, provide that the tax attributes of each member that is excluding COD Income are first subject to reduction before reducing tax attributes of other members of such group.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

Because the Plan provides that Holders of certain Claims will receive shares of the New Common Units, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the

70

fair market value (or, in the case of debt instruments, the adjusted issue price) of various forms of consideration to be received by Holders of Claims under the Plan.  These amounts cannot be known with certainty until after the Effective Date and, as a result, the total amount of attribute reduction as a result of the Plan cannot be determined until after the Effective Date.  Following this reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, they may not have NOL carryforwards remaining after emergence from chapter 11, but will have other significant tax attributes remaining.

### 2.       Limitation of NOL Carryforwards and Other Tax Attributes

As of the tax year ending February 2, 2019, the Debtors had approximately $251 million of U.S. federal NOLs, $341 million of U.S. state NOLs, $88 million of federal tax credits, and $48 million of interest deductions that have been deferred under section 163(j) of the Tax Code (the "163(j) Deductions").  After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

Under the transactions contemplated by the Plan, the Debtors would not be expected to recognize any taxable gain or loss as a result of the implementation of the Plan.  Subject to the discussion above regarding attribute reduction as a result of COD Income, and the discussion below regarding excess loss accounts, the Debtors' tax basis in their assets would remain unchanged.  Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the IRC.

Under Section 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Units pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### (a)       General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 2.31% for August 2019).  If the Debtors are in a net unrealized built in gain position, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Units, along with the cancellation of Existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective

71

Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

    (b)   Special Bankruptcy Exceptions

    Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  One exception to the foregoing annual limitation rules generally applies when shareholders and so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of a debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOL carryforwards would be reduced by the amount of any interest deductions claimed during any taxable year ending during the three taxable years period preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after the Effective Date, then the debtor's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

    Where the 382(l)(5) Exception is not applicable (either because a debtor does not qualify for it or a debtor otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This calculation differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under the 382(l)(6) Exception, the debtor corporation is not required to reduce its NOL carryforwards by interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the effective elimination of its Pre-Change Losses (rather, the resulting limitation would be determined under the regular rules for ownership changes).

    Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of any Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

    The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

    **3.**    **Excess Loss Accounts**

    Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary.  In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)-(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes.  The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration.  Alternatively, if a corporation sells the stock of a subsidiary in which it has an excess loss account, its taxable gain recognized on the disposition will be increased by such amount.  It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor.  In that case, the Debtors will

recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account.

Similarly, in the event that a subsidiary within a an affiliated group is owed a debt (whether evidenced by a note or an intercompany account), and all or part of the debt is forgiven, it generally would be treated as a constructive distribution, which would have the effect of reducing the basis (or increasing the excess loss account) of the immediate parent corporation in the subsidiary. In the event that such debt is not forgiven, but the creditor subsidiary liquidates without the obligation being satisfied or, under the facts, suffers a *de facto* liquidation (such as by becoming dormant, not having meaningful assets, or no longer conducting any meaningful business).

The immediate corporate parents of several U.S. subsidiaries within the Debtors' affiliated group have excess loss accounts and/or owe significant intercompany balances to the subsidiaries, largely due to distributions or advances made prior to the Prior Cases. The proposed Plan contemplates continued business operations integral to the overall business of Debtors by the subsidiaries for which there are excess loss accounts. Accordingly, the Debtors believe that any material excess loss accounts should not be triggered in the proposed restructuring under the Plan. In the event of an actual or de facto liquidation of these subsidiaries, very large tax liabilities would result, and, could prevent confirmation of the proposed Plan. If the Plan were to be converted to Chapter 7, those excess loss accounts would be recognized and recoveries to unsecured creditors would be reduced by the amount of such tax liabilities.

### 4. Transfer of Assets to a Liquidating Trust

Pursuant to the Plan, on or before the Effective Date, a Liquidating Trust will be established for the sole purpose of liquidating and administering the Liquidating Trust Assets and making distributions to holders of Class 5 Claims in accordance with Treasury Regulations Section 301.7701-4(d). On the Effective Date, all of the Liquidating Trust Assets of the holders of Class 5 Claims will be transferred to the Liquidating Trust. For U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust generally is treated as equivalent to a sale of the assets at then fair market value. *See* Section E.—"Tax Treatment of the Liquidating Trusts and Holders of Beneficial Interests Therein," below.

Although the Debtors may recognize taxable income in connection with the transfer of the Liquidating Trust Assets to the Liquidating Trust and their liquidation (which is intended to occur prior to December 31, 2019), the Debtors expect to have sufficient available NOLs and/or other tax attributes to avoid any meaningful U.S. federal, state, local or foreign income tax liability.

### 5. Other Income and Uncertainty of Debtors' Tax Treatment

No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

## C. CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes.

Neither the IRC nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the available collateral, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of

73

interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Note that the Tranche A-2 Term Loan has a term of exactly five years, and thus might be eligible for treatment as a "security."  **Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Tranche A-1 Term Loan Claims or Tranche A-2 Term Loan Secured Claims as "securities" for U.S. federal income tax purposes.**

       **1.**      **U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Prepetition Term Loan Claims**

Pursuant to the Plan, each U.S. Holder of a Tranche A-1 Term Loan Claim shall be paid [%] of its Allowed Tranche A-1 Term Loan Claim in Cash.  Each U.S. Holder of a Tranche A-2 Term Loan Secured Claim shall receive its *pro rata* share of 100% of the New Common Units.

       (a)      <u>Exchange of an Allowed Prepetition Tranche A-2 Term Loan Secured Claim for New Common Units</u>

If the Tranche A-2 Term Loan Secured Claim qualifies as a "security" of Payless, then the U.S. Holder of this Claim should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize no gain or loss upon receipt of the New Common Units.  The U.S. Holder should obtain a tax basis in the New Common Units equal to the adjusted tax basis of the U.S. Holders' exchanged Claim.  The holding period for New Common Units received should include the holding period for the exchanged Claim.

If the Tranche A-2 Term Loan Secured Claim does not constitute a "security," then the U.S. Holder of this Claim will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair value of the New Common Units received and (b) the U.S. Holder's adjusted tax basis in its Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" (as discussed below) and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The holding period for the New Common Units received should begin on the day following the Effective Date.  Subject to the rules regarding accrued but untaxed interest, the U.S. Holder should obtain a tax basis in the New Common Units equal to the fair market value of the New Common Units.

       (b)      <u>Exchange an Allowed Prepetition Tranche A-1 Term Loan Claim for Cash</u>

For Tranche A-1 Term Loan Claims such exchanges should be treated as a taxable exchange under Section 1001 of the IRC.  The U.S. Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the U.S. Holder's adjusted tax basis in its claim.  Such gain or loss should be capital in character (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Tranche A-1 Term Loan Claim were held for more than one year.  To the extent that a portion of the Tranche A-1 Term Loan Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income.  See "Accrued Interest" below.

       **2.**      **Holders of Allowed General Unsecured Claims**

Pursuant to the Plan, each U.S. Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the Liquidating Trust, as further described above.  In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed General Unsecured Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest or original issue discount ("<u>OID</u>")) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but

unpaid interest or accrued OID previously included in the holder's taxable income).  Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trusts (including holders of Allowed General Unsecured Claims receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.  To the extent that a portion of the Allowed General Unsecured Claim, as applicable, is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income.  See "Accrued Interest" below.

In the event of the subsequent disallowance of any Disputed General Unsecured Claim or the reallocation of undeliverable distributions, it is possible that a holder of a previously Allowed Claim may receive additional distributions in respect of its Claim.  Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are Allowed or Disallowed.  Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received.  *See also* Section C.3.—"Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein – Tax Reporting for Assets Allocable to Disputed Claims," below.

After the Effective Date, a holder's share of any collections received on the assets of the Liquidating Trust (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed General Unsecured Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year.  Each holder of an Allowed General Unsecured Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.  The character of any gain or loss depends on, among other things, the origin of the holder's Allowed General Unsecured Claim, when the holder receives payment in respect of such Allowed General Unsecured Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Allowed General Unsecured Claim at a discount, whether the holder has taken a bad debt deduction with respect to such Allowed General Unsecured Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will equal the fair market value of such interest increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and a holder's holding period generally will begin the day following establishment of the Liquidating Trust.

**3.      Issue Price**

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date.  In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

**4.      Accrued Interest**

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but untaxed interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income for U.S. federal income

tax purposes.  Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

**5.      Market Discount**

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC.  This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018.  However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain.  Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes.  U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

**6.      Medicare Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

7.       **Limitations on Use of Capital Losses**

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in other tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

8.       **U.S. Federal Income Tax Consequences to U.S. Holder Regarding Owning and Disposing of New Common Units**

(a)       Ownership and Disposition of New Common Units

(i)       *Dividends on New Common Units*

Any distributions made on account of the New Common Units will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Common Units, as determined under U.S. federal income tax principles.  "Qualified dividend income" received by a non-corporate U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in the New Common Units.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

(ii)       *Sale, Redemption, or Repurchase of New Common Units*

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Units.  Such capital gain will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder held the New Common Units for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.

D.       **U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS**

1.       **Gain Recognition**

Any gain income realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation, unless (a) the Non-U.S. Holder is an individual who was present in the United States for a hundred and eighty-three (183) days or more during the taxable year in which the exchange occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Accrued but Untaxed Interest (or OID)

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest (or OID) generally will not be subject to U.S. federal income or withholding tax; *provided*, that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of Payless or Reorganized Payless, as applicable, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, *provided* the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or OID) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty, *provided* certification requirements as discussed below under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Units — Dividends on New Common Units" are satisfied) on payments that are attributable to accrued but untaxed interest (or OID). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Units

#### (a) Dividends on New Common Units

Any distributions made with respect to the New Common Units will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Common Units, as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to the New Common Units held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Units held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, *provided* the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S.

federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

        (b)        <u>Sale, Redemption, or Repurchase of New Common Units</u>

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Units unless: (a) such Non-U.S. Holder is an individual who is present in the United States for a hundred eighty-three (183) days or more in the taxable year of disposition and certain other conditions are met; (b) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (c) Reorganized Payless is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Units.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  Based on the Reorganized Debtors' current business plans and operations, the Debtors do not anticipate that Payless is or was, or that any of the Reorganized Debtors will be a "U.S. real property holding corporation" for U.S. federal income tax purposes.

        **4.**        **FATCA**

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Units).  Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of property of a type that can produce U.S.-source interest or dividends, recently proposed U.S. Treasury Regulations suspend withholding on such gross proceeds payments indefinitely (which rule would apply to the New Common Units).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THE FATCA RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

**E.**        **TAX TREATMENT OF THE LIQUIDATING TRUST AND HOLDERS OF BENEFICIAL INTERESTS THEREIN**

As indicated above, the Liquidating Trustee will transfer the Liquidating Trust Assets to the Liquidating Trust on behalf of the Holders of Allowed General Unsecured Claims.  The foregoing discussion does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

        **1.**        **Classification of the Liquidating Trust**

The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed

Claims, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Liquidating Trust will be structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtors, the Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests.  Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trusts and the Holders of Allowed General Unsecured Claims could vary from those discussed herein.

## 2.        General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations.  The Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trusts as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the Liquidating Trust Beneficiaries will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets.  All parties to the Liquidating Trust (including, without limitation, the Debtors, Holders of Allowed General Unsecured Claims, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed General Unsecured Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed General Unsecured Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

### 3. Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (*i.e.*, a Disputed Claim Reserve) as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

## F.   INFORMATION REPORTING AND BACKUP WITHHOLDING

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24%. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle such Holder against whom such withholding is made to a refund from the IRS to the extent the withholding results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of Page Intentionally Left Blank*]

# X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

*/s/ Stephen Marotta*

Payless Holdings LLC
(for itself and on behalf of each of the Debtors)

By:      Stephen Marotta

Title:      Chief Restructuring Officer

Dated:      August 12, 2019

**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Case No. 19-40883-659 |
| | ) Chapter 11 |
| PAYLESS HOLDINGS LLC, *et al.*, | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

**JOINT PLAN OF REORGANIZATION OF PAYLESS HOLDINGS LLC AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Ira Dizengoff (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002

-and-

Julie Thompson (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street N.W.
Washington, D.C. 20006
Telephone:      (202) 887-4000
Facsimile:      (202) 887-4288

-and-

David Staber (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2300 N. Field Street
Suite 1800
Dallas, Texas 75201
Telephone:      (214) 969-2800
Facsimile:      (214) 969-4343

Richard W. Engel, Jr. (MO 34641)
Erin M. Edelman (MO 67374)
John G. Willard (MO 67049)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone:      (314) 621-5070
Facsimile:      (314) 621-2239

*Co-Counsel to the Debtors and Debtors in Possession*

John R. Ashmead (admitted *pro hac vice*)
Robert J. Gayda (admitted *pro hac vice*)
Catherine V. LoTempio (admitted *pro hac vice*)
**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, NY 10004
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421

*Counsel to the Debtors and Debtors in Possession, acting at the direction of the Special Committee*

## <u>TABLE OF CONTENTS</u>

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND
    DEFINED TERMS .................................................................................................................1
    A.      Rules of Interpretation, Computation of Time, and Governing Law .........................1
    B.      Defined Terms ...........................................................................................................2

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, PROFESSIONAL FEE
    CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEE ...................................17
    A.      Administrative Claims ..............................................................................................17
    B.      Administrative Claims Bar Date ...............................................................................18
    C.      Professional Compensation .......................................................................................18
    D.      Priority Tax Claims ...................................................................................................20
    E.      United States Trustee Statutory Fees ........................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............20
    A.      Summary ...................................................................................................................20
    B.      Classification and Treatment of Claims and Interests ..............................................21
    C.      Special Provision Governing Unimpaired Claims ....................................................23
    D.      Acceptance or Rejection of the Plan .........................................................................23
    E.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................24
    F.      Elimination of Vacant Classes ..................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................................24
    A.      General Settlement of All Claims ..............................................................................24
    B.      Restructuring Transactions ........................................................................................24
    C.      The New First Lien Facility and Approval of the New First Lien Facility ......................25
    D.      The CA Loan .............................................................................................................26
    E.      Corporate Existence ..................................................................................................27
    F.      Vesting of Assets in the Reorganized Debtors .........................................................27
    G.      Cancellation of Prepetition Term Loan Facility, Prepetition ABL Credit Facility
            Agreement, DIP Credit Agreement and Equity Interests .........................................28
    H.      Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors .........29
    I.      Effectuating Documents and Further Transactions ...................................................29
    J.      Issuance of New Equity .............................................................................................30
    K.      Simultaneous and Future Transactions .....................................................................31
    L.      Section 1145 Exemption ...........................................................................................33
    M.     New Organizational Documents ...............................................................................33
    N.      Exemption from Certain Transfer Taxes and Recording Fees ..................................33
    O.     Directors and Officers of Reorganized Payless and Other Reorganized Debtors .........34
    P.      Preservation of Causes of Action ..............................................................................35
    Q.     Directors and Officers Insurance Policies and Agreements ......................................35
    R.      Compensation and Benefits Programs ......................................................................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................37
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..............37
    B.      Indemnification Obligations......................................................................................37
    C.      Directors and Officers Insurance Policies and Agreements ......................................38
    D.      Insurance Policies and Surety Bonds ........................................................................38
    E.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Claims
            Based on Rejection of Executory Contracts and Unexpired Leases .........................39
    F.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ..........40
    G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ........40
    H.      Contracts and Leases Entered Into After the Petition Date .......................................41
    I.      Reservation of Rights.................................................................................................41
    J.      Nonoccurrence of Effective Date ..............................................................................41

i

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................................41
    A.    Distributions for Claims Allowed as of the Effective Date...........................................41
    B.    Liquidating Trust ..........................................................................................................42
    C.    Distributions on Account of Claims Allowed After the Effective Date........................45
    D.    Timing and Calculation of Amounts to Be Distributed................................................46
    E.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ................46
    F.    Compliance with Withholding and Reporting Tax Requirements/Allocations..............49
    G.    Setoffs ..........................................................................................................................50
    H.    Foreign Currency Exchange Rate .................................................................................51
    I.    Claims Paid or Payable by Third Parties......................................................................51

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
    DISPUTED CLAIMS ...................................................................................................................52
    A.    Allowance of Claims.....................................................................................................52
    B.    Claims Administration Responsibilities........................................................................52
    C.    Estimation of Claims ....................................................................................................52
    D.    Adjustment to Claims Without Objection .....................................................................53
    E.    Time to File Objections to Claims .................................................................................53
    F.    Disallowance of Claims ................................................................................................53
    G.    No Distribution Pending Allowance ..............................................................................53
    H.    Distribution After Allowance .......................................................................................53

ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN .........................................................................................................................................54
    A.    Conditions Precedent to the Confirmation of the Plan .................................................54
    B.    Conditions Precedent to Effective Date ........................................................................54
    C.    Waiver of Conditions ....................................................................................................55
    D.    Substantial Consummation ...........................................................................................55
    E.    Effect of Non Occurrence of Conditions to the Effective Date....................................55

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...............................55
    A.    Compromise and Settlement .........................................................................................55
    B.    Subordinated Claims .....................................................................................................56
    C.    Discharge of Claims and Termination of Equity Interests ............................................56
    D.    Release of Liens ............................................................................................................56
    E.    Debtor Release ..............................................................................................................57
    F.    Third-Party Release.......................................................................................................58
    G.    Exculpation ...................................................................................................................59
    H.    Injunction .....................................................................................................................60
    I.    No Release of Any Claims Held by the United States ..................................................60

ARTICLE X. RETENTION OF JURISDICTION .........................................................................................60

ARTICLE XI. MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN..................................63
    A.    Modification of Plan .....................................................................................................63
    B.    Effect of Confirmation on Modifications ......................................................................63
    C.    Revocation of Plan ........................................................................................................63

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................................63
    A.    Immediate Binding Effect .............................................................................................63
    B.    Additional Documents ...................................................................................................64
    C.    Reservation of Rights....................................................................................................64
    D.    Successors and Assigns.................................................................................................64
    E.    Service of Documents ...................................................................................................64
    F.    Term of Injunctions or Stays ........................................................................................65
    G.    Entire Agreement ..........................................................................................................65
    H.    Governing Law .............................................................................................................65

I.      Exhibits ....................................................................................................................65
J.      Nonseverability of Plan Provisions Upon Confirmation.........................................65
K.      Closing of Chapter 11 Cases ...................................................................................66
L.      Conflicts...................................................................................................................66
M.      Dissolution of Creditors' Committee .......................................................................66
N.      Section 1125(e) Good Faith Compliance .................................................................66
O.      Further Assurances...................................................................................................66
P.      No Stay of Confirmation Order................................................................................67
Q.      Waiver or Estoppel...................................................................................................67

## INTRODUCTION

Payless Holdings LLC and 26[1] of its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors") propose the following joint plan of reorganization for the resolution of the outstanding claims against, and regarding the equity interests in, the Debtors.  These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and contemplated future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.  Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION
## OF TIME, GOVERNING LAW, AND DEFINED TERMS

*A.     Rules of Interpretation, Computation of Time, and Governing Law*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the terms of such document or exhibit; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (h) any term used in capitalized form herein that is not otherwise defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

---

[1] For purposes of this Plan, "Debtors" excludes the Canadian Debtors (as defined below).  The Canadian Debtors intend to file a motion for dismissal of the Canadian Debtors' Chapter 11 Cases to be effective upon implementation of the Plan, and intend to separately bring forward a motion in the Canadian Court for approval of a plan of compromise or arrangement under the CCAA, all as outlined in further detail below.  A list of Debtors under this Plan is attached hereto as Schedule 1.

B.      *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.      "Accrued Professional Compensation" means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under Bankruptcy Code sections 328, 330, 331, or 363 or otherwise rendered allowable before the Effective Date by any Retained Professional in the Chapter 11 Cases.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Retained Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Bankruptcy Court or any higher court of competent jurisdiction.

2.      "Administrative Claim" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to Bankruptcy Code sections 503(b), 507(a)(2), 507(b) or 1114(e)(2), other than a Professional Fee Claim, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5).

3.      "Administrative Claims Bar Date" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, provided, however, pursuant to the Original Debtors Claims Bar Date Order and the July Debtors Claims Bar Date Order, Administrative Claims related to executory contracts or unexpired leases that have been rejected by the Debtors  are required to be filed by the later of (a) the Original Debtors Bar Date or the Supplemental General Bar Date (as applicable) and (b) 11:59 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the relevant order or deemed effective date of the rejection of such rejected contract or unexpired lease.

4.      "Affiliate" has the meaning set forth in Bankruptcy Code section 101(2).

5.      "Affiliate Transaction" means a transaction between the Reorganized Debtors, or any affiliate thereof, on the one hand, and any of the Axar Entities, the Alden Entities, the Invesco Entities, or the Octagon Entities on the other hand.

6.      "Alden" means Alden Global Capital.

7.      "Alden Entities" means Alden together with its Affiliates.

8.      "Allowed" means, with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the

2

Effective Date as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided, however*, that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

9.      "Axar" means Axar Capital Management.

10.      "Axar Entities" means Axar together with its Affiliates.

11.      "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

12.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

13.      "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Missouri.

14.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

15.      "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.      "CA Credit Agreement" means the Term Loan and Guarantee Agreement, dated as of October 2, 2018, by and among Payless CA Management Limited, as borrower, the guarantors and lenders from time to time party thereto, and Alden Global Opportunities Master Fund, L.P., as agent.

17.      "CA Loan" means the loan under the CA Credit Agreement.

18.      "CA Loan JV Entities" means the LatAm JV Entities other than Payless ShoeSource Andean Holdings, Payless ShoeSource Peru Holding, S.L., and each of their direct and indirect subsidiaries.

19.      "CA Loan Parties" means any Loan Parties under the CA Credit Agreement.

20.     "Canadian Court" means the Ontario Superior Court of Justice (Commercial List).

21.     "Canadian Debtors" means Payless ShoeSource Canada Inc., Payless ShoeSource Canada GP Inc. and Payless ShoeSource Canada LP, which are Affiliates of the Debtors.

22.     "Canadian GUC Amount" has the meaning set forth in Article IV.L.2.

23.     "Canadian Postpetition Loans" means the postpetition loans from Payless ShoeSource Canada LP to Payless Finance, Inc., which loans are reflected on the books and records of the Debtors and the Canadian Debtors and bear interest at a rate of 6% per annum.

24.     "Canadian Proceedings" means the CCAA proceedings commenced by the Canadian Debtors.

25.     "Cash" means the legal tender of the United States of America or the equivalent thereof.

26.     "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in Bankruptcy Code section 558; and (e) any state or foreign law fraudulent transfer or similar claim.

27.     "CCAA" means the *Companies' Creditors Arrangement Act* (Canada).

28.     "CCAA Plan" has the meaning set forth in Article IV.L.2.

29.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

30.     "Chief Restructuring Organization" means Ankura Consulting Group, LLC in its capacity as the Canadian Court-appointed Chief Restructuring Organization of the Canadian Debtors.

31.     "Claim" means any claim against a Debtor as defined in section Bankruptcy Code 101(5).

4

32.     "Claims Bar Date" means, as applicable, (a) the Original Debtors Bar Date, (b) the July Debtors Bar Date, (c) the Governmental Bar Date, (d) the July Debtors Governmental Bar Date or (e) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Original Debtors Claims Bar Date Order, the July Debtors Claims Bar Date Order or such other order entered by the Bankruptcy Court.

33.     "Claims Objection Bar Date" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Objecting to such Claims.

34.     "Claims Register" means the official register of Claims maintained by the Clerk of the Court for the United States Bankruptcy Court for the Eastern District of Missouri.

35.     "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan pursuant to section Bankruptcy Code 1122(a).

36.     "Compensation and Benefits Programs" means all employment and severance policies, and all compensation and benefit plans, policies, and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and employees, former employees, and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans.

37.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article VIII.A of the Plan having been satisfied or waived pursuant to Article VIII.C of the Plan.

38.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

40.     "Confirmation Order" means the order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "Consummation" means the occurrence of the Effective Date.

42.     "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Eastern District of Missouri in the Chapter 11 Cases on March 1, 2019, pursuant to Bankruptcy Code section 1102, comprising the Creditors' Committee Members, as may be reconstituted from time to time.

43.    "Creditors' Committee Members" means the members of the Creditors' Committee, as may be reconstituted from time to time, in each case, solely in their respective capacities as such, namely:  (a) Moda Shoe, Ltd.; (b) Xiamen C&D Light Industry Co, Ltd.; (c) Huge Development, Ltd.; (d) C and C Accord, Ltd.; (e) Simon Property Group, Inc.; (f) Brookfield Property REIT, Inc.; and (g) Yaquelin Garcia.

44.    "Cure" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under Bankruptcy Code sections 365 and 1123.

45.    "Cure Claim" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to Bankruptcy Code section 365.

46.    "Cure Notice" means a notice of a proposed amount of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

47.    "Debtor" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

48.    "Debtors" means Payless Holdings LLC and its affiliated debtors and debtors in possession other than the Canadian Debtors.

49.    "Debtors in Possession" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

50.    "Definitive Documents" means all documents (including any related orders, agreements, instruments, certificates, articles, schedules, or exhibits) that are contemplated by the Plan and that are otherwise necessary or desirable to implement, effectuate, or otherwise relate to the restructuring contemplated by the Plan, including, without limitation:  (a) the Plan; (b) the Disclosure Statement; (c) the motion seeking approval of the Disclosure Statement and the Disclosure Statement Order; (d) the Confirmation Order; (e) the New First Lien Facility Documents; and (f) the New Organizational Documents.

51.    "DIP Agent" means Wilmington Savings Fund Society, FSB.

52.    "DIP Credit Agreement" means the terms and conditions of that certain Senior Secured Superpriority Priming Debtor-in-Possession Term Loan and Guarantee Agreement, dated as of March 24, 2019, by and among Payless Inc., as borrower, Payless Holdings LLC and certain of its subsidiaries party thereto, as guarantors, the DIP Lenders, and the DIP Facility Agent.

53.    "DIP Facility" means the senior secured postpetition financing received by the Debtors under the DIP Credit Agreement.

54.    "DIP Facility Agent" means Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Lenders.

55.    "DIP Lenders" means the banks, financial institutions, and other lenders under the DIP Facility.

56.    "Disclosure Statement" means the *Disclosure Statement for the Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

57.    "Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement.

58.    "Disputed Claim" means, with respect to any Claim, any Claim that is not yet Allowed.

59.    "Distribution Agent" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the Noticing and Claims Agent, to make or to facilitate distributions required by the Plan, with the exception of distributions to Class 5 Claims by the Liquidating Trust under the Liquidating Trust Agreement.

60.    "Distribution Record Date" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

61.    "D&O Liability Insurance Policies" means all insurance policies for current and former director and officer liability maintained by the Debtors.

62.    "Effective Date" means the day that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.B of the Plan have been satisfied or waived pursuant to Article VIII.C of the Plan.

63.    "Entity" has the meaning set forth in Bankruptcy Code section 101(15).

64.    "Equity Interest" means the common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interest of any Debtor and any options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, membership interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to

7

subordination pursuant to Bankruptcy Code section 510(b) arising from or related to any of the foregoing; *provided, however*, that Equity Interest does not include any Intercompany Interest.

65.    "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to Bankruptcy Code section 541.

66.    "Exculpated Parties" means, collectively, the Reorganized Debtors and the Released Parties.

67.    "Exculpation" means the exculpation provision set forth in Article IX.G of the Plan.

68.    "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code sections 365 or 1123.

69.    "Existing Equity Interests" means the common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interest of Payless Holdings LLC and any options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, membership interests, or other equity, ownership, or profits interests of Payless Holdings LLC (whether or not arising under or in connection with any employment agreement), including any claim against Payless Holdings LLC subject to subordination pursuant to Bankruptcy Code section 510(b) arising from or related to any of the foregoing; provided, however, that Existing Equity Interest does not include any Intercompany Interest.

70.    "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date, compounded annually.

71.    "Final DIP Order" means that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, entered by the Bankruptcy Court on April 4, 2019 [Docket No. 797].

72.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

8

73.    "General Unsecured Claims" means any other Claims against any Debtor that are not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and are not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) Other Priority Claim; (d) an Other Secured Claim; (e) a Tranche A-1 Term Loan Claim; (f) a Tranche A-2 Term Loan Secured Claim; (g) an Intercompany Claim; (h) an Existing Equity Interest; or (i) an Intercompany Interest.

74.    "Governmental Bar Date" means 11:59 p.m. prevailing Central Time on August 19, 2019, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

75.    "Governmental Unit" shall have the meaning set forth in Bankruptcy Code section 101(27).

76.    "Holder" means an Entity holding a Claim against or an Interest in any of the Debtors.

77.    "Impaired" means any impaired Claim or Interest in an Impaired Class within the meaning of Bankruptcy Code section 1124.

78.    "Impaired Class" means an impaired Class within the meaning of Bankruptcy Code section 1124.

79.    "Indemnification Obligation" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers, employees, or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporation, articles of incorporation, certificate of formation, limited liability company agreement, bylaws, indemnification agreements, director or observer agreements, similar corporate documents and applicable law, in effect as of the Petition Date.

80.    "Independent Director" means an independent director and/or manager with relevant industry expertise and no prior or current relationship with the Axar Entities, the Alden Entities, the Octagon Entities, or the Invesco Entities, who shall be appointed in accordance with the Definitive Documents.

81.    "Initial Directors" means the four directors and/or managers who shall be appointed as of the Effective Date by Axar, Alden, Invesco and Octagon, as described under the Plan, to the board of directors of Reorganized Payless.

82.    "Initial Distribution Date" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

83.    "Insider Investigation" means the investigation, conducted by the Special Committee on behalf of the Debtors, of any Claims or Causes of Action in which the Alden

9

Entities or any past or current manager of the Payless Holdings LLC board of managers are or may be implicated.

84.    "Insurance Policies" means all insurance policies that have been issued at any time to or that provide coverage to any of the Debtors (excluding any D&O Liability Insurance Policies) and all agreements, documents, or instruments related thereto.

85.    "Intercompany Claim" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor, provided, however, that for purposes of this Plan, the Canadian Postpetition Loans shall not be Intercompany Claims.

86.    "Intercompany Interest" means an Equity Interest in a Debtor held by another Debtor.

87.    "Interest" means, collectively, Equity Interests and Intercompany Interests.

88.    "Interim Compensation Order" means that certain *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals and (II) Granting Related Relief*, entered by the Bankruptcy Court on April 3, 2019 [Docket No. 786], as may be amended from time to time, including by an order entered by the Bankruptcy Court approving the retention of a specific Retained Professional.

89.    "Invesco" means Invesco Senior Secured Management, Inc.

90.    "Invesco Entities" means Invesco, together with its Affiliates.

91.    "July Debtors" means Collective Brands Logistics Limited and Payless Sourcing, LLC.

92.    "July Debtors Bar Date" means 11:59 p.m. prevailing Central Time on August 30, 2019.

93.    "July Debtors Claims Bar Date Order" means that certain *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* for claims with respect to the July Debtors, entered by the Bankruptcy Court on July 19, 2019 [Docket No. 1366], as may be amended from time to time.

94.    "July Debtors Government Bar Date" means January 3, 2020, at 11:59 p.m., prevailing Central Time, as the bar date by which governmental units must file a Proof of Claim against the July Debtors.

95.    "JV" means a joint venture agreement, to which a Debtor entity is a party.

96.    "LatAm Business" the business operations of the LatAm JV Entities as coordinated by Payless ShoeSource Worldwide, Inc. through Collective Brands Coöperatief U.A. and the LatAm JV Partners.

97.     "LatAm JV Partners" means, collectively, (a) PLP, S.A., (b) South America Local Partners, S.A., (c) Pataya Inc., (d) Bluestone Financials Inc., and (e) Patagonia Capital Limited, and with respect to each of the foregoing entities in clauses (a) through (e), such entities' predecessors, successors, and assigns, wholly-owned subsidiaries, managed accounts, or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case, solely in their capacity as such.

98.     "LatAm JV Entities" means, collectively, (a) Payless ShoeSource (BVI) Holdings, Ltd., (b) Payless ShoeSource Andean Holdings, (c) Payless Colombia (BVI) Holdings, LTD., (d) Payless ShoeSource Peru Holding, S.L., (e) Payless ShoeSource Honduras S. DE R.L., (f) Payless ShoeSource, Limitada (Costa Rica), (g) PSS International (Costa Rica) Sourcing S.R.L., (h) Payless ShoeSource de la Republica Dominicana, S.R.L., (i) Payless ShoeSource of St. Lucia, Ltd, (j) Payless ShoeSource Overseas S.R.L., (k) Payless ShoeSource of El Salvador Ltda. De C.V., (l) Payless ShoeSource Trinidad Unlimited, (m) Payless ShoeSource Jamaica Limited, (n) Payless ShoeSource (Barbados) SRL, (o) Payless ShoeSource Dominica Ltd., (p) Payless ShoeSource St. Kitts Ltd., (q) Payless ShoeSource Uruguay SRL, (r) Payless ShoeSource Ecuador CIA Ltda, (s) Payless  ShoeSource  Spain, S.L., (t) Payless ShoeSource PSS de Colombia S.A.S., (u) Payless ShoeSource Peru S.R.L., (v) Payless ShoeSource Limitada y Compania Limitada (Nicaragua), (w) Payless ShoeSource (Barbados) SRL Antigua Branch, (x) Payless ShoeSource (Barbados) SRL Grenada Branch, (y) Payless ShoeSource (Barbados) SRL St. Lucia Branch, (z) Payless ShoeSource (Barbados) SRL St. Vincent Branch, (aa) Payless ShoeSource de Guatemala LTDA., and (bb) Payless ShoeSource (Panama) S.A. and such entities' predecessors, successors, and assigns, wholly-owned subsidiaries, managed accounts, or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case, solely in their capacity as such.

99.     "Liquidating Trust" means the trust established pursuant to Article VI.B.1, to hold the Liquidating Trust Assets and make distributions on account of Class 5 Claims.

100.     "Liquidating Trust Agreement" means the trust agreement, to be dated as of or prior to the Effective Date, between the Debtors and the Liquidating Trustee, governing the Liquidating Trust.

101.     "Liquidating Trust Assets" means [] less the Canadian GUC Amount and such other assets, if any, transferred to the Liquidating Trust as set forth in this Plan.

102.     "Liquidating Trust Beneficiaries" means the holders of an interest in the Liquidating Trust.

103.     "Liquidating Trust Expenses" means any and all reasonable fees, costs and expenses incurred by the Liquidating Trust or the Liquidating Trustee (or any professional or

11

other Entity retained by the Liquidating Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidating Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses, to be paid out of the Liquidating Trust Assets.

104. "Liquidating Trustee" means the natural person appointed by the Debtors in consultation with the Creditors' Committee to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement, or any successor appointed in accordance with the terms of the Plan and the Liquidating Trust Agreement.

105. "Local Bankruptcy Rules" means the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri.

106. "Management Incentive Plan" means that certain post-Effective Date director and employee compensation program to be approved and implemented by the New Board as set forth in Article IV.T hereof.

107. "New Board" means the initial board of directors and/or managers of the Reorganized Debtors, which board of directors and/or managers shall be comprised of (i) one director and/or manager appointed by Axar, (ii) one director and/or manager appointed by Alden, (iii) one director and/or manager jointly appointed by Invesco and Octagon, and (iv) an independent director and/or manager jointly appointed by Axar, Alden, Octagon, and Invesco with relevant industry expertise and no prior or current relationship with Axar, Alden, Octagon, or Invesco and disclosed in accordance with Bankruptcy Code section 1129(a)(5).

108. "New Common Units" means new common ownership units to be issued by Reorganized Payless on the Effective Date.

109. "New Incentive Units" means ownership units that may be issued pursuant to the Management Incentive Plan.

110. "New First Lien Facility" means the first lien senior secured debt facility, that may take the form of a loan, high-yield notes, a bridge facility or other arrangement, to be entered into by the Reorganized Debtors and the lender(s) thereunder as contemplated in Article IV.C. of this Plan, pursuant to the New First Lien Facility Documents.

111. "New First Lien Facility Documents" means the documentation providing for the New First Lien Facility, which documentation shall be set forth in the Plan Supplement.

112. "New Operating Agreement" means the new operating agreement or similar agreement of Reorganized Payless.

113. "New Organizational Documents" means the forms of the certificates or articles of incorporation, limited liability company agreement, bylaws, or such other applicable formation documents of each of the Reorganized Debtors.

114.    "<u>Noticing and Claims Agent</u>" means Prime Clerk LLC, in its capacity as notice and claims agent for the Debtors, pursuant to that certain *Order Authorizing Retention and Appointment of Prime Clerk LLC as Notice and Claims Agent* Nunc Pro Tunc *to the Petition Date*, entered by the Bankruptcy Court on March 15, 2019 [Docket No. 572], as may be amended from time to time.

115.    "<u>Octagon</u>" means Octagon Credit Investors, LLC.

116.    "<u>Octagon Entities</u>" means Octagon, together with its Affiliates.

117.    "<u>Original Debtors</u>" means the twenty-seven (27) Debtors that filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 18, 2019.

118.    "<u>Original Debtors Claims Bar Date</u>" (a) 11:59 p.m. prevailing Central Time on June 7, 2019.

119.    "<u>Original Debtors Claims Bar Date Order</u>" means that certain *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* entered by the Bankruptcy Court on May 3, 2019 [Docket No. 969], as may be amended from time to time.

120.    "<u>Other Priority Claim</u>" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

121.    "<u>Other Secured Claim</u>" means any secured Claim against the Debtors not specifically described in the Plan.

122.    "<u>Payless</u>" means Payless Holdings LLC, along with its Affiliates.

123.    "<u>Periodic Distribution Date</u>" means the first day of the month immediately following the month in which a Claim becomes Allowed, when distributions shall be made to Holders of any such then-Allowed Claims.

124.    "<u>Person</u>" has the meaning set forth in Bankruptcy Code section 101(41).

125.    "<u>Petition Date</u>" means February 18, 2019, the date on which the Original Debtors commenced the Chapter 11 Cases.

126.    "<u>Plan</u>" means the *Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated August 12, 2019, as amended, supplemented, or modified from time to time in accordance with its terms.

127.    "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules and exhibits, in each case, as amended, modified or supplemented from time to time in accordance with the terms of the Plan and applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents (a) the New First Lien Facility Agreement, (b) the Schedule of Assumed Executory Contracts and Unexpired

Leases, (c) a list of retained Causes of Action, (d) the New Organizational Documents, (e) the calculation of the Canadian Postpetition Loans; and (f) the Liquidating Trust Agreement.

128.    "Prepetition ABL Credit Facility Agreement" means that certain credit agreement, dated as of August 10, 2017 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date) with Payless Inc., Payless Finance, Inc., Payless ShoeSource, Inc. and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Wells Fargo as collateral agent and administrative agent, Wells Fargo as FILO agent, and the lenders party thereto from time to time.

129.    "Prepetition ABL Credit Facility Lenders" means the lenders party from time to time to the Prepetition ABL Credit Facility.

130.    "Prepetition Term Loan Facility" means that certain Term Loan and Guarantee Agreement, dated as of August 10, 2017, by and among WBG – PSS Holdings LLC, Payless, Payless Finance, Inc., Payless ShoeSource, Inc. and Payless ShoeSource Distribution, Inc., as borrowers, the subsidiary guarantors party thereto, the lenders from time to time party thereto, and the Prepetition Term Loan Agent.

131.    "Prepetition Term Loan Agent" means Cortland Products Corp.

132.    "Prepetition Term Loan Lenders" means the banks, financial institutions and other lenders under the Prepetition Term Loan Facility.

133.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in Bankruptcy Code section 507(a)(8).

134.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

135.    "Professional Fee Claim" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

136.    "Professional Fee Escrow Account" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

137.    "Professional Fee Reserve Amount" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.C.3 hereof.

138.    "Proof of Claim" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

14

139.    "Record Date" means August 30, 2019 for all Claims filed before such date, or, for any Claims filed after such date, the Claims Bar Date.

140.    "Reinstated" or "Reinstatement" means, with respect to Claims and Interests, the treatment provided for in Bankruptcy Code section 1124.

141.    "Released Parties" means, collectively, (a) the Debtors, (b) the Canadian Debtors, (c) the Reorganized Debtors, (d) the Creditors' Committee, (e) the DIP Facility Agent and DIP Facility Lenders, (f) [the Prepetition Term Loan Agent and Prepetition Term Loan Lenders,] (g) the Prepetition ABL Credit Facility Lenders and Wells Fargo, (h) the Chief Restructuring Organization, and each of their respective affiliates, officers, directors, predecessors, successors and assigns, managers, principals, members, employees, agents, partners, attorneys, accountants, investment bankers, consultants and other professionals.[2]

142.    "Releasing Parties" means, collectively, (a) the Debtors, (b) the DIP Lenders, (c) the DIP Agent and DIP Facility Agent, [(d) the Prepetition Term Loan Lenders, (e) the Prepetition Term Loan Agent,] (f) the Prepetition ABL Credit Facility Lenders and Wells Fargo, (g) all Holders of Claims and Equity Interests that are deemed unimpaired and presumed to accept the Plan, (h) all Holders of Claims who either (1) vote to accept the Plan or (2) receive a Ballot providing them the right to opt out of any applicable releases but abstain from voting on the Plan or otherwise do not elect pursuant to such Ballot to opt out of the Third-Party Release, (i) all Holders of Claims and Equity Interests who are not entitled to vote on the Plan but receive a notice advising them of their ability to opt out of the Third-Party Release but who do not elect to opt out of the Third-Party Release, (j) all other Holders of Claims and Equity Interests to the maximum extent permitted by law, and (k) with respect to the Debtors, the Reorganized Debtors, and each of the Entities in clauses (a) through (j), each such Entity's current and former Affiliates, and each such Entity's and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

143.    "Reorganized Debtors" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

144.    "Reorganized Payless" means Payless Holdings LLC, as reorganized pursuant to and under the Plan, or a new corporation or limited liability company that may be formed to directly or indirectly acquire all of the assets and/or stock of the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

145.    "Retained Professional" means any Entity:  (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to

---

[2] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action belonging to the Estates is ongoing.  The releases by the Debtors are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any such Claims and Causes of Action pending completion of the Insider Investigation.

sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

146.    "<u>Schedule of Assumed Executory Contracts and Unexpired Leases</u>" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as amended by the Debtors from time to time prior to the Effective Date. The Debtors will be deemed to reject any contracts and unexpired leases not expressly assumed in the Schedule of Assumed Executory Contracts and Unexpired Leases.

147.    "<u>Schedules</u>" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Original Debtors on April 1, 2019 and by the July Debtors on July 15, 2019, pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

148.    "<u>SEC</u>" means the United States Securities and Exchange Commission.

149.    "<u>Section 510(b) Claim</u>" means any Claim against the Debtors arising from the rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of such a Claim.

150.    "<u>Secured</u>" means, when referring to a Claim, a Claim:  (a) secured by a lien on property in which the applicable Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

151.    "<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

152.    "<u>Significant Holders</u>" means Holders of 5% or more of the New Common Units as of the Effective Date.

153.    "<u>Third-Party Release</u>" means the releases set forth in Article IX.F.

154.    "<u>Tranche A-1 Term Loan Claims</u>" means any claims arising under the Tranche A-1 Term Loan, as such term is defined in the Prepetition Term Loan Facility.

155.    "<u>Tranche A-2 Term Loan Secured Claims</u>" means any Secured Claims arising under the Tranche A-2 Term Loan, as such term is defined in the Prepetition Term Loan Facility.

156.    "<u>Tranche A-2 Term Loan Unsecured Claims</u>" means any Claims arising under the Tranche A-2 Term Loan, as such term is defined in the Prepetition Term Loan Facility that are not Tranche A-2 Term Loan Secured Claims.

157.    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code sections 365 or 1123.

158.    "Unimpaired" means any unimpaired Claim or Interest in an Unimpaired Class within the meaning of Bankruptcy Code section 1124.

159.    "Unimpaired Class" means an unimpaired Class within the meaning of Bankruptcy Code section 1124.

160.    "United States Trustee" means the United States Trustee for the Eastern District of Missouri.

161.    "Voting Classes" means, collectively, Classes 3, 4 and 5.

162.    "Voting Deadline" means 4:00 p.m. prevailing Central Time on October [14], 2019.

163.    "Wells Fargo" means Wells Fargo Bank, National Association.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, PROFESSIONAL FEE CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEE

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Priority Tax Claims and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.  Notwithstanding any provision of the Plan to the contrary, no Governmental Unit shall be required to file a request for the payment of an expense described in 11 U.S.C. § 503(b)(1)(B) or (C) as a condition of it being allowed as an administrative expense.

For the avoidance of doubt, the Canadian Postpetition Loans shall be allowed Administrative Claims and shall be paid on the Effective Date.

B.    *Administrative Claims Bar Date*

All requests for payment of an Administrative Claim (other than Professional Fee Claims) that accrued on or before the Effective Date must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date, provided, however, pursuant to the Original Debtors Claims Bar Date Order and the July Debtors Claims Bar Date Order, Administrative Claims related to executory contracts or unexpired leases that have been rejected by the Debtors are required to be filed by the later of (a) the Original Debtors Bar Date or the Supplemental General Bar Date (as applicable) and (b) 11:59 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the relevant order or deemed effective date of the rejection of such rejected contract or unexpired lease. Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

C.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for Professional Fee Claims shall be filed no later than 30 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized

Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

   3.   <u>Professional Fee Reserve Amount</u>

   To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

   4.   <u>Post-Effective Date Fees and Expenses</u>

   Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Debtor and Reorganized Debtor (as applicable) shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Debtors and Reorganized Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable). If the Debtors or Reorganized Debtors (as applicable), dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein. Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

   5.   <u>Substantial Contribution Compensation and Expenses</u>

   Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

D.       *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C).

E.       *United States Trustee Statutory Fees*

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

A.       *Summary*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and Professional Fee Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, voting, Confirmation, and distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

     1.       Summary of Classification and Treatment of Classified Claims and Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Tranche A-1 Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Tranche A-2 Term Loan Secured Claims | Impaired | Entitled to Vote |

20

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Accept |
| 7 | Existing Equity Interests | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Deemed to Accept |

B.   *Classification and Treatment of Claims and Interests*

1.   Class 1 – Other Priority Claims

(a)   *Classification*:  Class 1 consists of Other Priority Claims against the Debtors.

(b)   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall be paid in full in cash on the Effective Date, or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code.

(c)   *Voting*:  Unimpaired; not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims

(a)   *Classification*:  Class 2 consists of Other Secured Claims against the Debtors.

(b)   *Treatment*:  On or after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Other Secured Claim, each Holder of any such Claim (i) shall receive payment in cash in an amount equal to such Claim, (ii) shall receive the collateral underlying such Claim, or (iii) shall receive such other treatment so as to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)   *Voting*:  Unimpaired; not entitled to vote to accept or reject the Plan.

3.   Class 3 – Tranche A-1 Term Loan Claims

(a)   *Classification*:  Class 3 consists of Tranche A-1 Term Loan Claims against the Debtors.

(b)   *Allowance*:  The Tranche A-1 Term Loan Claims shall be deemed Allowed Claims in the amount of [].

(c)   *Treatment*:  On the Effective Date, each holder of an Allowed Tranche A-1 Term Loan Claim shall receive, in full satisfaction, settlement, release and

discharge of, and in exchange for such Claim, Cash in an amount equal to [%] of its Allowed Tranche A-1 Term Loan Claim.

(d)    *Voting*:  Impaired; entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Tranche A-2 Term Loan Secured Claims</u>

(a)    *Classification*:  Class 4 consists of Tranche A-2 Term Loan Secured Claims against the Debtors.

(b)    *Allowance*:  The Tranche A-2 Term Loan Secured Claims shall be allowed in the aggregate amount of $[].

(c)    *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Tranche A-2 Term Loan Secured Claim, each Holder of a Tranche A-2 Term Loan Secured Claim shall receive its *pro rata* share of 100% of the New Common Units.  Holders of Class 4 Claims shall be deemed to waive any distributions under Class 5 on account of their Tranche A-2 Term Loan Unsecured Claims.

(d)    *Voting*: Impaired; entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – General Unsecured Claims</u>

(a)    *Classification*:  Class 5 consists of General Unsecured Claims against the Debtors.

(b)    *Treatment*:  On or as soon as reasonably practicable after the Effective Date (and subject to the allowance, objection, and distribution procedures set forth in the Plan), except to the extent that a Holder agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed General Unsecured Claim, each Holder of any such Claim shall receive its *pro rata* share of the Liquidating Trust.

(c)    *Voting*:  Impaired; entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Claims</u>

(a)    *Classification*:  Class 6 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Intercompany Claim shall either be (a) reinstated as of the Effective Date or (b) cancelled, in which case no distribution shall be made on account of such Intercompany Claim, in each case as determined by the Debtors.

(c)    *Voting*:  Deemed to accept the Plan; not entitled to vote to accept or reject the Plan.

7. <u>Class 7 – Existing Equity Interests in Payless</u>

    (a)    *Classification*:  Class 7 consists of Existing Equity Interests.

    (b)    *Treatment*:  All Existing Equity Interests in Payless Holdings LLC, whether represented by stock, preferred share purchase rights, warrants, options, membership units or otherwise, will be cancelled, released, and extinguished and the Holders of such Existing Equity Interests will receive no distribution under the Plan on account thereof.

    (c)    *Voting*:  Impaired; deemed to reject the Plan.

8. <u>Class 8 – Intercompany Interests</u>

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  Each Intercompany Interest shall either be (a) reinstated as of the Effective Date or (b) cancelled, in which case no distribution shall be made on account of such Intercompany Interest, in each case as determined by the Debtors.

    (c)    *Voting*:  Deemed to accept the Plan; not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

Subject to Article IV.Q, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D. *Acceptance or Rejection of the Plan*

1. <u>Presumed Acceptance of Plan</u>

Classes 1 and 2 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 6 and 8 are presumed to have accepted the Plan.

2. <u>Voting Classes</u>

Each Holder of an Allowed Claim in each of Classes 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

3. <u>Presumed Rejection of Plan</u>

Class 7 is presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Plan will satisfy section 1129(a)(10) of the Bankruptcy Code and, as necessary, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any rejecting class of Claims or Equity Interests.

F.      *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of All Claims*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements, certificates or other documents or instruments of merger, consolidation, conversion, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, merger, conversion, or consolidation with the appropriate governmental authorities pursuant to applicable

law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate.

By this Plan, the Debtors are authorized but not directed to, in an orderly manner, abandon, dissolve, liquidate or cause to be liquidated any Debtor entities, subsidiaries or Affiliates as the Debtors decide would be in the best interests of the Estates.

C.    *The New First Lien Facility and Approval of the New First Lien Facility*

On the Effective Date, the Reorganized Debtors will enter into definitive documentation, with respect to the New First Lien Facility in an aggregate amount up to $[50] million.

Confirmation of the Plan shall be deemed to constitute approval of the New First Lien Facility and the New First Lien Facility Documents (including all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New First Lien Facility Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the New First Lien Facility Documents.

On the Effective Date, the New First Lien Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New First Lien Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the liens and security interests to be granted in accordance with the New First Lien Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New First Lien Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.  To the extent that any Holder of a Secured

Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the New First Lien Facility Documents that are necessary to cancel and/or extinguish such liens and/or security interests.

D.    The CA Loan

[The CA Credit Agreement and any other applicable documentation related to the CA Loan shall be amended to ensure that:

- Interest in all Interest Periods (as defined in the CA Credit Agreement) following October 2, 2019 shall be paid in cash as currently provided in the CA Credit Agreement;

- Amortization of the CA Loan shall occur following the Effective Date, payable on the first anniversary of the Effective Date and every six (6) months thereafter (or, if such date is not a business day, the business day immediately preceding such date), in an aggregate annual amount equal to 5% of the original principal amount in the year beginning with the first anniversary after the Effective Date and 10% of the original principal amount for each year thereafter.  The remaining aggregate principal amount of the CA Loan will be payable in full at maturity;

- Covenants, events of default, and representations under the CA Credit Agreement shall be modified to include:

  - A negative pledge on all assets of the CA Loan Parties that are not pledged as collateral for the CA Loan;

  - Proceeds of the following transactions shall be used to mandatorily prepay the principal amount under the CA Loan until paid in full:  (i) any sale of assets of any of the CA Loan Parties including any interests in the CA Loan JV Entities, (ii) any equity issuance by PSS Latin America Holdings or any of its direct or indirect subsidiaries (including any CA Loan JV Entities), or (iii) prohibited debt issuances at the CA Loan Parties;

  - The principal amount of the CA Loan will become immediately due and payable upon the sale of all or substantially all of the assets of the CA Loan Parties;

  - Dividends and other restricted payments from the CA Loan Parties will be subject to an overall dollar limitation of [__] until the CA Loan is paid in full;

  - The change of control event of default will be triggered if (i) the borrower under the CA Loan ceases to directly own 100% of any interests in the LatAm JV Entities owned by the borrower as of the Effective Date, (ii) PSS Latin America Holdings ceases to directly own 100% of Payless CA, (iii) Reorganized Payless, or substantially all of its assets, are sold, or (iv) any

26

Person other than the Alden Entities acquires more than 50% of the New Common Units as a result of the purchase of New Common Units, other than where more than 50% of the New Common Units is acquired by such Person from the Alden Entities in a transaction in which the purchase of New Common Units is not open to all other Holders of New Common Units on a pro rata basis;

o The ability of the CA Loan Parties to transfer assets as investments down to subsidiaries, or to do sale-leaseback transactions, shall be subject to an overall dollar limitation of [__];

o The ability of any CA Loan Parties to transfer any material portion of the LatAm Business shall be prohibited, unless such transfer results in proceeds sufficient to repay the CA Loan pursuant to its terms;

o The existing $25 million debt and lien baskets shall be eliminated; and

o Non-arm's-length transactions with non-guarantor subsidiaries shall be prohibited.

o The insolvency or bankruptcy of any of the Reorganized Debtors, the CA Loan Parties, or any of their subsidiaries shall be an event of default.

[TBD]]

E.    *Corporate Existence*

Subject to any restructuring transactions as permitted under Article IV.B, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other similar formation and governance documents) are amended by or in connection with the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable foreign, state, provincial, or federal law).

As provided in Article IV.B, the Debtors are authorized by this Plan to, in an orderly manner, abandon, dissolve, liquidate or cause to be liquidated any Debtor entities, subsidiaries or Affiliates as the Debtors decide would be in the best interests of the Estates.

F.    *Vesting of Assets in the Reorganized Debtors*

Subject to Article IV.Q, and except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all

27

property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Prepetition Term Loan Facility, Prepetition ABL Credit Facility Agreement, DIP Credit Agreement and Equity Interests*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Term Loan Facility, the Prepetition ABL Credit Facility, the DIP Credit Facility and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and all documentation in respect of those enumerated facilities is terminated, except as expressly provided below, and the Reorganized Debtors and their Affiliates shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged.  Notwithstanding the foregoing:

- The Prepetition Term Loan Facility shall continue in effect solely for the purpose of: (i) allowing Holders of the Prepetition Term Loan Claims to receive the distributions provided for under the Plan; (ii) allowing the Prepetition Term Loan Agent to receive distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the Prepetition Term Loan Agents' right to indemnification pursuant and subject to the terms of the Prepetition Term Loan Facility in respect of any Claim or Cause of Action asserted against the Prepetition Term Loan Agents;

- The Prepetition ABL Credit Facility and the DIP Facility shall continue solely for the purpose of preserving the rights of Wells Fargo, the DIP Agent and DIP Facility Agent and the DIP Lenders to indemnification pursuant to and subject to the respective agreements.

- The Prepetition Term Loan Facility Agent, the DIP Agent, and Wells Fargo, as collateral agent and administrative agent, for the Prepetition ABL Credit Facility, are authorized to execute any and all documentation necessary or desirable to evidence the termination of

28

the Prepetition Term Loan Facility, the DIP Facility and the Prepetition ABL Credit Facility.

- The Debtors are authorized to file any necessary security interest and/or lien releases or terminations to evidence the termination of the Prepetition Term Loan Facility, the DIP Facility and the Prepetition ABL Credit Facility.

- The foregoing shall not affect the cancellation of units issued pursuant to the Plan nor any other units held by one Debtor in the capital of another Debtor.

H.    *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

The Cash necessary for the Reorganized Debtors to make Cash payments required pursuant to the Plan will be funded from two sources:  (1) proceeds from the New First Lien Facility and (2) Cash on hand as of the Effective Date.

In making such Cash payments, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves, as they determine to be necessary or appropriate, to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

I.    *Effectuating Documents and Further Transactions*

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions. Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors, or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers, or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

J.    *Issuance of New Equity*

1.    New Common Units

On the Effective Date, Reorganized Payless shall issue New Common Units in accordance with the terms of the Plan and the New Organizational Documents, without the need for any further corporate or member action.

Pursuant to the New Organizational Documents, Reorganized Payless will further be authorized, but not required, to issue New Incentive Units pursuant to the Management Incentive Plan (as described below).

Upon the Effective Date, (i) the New Common Units shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors will be a reporting company under the Exchange Act.  The New Common Units will be issued pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act, and the New Common Units may be resold without registration under the Securities Act by the recipients thereof, subject to certain restrictions under the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, if applicable, and affiliates under applicable securities laws.  Transfers of New Common Units will not otherwise require approval of the New Board or be subject to other restrictions except for the obligation of transferees to become party to the New Operating Agreement.

The distribution of New Common Units pursuant to the Plan may be made by delivery of one or more certificates representing such new units as described herein, by means of book entry registration on the books of the transfer agent of New Common Units or by means of book entry exchange through the facilities of a transfer agent satisfactory to the Debtors in accordance with the customary practices of such agent, as and to the extent practicable.

2.    Tag, Drag and Preemptive Rights

Significant Holders shall have customary tag-along rights on transfers by either the Alden Entities (and their transferees) or the Axar Entities (and their transferees) of 25% or more of the Alden Entities or the Axar Entities respective holdings of New Common Units in a single transaction.  The tag-along rights of any Significant Holder shall be with respect to the percentage of its holdings equal to the percentage of the holdings of the Alden Entities or the Axar Entities that the Alden Entities or the Axar Entities seek to transfer.  A Significant Holder shall retain its right to these customary tag-along rights so long as such Significant Holder owns at least 51% of the New Common Units that it owned as of the Effective Date (or acquired following the Effective Date at which time it became the holder of 5% or more of the New Common Units.)

All holders of New Common Units shall have customary preemptive rights and other minority protections.  Customary drag-along rights shall apply to the sale in a single transaction of a majority of the New Common Units, which drag-along rights may be exercised in the first three years following the Effective Date by holders of at least 75% of the issued and outstanding

30

New Common Units and following the third anniversary of the Effective Date by holders of a majority of the issued and outstanding New Common Units.

3.   Private Companies

On the Effective Date, the Reorganized Debtors shall be private, non-SEC reporting companies.

K.   *Simultaneous and Future Transactions*

1.   LatAm Business

Under the Plan, the LatAm Business shall be retained as property of the Reorganized Debtors as of the Effective Date, and all obligations of the Debtors' direct or indirect non-Debtor subsidiaries that own or control the LatAm Business shall remain outstanding and continue in effect.

2.   Royalty, Licensing, Sourcing and Service Agreements

All of the Debtors' royalty, licensing, services and sourcing agreements shall be assumed and retained as property of the Reorganized Debtors as of the Effective Date.

3.   Canadian Debtors

The Canadian Debtors are not plan proponents under the Plan.   The Debtors or Reorganized Debtors shall cause the Canadian Debtors to bring forward a motion for approval of a plan of compromise or arrangement under the *CCAA* (the "CCAA Plan") in the Canadian Court.  The CCAA Plan shall be in form and substance acceptable to the Prepetition Term Loan Agent and the Canadian Debtors.  In connection with implementation of the CCAA Plan:  (a) the Prepetition Term Loan Agent shall consent to release its security over funds held by the Canadian Debtors in an amount to be determined, but which amount will provide a recovery to unsecured creditors of the Canadian Debtors on a similar pro rata basis as the recovery received by General Unsecured Creditors of the Debtors (the "Canadian GUC Amount"); (b) the Canadian Debtors will consent to the appointment of a receiver, upon application by the Prepetition Term Loan Agent, over the proceeds of the Canadian Postpetition Loans, once received by the Canadian Debtors, and any other funds provided therefore pursuant to the CCAA Plan, but excluding the Canadian GUC Amount; and (c) the Canadian Debtors will cancel the claims of the Debtors against the Canadian Debtors, or otherwise resolve such intercompany claims in a manner acceptable to the Debtors or the Reorganized Debtors and the Canadian Debtors.

4.   Collective Brands Logistics Limited

Collective Brands Logistics Limited is authorized, but not directed, to commence or continue the liquidation process of its business and assets in the Asian courts or proceed as is otherwise appropriate in the subject jurisdictions.  In exchange for the treatment of the Holders of General Unsecured Claims of Collective Brands Logistics Limited pursuant to Class 5 of this Plan, Collective Brands Logistics Limited shall be authorized (i) to assume and assign any

executory contracts pursuant to Section V, (ii) transfer any shares of its direct or indirect subsidiaries, and (iii) transfer any de minimis assets, in each instance free and clear of all liens, claims and encumbrances, to Dynamic Assets Limited under this Plan.

Collective Brands Logistics Limited is further authorized, but not directed, to reject that certain Restated Joint Business Agreement dated December 21, 2016 between Payless Sourcing, LLC and Collective Brands Logistics Limited.  Further, Collective Brands Logistics Limited is authorized, but not directed, to abandon and/or liquidate Collective Brands Services Limited as well as Collective Brands Holdings Limited and the China and Vietnam Subsidiaries of Collective Brands Holdings Limited.  By this Plan, Collective Brands Logistics Limited is authorized, in its discretion, to transfer any employees to Dynamic Assets Limited.

All Intercompany Claims between Collective Brands Logistics Limited and Payless Sourcing LLC on the one hand, and the remaining Debtors on the other hand, shall be deemed released as of the Effective Date.

5.    Transactions With Affiliates

There shall be no Affiliate Transactions unless approved by all members of the New Board, excluding the New Board member designated by the applicable member (or its affiliate) that is party to the Affiliate Transaction.  In addition, the New Board member designated by such applicable member shall be excluded from all deliberations on any such Affiliate Transaction.

6.    Compelled Sale of the Company

After the third anniversary of the Effective Date, either the Alden Entities or the Axar Entities (so long as the Alden Entities and the Axar Entities, respectively, own at least 51% of the New Common Units that it owned as of the Effective Date) may compel the Reorganized Debtors to sell all of their remaining assets through a competitive process managed by independent third party financial advisors or investment bankers.  After the fourth anniversary of the Effective Date, the holders of at least 25% of the New Common Units (without regard to New Incentive Units) may compel the Reorganized Debtors to sell all of their remaining assets through a competitive process managed by independent third party financial advisors or investment bankers.

The Axar Entities, the Alden Entities, the Invesco Entities, and the Octagon Entities shall have any right of first refusal or similar right to purchase any or all of the assets of the Reorganized Debtors, but each may submit proposals to purchase such assets, *provided, however*, that if any of the Axar Entities, the Alden Entities, the Invesco Entities, or the Octagon Entities participate in the sale process, such participant or participants shall be excluded from management of the process and will not have access to any advisors retained in connection with the process other than in its capacity as a bidding party.  Any sale to any of the Axar Entities, the Alden Entities, the Invesco Entities, or the Octagon Entities will require the delivery of a fairness option by the third party financial advisor or investment bank retained to manage such sale.

32

L.      *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code and/or, to the extent that section 1145 of the Bankruptcy Code is unavailable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to this Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities.  In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, to the extent applicable, any and all New Common Units contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable and transferable by any initial recipient thereof, subject to certain exceptions if the recipient (x) is an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has been such an "affiliate" within 90 days of such transfer, and (z) is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

M.      *New Organizational Documents*

On or immediately prior to the Effective Date, the organizational documents of each of the Debtors shall be amended and restated, as may be necessary to effectuate the transactions contemplated by the Plan, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code.  Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

N.      *Exemption from Certain Transfer Taxes and Recording Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer of property from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral as security for any or all of the New First Lien Facility, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax, or other similar tax or governmental assessment, and the appropriate state or local

33

governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Directors and Officers of Reorganized Payless and Other Reorganized Debtors*

On the Effective Date, the New Board shall consist of the following Initial Directors:  (i) one director and/or manager appointed by Axar; (ii) one director and/or manager appointed by Alden; (iii) one director and/or manager jointly appointed by Invesco and Octagon; and (iv) an Independent Director and/or manager jointly appointed by Axar, Alden, Octagon, and Invesco no later than ten (10) days prior to the deadline to object to confirmation of this Plan.  In the event Invesco and Octagon, together with their respective affiliates, cease to hold any New Common Units, the Independent Director's seat on the New Board shall be filled through annual election by the Holders of a majority of the New Common Units, and such director shall have industry experience, and shall be independent and have no prior or current relationship with any of the remaining pre-existing designees.

The full processes for election of directors/managers and replacement of directors/managers will be provided for in the New Operating Agreement.  For so long as the New Board is composed of four directors, to the extent a decision or action of the Reorganized Debtors is approved by two members of the New Board, and two members of the New Board oppose a decision or action, such decision or action may, at the request of the members of the New Board approving such action, be put to a vote of Holders of issued and outstanding New Common Units, and if approved by Holders of at least 90% of the issued and outstanding New Common Units, shall be deemed approved; provided that, in the event Invesco and Octagon collectively cease to hold any New Common Units but the New Board continues to be comprised of four directors, the foregoing reference to 90% shall be reduced to 75%.

The following are decisions and actions that, if approved by the New Board acting by less than unanimous consent, will require approval of holders of at least 75% of the issued and outstanding New Common Units:  (i) the sale of the LatAm Business, (ii) the consummation by Reorganized Payless of a transaction resulting in a change of control of Reorganized Payless, (iii) the acquisition by Reorganized Payless of another unaffiliated entity or business, whether via merger, the acquisition of equity or the assets of such entity, which transaction has a purchase price in an amount greater than 25% of the equity value of Reorganized Payless at such time (prior to consummation of such transaction), (iv) the sale or disposition by Reorganized Payless of assets of Reorganized Payless outside of the ordinary course of business for a sale price greater than 25% of the equity value of Reorganized Payless at such time (prior to consummation of such sale or disposition), (v) a fundamental change to the nature of Reorganized Payless's business, and (vi) the issuance of more than 20% of New Common Units (subject to certain customary issuance exceptions as apply to preemptive rights referenced above), provided,

34

however that the foregoing approvals shall not apply to a compelled sale of Reorganized Payless as set forth below in the Article IV.L.6.

P.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX below, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including Article IX.  The Reorganized Debtors may in their sole discretion pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IV.Q and Article IX of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article IV.Q and Article IX of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

Q.    *Directors and Officers Insurance Policies and Agreements*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to Bankruptcy Code section 365(a). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding

35

anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

On the Effective Date, the Reorganized Debtors shall purchase a customary D&O tail policy.

R.      *Compensation and Benefits Programs*

Unless otherwise provided herein, in the Confirmation Order, or any applicable agreements binding on the Debtors, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

1.      Management Incentive Plan

Promptly on or as soon as practicable after the Effective Date, the New Board will adopt and implement a Management Incentive Plan, the terms of which shall be approved by the New Board. The New Board will determine the number of New Incentive Units, if any, to be available for award under the Management Incentive Plan and the allocation of New Incentive Units, if any.

2.      Continuation of Retiree Benefits

The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.

3.      Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for

workers' compensation and workers' compensation insurance, including without limitation, any Insurance Policies providing workers' compensation insurance coverage to the Debtors. Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to object to Claims asserted pursuant to applicable workers' compensation programs and to seek to reduce any bonds, letters of credit, or other security related to such programs.

All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; *provided, further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases filed with the Plan Supplement shall be assumed.  The Debtors are deemed to reject any contracts not expressly assumed on the Schedule of Assumed Executory Contracts and Unexpired Leases.  The Debtors shall have the right to remove any executory contracts and unexpired leases from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date, and any such removed executory contracts and unexpired leases shall be deemed rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court shall be vested in and be fully enforceable by the Reorganized Debtors in accordance with its terms, unless otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease, and except as such terms are modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

B.      *Indemnification Obligations*

On the Effective Date, except as otherwise provided herein, all Indemnification Obligations, consistent with applicable law, (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed, which assumption shall be irrevocable, and shall survive the Effective Date.

C.      *Directors and Officers Insurance Policies and Agreements*

Pursuant to Article IV.S hereof, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

D.      *Insurance Policies and Surety Bonds*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Confirmation Order, the Claims Bar Date Order, any claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (1) on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Insurance Policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.C of the Plan) and all obligations thereunder, regardless of when they arise; and (2) except as set forth in Article V.C of the Plan, nothing (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (b) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a Cure objection or a request, application, Claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Claims or Claims.

Notwithstanding any other provision of the Plan, on the Effective Date:  (1) all of the Debtors' obligations and commitments to any surety bond provider, including without limitation, obligations under any related indemnity agreements, shall be deemed reaffirmed and shall be continuing obligations of the Reorganized Debtors; (2) all bonded obligations of the Debtors for which such surety bonds secure performance by the Debtors shall be deemed assumed by the Debtors and shall be unimpaired by the Plan or Confirmation Order; and (3) to the extent any of the obligations and commitments set forth in this provision are secured by collateral, such collateral shall remain in place.  Nothing in the Plan or Confirmation Order shall be deemed to: (a) modify or impair the rights of any party under the Debtors' surety bonds, related indemnity agreements, or applicable law; (b) require any surety bond provider to issue any new surety bonds or extensions or renewals of  any surety bonds; or (c) affect the sureties' respective rights (only to the extent such rights exist with respect to the surety bonds, indemnity agreements or under applicable law) to require the Reorganized Debtors to execute and deliver to the Sureties new indemnity agreements containing such new or additional terms as the Sureties may require in their discretion.  Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to object to the Claims secured by such surety bond and seek to reduce such surety bonds in accordance with the objections.

E.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Claims Based on Rejection of Executory Contracts and Unexpired Leases*

The Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement.  Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute between the Debtors and a counterparty to any Executory Contracts or Unexpired Leases that is not resolved between the parties regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date.

The Debtors will cause notices of proposed assumption and proposed Cure Claims to be served by overnight delivery service upon the applicable contract counterparty affected by such notices and by email upon counsel of record for the applicable contract counterparty, if any.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed, served, and actually received by the Debtors no later than fourteen (14) days after service of the notice of proposed assumption and proposed Cure Claims.  Any such objections will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.  To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.  Notwithstanding the foregoing, all landlords' rights to recover amounts which have accrued or come due between the Cure objection deadline and the effective date of assumption are reserved.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of any one of the following:  (1) amounts listed on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases (if no objections to the Cure Claim is filed within the applicable objection period), (2) amounts agreed to by the Debtors and the applicable counterparty, or (3) amounts as ordered by the Court; *provided, however*, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. All Executory Contracts or Unexpired Leases not expressly assumed pursuant to this Plan shall be deemed rejected.

**Any Proofs of Claim filed with respect to an Executory Contract, Unexpired Lease, or Insurance Policy that has been assumed pursuant to the provisions of the Plan shall be deemed satisfied upon the Debtors' curing of any and all defaults related thereto, without further notice to or action, order, or approval of the Bankruptcy Court.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

F.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

40

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, and any agreements entered into with creditors pursuant to the interim and final orders authorizing the Debtors to pay prepetition claims of critical vendors, carriers, warehousemen, and section 503(b)(9) claimants [Docket Nos. 88, 600], will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

I.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

J.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4).

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Allowed Claims other than Class 5 Claims on the Effective Date or as soon as practicable after the Initial Distribution Date.

41

B.      *Liquidating Trust*

1.      <u>Formation of the Liquidating Trust</u>

(a)      On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement and become effective for the sole purpose of liquidating and administering the Liquidating Trust Assets and making distributions to holders of Class 5 Claims as provided for under the terms of the Plan in accordance with Treas. Reg. § 301.7701-4(d).

(b)      The Liquidating Trust shall have a separate existence from the Debtors.  On the Effective Date, the Liquidating Trust Assets shall be deposited into the Liquidating Trust.  The Confirmation Order shall provide that the Reorganized Debtors shall not have a property interest in the Liquidating Trust and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, or other encumbrances granted under the Plan shall not extend to an interest in the funds held in the Liquidating Trust.  The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

(c)      Subject to, and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court pursuant to, or in furtherance of, the Plan), the Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.  In the event of any conflict between the terms of this Section VI.B.1 and the terms of the Liquidating Trust Agreement as such conflicts relate to the establishment of the Liquidating Trust, the terms of this Section VI.B.1 shall govern.

(d)      The Liquidating Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Liquidating Trust Agreement.

(e)      On the Effective Date, the Liquidating Trustee, on behalf of the Debtors, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan.

(f)      The Liquidating Trust and the Liquidating Trustee will each be a representative of the Estates with respect to the Liquidating Trust Assets under Bankruptcy Code section 1123(b)(3)(B), and the Liquidating Trustee will be the trustee

42

of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Liquidating Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Liquidating Trust Assets.

(g)     On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all title and interest in all of the Liquidating Trust Assets, as well as the rights and powers of each Debtor in such Liquidating Trust Assets, shall automatically vest in the Liquidating Trust, free and clear of all Claims and Interests for the benefit of the Liquidating Trust Beneficiaries. Upon the transfer of the Liquidating Trust Assets, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors and assigns, shall be discharged and released from all liability with respect to the delivery of such distributions and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement.

2.     The Liquidating Trustee

(a)     The Liquidating Trustee will be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate of each of the Debtors appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The duties and powers of the Liquidating Trustee shall include all powers necessary to implement the Plan and to administer the Liquidating Trust Assets, including, without limitation, the duties and powers listed herein. The powers, rights and responsibilities of the Liquidating Trustee will be specified in the Liquidating Trust Agreement. The Liquidating Trustee will have the right and authority, without the need for Bankruptcy Court approval (unless otherwise indicated), to distribute the Liquidating Trust Assets and to carry out and implement other actions in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

(b)     Such power and authority of the Liquidating Trustee shall include, without limitation:

(i)     except to the extent Claims have been previously Allowed, control and effectuate the Class 5 Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Class 5 Claims;

43

(ii)     make Distributions to Holders of Allowed Class 5 Claims as set forth in the Plan;

(iii)     determine Distribution Dates, in accordance with the Plan; maintain the books and records and accounts of the Liquidating Trust;

(iv)     maintain the books and records and accounts of the Liquidating Trust;

(v)     invest Cash of the Liquidating Trust, and any income earned thereon; incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Liquidating Trustee;

(vi)     administer the Liquidating Trust's tax obligations, including (I) filing tax returns and paying tax obligations, (II) requesting, if necessary, an expedited determination of any unpaid tax liability of the Liquidating Trust for all taxable periods of such Liquidating Trust through the dissolution of the Liquidating Trust as determined under applicable tax laws, and (III) representing the interest and account of the Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(vii)     prepare and file any and all returns, reports, statements, or disclosures relating to the Liquidating Trust that are required under the Plan, by any governmental unit or applicable law;

(viii)     maintain appropriate liability insurance for the Liquidating Trustee;

(ix)     pay statutory fees; and

(x)     perform other duties and functions that are consistent with the implementation of the Plan and the Liquidating Trust Agreement.

(c)     Notwithstanding anything in the Plan or Liquidating Trust Agreement to the contrary, the Liquidating Trustee shall always act consistently with, and not contrary to, the purpose of the Liquidating Trust as set forth in this Section VI.B of the Plan.  The Liquidating Trustee shall have fiduciary duties to the Liquidating Trust Beneficiaries consistent with the fiduciary duties that a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code has to the creditor constituents represented by such committee and shall exercise his, her or its responsibilities accordingly.

3.     Fees and Expenses of the Liquidating Trust

(a)     The Liquidating Trust Expenses will be paid from the Liquidating Trust Assets.  The Liquidating Trustee, on behalf of the Liquidating Trust, may, without

further order of the Bankruptcy Court, retain third party professionals to assist in carrying out its duties hereunder and may compensate and reimburse the expenses of these professionals without further order of the Bankruptcy Court from the Liquidating Trust Assets.

4.    Tax Treatment.

The Liquidating Trust is intended to qualify as a liquidating trust under Treasury Regulations section 301.7701-4(d), for the benefit of the Holders of Class 5 Claims entitled to distributions, and otherwise as one or more disputed ownership funds within the meaning of Treasury Regulations section 1.468B-9(b)(1).  Accordingly, for all federal income tax purposes the transfer of the Liquidating Trust Assets to the Liquidating Trust will be treated as:  (a) to the extent of pending payments, a transfer of the pending payments directly from the Debtors to the holders of such Allowed Claims followed by the transfer of such pending payments by the holders of Allowed Claims to the Liquidating Trust in exchange for rights to distributions from the Liquidating Trust; and (b) to the extent of amounts that are not pending payments, as a transfer to one or more disputed ownership funds.  The Holders of Allowed Claims entitled to distributions will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidating Trust Assets in the amounts of the pending payments and any earnings thereof.  The Liquidating Trustee will be required by the Liquidating Trust Agreement to file federal tax returns for the Liquidating Trust as a grantor trust with respect to pending payments and as one or more disputed ownership funds with respect to all other funds or other property held by the Liquidating Trust pursuant to applicable Treasury Regulations, and any income of the Liquidating Trust will be treated as subject to tax on a current basis.  The Liquidating Trust Agreement will provide that the Liquidating Trustee will pay such taxes from the Liquidating Trust Assets.  The Liquidating Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension upon a finding that such an extension is necessary for the Liquidating Trust to complete its aims.

5.    Indemnification.

The Liquidating Trustee (and each of its agents and professionals) shall be indemnified in accordance with the terms of the Liquidating Trust Agreement.

6.    Payment.

Unless an alternate fee arrangement has been agreed to, the fees and expenses of the Liquidating Trustee, including fees and expenses incurred by professionals retained by the Liquidating Trustee shall be paid from the net proceeds of Liquidating Trust Assets.

C.    *Distributions on Account of Claims Allowed After the Effective Date*

1.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the

45

Disputed Claim becomes an Allowed Claim. Payments to Holders of Allowed General Unsecured Claims shall be made out of the Liquidating Trust.

Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2. Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors or Liquidating Trustee, as applicable, shall establish appropriate reserves for potential payment of such Claims.

### D. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided herein, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as practicable after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in this Article VI. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### E. Delivery and Distributions and Undeliverable or Unclaimed Distributions

### 1. Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 2. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such

distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

        3.      Delivery of Distributions to Prepetition Term Loan Lenders

Except as set forth in this Article VI.E.3, the Prepetition Term Loan Agent shall be deemed to be the Holder of all Prepetition Term Loan Lender Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition Term Loan Lender Claims shall be made to or on behalf of the Prepetition First Lien Agent.  The Prepetition Term Loan Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Prepetition Term Loan Lender Claims, as applicable.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition Term Loan Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Term Loan Agent.

        4.      Distributions by Distribution Agents (if any)

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors, the Reorganized Debtors and/or the Liquidating Trust, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety bond, or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable.

The Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors, the Reorganized Debtors, or the Liquidating Trust as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors, the Reorganized Debtors or the Liquidating Trusteee, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, deem to be unreasonable.  In the event that the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors, the Reorganized Debtors or

the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

5.      Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors or the Liquidating Trust, as applicable, shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Units under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Units (up or down), with half dollars and half shares of New Common Units or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if:  (a) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value of less than $10, which shall be treated as an undeliverable distribution under Article VI.E.

6.      Undeliverable Distributions

(a)      Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors, the Liquidating Trust (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, the Liquidating Trust (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Liquidating Trust, subject to Article VI.E.7(b) hereof, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b)      Failure to Claim Undeliverable Distributions

No later than 120 days after the Effective Date, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors or the Liquidating Trustee for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors or the Liquidating Trust, as applicable, of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be

48

forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or the Liquidating Trust, as applicable or their property.

In such cases, (i) any Cash or New Common Units held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under Bankruptcy Code section 347(b) and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. For the avoidance of doubt, any undeliverable distributions out of the Liquidating Trust shall be returned to the Liquidating Trust and will not go to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors or the Liquidating Trustee, as applicable, for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors or the Liquidating Trust, as applicable, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

F.     *Compliance with Withholding and Reporting Tax Requirements/Allocations*

1.     <u>Withholding Rights</u>.   In connection with the Plan, any party issuing any instrument or making any Distributions described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution

pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Moreover, the Reorganized Debtors or the Liquidating Trustee, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

2.     <u>Forms</u>. Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Liquidating Trustee (which Entity shall subsequently deliver to the Distribution Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8. If such request is made by the Liquidating Trustee, the Distribution Agent, or such other Entity designated by the Liquidating Trustee or Distribution Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of Distribution, the amount of such Distribution shall irrevocably revert to the applicable Liquidating Trustee and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Liquidating Trustee or its respective property.

3.     <u>Allocation of Distributions between Principal and Interest</u>. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

G.     *Setoffs*

Subject to Article IV.Q, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim. In the event that any such Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors or the Liquidating Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable, of any such Claims,

Equity Interests, rights, and Causes of Action that the Debtors, the Reorganized Debtors or the Liquidating Trust, as applicable may possess against any such Holder, except as specifically provided herein.

**H.      *Foreign Currency Exchange Rate***

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

**I.      *Claims Paid or Payable by Third Parties***

**1.      Claims Paid by Third Parties**

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor or the Liquidating Trust, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution from the Debtors, the Reorganized Debtors, or the Liquidating Trust, as applicable, on account of such Claim and also receives payment from a party that is not a Debtor, a Reorganized Debtor or the Liquidating Trust, as applicable, on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Liquidating Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan. If the Debtors become aware of the payment by a third party, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

**2.      Claims Payable by Third Parties**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including any insurer(s) under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the Insurance Policies.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, the Reorganized Debtors or the Liquidating Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Subject to the Liquidating Trust Agreement, and except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided, however*, that the Liquidating Trust will have responsibility for administration of Class 5 Claims.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors, Reorganized Debtors, or the Liquidating Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions),

and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any Claim or Interest that has been paid or satisfied, or any such Claim or Interest that has been cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

F.      *Disallowance of Claims*

All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

G.      *No Distribution Pending Allowance*

If an objection to a Claim or portion thereof is filed as set forth in Article VII.E, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

H.      *Distribution After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Confirmation of the Plan*

The following shall be satisfied or waived as conditions precedent to the Confirmation of the Plan:

1.    The Plan must be, in form and substance, reasonably acceptable to the Debtors.

2.    The Plan Supplement documents must be, in form and substance, reasonably acceptable to the Debtors.

3.    The proposed form of order confirming the Plan shall be, in form and substance, reasonably acceptable to the Debtors.

B.    *Conditions Precedent to Effective Date*

The following shall be satisfied or waived as conditions precedent to the Effective Date:

1.    The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of Bankruptcy Code section 1125.

2.    The Confirmation Order shall have been entered and become a Final Order.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing, and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan.

3.    The Definitive Documents must be, in form and substance, reasonably acceptable to the Debtors.

4.    All documents and agreements necessary to implement the Plan, shall have (a) been tendered for delivery and (b) been effected or executed.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5.    All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

6.    The Professional Fee Escrow Account shall have been established and funded.

7.    The Liquidating Trust Agreement has been executed.

8.    To the extent necessary, an order in the Canadian Proceedings shall have been obtained, in form and substance reasonably satisfactory to the Debtors and the Canadian Debtors, permitting the treatment of the Intercompany Claims set out herein with respect to the Canadian Debtors.

C.    *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in this Article VIII may be waived by the Debtors, without notice to parties in interest and without any further notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan, provided however, that the condition set forth in section B-8 in this Article VIII cannot be waived without the consent of the Canadian Debtors unless the Intercompany Claim with respect to the Canadian Debtors is not affected by the Plan.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.    *Effect of Non Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement*

Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, including the releases set forth in this Article IX, shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

**B.**      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise.  Pursuant to Bankruptcy Code section 510, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**C.**      *Discharge of Claims and Termination of Equity Interests*

Pursuant to and to the fullest extent permitted by Bankruptcy Code section 1141(d), and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

**D.**      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III hereof and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security

interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

E.      *Debtor Release*[3]

       **[Pursuant to Bankruptcy Code section 1123(b), and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Canadian Proceedings, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan.**

       **Notwithstanding anything to the contrary herein, the "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor:  (1) arising under any contract, instrument, agreement, release, or document delivered pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, or related documents.**

       **The parties acknowledge that the compromise and release of direct and estate causes of action against the Released Parties under the Plan results in the distributions available to unsecured creditors.**

---

[3] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action belonging to the Estates is ongoing.  The releases by the Debtors are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any such Claims and Causes of Action pending completion of the Insider Investigation.

Any claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 551, and 553(b) of the Bankruptcy Code, shall be retained by the Reorganized Debtors except to the extent expressly released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.]

F.    *Third-Party Release*[4]

[Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Canadian Proceedings, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence relating to the foregoing taking place on or before the Effective Date of the Plan.

---

[4] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing.  The releases by the Releasing Parties are subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any Claims and Causes of Action pending completion of the Insider Investigation.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Third-Party Release includes a release of the Released Parties of any claim or Cause of Action. The consideration provided by the Released Parties are in settlement of any and all potential claims, Causes of Action, or liabilities against any of the Released Parties arising out of or relating to any act or omission, transaction, or occurrence relating to the Debtors or the Estates taking place on or before the Effective Date of the Plan.

The parties acknowledge that the compromise and release of direct and estate causes of action against the Released Parties under the Plan results in the distributions available to unsecured creditors.

Any claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 551, and 553(b) of the Bankruptcy Code, shall be retained by the Reorganized Debtors except to the extent expressly released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Third-Party Release against any of the Released Parties.]

G.      *Exculpation*[5]

[Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125(e).

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases or the

---

[5] The Debtors' investigation, at the direction of the Special Committee, into potential Claims and Causes of Action is ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to pursue or settle any such Claims or Causes of Action and do not release any Claims or Causes of Action pending completion of the Insider Investigation.

Canadian Proceedings, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing, and/or effecting the DIP Documents, the Disclosure Statement, and the Plan; the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan; and/or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its respective duties under, pursuant to, or in connection with the Plan.]

H.      *Injunction*

The satisfaction, release, and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

I.      *No Release of Any Claims Held by the United States*

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or

related to, the Chapter 11 Cases[6] and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

---

[6] For the avoidance of doubt, this provision excludes the Canadian Debtors.

61

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to Bankruptcy Code section 507;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Hear and determine any matters concerning the Liquidating Trust and the Liquidating Trust Agreement.

24.     Enforce all orders previously entered by the Bankruptcy Court; and

25.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN

*A.     Modification of Plan*

Subject to the limitations contained in the Plan:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Bankruptcy Code section 1129(b); and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon the order of the Bankruptcy Court, amend or modify the Plan, in accordance with Bankruptcy Code section 1127(b), or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

*B.     Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.     Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each

Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

E.      *Service of Documents*

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed renewed requests for service.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve a notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with notice of the Confirmation Hearing; *provided, however*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors served the notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

To supplement the notice described in the preceding sentence, within twenty (20) days of the date of the Confirmation Order the Debtors shall publish notice of the Confirmation Hearing on one occasion in the national editions of *The New York Times*.  Mailing and publication of the

64

notice of the Confirmation Hearing in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    *Entire Agreement*

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided, however*, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not incorporated or organized in Delaware shall be governed by the laws of the place of incorporation or organization of the applicable Debtor or Reorganized Debtor, as applicable.

I.    *Exhibits*

All exhibits and documents are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at https://cases.primeclerk.com/pss or the Bankruptcy Court's website at www.moeb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.    *Nonseverability of Plan Provisions Upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent

65

practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

K.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

M.      *Dissolution of Creditors' Committee*

The Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided*, that the Creditors' Committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Retained Professionals pursuant to Bankruptcy Code sections 330 and 331.  The Reorganized Debtors shall not be responsible for paying fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

N.      *Section 1125(e) Good Faith Compliance*

The Debtors, Reorganized Debtors, the Special Committee, and each of their respective representatives, shall be deemed to have acted in "good faith" under Bankruptcy Code section 1125(e).

O.      *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder, and all other parties-in-interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

P.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

Q.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Respectfully submitted,

 Date:  August 12, 2019

By:      */s/  Stephen Marotta*
Name:  Stephen Marotta
Title:    Chief Restructuring Officer, Payless
          Holdings LLC

**Schedule 1**

| DEBTOR | TAX I.D. NUMBER |
|---|---|
| Payless Holdings, LLC | 80-0855704 |
| Payless Intermediate Holdings LLC | 46-1125190 |
| WBG-PSS Holdings LLC | 45-5170673 |
| Payless Inc. | 43-1813160 |
| Payless Finance, Inc. | 43-1622101 |
| Collective Brands Services, Inc. | 48-1227266 |
| PSS Delaware Company 4, Inc. | 48-1221466 |
| Shoe Sourcing, Inc. | 48-1234075 |
| Payless ShoeSource, Inc. | 48-0674097 |
| Eastborough Inc. | 48-1212803 |
| Payless Purchasing Services, Inc. | 48-1253043 |
| Payless ShoeSource Merchandising, Inc. | 48-1140946 |
| Payless Gold Value CO, Inc. | 46-1103581 |
| Payless ShoeSource Distribution, Inc. | 48-1140944 |
| Payless ShoeSource Worldwide, Inc. | 43-1646884 |
| Payless NYC, Inc. | 48-1194126 |
| Payless ShoeSource of Puerto Rico, Inc. | 66-0479017 |
| Payless Collective GP, LLC | 82-1302940 |
| Collective Licensing, L.P. | 20-4231256 |
| Collective Licensing International, LLC | 05-0585451 |
| Clinch, LLC | 27-2429836 |
| Collective Brands Franchising Services, LLC | 26-3883636 |
| Payless International Franchising, LLC | 27-3686448 |
| PSS Canada, Inc. | 74-2834969 |
| Collective Brands Logistics Limited | 98-0546466 |
| Payless Sourcing, LLC | 35-2579725 |